IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

EDWARD H. ALEWINE, *et al.*,          )
                                      )
      Plaintiffs,                    )
                                      )
v.                                    )          Case No. 3:06cv886-MHT
                                      )
AMERICA'S SERVICING COMPANY,)
                                      )
      Defendant.                     )

**DEFENDANT'S EVIDENTIARY SUBMISSION
IN SUPPORT OF BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant America's Servicing Company submits the following evidentiary

materials in opposition to Plaintiffs' Motion for Summary Judgment:

Exhibit A -     Deposition of Cindy Shanabrook taken on July 10, 2007 with exhibits

Exhibit B -     Deposition of Edward H. Alewine taken on August 24, 2007 with exhibits

Exhibit C -     Docket Sheet, downloaded from the "PACER" system, relating to Plaintiffs' bankruptcy case

Exhibit D -     Deposition of Shelly M. Alewine taken on August 24, 2007 with exhibits

Exhibit E -     Affidavit of Cindy Shanabrook

Exhibit F -     Email correspondence between America's Service Company and Ocwen

/s/ James H. White
D. KEITH ANDRESS
JAMES H. WHITE, IV

Attorneys for America's Servicing Company

OF COUNSEL:

BAKER, DONELSON, BEARMAN,
 CALDWELL & BERKOWITZ, P.C.
420 North 20th Street, Ste. 1600
Birmingham, Alabama 35203
(205) 328-0480 – telephone
(205) 322-8007 – facsimile
kandress@bakerdonelson.com
jwhite@bakerdonelson.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2007, the foregoing has been served upon the following counsel of record by electronic mail via the Court's cm/ecf system:

Mr. Nicholas H. Wooten
Mr. Anjali Kamath
Wooten Law Firm, P.C.
P.O. Drawer 290
Lafayette, AL 36862

/s/ James H. White
Of Counsel

B JHW 756991 v1
2780973-000281 8/31/2007

# EXHIBIT A
# (1 of 3)

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2       FOR THE MIDDLE DISTRICT OF ALABAMA

 3                EASTERN DIVISION

 4

 5    EDWARD H. ALEWINE,                 COPY

 6    SHELLY M. ALEWINE,

 7

 8         Plaintiff,

 9         vs.                CIVIL ACTION #:
                              3:06cv886-MHT
10

11    AMERICA'S SERVICING COMPANY,

12         Defendant.

13

14

15              VIDEOTAPED

16       DEPOSITION OF CINDY SHANABROOK

17

18        The Videotaped Deposition of CINDY

19    SHANABROOK was taken before Lori E.

20    Defnall, on Tuesday, July 10, 2007, at

21    the Offices of Baker, Donelson, Bearman,

22    Caldwell & Berkowitz, Birmingham,

23    Alabama, commencing at 9:57 a.m.,

24    pursuant to the stipulations set forth

25    herein:
```

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    2

1                   A P P E A R A N C E S

2

3        APPEARING FOR THE PLAINTIFF:

4            WOOTEN LAW FIRM, P.C.
             BY:  Mr. Nicholas H. Wooten
5            10 2nd Avenue South East
             Lafayette, Alabama 36862
6

7

8        APPEARING FOR THE DEFENDANT:

9            BAKER, DONELSON, BEARMAN, CALDWELL
             & BERKOWITZ, P.C.
10           BY:  Mr. Keith Andress
             420 North 20th Street, Suite 1600
11           Birmingham, Alabama 35203

12

13       VIDEOGRAPHER:

14           ALABAMA VIDEO PRODUCTIONS
             BY:  Mr. Wyman Higgins
15

16       ALSO PRESENT:

17           Beverly DeCaro with Wells Fargo

18

19

20

21

22

23       Reported by:

24           Lori E. Defnall

25

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          3

1                    I N D E X

2

3      EXAMINATION OF CINDY SHANABROOK

4      EXAMINATION BY:              PAGE NUMBER

5

6      Mr. Wooten.......................7,70,72

7      Mr. Andress......................68,71

8

9

10                   E X H I B I T S

11
       Plaintiff's Exhibit 1............28
12
       Plaintiff's Exhibit 2............30
13
       Plaintiff's Exhibit 3............33
14
       Plaintiff's Exhibit 4............44
15
       Plaintiff's Exhibit 5............51
16
       Plaintiff's Exhibit 6............51
17
       Plaintiff's Exhibit 7............52
18
       Plaintiff's Exhibit 8............57
19
       Plaintiff's Exhibit 9............58
20
       Plaintiff's Exhibit 10...........62
21
       Plaintiff's Exhibit 11...........66
22

23

24     Reporter's Certificate...........74

25     Word Index.......................75

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    4

1              S T I P U L A T I O N S

2

3          IT IS STIPULATED AND AGREED by and

4      between the parties through their

5      respective counsel, that the deposition

6      of **CINDY SHANABROOK** to be taken before

7      LORI E. DEFNALL, State of Alabama at

8      Large at the Offices of Baker,

9      Donelson, Bearman, Caldwell &

10     Berkowitz, Birmingham, Alabama on

11     Tuesday, July 10, 2007.

12

13         IT IS FURTHER STIPULATED AND AGREED

14     that the signature to and the reading

15     of the deposition by the witness is

16     waived, the deposition to have the same

17     force and effect as if full compliance

18     had been with all laws and rules of

19     Court relating to the taking of

20     depositions.

21

22         IT IS FURTHER STIPULATED AND AGREED

23     that is shall not be necessary for any

24     objections to be made by counsel to any

25     questions, except as to the form or

1    leading questions, and that counsel for

2    the parties may make objections and

3    assign grounds at the time of the

4    trial, or at the time said deposition

5    is offered in evidence, or prior

6    thereto.

7

8         IT IS FURTHER STIPULATED AND AGREED

9    that notice of filing of the deposition

10   by the Commissioner is waived.

11

12

13

14        *         *         *         *         *

15

16

17

18

19

20

21

22

23

24

25

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          6

1            VIDEOGRAPHER:  We're on the

2       record.  Today's date is July the 10th,

3       2007.  The time is approximately ten

4       o'clock a.m., central daylight time.  We

5       now commence tape number one for the          09:57:46A

6       videotaped deposition of Cindy

7       Shanabrook, in the matter of Edward H.

8       Alewine, and Sherry (sic) M. Alewine,

9       verses America's Services Company.  Case

10      Number 3:06cv886-MHT, filed in the            09:58:04A

11      United States District Court for the

12      Middle District of Alabama Eastern

13      Division.  We're located at the law firm

14      of Baker, Donelson, Bearman, Caldwell &

15      Berkowitz, at 420 North 20th Street,

16      Suite 1600, Birmingham, Alabama.  The

17      court reporter is Lori Defnall.  The

18      videographer is Wyman Higgins.  The

19      witness will now be sworn in by the

20      court reporter, and then the attorneys        09:58:42A

21      may introduce themselves and begin.  We

22      also have a person sitting in, Beverly

23      DeCaro.  You may swear the witness.

24

25

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          7

1                    CINDY SHANABROOK,

2      after having been first duly sworn under

3      oath, was examined and testified as

4      follows:

5

6              COURT REPORTER:  Would

7          you like the usual

8          stipulations?

9              MR. WOOTEN:  Yes.

10             MR. ANDRESS:  Yes.

11

12             MR. WOOTEN:  I'm Nick

13         Wooten, and I represent the

14         Plaintiffs.

15             MR. ANDRESS:  I'm Keith

16         Andress, and I represent ASC.

17

18             EXAMINATION BY MR.

19         WOOTEN:

20         Q.   Ma'am, if you would, state your     09:59:02A

21     full name for the record, please.

22         A.   Cindy Theresa Shanabrook.

23         Q.   And I assume this is not your

24     first deposition?

25         A.   No, sir.  It is my first     09:59:26A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

```
 1    deposition.

 2            Q.    This is your first deposition?

 3            A.    Yes, sir.

 4            Q.    All right.   The deposition is a

 5    chance for the parties to gather evidence          09:59:36A

 6    in the form of a written communication.

 7    So, the way this is going to work is, I'm

 8    going to ask you a question, and then I'm

 9    going to allow you to give me an answer,

10    okay?                                              09:59:46A

11            A.    Yes, sir.

12            Q.    Generally, for the court

13    reporter's sake, it's helpful if we don't

14    speak over each other.   And it's helpful

15    if your answer is a yes or a no, rather           09:59:54A

16    than, in this part of the world, we get a

17    lot of uh-huh's and the huh-uh's.   Are you

18    have any questions about this before we

19    begin?

20            A.    No, sir.                             10:00:04A

21            Q.    Ms. Shanabrook, where do you

22    currently reside?

23            A.    Frederick, Maryland.

24            Q.    Okay.   And what is your

25    physical address there?                           10:00:12A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    9

```
 1              A.    5252 Earl's Court, Frederick,
 2      Maryland 21703.
 3              Q.    Okay.  And what is your date of
 4      birth, ma'am?
 5              A.    August 30th, 1963.                    10:00:24A
 6              Q.    All right.  And how are you
 7      presently employed?
 8              A.    I'm a litigation specialist
 9      with Wells Fargo.
10              Q.    And how long have you had that    10:00:34A
11      position?
12              A.    Since March 26th, 2007.
13              Q.    What is the job of a litigation
14      specialist at Wells Fargo?
15              A.    To monitor the loans when they    10:00:54A
16      are in litigation, to refer the loans to
17      the attorneys for the cases to be worked,
18      and to provide them information.
19              Q.    And prior to becoming a
20      litigation specialist, what was your --      10:01:12A
21      how were you employed?
22              A.    I was a senior bankruptcy
23      paralegal with Bierman, Geesing & Ward in
24      Bethesda, Maryland, for a little over five
25      years.                                        10:01:26A
```

```
 1            Q.    And what was the name of that
 2      firm?
 3            A.    Bierman, Geesing & Ward.
 4            Q.    Okay.  And did you work
 5      primarily in the area of creditor's          10:01:34A
 6      rights?
 7            A.    Yes, I did.
 8            Q.    So y'all represented banks and
 9      finance companies, and those type of
10      people, against consumers?                    10:01:44A
11            A.    Yes, sir.
12            Q.    Okay.  And what your goal in
13      those situations would have been, would be
14      to try to collect the debts that were
15      owed, even for the people that had filed      10:01:52A
16      bankruptcy, right?
17            A.    We would monitor the loans for
18      compliance and receive referrals from the
19      mortgage companies, in order to file any
20      motions or -- motions for relief, proof of    10:02:04A
21      claim.
22            Q.    Okay.  And you worked
23      exclusively for creditors?
24            A.    Yes, sir.
25            Q.    Did you work for Wells Fargo,     10:02:16A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          11

```
1    in that capacity?
2         A.    No, sir.
3         Q.    Okay.  Is it your testimony
4    that you left that position and went
5    directly to Wells Fargo as a litigation      10:02:26A
6    specialist?
7         A.    Yes, sir.
8         Q.    Okay.  When did your employment
9    begin as a paralegal?
10        A.    In 1997.                            10:02:36A
11        Q.    Okay.  You said you worked the
12   job, before Wells Fargo, for approximately
13   five years?
14        A.    Yes, sir, I did.
15        Q.    Okay.  Where did you work          10:02:52A
16   before that job?
17        A.    I worked for Joel Carpenter, an
18   attorney in Baltimore.
19        Q.    Okay.  And what did your work
20   for Mr. Carpenter involve?                    10:03:02A
21        A.    I was a paralegal and a
22   receptionist.  He was the sole
23   practitioner.
24        Q.    Okay.  Was his practice focused
25   in any specific area, or was he a general     10:03:12A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    12

1    practitioner?

2          A.    General practitioner, sir.

3          Q.    Okay.  And how long -- what

4    were the dates of your employment with Mr.

5    Carpenter?                                        10:03:20A

6          A.    April of 1997, until April of

7    1998.

8          Q.    And then you left that position

9    to take the position with the other law

10   firm?                                             10:03:34A

11         A.    No, sir.

12         Q.    Okay.  Let's start with the

13   firm you were working for immediately

14   before Wells Fargo.

15         A.    Yes, sir.                             10:03:42A

16         Q.    Tell me their name again.

17         A.    Bierman, Geesing & Ward.

18         Q.    Be all right if I called them

19   Bierman?

20         A.    Yes, sir.                             10:03:50A

21         Q.    Who did you work for before

22   Bierman?

23         A.    Ocwen Federal Bank.

24         Q.    Ocwen?  Does Ocwen have any

25   relationship to Wells Fargo?                      10:04:00A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          13

1          A.     No, sir.

2          Q.     Okay.  What did you do for

3      Ocwen?

4          A.     I was a bankruptcy paralegal.

5          Q.     And what were your dates of          10:04:12A

6      employment with Ocwen?

7          A.     Approximately, February of

8      2001, until two thousand -- February of

9      2002.

10         Q.     Immediately prior to Ocwen, who     10:04:28A

11     did you work for?

12         A.     Maryland State Highway.

13         Q.     What was your position with

14     them?

15         A.     I was a Administrative              10:04:42A

16     Assistant II, and co-coordinator of the

17     Maryland Trac Program.

18         Q.     I'm sorry, the Maryland what?

19         A.     Trac Program, T-R-A-C.

20         Q.     Okay.  And what was that?          10:05:00A

21         A.     It's an organization within

22     state highway, which is an outreach

23     program for Baltimore City youth, in order

24     to get them interested in engineering.

25         Q.     All right.  What were the dates    10:05:16A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          14

1       of that employment?

2               A.      Approximately, September of

3       '98, until, approximately, September of

4       2000.

5               Q.      And prior to Maryland State          10:05:40A

6       Highway, where did you work?

7               A.      I was unemployed.

8               Q.      Okay.  And was that the period

9       of time between when you left

10      Mr. Carpenter and when you went to work        10:05:58A

11      for Maryland State Highway?

12              A.      Yes, sir.

13              Q.      Okay.  What were the dates of

14      your employment with Bierman?

15              A.      From February of 2002 -- I'm        10:06:08A

16      sorry, March of 2002, until March of 2007.

17              Q.      Okay.  And you went directly

18      from their employment to Wells Fargo?

19              A.      Yes, sir, I did.

20              Q.      Have you ever been a plaintiff      10:06:28A

21      in a lawsuit?

22              A.      No, sir.

23              Q.      Have you ever been sued,

24      individually?

25              A.      No, sir.                             10:06:46A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          15

1          Q.    Have you personally ever filed

2     bankruptcy or Chapter 13?

3          A.    No, sir.

4          Q.    Have you ever been convicted of

5     any felony?                                                  10:06:54A

6          A.    No, sir.

7          Q.    Have you ever been convicted of

8     any species of theft, that was not a

9     felony?

10         A.    No, sir.                                          10:07:02A

11         Q.    And your testimony is that this

12    is the first time, ever, that you've given

13    a deposition?

14         A.    Yes, sir.

15         Q.    Is that normally part of the                     10:07:12A

16    job respirabilities of a litigation

17    specialist?

18         A.    Yes, sir.

19         Q.    It's my understanding that you

20    reviewed and answered interrogatories that                  10:07:36A

21    I propounded in this lawsuit; is that

22    correct?

23         A.    Yes, sir.

24         Q.    Interrogatory number two said,

25    "please state the name of the person most                   10:07:48A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1    knowledgeable concerning this defendant's

2    policies and procedures for servicing

3    mortgages." Are you the person at Wells

4    Fargo who is most knowledgeable concerning

5    your defendant's policies and procedures        10:08:04A

6    for servicing mortgages?

7         A.   No, sir.

8         Q.   No? In fact, you've been

9    employed there for less than four months,

10   right?                                          10:08:10A

11        A.   Correct.

12        Q.   And you have no experience with

13   the policies and procedures with servicing

14   mortgages?

15        A.   No, sir.                              10:08:16A

16        Q.   Okay. Have you had any

17   training from Wells Fargo, regarding Wells

18   Fargo's policies and procedures for

19   servicing mortgages?

20        A.   Yes, sir, I have.                     10:08:28A

21        Q.   Okay. Is that part of your

22   initial training for becoming a litigation

23   specialist?

24        A.   Yes, sir, it is.

25        Q.   Is that your only training in        10:08:34A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          17

```
1        servicing mortgages at Wells Fargo?
2             A.    Yes, sir, it is.
3             Q.    And how much training did you
4        receive?
5             A.    Approximately, 30 days.              10:08:42A
6             Q.    Okay.  Was that prior to
7        actually beginning to work as a litigation
8        specialist and handling files?
9             A.    Yes, sir.
10            Q.    Now, was that classroom              10:09:04A
11       training?
12            A.    Yes, sir.
13            Q.    Did you receive a manual for
14       that?
15            A.    Yes, sir.                            10:09:08A
16            Q.    A handbook of some type?
17            A.    No, sir.
18            Q.    Was it like a three-ring
19       binder?
20            A.    No, sir.                             10:09:14A
21            Q.    Okay.  Describe the manual that
22       you received.
23            A.    It's a manual that is contained
24       within our internet.
25            Q.    So it's web based?                   10:09:24A
```

301 Title Building/300 21st Street North
Birmingham, Alabama   35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224        18

1          A.    Yes, sir, it is.

2          Q.    So it's available to anyone who

3    has access to your corporate web?

4          A.    Yes, sir.

5          Q.    And that's how you received       10:09:34A

6    your training at Wells Fargo?

7          A.    Yes, sir.

8          Q.    Do these policies and

9    procedures govern how America's Servicing

10   Company responds to customer inquiries and    10:09:56A

11   forms of qualified written requests?

12         A.    Yes, sir.

13         Q.    Okay.  Does this manual

14   describe and control how payments are

15   credited to customer's mortgage accounts?     10:10:14A

16         A.    No, sir.

17         Q.    How is that controlled?

18         A.    That is -- I'm not quite sure I

19   understand the question.

20         Q.    Okay.  Let me rephrase the        10:10:32A

21   question.  You said that Wells Fargo --

22   let me back up a little bit further, and

23   we'll come back to that.  What is

24   relationship between Wells Fargo and

25   America's Servicing Company?                   10:10:46A

301 Title Building/300 21st Street North
Birmingham, Alabama   35203

```
 1              A.    America's Service Company is a
 2       fictitious name for Wells Fargo.
 3              Q.    Is that what -- when you say
 4       fictitious, would you consider that a
 5       trade name?                                          10:11:10A
 6              A.    Yes, sir, it's a trade name.
 7              Q.    So there is no separate entity,
 8       there is no legal entity, no other
 9       corporation, called America's Servicing
10       Company?
11              A.    No, sir.
12              Q.    So, America's Servicing Company
13       is Wells Fargo?
14              A.    Yes, sir.
15              Q.    It is, for lack of a better        10:11:26A
16       term, an alter ego?
17              A.    Yes, sir.
18              Q.    Is it a unified or separated
19       subdivision of Wells Fargo?
20              A.    I don't know.                       10:11:40A
21              MR. ANDRESS:  Mr. Wooten, we
22       disclosed all this in the corporate
23       disclosures.  And just to keep the
24       testimony completely accurate.
25              Q.    Okay.  As to your policies and     10:11:54A
```

```
 1      procedures, are there policies and
 2      procedures on this corporate web, that
 3      dictate how payments are applied, to a
 4      mortgage account by Wells Fargo?
 5           A.    I don't know.                        10:12:14A
 6           Q.    Do not know?
 7           A.    No, sir.
 8           Q.    Do employees of Wells Fargo
 9      have the capacity to print off portions of
10      this policy and procedures manual, as web    10:12:36A
11      based, for review?
12           A.    Yes, sir.
13           Q.    Could you print off the whole
14      policies and procedures manual?
15           A.    Yes, sir.                            10:12:46A
16           Q.    About how long is that policy
17      and procedures manual?
18           A.    Several inches thick.
19           Q.    Okay.  Does that policies and
20      procedures manual have a name?               10:13:00A
21           A.    I don't know.
22           Q.    Does it have any type of
23      special designation within Wells Fargo?
24           A.    I don't know.
25           Q.    Did your training program have    10:13:14A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    21

```
 1        a specific name?
 2              A.    Yes, sir.
 3              Q.    What was it?
 4              A.    ALEX.
 5              Q.    And what does ALEX stand for?     10:13:26A
 6              A.    I don't recall.
 7              Q.    And is that spelled A-L-E-X?
 8              A.    Yes, sir.
 9              Q.    Okay.  And that is a litigation
10        specialist training program?                  10:13:40A
11              A.    No, sir.
12              Q.    Okay.  What is that; what is
13        ALEX?
14              A.    Wells Fargo employee training
15        program.                                      10:13:50A
16              Q.    Okay.  So this is what every
17        person at Wells Fargo takes as training on
18        mortgage servicing?
19              A.    Yes, sir.
20              Q.    Okay.  And that is irrespective    10:14:02A
21        of what department that they work in, as
22        long as they work with mortgage servicing?
23              A.    Yes, sir.
24              Q.    Who would be the person at
25        Wells Fargo most knowledgeable of the ALEX    10:14:38A
```

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                22

1      system?

2              A.     I don't know.

3              Q.     Did you have a trainer or a

4      director of training at Wells Fargo?

5              A.     My supervisor.                          10:14:48A

6              Q.     And who is that?

7              A.     Marc Kline.

8              Q.     How do you spell Marc's name?

9              A.     M-A-R-C.  Kline, K-L-I-N-E.

10             Q.     All right.  And I think the       10:15:02A

11     last time I saw Marc's name, he was a

12     senior litigation specialist?

13             A.     He's now my supervisor.

14             Q.     Okay.  So now he is a

15     supervisor?  And is that within the        10:15:12A

16     litigation specialist department?

17             A.     Yes, sir, it is.

18             Q.     So what is his full title

19     today?

20             A.     Litigation supervisor.             10:15:24A

21             Q.     After your initial training,

22     did you receive any additional training on

23     this program?

24             A.     On which program?

25             Q.     On ALEX?                           10:15:56A

1           A.    No, sir.

2           Q.    After the ALEX training, did

3     you receive any other type of training of

4     any type?

5           A.    Yes, sir.                                    10:16:04A

6           Q.    Okay.  Explain what training

7     you received beyond ALEX.

8           A.    Training within the database

9     system.

10          Q.    All right.  Let me ask you          10:16:14A

11    this:  Does the database system have a

12    name?

13          A.    Yes, sir.

14          Q.    What is the name of the

15    database system?                                 10:16:22A

16          A.    Fidelity.

17          Q.    Does Fidelity stand for

18    anything?

19          A.    No, sir.

20          Q.    What is the job of Fidelity?        10:16:26A

21          A.    It contains the information on

22    the loan.

23          Q.    Does it contain all of the loan

24    information?

25          A.    Yes, sir.                            10:16:48A

tk

1          Q.    All payment histories?

2          A.    Yes, sir.

3          Q.    All internal codes?

4          A.    Yes, sir.

5          Q.    All notes regarding
6    communications with debtors?          10:17:02A

7          A.    Yes, sir.

8          Q.    Does it contain any audio
9    recordings of conversations with debtors?

10         A.    No, sir.          10:17:14A

11         Q.    Is there a separate system
12   which does that?

13         A.    Yes, sir.

14         Q.    What is the name of that
15   system?          10:17:20A

16         A.    I do not know.

17         Q.    Okay.  Have you ever used that
18   system before?

19         A.    No, sir.

20         Q.    How is that system          10:17:24A
21   differentiated between ALEX and Fidelity?

22         A.    ALEX is a training system.
23   Fidelity is the database system, which
24   contains the loan information.

25         Q.    How do you operate the          10:17:40A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                25

```
 1     recording system?
 2          A.    I don't have that information.
 3          Q.    Is that something that is
 4     computer based?
 5          A.    I don't know.                        10:17:56A
 6          Q.    Who would be the person most
 7     knowledge about the recording system?
 8          A.    I don't know.
 9          Q.    You don't know the name of the
10     recording system?                               10:18:06A
11          A.    No, sir.
12          Q.    Would it possibly be called the
13     One Hundred Percent Monitoring System?
14          A.    I don't know.
15          Q.    Have you ever heard of the term     10:18:30A
16     One Hundred Percent Monitoring?
17          A.    No, sir.
18          Q.    I'm going to show you, but I'm
19     not going to mark this as an exhibit.
20     That was my second interrogatories in           10:18:52A
21     request for production.  The first
22     question is number 22.  It ask a question
23     about the One Hundred Percent Monitoring
24     System.  Now you signed the answer to
25     those interrogatories, correct?                 10:19:06A
```

1          A.    Yes, sir.

2          Q.    Did you provide that

3     information to your attorney?

4          A.    (Witness reviewing document.)

5     Yes, sir.                                          10:19:14A

6          Q.    Okay.  And what is your answer

7     to question number 22?

8          A.    "Defendant has the capability

9     to record certain telephone conversations

10    with it's customers.  This ability is           10:19:24A

11    disclosed to customers at the outset of

12    the conversation."

13         Q.    So, how do you determine what

14    recordings you might have of any

15    conversations with my clients, Edward and       10:19:36A

16    Shelly Alewine?

17         A.    I'm sorry, could you repeat

18    that?

19         Q.    How do you determine what

20    conversations and recordings you might          10:19:44A

21    have of any conversations with my clients,

22    Edward and Shelly Alewine?

23         A.    I don't know.

24         Q.    Who is the person at Wells

25    Fargo who would be most knowledgeable           10:19:54A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          27

1    about determining that information?

2         A.    I don't know.

3         Q.    Do you have a director of

4    technology, or information technology, at

5    Wells Fargo?                                      10:20:06A

6         A.    I don't have that information.

7         Q.    You have a vice president of

8    technology, or information technology, at

9    Wells Fargo?

10        A.    I don't know.                          10:20:14A

11        Q.    Who would be a person who would

12   know that information?

13        A.    Possibly, my supervisor.

14        Q.    Mr. Kline?

15        A.    Yes, sir.                              10:20:26A

16        Q.    Okay.  Does Wells Fargo

17   maintain a separate computer base system

18   for collections?

19        A.    No, sir.

20        Q.    Is that all handled through           10:21:00A

21   Fidelity?

22        A.    Yes, sir.

23        Q.    Would Fidelity have a record of

24   every call or correspondence, made to my

25   clients, in this case?                            10:21:12A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          28

1          A.     Yes, sir.

2          Q.     Okay.  Would Fidelity have any

3     records indicating whether or not a

4     recording was made of any of those

5     conversations?                                    10:21:20A

6          A.     I don't know.

7          Q.     I'm going to mark a cumulative

8     exhibit as Number One.

9

10          (Whereupon, Plaintiff's Exhibit

11     Number One was marked for

12     identification.)

13

14          And I'll represent to you it is

15     a copy of a qualified written              10:21:44A

16     request that I mailed to America's

17     Servicing Company on October 3rd,

18     2005.  And it includes several pages

19     of attachments, including a letter

20     from ASC to my clients.  As well as      10:22:00A

21     several pages of insurance

22     declarations.  As well as several

23     pages of property tax payment

24     receipts.  As well as two copies of

25     mortgage statements from ASC.  And       10:22:22A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    29

1      all of those are numbered.  And the

2      document itself reflects what those

3      numbers represent.  I'm going to ask

4      you to take a look at that, please.

5         A.    Yes, sir.  (Witness reviewing          10:22:32A

6      document.)  Yes, sir.

7         Q.    Prior to preparing for this

8      deposition, have you seen that document

9      before?

10        A.    No, sir.                                10:23:54A

11        Q.    Okay.  So what you know about

12     that document is from your preparation to

13     testify today?

14        A.    Yes, sir.

15        Q.    Is it Wells Fargo's position           10:24:02A

16     that they did not receive that document?

17        A.    No, sir.

18        Q.    When did Wells Fargo receive

19     that document?

20        A.    Approximately, the time period         10:24:16A

21     after the date of the letter.

22        Q.    So Wells Fargo received that

23     document in October of 2005, correct?

24        A.    Yes, sir.

25        Q.    What is Wells Fargo's                   10:24:40A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1    responsibility, under the Real Estate

2    Settlement and Procedures Act, to respond

3    to a qualified written request?

4         A.    To respond within 20 days.

5         Q.    Okay.  Is it Wells Fargo's

6    position that they responded within 20

7    days in this case?

8         A.    No, sir.

9         Q.    Okay.  When did Wells Fargo

10   first respond to that document?

11        A.    Approximately, August of 2006.

12        Q.    Okay.  I'm going to show you a

13   document that was produced by your

14   attorney as part of this litigation.  It's

15   numbered ASC 261, Bate stamp.

16        A.    Yes, sir.

17        Q.    I've marked it as Exhibit Two

18   to this case.

19

20        (Whereupon, Plaintiff's Exhibit

21    Number Two was marked for

22    identification.)

23

24        Ask you, is that in fact an

25    internal document generated by Wells

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    31

1          Fargo?

2               A.    (Witness reviewing document.)

3     Yes, sir.

4               Q.    And is that the document from

5     the Fidelity database?                                    10:25:50A

6               A.    Yes, sir.

7               Q.    All right.  Now, does that

8     document indicate that Wells Fargo

9     received my qualified written request on

10    behalf of my clients, on or about October          10:26:06A

11    17th of 2005?

12              A.    No, sir.

13              MR. ANDRESS:   What number is

14    this?

15              Q.    261.                                       10:26:16A

16              A.    (Witness reviewing document.)

17    Oh.  Yes, sir.

18              Q.    It does?

19              A.    Yes, sir.

20              Q.    On that page, there is entry on   10:26:26A

21    July 20th of 2006, it appears, what does

22    the designation -- let me show you what

23    entry I'm referring to.  This letter

24    (indicating), that identifies when the

25    letter was imaged.  What does the initials   10:26:54A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

```
 1    or letters SER stand for, on that page?
 2         A.    (Witness reviewing document.)
 3    That's customer service.
 4         Q.    Okay.  So does that designate
 5    the department who would have been making      10:27:06A
 6    this entry?
 7         A.    Yes, sir.
 8         Q.    Okay.  And what do the letters
 9    ENW stand for?
10         A.    That is the person that made        10:27:12A
11    the entry.
12         Q.    Okay.  So that would have been
13    the employee who made the entry?
14         A.    Yes, sir.
15         Q.    And I'm assuming that Wells          10:27:20A
16    Fargo could identify that person by those
17    initials?
18         A.    Yes, sir.
19         Q.    Okay.  Now, that actual entry
20    reads, "pending correspondence research        10:27:34A
21    regarding:  Received letter forwarded from
22    DOS."  Who is that?
23         A.    That is our department.
24         Q.    Okay.
25         A.    Default servicing.                   10:27:48A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          33

1          Q.    Okay.   "Regarding QWR, dated

2     10/3/05.   It was imaged on 10/17/05 but

3     appears was not addressed.   Sent BWU

4     letter."   Is that the -- explain what that

5     is.                                                 10:28:04A

6          A.    I don't know what the BWU

7     stands for.

8          Q.    Let me show you the document

9     that I'm going to mark as Exhibit Three to

10    this deposition.                                    10:28:18A

11

12          (Whereupon, Plaintiff's Exhibit

13      Number Three was marked for

14      identification.)

15

16     MR. ANDRESS:   Is ASC 261

17    Exhibit Two?

18          Q.    It is two?   I'm going to ask

19    you if you've ever seen that document

20    before?                                             10:28:30A

21          A.    (Witness reviewing document.)

22    No, sir.

23          MR. ANDRESS:   Do you have

24    copies for me?

25          Q.    No.   I only made one copy to   10:28:46A

301 Title Building/300 21st Street North
Birmingham, Alabama   35203

# EXHIBIT A
# (2 of 3)

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          34

1    mark.  I've got my originals.  These are

2    the ones you produced, I think.  Or are

3    those the ones that's y'all sent -- okay.

4    That's the one you sent to me.  Does that

5    appear to be the letter referred to in          10:29:00A

6    this entry on ASC 261 or Exhibit Two?

7          A.    Yes, sir.

8          Q.    Okay.  And it bears the same

9    date as this entry?

10         A.    Yes, sir, it does.          10:29:12A

11         Q.    Okay.  Now, off to the right of

12   that entry, there are a series of letters,

13   PENCOR.  What do those letters mean?

14         A.    I don't know.

15         Q.    Okay.  So you don't have any          10:29:26A

16   idea what that entry is for?

17         A.    No, sir.

18         Q.    Okay.  On this -- back to this

19   document, onto the right side -- the left

20   side, where it has these three letter          10:29:46A

21   designations.  At the top of that page it

22   says HAZ.  What department is that?

23         A.    That's hazard insurance.

24         Q.    Okay.  And what -- can you

25   explain that entry, that continues to the          10:30:00A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          35

1    right, this the hazard entry, what are

2    those -- is BJV the initials of the

3    operator again?

4          A.    Yes, sir, they are.

5          Q.    Okay.   Now, what do the actual    10:30:14A

6    entries, there, in those terms, what do

7    they stand for?

8          A.    (Witness reviewing document.)

9    I don't know.

10         Q.    Okay.   So it says ID 3011291.     10:30:26A

11   You don't know what that means?

12         A.    No, sir.

13         Q.    And then it says DOC ID 7.   You

14   don't know what that stands for?

15         A.    No, sir, I don't.               10:30:44A

16         Q.    And HIPC, you don't know what

17   that stands for?

18         A.    No, sir.

19         Q.    Down below the servicing

20   entries, it has some entries that say COL.    10:30:54A

21   I'm assuming that's collections?

22         A.    Yes, sir.

23         Q.    Okay.   And that is where folks

24   from Wells Fargo collection department are

25   trying to contact, or are contacting my       10:31:04A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1    clients, correct?

2         A.    Yes, sir.

3         Q.    Okay.  And so, each of those

4    entries, the numeric entries beside

5    collection, that would be the date?                10:31:16A

6         A.    Yes, sir.

7         Q.    Okay.  And then, these next

8    entries that are three letters, in some

9    instances, would that be employees again?

10        A.    No, sir.                                 10:31:28A

11        Q.    Okay.  What is DVX?

12        A.    That is the dialing system.

13   It's an automated system.

14        Q.    What's commonly referred to as

15   a roto dialer, an auto dialer?                      10:31:40A

16        A.    Yes, sir.

17        Q.    Okay.  So that is something

18   that y'all do, just to see if someone's

19   home, and it transfers to a live person,

20   or leaves a message?                                10:31:48A

21        A.    It'll leave a message.

22        Q.    Okay.  The second collection

23   entry from the top, that is 7/11/06, it

24   does not have any initials.  It says Score

25   007.  And then it has a series of numbers,          10:32:06A

```
 1     07/11/06, which I assume is the date; does
 2     that look right to you?
 3              A.    Yes, sir.
 4              Q.    What does Score 7 mean?
 5              A.    I don't know.                      10:32:18A
 6              Q.    Then it has the letters AGT
 7     E16S Days DEL 012 Risk E.  Do you know
 8     what any of that means?
 9              A.    No, sir, I do not.
10              Q.    Did you receive any training on  10:32:40A
11     collections as part of your training as a
12     litigation specialist?
13              A.    No, sir.
14              Q.    Who is the person who is in
15     charge of collections for Wells Fargo?          10:32:52A
16              A.    I don't know.
17              Q.    Down at the next to last entry
18     on that page, the initials there are VKS.
19     Is that an employee or is that some other
20     designation?                                    10:33:10A
21              A.    I don't know.
22              Q.    Okay.  And then the last entry
23     has D in parenthesis.  Do you know what
24     that designation means?
25              A.    No, sir, I do not.               10:33:24A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          38

1          Q.    Is there any document that
2    explains what these entries mean, that is
3    owned by Wells Fargo, or controlled by
4    Wells Fargo?
5          A.    In the collections training          10:33:54A
6    manual.
7          Q.    Okay.  Let's talk about that.
8    Is the collections training manual web
9    based?
10         A.    Yes, sir.                             10:34:10A
11         Q.    Is it printable?
12         A.    Yes, sir.
13         Q.    Does it have a name?
14         A.    Not that I'm aware of.
15         Q.    Is there a supervisor of the         10:34:28A
16   collections department who you work with
17   on a regular basis?
18         A.    No, sir.
19         Q.    I'm going to take a brief side
20   track.  Explain to me the set up, or the         10:34:50A
21   floor plan, of the building where you
22   work?
23         A.    Okay.
24         Q.    All right.  Tell me, is it a
25   multi-story building?                             10:35:00A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224              39

```
 1              A.    Two story.
 2              Q.    Two story?
 3              A.    (Witness nods head.)
 4              Q.    Approximately, how many people
 5      work on each story?                                    10:35:06A
 6              A.    Several hundred.
 7              Q.    Several hundred?  Okay.  Are
 8      the floors divided into departments?
 9              A.    Yes, sir, they are.
10              Q.    Okay.  So the litigation            10:35:20A
11      specialist department, you have your own
12      area?
13              A.    Yes, sir.
14              Q.    Okay.  And collections has
15      their own area?                                        10:35:32A
16              A.    Yes, sir.
17              Q.    Servicing has their own area?
18              A.    Yes, sir.
19              Q.    And hazard has their own area?
20              A.    Yes, sir.                                10:35:40A
21              Q.    What other areas are their
22      within that department?
23              A.    REO department.
24              Q.    All right.  Explain what REO
25      is?                                                    10:35:50A
```

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          40

1          A.    Real Estate Own, where

2     properties are --

3          Q.    Foreclosed?

4          A.    -- foreclosed, and the bank

5     purchases it back.                                    10:35:56A

6          Q.    All right.  And that's Wells

7     Fargo Bank?

8          A.    Yes, sir.

9          Q.    So is Wells Fargo Bank's REO

10    division?                                             10:36:02A

11         A.    Yes, sir.

12         Q.    What other departments?

13         A.    Within our building, that's it.

14         Q.    Okay.  What departments are

15    nearest to your department?                           10:36:18A

16         A.    It's all litigation on our

17    section.

18         Q.    Okay.  So, does your section

19    open to the outside?

20         A.    Yes, it does.                              10:36:36A

21         Q.    Okay.  So you go through your

22    own doors and your own security to go into

23    the litigation department?

24         A.    Yes, sir.

25         Q.    Do you have any contact with        10:36:42A

301 Title Building/300 21st Street North
Birmingham, Alabama   35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          41

1     any other members of any other department?
2          A.    No, sir.
3          Q.    All right.  So, the litigation
4     department has no interaction with any
5     other employees of Wells Fargo, who are in          10:36:52A
6     that two story building?
7          A.    No, sir.
8          Q.    So y'all don't share bathrooms
9     or break rooms, or anything?
10         A.    We're the only ones left in the          10:37:02A
11    building.  The rest have actually begun
12    moving to the new facility.
13         Q.    Okay.  All right.  And how long
14    has that been the case?
15         A.    Several months.          10:37:10A
16         Q.    Okay.  Prior to that, did you
17    have interaction with any of these other
18    departments?
19         A.    No, sir.
20         Q.    So y'all are, more or less, an          10:37:18A
21    island unto yourself?
22         A.    Yes, sir.
23         Q.    Do you receive e-mails or
24    instance messages from these other
25    departments?          10:37:32A

```
 1            A.    E-mails.
 2            Q.    Okay.  And does the company
 3      keep any record of e-mails, as it relates
 4      to loan numbers or individual account
 5      holders?                                        10:37:48A
 6            A.    No, sir.
 7            Q.    Okay.  So, there is no internal
 8      recordkeeping system that puts certain
 9      e-mails with certain files?
10            A.    No, sir.                            10:38:02A
11            Q.    Do you have a name for your web
12      -- your e-mail system?
13            A.    Outlook.
14            Q.    Okay.  So y'all just use
15      Microsoft Outlook?                              10:38:14A
16            A.    Yes, sir.
17            Q.    Okay.  Do you have a domain
18      name, such as:
19      CindyShanabrook@WellsFargo.com?
20            A.    That would be my e-mail            10:38:24A
21      address.
22            Q.    That's what I'm saying.
23            A.    Yes, sir.
24            Q.    So everybody who works there
25      has an e-mail that ends in --                   10:38:32A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          43

1          A.      WellsFargo.com.

2          Q.      -- WellsFargo.com?

3          A.      Yes, sir.

4          Q.      Are you trained or instructed

5     to use the companies e-mail system to make          10:38:46A

6     all communications regarding accounts?

7          A.      Yes, sir.

8          Q.      Is it against corporate policy

9     to have an e-mail account that is not a

10    corporate account?          10:39:04A

11         A.      Yes, sir.

12         Q.      So any e-mail that you have

13    ever sent, since you have been employed at

14    Wells Fargo, is under the name

15    CindyShanabrook@WellsFargo.com?          10:39:16A

16         A.      Correct.

17         Q.      And you assume that every other

18    employee is the same way?

19         A.      Yes, sir.

20         Q.      Is your department moving to          10:39:24A

21    the new facility as well?

22         A.      Yes, sir.

23         Q.      You just the last to go?

24         A.      Yes, sir.

25         Q.      Okay.  Better to be the last          10:39:38A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1    man out than a left man, right?  I'm going

2    to pull off the top page of these series

3    of documents that you have produced.  This

4    one's marked ASC number 233.  And I'm

5    going to represent to you that in                   10:39:58A

6    reviewing this, this set of documents, it

7    appears to be a printout from the Fidelity

8    system.  And it's titled "Consolidated

9    Notes Log."

10           A.    Yes, sir.                             10:40:12A

11           Q.    I'm going to ask you -- you

12    know what?  I need to give you -- we'll

13    use that one.  And I'll just put this one

14    back on top.

15           MR. ANDRESS:  So what's that,              10:40:34A

16    Plaintiff's Exhibit Four?

17           Q.    Four.  And it's 233.

18

19           (Whereupon, Plaintiff's Exhibit

20        Number Four was marked for

21        identification.)

22

23        Now, this whole page, the

24    entries on the left, are all

25    collection entries?                                10:40:44A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          45

1         A.    Yes, sir.

2         Q.    Okay.  And then the second

3    column are all the dates?

4         A.    Yes, sir.

5         Q.    And then every designation in        10:40:50A

6    here, that is all letters, is a DVX, which

7    is your dialer?

8         A.    Yes, sir.

9         Q.    Okay.  Then you have some --

10   three entries about mid way down the page       10:41:08A

11   all dated 3/28/05 that say C 32.  Do you

12   know what that designation is?

13        A.    (Witness reviewing document.)

14   No, sir.

15        Q.    Is it possible that that            10:41:20A

16   designation indicates recording?

17        A.    I don't know.

18        Q.    Now, in reading those C 32

19   designations, these appear to memorialize

20   conversations between a Wells Fargo            10:41:42A

21   employee, who is unidentified, and my

22   clients.

23        A.    Yes, sir.

24        Q.    Is there a reason that Wells

25   Fargo would not identify who their             10:41:50A

1      employees were, who were talking to the

2      clients in this situation?

3            A.    I don't know.

4            Q.    Is it possible that C 32 does

5      identify the person who spoke to my                    10:42:02A

6      clients?

7            A.    It's possible, yes, sir.

8            Q.    Okay.  You've never seen those

9      designations before today?

10           A.    No, sir.                                    10:42:10A

11           Q.    Did you go over these documents

12     to prepare for your deposition?

13           A.    Yes, sir.

14           Q.    Did you discuss these documents

15     with anyone other than your attorney?          10:42:18A

16           A.    No, sir.

17           Q.    The entry from the top, the

18     second C 32 entry, are you able to read

19     those notes and determine what's being

20     said there?                                            10:42:38A

21           A.    Yes, sir.

22           Q.    Can you interpret that for me,

23     please?

24           A.    Yes, sir.  "Borrower states

25     that he should be current because he makes    10:42:46A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                47

1    his payments every month.  But I advised

2    that his loan has been behind, probably

3    since we received.  He stated he already

4    --"  and that moves into the next entry.

5         Q.    Okay.                                    10:43:00A

6         A.    "-- had payment history and

7    couldn't understand it.  I tried trans to

8    customer service, but borrower hung up."

9         Q.    Okay.  Up at the top, where

10   these asterisk make their entry there by    10:43:20A

11   4/5/05, this says Score 222; and it says

12   04/04/05, AGT E30S days delinquent 035

13   Risk E.  Are you able to interpret what

14   Score 222 means?

15        A.    No, sir.                                 10:43:48A

16        Q.    Is that some internal system

17   that Wells Fargo has developed to

18   determine the risk of a loan default, or

19   something of that nature?

20        A.    I don't know.                            10:43:58A

21        Q.    So you have no idea of the

22   significance or insignificance of the term

23   Score 222?

24        A.    No, sir, I do not.

25        Q.    Who would be the person most           10:44:06A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                48

```
 1      knowledgeable about what that means?
 2              A.    I don't know.
 3              Q.    Okay.  Do you know what AGT
 4      E30S means?
 5              A.    No, sir, I don't.                      10:44:16A
 6              Q.    Do you agree with me that that
 7      next entry means days delinquent, right
 8      beside E30S?  Is that how you interpret
 9      that, based on your training with Wells
10      Fargo?                                              10:44:32A
11              A.    I don't know.
12              Q.    So you're not even sure that
13      means days delinquent?
14              A.    No, sir.
15              Q.    And then -- so that whole line    10:44:38A
16      is just a blur to you, you know nothing
17      about that?
18              A.    Correct.
19              Q.    Do you know the person in
20      charge of collections training at Wells     10:44:50A
21      Fargo?
22              A.    No, I don't.
23              Q.    So, it really wouldn't do me
24      any good to go through this page by page,
25      these entries that you've sent me, that
```

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1      are 234 to 272, that appear to be the

2      consolidated note log.  It wouldn't do us

3      any good to try to discuss those line by

4      line, because there's going to be a lot of

5      things that you don't know in those,                    10:45:24A

6      right?

7              MR. ANDRESS:  Object to form.

8          Q.    You can answer.

9          A.    Oh, I'm sorry.

10         Q.    Would you like to take a second        10:45:34A

11     to look through some of them and see?

12         A.    Yes, sir.

13         Q.    Let me show you, I'll start

14     with just 234.  I won't mark it yet.  But

15     just take a second and look through that.              10:45:42A

16         A.    (Witness reviewing document.)

17     Okay.  Some of the lines I would not

18     understand.

19         Q.    So, is it fair to say that

20     every line with asterisks, that has the                10:45:54A

21     Score 222 beside it, are lines that you

22     could not interpret for me?

23         A.    That is correct.

24         Q.    Okay.  And every line that says

25     DVX on that page, you can tell me is an               10:46:08A

1     automatic dialer to my clients?

2          A.     That is correct.

3          Q.     Okay.   There's another line

4     with asterisks dated 5/3/05.   It's the

5     second entry from the top on that date.          10:46:22A

6     It says, CL747; do you know what that

7     means?

8          A.     No, sir, I don't.

9          Q.     Okay.   Down where it says, the

10    one entry on that page, is says SER, which        10:46:36A

11    is customer service department, correct?

12         A.     Correct.

13         Q.     It's dated 4/21/05, it says

14    DL3; do you know what that means?

15         A.     That would be the identifier of        10:46:48A

16    the person who made the entry.

17         Q.     Okay.   Are you able to

18    interpret what that line says?

19         A.     "Open collection 24B for BK

20    history."                                          10:46:58A

21         Q.     So is that -- does that say to

22    you that at that point, on that day, that

23    someone sent for a bankruptcy history on

24    this file?

25         A.     That is correct.                       10:47:10A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          51

1          Q.   All right.  Let me go ahead and

2     mark that one.  We'll just mark that one

3     as Five.

4

5          (Whereupon, Plaintiff's Exhibit

6          Number Five was marked for

7          identification.)

8

9          I'm going to mark the one

10         labeled 235 as Six, and ask you to          10:47:36A

11         take a look at that one.

12

13         (Whereupon, Plaintiff's Exhibit

14         Number Six was marked for

15         identification.)

16

17         My particular interest in that

18         page, again, there are a lot of

19         entries there that are your

20         automatic dialer?          10:47:52A

21         A.   (Witness reviewing document.)

22    Yes, sir.

23         Q.   And then you have some CL747

24    entry at the top, and some Score 222

25    entries, which you've indicated you don't          10:48:02A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          52

1     know what they are?

2            A.     Correct.

3            Q.     But about half, three quarters

4     of the way down, there is a collection

5     entry dated 05/16/05, has the initials          10:48:10A

6     MEL.  That would be the operator, correct?

7            A.     Correct.

8            Q.     And it says, "acceleration

9     demand letter sent.  Expires in 30 days."

10           A.     Correct.                            10:48:20A

11           Q.     Okay.  Let's talk about page

12    236 for just a minute.  I'm going to mark

13    it.

14

15           (Whereupon, Plaintiff's Exhibit

16      Number Seven was marked for

17      identification.)

18

19           I'm going to go ahead and write

20      some of these down so I can keep up         10:49:00A

21      with where I'm at.  This is 236.

22      The top entry on 236 is a service --

23      customer service department entry?

24           A.     (Witness reviewing document.)

25    Yes, sir.                                        10:49:38A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1          Q.    Do you know what 46T

2    represents, beside the date?

3          A.    That is the person that made

4    the entry.  It's their designation.

5          Q.    So that's a number and a                    10:49:48A

6    letter?

7          A.    Yes, sir.

8          Q.    Do you know how they set those

9    designations up?

10         A.    No, sir, I don't.                           10:49:54A

11         Q.    Who would be the person who

12   knows the most at Wells Fargo about how

13   those designations are given?

14         A.    I don't know.

15         Q.    Do you understand that entry,            10:50:04A

16   beside the designation, 46T?

17         A.    Yes, I do.

18         Q.    Okay.  Can you explain it to

19   me?

20         A.    The LITC is litigation costs.           10:50:14A

21   And 4.11 is the dollar amount.  01R01

22   means that it is recoverable from the

23   borrower.  And it was sent to Doris for

24   processing, in default servicing.

25         Q.    Okay.                                    10:50:32A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          54

```
 1              A.    So that the litigation cost
 2       bill was actually sent to be processed.
 3              Q.    Is Doris, D. Ramsburg?
 4              A.    I don't know.
 5              Q.    Do you know who D. Ramsburg is      10:50:44A
 6       reflected in that entry?
 7              A.    No, I don't.
 8              Q.    And you don't know if Doris'
 9       last name is Ramsburg?
10              A.    No, I don't.                        10:50:56A
11              Q.    Do you know Doris?
12              A.    I know a Doris.
13              Q.    What does DOS stand for after
14       her name?
15              A.    Default servicing.                  10:51:02A
16              Q.    And MD, is that state?
17              A.    That's Maryland.
18              Q.    Yeah.  Down below that is,
19       again, two entries down, in the servicing
20       department on June 21st of '05, it says          10:51:14A
21       FSD.  What is that?  Is that the person's
22       designation again?
23              A.    Yes, sir, it is.
24              Q.    Okay.  And does that reflect
25       that Wells Fargo was corresponding with          10:51:32A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          55

1     Ocwen regarding a history of this loan,

2     prior to purchasing the loan?

3          A.    (Witness reviewing document.)

4     It states that we e-mailed Ocwen for the

5     payment history.                                10:52:04A

6          Q.    Okay.  Do you know why this

7     entry was made; what was the purpose of

8     this entry?  Was it made in response to

9     litigation?

10         A.    Made in response to               10:52:18A

11    correspondence that was received.  And

12    there was research being done.

13         Q.    Okay.  Down, the next serviced

14    entry down, customer service department on

15    6/14/05, again, OFQ is the person that       10:52:40A

16    handled this, correct?

17         A.    Correct.

18         Q.    And that entry has to do with a

19    waiver of summons from a prior lawsuit;

20    are you familiar with that?                   10:52:54A

21         A.    No, sir.

22         Q.    Are you aware that there's been

23    litigation over this same account,

24    previous to this lawsuit?

25         A.    Yes, sir, I am.                    10:53:16A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          56

1         Q.    Okay.  Did you review that, in

2    preparing for this deposition?

3         A.    Yes, I did.

4         Q.    Okay.  Is it safe to say that

5    any entry in these documents that we've          10:53:54A

6    talked about through 272, I believe is the

7    number, where the designation on the left

8    is COL, that is from Wells Fargo's

9    collection department?

10        A.    That is correct.                       10:54:08A

11        Q.    That they are the person

12   responsible for that entry?

13        A.    Yes, sir.

14        Q.    Okay.  And whatever those

15   entries say, Wells Fargo does not dispute        10:54:16A

16   either those contents or the entries

17   themselves?

18        A.    Correct.

19        Q.    Okay.  Are you familiar with

20   whether or not Wells Fargo has ever been         10:54:36A

21   sued, prior to this lawsuit, for any claim

22   of failure to properly service a mortgage?

23        A.    No, sir, I'm not aware.

24        Q.    In preparing for this

25   deposition today, did you inquire as to          10:54:50A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1    whether or not Wells Fargo had ever been

2    sued for any prior suit, claiming a

3    failure to properly service a mortgage?

4         A.    No, sir, I have not.

5         Q.    When did Wells Fargo begin to          10:55:04A

6    service this mortgage?

7         A.    I don't recall the date, off

8    the top of my head.

9         Q.    Okay.  I'm going to show you a

10   document that I'm going to mark as Exhibit          10:55:40A

11   Eight.

12

13        (Whereupon, Plaintiff's Exhibit

14        Number Eight was marked for

15        identification.)

16

17        It's -- I'll represent to you

18        that it's a notice received by my

19        clients from Ocwen, that ASC would

20        be serving this mortgage.                     10:56:02A

21        A.    (Witness reviewing document.)

22   Okay.

23        Q.    The contents of this indicate

24   that ASC would begin servicing mortgage on

25   November 1st of 2002.  Are you able to see          10:56:14A

1    that in the first line of that letter,

2    first two lines of that letter?

3        A.    Yes, sir, I am.

4        Q.    Do you dispute that that is the

5    time in which ASC began servicing this          10:56:24A

6    loan?

7        A.    No, sir.  I'm not disputing

8    that.

9        Q.    In reviewing the documents that

10   ASC maintains, are you able to determine         10:56:32A

11   that that is correct?

12       A.    That is correct.

13       Q.    Okay.  I'm going to mark this

14   document as Exhibit Nine.

15

16            (Whereupon, Plaintiff's Exhibit

17        Number Nine was marked for

18        identification.)

19

20            Ask you if you have -- this is         10:56:50A

21        going to have to be a cumulative

22        exhibit.  We got any paper clips or

23        staplers?  This is a response from

24        ASC.  I assumed y'all already had a

25        copy of that.  I represent to you          10:57:16A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224        59

1    that that is the ultimate response

2    received by my clients, to the

3    qualified written request, that I

4    sent to ASC on August -- or October

5    of 2005.  Have you seen that        10:57:38A

6    document, in preparation for this

7    deposition?

8        A.    Yes, sir, I have.

9        Q.    Okay.  Have you reviewed that

10   document?        10:57:50A

11       A.    Yes, sir, I have.

12       Q.    And it's my understanding that,

13   as we sit here today, ASC's position is

14   that the amounts charged by Ocwen, for

15   insurance in 2000 and 2001, were improper;        10:58:02A

16   are due to be refunded?

17       A.    I'm sorry, could you rephrase

18   that?

19       Q.    Let me back up a little bit

20   further.  Up to today, America's Servicing        10:58:16A

21   Company's position has been that insurance

22   was not paid on this loan in 2000 and

23   2001, correct?

24       A.    Correct.

25       Q.    Okay.  And that is reason why        10:58:26A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

1    the payment changed on my client's

2    mortgage in, approximately, August of

3    2005?

4         A.    Correct.

5         Q.    Okay.  And it's my                    10:58:36A

6    understanding, that in preparing for this

7    deposition, America's Servicing Company or

8    Wells Fargo has realized that that is in

9    fact incorrect?

10        A.    Correct.                              10:58:50A

11        Q.    And that my client's do not owe

12   insurance for 2000 or 2001?

13        A.    That is correct.

14        Q.    Okay.  But that was not the

15   case in this response that was issued in      10:58:58A

16   August of 2006, correct?

17        A.    Correct, sir.

18        Q.    Okay.  So is it Wells Fargo's

19   position, as we sit here today, that their

20   intention is to correct the mortgage          10:59:10A

21   account of my client's and remove those

22   charges and bring everything current?

23        A.    Correct.

24        Q.    And that includes refunding all

25   the late fees and collection charges and      10:59:24A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          61

1    things that were put on the account since

2    then?

3         A.    Correct.

4         Q.    And that's what your

5    responsibilities are under the servicing          10:59:30A

6    provisions of the RESPA Act, correct?

7         A.    Correct.

8         Q.    Do you agree that ASC or Wells

9    Fargo began to service this loan when my

10   clients were in Chapter 13 bankruptcy?            10:59:52A

11        A.    Yes, sir.

12        Q.    Okay.  And that would have

13   qualified as a default under the terms of

14   their loan, correct?

15             MR. ANDRESS:  Object to the            11:00:04A

16   form.  Legal conclusion.

17        Q.    You can answer.

18        A.    Could you rephrase the

19   question, please?

20        Q.    Certainly.                            11:00:18A

21        A.    Thank you.

22        Q.    You agree that the failure to

23   pay is required, is a default under the

24   terms of the note, correct?

25        A.    Correct.                              11:00:32A

1          Q.    And you agree that a bankruptcy

2    is a default under the terms of the

3    mortgage, right?

4              MR. ANDRESS:  Could you show

5    her the note?                                    11:00:44A

6          Q.    Certainly.  I'm about to mark

7    it.  I'm going to mark as Exhibit Ten, a

8    copy of the note and mortgage.  And these

9    are Bate stamped ASC 98 through 104.

10

11              (Whereupon, Plaintiff's Exhibit

12          Number Ten was marked for

13          identification.)

14

15          A.    Okay.                               11:01:28A

16          Q.    Take a look at that.

17          A.    (Witness reviewing document.)

18    Yes, sir.

19          Q.    Okay.  Do you agree that a

20    default occurs when a mortgager does not         11:01:52A

21    pay as agreed, correct?

22          A.    Correct.

23          Q.    I mean, y'all sent out,

24    literally, dozens of letters to these

25    folks saying they're in default, since           11:02:02A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          63

1    you've serviced the loan, right?  And you

2    reviewed those, haven't you?

3         A.    Letters?

4         Q.    Right.  You sent out notices of

5    default, as part of your servicing?          11:02:14A

6         A.    We have sent out letters.

7         Q.    Have you reviewed those

8    letters?

9         A.    Yes, I have.

10        Q.    Some of them say that my          11:02:22A

11   clients were in default?

12        A.    Correct.

13        Q.    Would they have been in default

14   if they were in bankruptcy?

15             MR. ANDRESS:  Object to form.      11:02:32A

16   Legal conclusion.

17        Q.    Well now, you're here as the

18   corporate rep of Wells Fargo?

19        A.    Yes, sir, I am.

20        Q.    And you're a litigation          11:02:36A

21   specialist?

22        A.    Yes, I am.

23        Q.    Is a default triggered when a

24   person's in bankruptcy?

25             MR. ANDRESS:  Same objection.      11:02:46A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          64

1          Q.    You can still answer.
2          A.    The bankruptcy is filed to
3     protect the person when they are in
4     default.
5          Q.    Okay.  So that means that          11:02:54A
6     they're in default if they're in
7     bankruptcy, basically?
8               MR. ANDRESS:  Same objection.
9          A.    At that time, then it becomes a
10    post-petition issue.          11:03:06A
11         Q.    Okay.  Let me do a little bit
12    better job with my questions, okay?
13         A.    Okay.
14         Q.    I guess the issue here is, that
15    my clients -- you purchased the servicing          11:03:16A
16    of this loan while my client's were in
17    bankruptcy?
18         A.    Correct.
19         Q.    And that means that, prior to
20    filing bankruptcy, my clients must have          11:03:26A
21    been in default, right?
22               MR. ANDRESS:  Object to the
23    form.  Legal conclusion.
24         A.    I don't know.
25         Q.    Have you reviewed those          11:03:32A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    65

1    documents to determine that?

2             A.    Prior to the bankruptcy?

3             Q.    Uh-huh.

4             A.    No, sir, I have not.

5             Q.    Have you reviewed the payment          11:03:40A

6    history from America's Servicing Company,

7    or from Ocwen, in preparation for this

8    deposition?

9             A.    No, sir, I did not.

10            Q.    I'll get around to it in just a        11:03:54A

11   minute.  Was Wells Fargo Bank formerly

12   known as Norwest?

13            A.    Yes, sir.

14            Q.    When did that name change take

15   place?                                                11:04:20A

16            A.    I don't know.

17            Q.    Did Wells Fargo ever have any

18   ownership interest in Ocwen Bank?

19            A.    No, sir.

20            Q.    Let's go off the record for            11:04:34A

21   just a minute.

22                 VIDEOGRAPHER:  Standby, please.

23   We're off the record at 11:06.

24

25                 (Whereupon, a discussion was

301 Title Building/300 21st Street North
Birmingham, Alabama   35203

```
 1          held off the record.)

 2

 3              VIDEOGRAPHER:  We're back on

 4          the record at 11:15 a.m.

 5          Q.    Let me show you a document that    11:12:32A

 6     I have marked as Exhibit 11, and let you

 7     take a look at that.

 8

 9              (Whereupon, Plaintiff's Exhibit

10          Number 11 was marked for

11          identification.)

12

13          A.    (Witness reviewing document.)

14     Yes, sir.

15          Q.    Who filed that -- well, let's     11:13:38A

16     back up a little further than that.  Is

17     that a pleading filed in my client's

18     Chapter 13 bankruptcy?

19          A.    Yes, it is.

20          Q.    Was it filed in December of       11:13:50A

21     2000?

22          A.    (Witness reviewing document.)

23     Yes, sir.

24          Q.    And who filed that pleading;

25     what company?                                11:14:08A
```

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          67

1          A.    Secure Creditor, Wells Fargo
2     Bank.
3          Q.    That'd be y'all, right?
4          A.    Yes, sir.
5          Q.    What does paragraph three say,          11:14:16A
6     second sentence?
7          A.    "Said mortgage is payable in
8     monthly installments which include
9     principle, interest and escrow.  The
10    payments upon such mortgage are currently          11:14:26A
11    post-petition delinquent for the months of
12    October through November, 2000."
13         Q.    Post-petition delinquent for
14    two months would be in default, right?
15         A.    Correct.                                11:14:40A
16         Q.    So when you bought this loan,
17    it was in default?
18         A.    Post-petition.
19         Q.    Default?
20         A.    Correct.                                11:14:52A
21         Q.    Okay.  To just show, so it's
22    clear for the court, sometime after this,
23    Ocwen service this loan for a period of
24    time?
25         A.    Correct.                                11:15:10A

1          Q.   And then Wells Fargo took it
2     back?
3          A.   Correct.
4          Q.   Under the doing business as
5     name of America's Servicing Company?          11:15:18A
6          A.   Correct.
7          Q.   Okay.  I think that's all I
8     have.
9
10              EXAMINATION BY MR. ANDRESS:          11:15:30A
11         Q.   Let me ask you a question.  You
12    were asked earlier about whether or not
13    ASC adopts the log notes; do you remember
14    that question by the plaintiff's counsel?
15         A.   Yes, sir.                           11:15:46A
16         Q.   And you responded, yes.  Now,
17    by that response, did you mean that those
18    are -- that you -- that Wells Fargo does
19    not dispute that those are the business
20    records for the collection notes?            11:15:58A
21         A.   That is correct.
22         Q.   You did not, during your
23    deposition, review every entry in those
24    log notes, did you?
25         A.   No, sir, I did not.                 11:16:10A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          69

1          Q.    And you were not asked to do

2    that, were you?

3          A.    No, sir, I was not.

4          Q.    So, is it your position, as the

5    corporate representative of ASC, that          11:16:16A

6    those documents that you were referred to

7    my plaintiff's counsel, were simply the

8    log notes, the business records of ASC?

9          A.    That is correct.

10          Q.    Let me see the other exhibits.          11:16:24A

11    Do y'all have a stack of them?  You were

12    handed a document, Plaintiff's Exhibit 11,

13    which was a bankruptcy petition.  Did you

14    have an opportunity to review that before

15    your deposition?          11:17:00A

16          A.    Yes, sir.

17          Q.    You did?  Did you -- do you

18    know whether or not any response to this

19    motion was filed by the Alewines?

20          A.    No, sir.          11:17:10A

21          Q.    And you don't know, sitting

22    here today, what the payment history was

23    in October or November of 2000, for the

24    Alewines, do you?

25          A.    No, sir, I do not.          11:17:18A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                70

1          Q.    That's all I have.

2

3                RE-EXAMINATION BY MR. WOOTEN:

4          Q.    I'm going to be very brief.

5    Because you did not read each of those          11:17:32A

6    individual entries, you are not attempting

7    to say that those entries are not, were

8    not, the entries of employees of Wells

9    Fargo that corresponded to their

10   activities, with respect to my client's          11:17:48A

11   mortgage, on the day that they were

12   entered?

13         A.    I'm sorry, could you rephrase

14   that?

15         Q.    The log notes, I think your          11:17:56A

16   lawyer's term was, they are business

17   records of Wells Fargo?

18         A.    Correct.

19         Q.    You don't have any reason to

20   believe that they are, in any material          11:18:06A

21   way, inaccurate, do you?

22         A.    No, sir.

23         Q.    And you rely on those entries

24   to refresh your recollection, or to

25   provide you knowledge, with what your          11:18:16A

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          71

1    company did with respect to this loan, at

2    each entry?

3         A.    Correct.

4         Q.    So you would rely on, as a

5    corporate rep, the accuracy of those          11:18:26A

6    records, when determining what your

7    company did, with respect to my client's

8    loan?

9         A.    Correct.

10        Q.    Okay.  Nothing else.                11:18:34A

11

12             RE-EXAMINATION BY MR. ANDRESS:

13        Q.    And if there was anything in

14   the records that you were not certain of,

15   would you conduct additional investigation    11:18:42A

16   into the incident recorded?

17        A.    Yes, sir, I would.

18        Q.    Thank you.

19

20             VIDEOGRAPHER:  Does that             11:18:54A

21   conclude the deposition?

22             MR. WOOTEN:  How much tape you

23   got left?

24             VIDEOGRAPHER:  About 20

25   minutes.                                       11:19:02A

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    72

```
 1                    MR. WOOTEN:   Just a second.

 2

 3                    RE-EXAMINATION BY MR. WOOTEN:

 4          Q.    Are the log notes the best

 5    source of information to determine what          11:19:08A

 6    America's Servicing Company did with

 7    respect to my client's loan, based on each

 8    entry?

 9          A.    Yes, sir.

10          Q.    Is there any more complete           11:19:20A

11    repository information, with respect to my

12    client's mortgage, that is controlled by

13    Wells Fargo?

14          A.    I don't have that information.

15          Q.    Okay.  So you don't have any         11:19:30A

16    idea whether that's the case or not?

17          A.    No, sir, I do not.

18          Q.    So you don't have access to

19    that information?

20          A.    No, sir, I do not.                   11:19:38A

21          Q.    You don't know whether it even

22    exists?

23          A.    No, sir, I do not.

24          Q.    Okay.  I'm through now.

25                    MR. ANDRESS:  Thank you.         11:19:48A
```

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          73

1          VIDEOGRAPHER:  That concludes

2     the deposition.  We're off the record at

3     11:23 a.m., ending tape number one.  Thank

4     you.

5

6          (Whereupon, the preceding

7          deposition was concluded at 11:23

8          a.m.)

9

10

11

12

13

14

15

16            .

17

18

19

20

21

22

23

24

25

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224

REPORTER'S CERTIFICATE

STATE OF ALABAMA    )
JEFFERSON COUNTY    )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing, to the best of my ability and understanding.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

Lori E. Deffall

301 Title Building/300 21st Street North
Birmingham, Alabama  35203

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224                    75

| | | | | |
|---|---|---|---|---|
| **'** | **21703** [1] - 9:2 | **8** | 22:25, 23:2, 23:7, 24:21, 24:22 | **August**[5] - 9:5, 30:11, 59:4, 60:2, 60:16 |

'05 [1] - 54:20
'98 [1] - 14:3

**0**

007 [1] - 36:25
012 [1] - 37:7
01r01 [1] - 53:21
035 [1] - 47:12
04/04/05 [1] - 47:12
05/16/05 [1] - 52:5
07/11/06 [1] - 37:1

**1**

1 [1] - 3:11
10 [4] - 1:20, 2:5, 3:20, 4:11
10/17/05 [1] - 33:2
10/3/05 [1] - 33:2
104 [1] - 62:9
10th [1] - 6:2
11 [4] - 3:21, 66:6, 66:10, 69:12
11:06 [1] - 65:23
11:15 [1] - 66:4
11:23 [2] - 73:3, 73:7
13 [3] - 15:2, 61:10, 66:18
1600 [2] - 2:10, 6:16
17th [1] - 31:11
1963 [1] - 9:5
1997 [2] - 11:10, 12:6
1998 [1] - 12:7
1st [1] - 57:25

**2**

2 [1] - 3:12
20 [3] - 30:4, 30:6, 71:24
2000 [7] - 14:4, 59:15, 59:22, 60:12, 66:21, 67:12, 69:23
2001 [4] - 13:8, 59:15, 59:23, 60:12
2002 [4] - 13:9, 14:15, 14:16, 57:25
2005 [5] - 28:18, 29:23, 31:11, 59:5, 60:3
2006 [3] - 30:11, 31:21, 60:16
2007 [5] - 1:20, 4:11, 6:3, 9:12, 14:16
20th [3] - 2:10, 6:15, 31:21

21st [1] - 54:20
22 [2] - 25:22, 26:7
222 [5] - 47:11, 47:14, 47:23, 49:21, 51:24
233 [2] - 44:4, 44:17
234 [2] - 49:1, 49:14
235 [1] - 51:10
236 [3] - 52:12, 52:21, 52:22
24b [1] - 50:19
261 [4] - 30:15, 31:15, 33:16, 34:6
26th [1] - 9:12
272 [2] - 49:1, 56:6
2nd [1] - 2:5

**3**

3 [1] - 3:13
3/28/05 [1] - 45:11
30 [2] - 17:5, 52:9
3011291 [1] - 35:10
30th [1] - 9:5
32 [4] - 45:11, 45:18, 46:4, 46:18
35203 [1] - 2:11
36862 [1] - 2:5
3:06cv886-mht [2] - 1:9, 6:10
3rd [1] - 28:17

**4**

4 [1] - 3:14
4.11 [1] - 53:21
4/21/05 [1] - 50:13
4/5/05 [1] - 47:11
420 [2] - 2:10, 6:15
46t [2] - 53:1, 53:16

**5**

5 [1] - 3:15
5/3/05 [1] - 50:4
5252 [1] - 9:1

**6**

6 [1] - 3:16
6/14/05 [1] - 55:15

**7**

7 [3] - 3:17, 35:13, 37:4
7/11/06 [1] - 36:23

**8**

8 [1] - 3:18

**9**

9 [1] - 3:19
98 [1] - 62:9
9:57 [1] - 1:23

**A**

ability [2] - 26:10, 74:14
able [5] - 46:18, 47:13, 50:17, 57:25, 58:10
acceleration [1] - 52:8
access [2] - 18:3, 72:18
account [7] - 20:4, 42:4, 43:9, 43:10, 55:23, 60:21, 61:1
accounts [2] - 18:15, 43:6
accuracy [1] - 71:5
accurate [1] - 19:24
Act [2] - 30:2, 61:6
action [1] - 74:17
Action [1] - 1:9
activities [1] - 70:10
actual [2] - 32:19, 35:5
additional [2] - 22:22, 71:15
address [2] - 8:25, 42:21
addressed [1] - 33:3
Administrative [1] - 13:15
adopts [1] - 68:13
advised [1] - 47:1
agree [5] - 48:6, 61:8, 61:22, 62:1, 62:19
agreed [1] - 62:21
Agreed [4] - 4:3, 4:13, 4:22, 5:8
Agt [3] - 37:6, 47:12, 48:3
ahead [2] - 51:1, 52:19
aided [1] - 74:9
Alabama [10] - 1:2, 1:22, 2:5, 2:11, 2:13, 4:7, 4:10, 6:12, 6:16, 74:3
Alewine [6] - 1:5, 1:6, 6:8, 26:16, 26:22
Alewines [2] - 69:19, 69:24
Alex [10] - 21:4, 21:5, 21:7, 21:13, 21:25,

22:25, 23:2, 23:7, 24:21, 24:22
allow [1] - 8:9
alter [1] - 19:16
America's [13] - 1:11, 6:9, 18:9, 18:25, 19:1, 19:9, 19:12, 28:16, 59:20, 60:7, 65:6, 68:5, 72:6
amount [1] - 53:21
amounts [1] - 59:14
Andress [2] - 2:10, 3:6, 7:10, 7:15, 7:16, 19:21, 31:13, 33:16, 33:23, 44:15, 49:7, 61:15, 62:4, 63:15, 63:25, 64:8, 64:22, 68:10, 71:12, 72:25
answer [7] - 8:9, 8:15, 25:24, 26:6, 49:8, 61:17, 64:1
answered [1] - 15:20
answers [1] - 74:8
anywise [1] - 74:18
appear [3] - 34:5, 45:19, 49:1
Appearing [2] - 2:3, 2:8
applied [1] - 20:3
April [2] - 12:6
area [6] - 10:5, 11:25, 39:12, 39:15, 39:17, 39:19
areas [1] - 39:21
Asc [18] - 7:16, 28:20, 28:25, 30:15, 33:16, 34:6, 44:4, 57:19, 57:24, 58:5, 58:10, 58:24, 59:4, 61:8, 62:9, 68:13, 69:5, 69:8
Asc's [1] - 59:13
assign [1] - 5:3
Assistant [1] - 13:16
assume [3] - 7:23, 37:1, 43:17
assumed [1] - 58:24
assuming [2] - 32:15, 35:21
asterisk [1] - 47:10
asterisks [2] - 49:20, 50:4
attachments [1] - 28:19
attempting [1] - 70:6
attorney [4] - 11:18, 26:3, 30:14, 46:15
attorneys [2] - 6:20, 9:17
audio [1] - 24:8

August [5] - 9:5, 30:11, 59:4, 60:2, 60:16
auto [1] - 36:15
automated [1] - 36:13
automatic [2] - 50:1, 51:20
available [1] - 18:2
Avenue [1] - 2:5
aware [3] - 38:14, 55:22, 56:23

**B**

Baker [4] - 1:21, 2:9, 4:8, 6:14
Baltimore [2] - 11:18, 13:23
bank [2] - 40:4
Bank [5] - 12:23, 40:7, 65:11, 65:18, 67:2
Bank's [1] - 40:9
bankruptcy [16] - 9:22, 10:16, 13:4, 15:2, 50:23, 61:10, 62:1, 63:14, 63:24, 64:2, 64:7, 64:17, 64:20, 65:2, 66:18, 69:13
banks [1] - 10:8
base [1] - 27:17
based [6] - 17:25, 20:11, 25:4, 38:9, 48:9, 72:7
basis [1] - 38:17
Bate [2] - 30:15, 62:9
bathrooms [1] - 41:8
Bearman [4] - 1:21, 2:9, 4:9, 6:14
bears [1] - 34:8
becomes [1] - 64:9
becoming [2] - 9:19, 16:22
began [2] - 58:5, 61:9
begin [5] - 6:21, 8:19, 11:9, 57:5, 57:24
beginning [1] - 17:7
begun [1] - 41:11
behalf [1] - 31:10
behind [1] - 47:2
below [2] - 35:19, 54:18
Berkowitz [4] - 1:22, 2:9, 4:10, 6:15
beside [5] - 36:4, 48:8, 49:21, 53:2, 53:16
best [2] - 72:4, 74:13
Bethesda [1] - 9:24
better [2] - 19:15, 64:12

# EXHIBIT A
# (3 of 3)

Better[1] - 43:25
between[2] - 4:4, 14:9, 18:24, 24:21, 45:20
Beverly[2] - 2:17, 6:22
beyond[1] - 23:7
Bierman[6] - 9:23, 10:3, 12:17, 12:19, 12:22, 14:14
bill[1] - 54:2
binder[1] - 17:19
Birmingham[4] - 1:22, 2:11, 4:10, 6:16
birth[1] - 9:4
bit[3] - 18:22, 59:19, 64:11
Bjv[1] - 35:2
Bk[1] - 50:19
blur[1] - 48:16
Borrower[1] - 46:24
borrower[2] - 47:8, 53:23
bought[1] - 67:16
break[1] - 41:9
brief[2] - 38:19, 70:4
bring[1] - 60:22
building[5] - 38:21, 38:25, 40:13, 41:6, 41:11
business[4] - 68:4, 68:19, 69:8, 70:16
Bwu[2] - 33:3, 33:6

**C**

Caldwell[4] - 1:21, 2:9, 4:9, 6:14
capability[1] - 26:8
capacity[2] - 11:1, 20:9
Carpenter[4] - 11:17, 11:20, 12:5, 14:10
case[6] - 27:25, 30:7, 30:18, 41:14, 60:15, 72:16
Case[1] - 6:9
cases[1] - 9:17
central[1] - 6:4
certain[4] - 26:9, 42:8, 42:9, 71:14
Certainly[2] - 61:20, 62:6
Certificate[2] - 3:24, 74:1
certify[2] - 74:5, 74:15
chance[1] - 8:5
change[1] - 65:14

changed[1] - 60:1
Chapter[3] - 15:2, 61:10, 66:18
charge[2] - 37:15, 48:20
charged[1] - 59:14
charges[2] - 60:22, 60:25
Cindy[7] - 1:16, 1:18, 3:2, 4:6, 6:6, 7:1, 7:22
Cindyshanabrook@ wellsfargo.com[2] - 42:19, 43:15
City[1] - 13:23
Civil[1] - 1:9
Cl747[2] - 50:6, 51:23
claim[2] - 10:21, 56:21
claiming[1] - 57:2
classroom[1] - 17:10
clear[1] - 67:22
client's[9] - 60:1, 60:11, 60:21, 64:16, 66:17, 70:10, 71:7, 72:7, 72:12
clients[16] - 26:15, 26:21, 27:25, 28:20, 31:10, 36:1, 45:22, 46:2, 46:6, 50:1, 57:19, 59:2, 61:10, 63:11, 64:15, 64:20
clips[1] - 58:22
co[1] - 13:16
co-coordinator[1] - 13:16
codes[1] - 24:3
Col[2] - 35:20, 56:8
collect[1] - 10:14
collection[1] - 35:24, 36:5, 36:22, 44:25, 50:19, 52:4, 56:9, 60:25, 68:20
collections[9] - 27:18, 35:21, 37:11, 37:15, 38:5, 38:8, 38:16, 39:14, 48:20
column[1] - 45:3
commence[1] - 6:5
commencing[1] - 1:23
Commissioner[1] - 5:10
commonly[1] - 36:14
communication[1] - 8:6
communications[2] - 24:6, 43:6
companies[3] - 10:9, 10:19, 43:5

company[4] - 42:2, 66:25, 71:1, 71:7
Company[12] - 1:11, 6:9, 18:10, 18:25, 19:1, 19:10, 19:12, 28:17, 60:7, 65:6, 68:5, 72:6
Company's[1] - 59:21
complete[1] - 72:10
completely[1] - 19:24
compliance[2] - 4:17, 10:18
computer[3] - 25:4, 27:17, 74:9
computer-aided[1] - 74:9
concerning[2] - 16:1, 16:4
conclude[1] - 71:21
concluded[1] - 73:7
concludes[1] - 73:1
conclusion[3] - 61:16, 63:16, 64:23
conduct[1] - 71:15
consider[1] - 19:4
consolidated[1] - 49:2
Consolidated[1] - 44:8
consumers[1] - 10:10
contact[2] - 35:25, 40:25
contacting[1] - 35:25
contain[2] - 23:23, 24:8
contained[1] - 17:23
contains[2] - 23:21, 24:24
contents[2] - 56:16, 57:23
continues[1] - 34:25
control[1] - 18:14
controlled[3] - 18:17, 38:3, 72:12
conversation[1] - 26:12
conversations[7] - 24:9, 26:9, 26:15, 26:20, 26:21, 28:5, 45:20
convicted[2] - 15:4, 15:7
coordinator[1] - 13:16
copies[2] - 28:24, 33:24
copy[4] - 28:15, 33:25, 58:25, 62:8
corporate[8] - 18:3, 19:22, 20:2, 43:8,

43:10, 63:18, 69:5, 71:5
corporation[1] - 19:9
correct[24] - 15:22, 25:25, 29:23, 36:1, 49:23, 50:2, 50:11, 50:25, 52:6, 55:16, 56:10, 58:11, 58:12, 59:23, 60:13, 60:16, 60:20, 61:6, 61:14, 61:24, 62:21, 68:21, 69:9, 74:11
Correct[28] - 16:11, 43:16, 48:18, 50:12, 52:2, 52:7, 52:10, 55:17, 56:18, 59:24, 60:4, 60:10, 60:17, 60:23, 61:3, 61:7, 61:25, 62:22, 63:12, 64:18, 67:15, 67:20, 67:25, 68:3, 68:6, 70:18, 71:3, 71:9
corresponded[1] - 70:9
correspondence[3] - 27:24, 32:20, 55:11
corresponding[1] - 54:25
cost[1] - 54:1
costs[1] - 53:20
counsel[6] - 4:5, 4:24, 5:1, 68:14, 69:7, 74:16
County[1] - 74:3
court[4] - 6:17, 6:20, 8:12, 67:22
Court[5] - 1:1, 4:19, 6:11, 7:6, 9:1
credited[1] - 18:15
Creditor[1] - 67:1
creditor's[1] - 10:5
creditors[1] - 10:23
cumulative[2] - 28:7, 58:21
current[2] - 46:25, 60:22
customer[6] - 18:10, 32:3, 47:8, 50:11, 52:23, 55:14
customer's[1] - 18:15
customers[2] - 26:10, 26:11

**D**

database[5] - 23:8, 23:11, 23:15, 24:23, 31:5
date[9] - 6:2, 9:3, 29:21, 34:9, 36:5,

37:1, 50:5, 53:2, 57:7
dated[5] - 33:1, 45:11, 50:4, 50:13, 52:5
dates[5] - 12:4, 13:5, 13:25, 14:13, 45:3
daylight[1] - 6:4
days[7] - 17:5, 30:4, 30:7, 47:12, 48:7, 48:13, 52:9
Days[1] - 37:7
debtors[2] - 24:6, 24:9
debts[1] - 10:14
Decaro[2] - 2:17, 6:23
December[1] - 66:20
declarations[1] - 28:22
Default[3] - 32:25, 54:15, 67:19
default[16] - 47:18, 53:24, 61:13, 61:23, 62:2, 62:20, 62:25, 63:5, 63:11, 63:13, 63:23, 64:4, 64:6, 64:21, 67:14, 67:17
Defendant[3] - 1:12, 2:8, 26:8
defendant's[2] - 16:1, 16:5
Defnall[5] - 1:19, 2:23, 4:7, 6:17, 74:21
Del[1] - 37:7
delinquent[5] - 47:12, 48:7, 48:13, 67:11, 67:13
demand[1] - 52:9
department[20] - 21:21, 22:16, 32:5, 32:23, 34:22, 35:24, 38:16, 39:11, 39:22, 39:23, 40:15, 40:23, 41:1, 41:4, 43:20, 50:11, 52:23, 54:20, 55:14, 56:9
departments[5] - 39:8, 40:12, 40:14, 41:18, 41:25
Deposition[1] - 1:16, 1:18
deposition[25] - 4:5, 4:15, 4:16, 5:4, 5:9, 6:6, 7:24, 8:1, 8:2, 8:4, 15:13, 29:8, 33:10, 46:12, 56:2, 56:25, 59:7, 60:7, 65:8, 68:23, 69:15, 71:21, 73:2, 73:7,

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          77

74:6
**depositions** [1] - 4:20
**describe** [1] - 18:14
**Describe** [1] - 17:21
**designate** [1] - 32:4
**designation** [11] -
    20:23, 31:22, 37:20,
    37:24, 45:5, 45:12,
    45:16, 53:4, 53:16,
    54:22, 56:7
**designations** [5] -
    34:21, 45:19, 46:9,
    53:9, 53:13
**determine** [7] - 26:13,
    26:19, 46:19, 47:18,
    58:10, 65:1, 72:5
**determining** [2] -
    27:1, 71:6
**developed** [1] - 47:17
**dialer** [5] - 36:15,
    45:7, 50:1, 51:20
**dialing** [1] - 36:12
**dictate** [1] - 20:3
**differentiated** [1] -
    24:21
**directly** [2] - 11:5,
    14:17
**director** [2] - 22:4,
    27:3
**disclosed** [2] - 19:22,
    26:11
**disclosures** [1] -
    19:23
**discuss** [2] - 46:14,
    49:3
**discussion** [1] - 65:25
**dispute** [3] - 56:15,
    58:4, 68:19
**disputing** [1] - 58:7
**District** [4] - 1:1, 1:2,
    6:11, 6:12
**divided** [1] - 39:8
**Division** [2] - 1:3, 6:13
**division** [1] - 40:10
**DB** [1] - 50:14
**Doc** [1] - 35:13
**document** [37] - 26:4,
    29:2, 29:6, 29:8,
    29:12, 29:16, 29:19,
    29:23, 30:10, 30:13,
    30:25, 31:2, 31:4,
    31:8, 31:16, 32:2,
    33:8, 33:19, 33:21,
    34:19, 35:8, 38:1,
    45:13, 49:16, 51:21,
    52:24, 55:3, 57:10,
    57:21, 58:14, 59:6,
    59:10, 62:17, 66:5,
    66:13, 66:22, 69:12
**documents** [8] - 44:3,

44:6, 46:11, 46:14,
    56:5, 58:9, 65:1,
    69:6
**dollar** [1] - 53:21
**domain** [1] - 42:17
**done** [1] - 55:12
**Donelson** [4] - 1:21,
    2:9, 4:9, 6:14
**doors** [1] - 40:22
**Doris** [4] - 53:23, 54:3,
    54:11, 54:12
**Doris'** [1] - 54:8
**Dos** [2] - 32:22, 54:13
**down** [6] - 45:10, 52:4,
    52:20, 54:19, 55:14,
    74:7
**Down** [5] - 35:19,
    37:17, 50:9, 54:18,
    55:13
**dozens** [1] - 62:24
**due** [1] - 59:16
**duly** [1] - 7:2
**during** [1] - 68:22
**Dvx** [3] - 36:11, 45:6,
    49:25

E

**e-mail** [6] - 42:12,
    42:20, 42:25, 43:5,
    43:9, 43:12
**e-mailed** [1] - 55:4
**e-mails** [3] - 41:23,
    42:3, 42:9
**E-mails** [1] - 42:1
**E16s** [1] - 37:7
**E30s** [3] - 47:12, 48:4,
    48:8
**Earl's** [1] - 9:1
**East** [1] - 2:5
**Eastern** [2] - 1:3, 6:12
**Edward** [4] - 1:5, 6:7,
    26:15, 26:22
**effect** [1] - 4:17
**ego** [1] - 19:16
**Eight** [2] - 57:11,
    57:14
**either** [1] - 56:16
**employed** [4] - 9:7,
    9:21, 16:9, 43:13
**employee** [5] - 21:14,
    32:13, 37:19, 43:18,
    45:21
**employees** [5] - 20:8,
    36:9, 41:5, 46:1,
    70:8
**employment** [6] -
    11:8, 12:4, 13:6,
    14:1, 14:14, 14:18
**ending** [1] - 73:3

**ends** [1] - 42:25
**engineering** [1] -
    13:24
**entered** [1] - 70:12
**entity** [2] - 19:7, 19:8
**entries** [20] - 35:6,
    35:20, 36:4, 36:8,
    38:2, 44:24, 44:25,
    45:10, 48:25, 51:19,
    51:25, 54:19, 56:15,
    56:16, 70:6, 70:7,
    70:8, 70:23
**entry** [39] - 31:20,
    31:23, 32:6, 32:11,
    32:13, 32:19, 34:6,
    34:9, 34:12, 34:16,
    34:25, 35:1, 36:23,
    37:17, 37:22, 46:17,
    46:18, 47:4, 47:10,
    48:7, 50:5, 50:10,
    50:16, 51:24, 52:5,
    52:22, 52:23, 53:4,
    53:15, 54:6, 55:7,
    55:8, 55:14, 55:18,
    56:5, 56:12, 68:23,
    71:2, 72:8
**Enw** [1] - 32:9
**escrow** [1] - 67:9
**Estate** [2] - 30:1, 40:1
**evidence** [2] - 5:5, 8:5
**examination** [3] -
    70:3, 71:12, 72:3
**Examination** [4] - 3:2,
    3:4, 7:18, 68:10
**examined** [1] - 7:3
**except** [1] - 4:25
**exclusively** [1] - 10:23
**exhibit** [3] - 25:19,
    28:8, 58:22
**Exhibit** [32] - 3:11,
    3:12, 3:13, 3:14,
    3:15, 3:16, 3:17,
    3:18, 3:19, 3:20,
    3:21, 28:10, 30:17,
    30:20, 33:9, 33:12,
    33:17, 34:6, 44:16,
    44:19, 51:5, 51:13,
    52:15, 57:10, 57:13,
    58:14, 58:16, 62:7,
    62:11, 66:6, 66:9,
    69:12
**exhibits** [1] - 69:10
**exists** [1] - 72:22
**experience** [1] - 16:12
**Expires** [1] - 52:9
**explain** [3] - 33:4,
    34:25, 53:18
**Explain** [3] - 23:6,
    38:20, 39:24
**explains** [1] - 38:2

F

**facility** [2] - 41:12,
    43:21
**fact** [3] - 16:8, 30:24,
    60:9
**failure** [2] - 56:22,
    57:3, 61:22
**fair** [1] - 49:19
**familiar** [1] - 55:20,
    56:19
**Fargo** [65] - 2:17, 9:9,
    9:14, 10:25, 11:5,
    11:12, 12:14, 12:25,
    14:18, 16:4, 16:17,
    17:1, 18:6, 18:21,
    18:24, 19:2, 19:13,
    19:19, 20:4, 20:8,
    20:23, 21:14, 21:17,
    21:25, 22:4, 26:25,
    27:5, 27:9, 27:16,
    29:18, 29:22, 30:9,
    31:1, 31:8, 32:16,
    35:24, 37:15, 38:3,
    38:4, 40:7, 40:9,
    41:5, 43:14, 45:20,
    45:25, 47:17, 48:10,
    48:21, 53:12, 54:25,
    56:15, 56:20, 57:1,
    57:5, 60:8, 61:9,
    63:18, 65:11, 65:17,
    67:1, 68:1, 68:18,
    70:9, 70:17, 72:13
**Fargo's** [6] - 16:18,
    29:15, 29:25, 30:5,
    56:8, 60:18
**February** [3] - 13:7,
    13:8, 14:15
**Federal** [1] - 12:23
**fees** [1] - 60:25
**felony** [2] - 15:5, 15:9
**fictitious** [2] - 19:2,
    19:4
**Fidelity** [10] - 23:16,
    23:17, 23:20, 24:21,
    24:23, 27:21, 27:23,
    28:2, 31:5, 44:7
**file** [2] - 10:19, 50:24
**filed** [9] - 6:10, 10:15,
    15:1, 64:2, 66:15,
    66:17, 66:20, 66:24,
    69:19
**files** [2] - 17:8, 42:9
**filing** [2] - 5:9, 64:20
**finance** [1] - 10:9
**Firm** [1] - 2:4
**firm** [4] - 6:13, 10:2,
    12:10, 12:13
**first** [9] - 7:2, 7:24,
    7:25, 8:2, 15:12,

25:21, 30:10, 58:1,
    58:2
**Five** [2] - 51:3, 51:6
**five** [2] - 9:24, 11:13
**floor** [1] - 38:21
**floors** [1] - 39:8
**focused** [1] - 11:24
**folks** [2] - 35:23, 62:25
**follows** [1] - 7:4
**force** [1] - 4:17
**Foreclosed** [1] - 40:3
**foreclosed** [1] - 40:4
**foregoing** [2] - 74:6,
    74:10
**form** [6] - 4:25, 8:6,
    49:7, 61:16, 63:15,
    64:23
**formerly** [1] - 65:11
**forms** [1] - 18:11
**forth** [1] - 1:24
**forwarded** [1] - 32:21
**Four** [3] - 44:16, 44:17,
    44:20
**four** [1] - 16:9
**Frederick** [2] - 8:23,
    9:1
**Fsd** [1] - 54:21
**full** [3] - 4:17, 7:21,
    22:18

G

**gather** [1] - 8:5
**Geesing** [3] - 9:23,
    10:3, 12:17
**general** [1] - 11:25
**General** [1] - 12:2
**Generally** [1] - 8:12
**generated** [1] - 30:25
**given** [3] - 15:12,
    53:13, 74:12
**goal** [1] - 10:12
**govern** [1] - 18:9
**grounds** [1] - 5:3
**guess** [1] - 64:14

H

**half** [1] - 52:3
**handbook** [1] - 17:16
**handed** [1] - 69:12
**handled** [2] - 27:20,
    55:16
**handling** [1] - 17:8
**Haz** [1] - 34:22
**hazard** [3] - 34:23,
    35:1, 39:19
**head** [2] - 39:3, 57:8
**heard** [1] - 25:15

ASSOCIATED COURT REPORTERS, LLC

(205) 251-4227 / FAX (205) 251-4224          78

hearing [1] - 74:13
held [1] - 66:1
helpful [2] - 8:13, 8:14
hereby [1] - 74:5
herein [1] - 1:24
Higgins [2] - 2:14, 6:18
Highway [3] - 13:12, 14:6, 14:11
highway [1] - 13:22
Hipc [1] - 35:16
histories [1] - 24:1
history [7] - 47:6, 50:20, 50:23, 55:1, 55:5, 65:6, 69:22
holders [1] - 42:5
home [1] - 36:19
huh's [1] - 8:17
huh-uh's [1] - 8:17
Hundred [3] - 25:13, 25:16, 25:23
hundred [2] - 39:6, 39:7
hung [1] - 47:8

**I**

Id [2] - 35:10, 35:13
idea [3] - 34:16, 47:21, 72:16
identification [11] - 28:12, 30:22, 33:14, 44:21, 51:7, 51:15, 52:17, 57:15, 58:18, 62:13, 66:11
identifier [1] - 50:15
identifies [1] - 31:24
identify [3] - 32:16, 45:25, 46:5
li [1] - 13:16
imaged [2] - 31:25, 33:2
immediately [1] - 12:13
Immediately [1] - 13:10
improper [1] - 59:15
inaccurate [1] - 70:21
inches [1] - 20:18
incident [1] - 71:16
include [1] - 67:8
includes [2] - 28:18, 60:24
including [1] - 28:19
incorrect [1] - 60:9
Index [1] - 3:25
indicate [2] - 31:8, 57:23
indicated [1] - 51:25

indicates [1] - 45:16
indicating [2] - 28:3, 31:24
individual [2] - 42:4, 70:6
individually [1] - 14:24
information [15] - 9:18, 23:21, 23:24, 24:24, 25:2, 26:3, 27:1, 27:4, 27:6, 27:8, 27:12, 72:5, 72:11, 72:14, 72:19
initial [2] - 16:22, 22:21
initials [6] - 31:25, 32:17, 35:2, 36:24, 37:18, 52:5
inquire [1] - 56:25
inquiries [1] - 18:10
insignificance [1] - 47:22
installments [1] - 67:8
instance [1] - 41:24
instances [1] - 36:9
instructed [1] - 43:4
insurance [5] - 28:21, 34:23, 59:15, 59:21, 60:12
intention [1] - 60:20
interaction [2] - 41:4, 41:17
interest [3] - 51:17, 65:18, 67:9
interested [1] - 13:24, 74:18
internal [4] - 24:3, 30:25, 42:7, 47:16
internet [1] - 17:24
interpret [5] - 46:22, 47:13, 48:8, 49:22, 50:18
interrogatories [3] - 15:20, 25:20, 25:25
Interrogatory [1] - 15:24
introduce [1] - 6:21
investigation [1] - 71:15
involve [1] - 11:20
irrespective [1] - 21:20
island [1] - 41:21
issue [2] - 64:10, 64:14
issued [1] - 60:15
It'll [1] - 36:21
itself [1] - 29:2

**J**

Jefferson [1] - 74:3
job [6] - 9:13, 11:12, 11:16, 15:16, 23:20, 64:12
Joel [1] - 11:17
July [4] - 1:20, 4:11, 6:2, 31:21
June [1] - 54:20

**K**

keep [3] - 19:23, 42:3, 52:20
Keith [2] - 2:10, 7:15
kin [1] - 74:16
Kline [4] - 22:7, 22:9, 27:14
knowledge [2] - 25:7, 70:25
knowledgeable [5] - 16:1, 16:4, 21:25, 26:25, 48:1
known [1] - 65:12
knows [1] - 53:12

**L**

labeled [1] - 51:10
lack [1] - 19:15
Lafayette [1] - 2:5
Large [1] - 4:8
last [6] - 22:11, 37:17, 37:22, 43:23, 43:25, 54:9
late [1] - 60:25
law [2] - 6:13, 12:9
Law [1] - 2:4
laws [1] - 4:18
lawsuit [6] - 14:21, 15:21, 55:19, 55:24, 56:21
lawyer's [1] - 70:16
leading [1] - 5:1
leave [1] - 36:21
leaves [1] - 36:20
left [9] - 11:4, 12:8, 14:9, 34:19, 41:10, 44:1, 44:24, 56:7, 71:23
legal [1] - 19:8
Legal [3] - 61:16, 63:16, 64:23
less [2] - 16:9, 41:20
letter [12] - 28:19, 29:21, 31:23, 31:25, 32:21, 33:4, 34:5, 34:20, 52:9, 53:6,

58:1, 58:2
Letters [1] - 63:3
letters [10] - 32:1, 32:8, 34:12, 34:13, 36:8, 37:6, 45:6, 62:24, 63:6, 63:8
line [8] - 48:15, 49:3, 49:4, 49:20, 49:24, 50:3, 50:18, 58:1
lines [3] - 49:17, 49:21, 58:2
Litq [1] - 53:20
literally [1] - 62:24
litigation [22] - 9:8, 9:13, 9:16, 9:20, 11:5, 15:16, 16:22, 17:7, 21:9, 22:12, 22:16, 30:14, 37:12, 39:10, 40:16, 40:23, 41:3, 53:20, 54:1, 55:9, 55:23, 63:20
Litigation [1] - 22:20
live [1] - 36:19
loan [19] - 23:22, 23:23, 24:24, 42:4, 47:2, 47:18, 55:1, 55:2, 58:6, 59:22, 61:9, 61:14, 63:1, 64:16, 67:16, 67:23, 71:1, 71:8, 72:7
loans [3] - 9:15, 9:16, 10:17
located [1] - 6:13
log [6] - 49:2, 68:13, 68:24, 69:8, 70:15, 72:4
Log [1] - 44:9
look [7] - 29:4, 37:2, 49:11, 49:15, 51:11, 62:16, 66:7
Lori [5] - 1:19, 2:23, 4:7, 6:17, 74:21

**M**

Ma'am [1] - 7:20
ma'am [1] - 9:4
mail [6] - 42:12, 42:20, 42:25, 43:5, 43:9, 43:12
mailed [2] - 28:16, 55:4
mails [4] - 41:23, 42:1, 42:3, 42:9
maintain [1] - 27:17
maintains [1] - 58:10
man [2] - 44:1
manual [10] - 17:13, 17:21, 17:23, 18:13, 20:10, 20:14, 20:17,

20:20, 38:6, 38:8
Marc [2] - 22:7, 22:9
Marc's [2] - 22:8, 22:11
March [3] - 9:12, 14:16
mark [13] - 25:19, 28:7, 33:9, 34:1, 49:14, 51:2, 51:9, 52:12, 57:10, 58:13, 62:6, 62:7
marked [14] - 28:11, 30:17, 30:21, 33:13, 44:4, 44:20, 51:6, 51:14, 52:16, 57:14, 58:17, 62:12, 66:6, 66:10
Maryland [9] - 8:23, 9:2, 9:24, 13:12, 13:17, 13:18, 14:5, 14:11, 54:17
material [1] - 70:20
matter [1] - 6:7
Md [1] - 54:16
mean [5] - 34:13, 37:4, 38:2, 62:23, 68:17
means [14] - 35:11, 37:8, 37:24, 47:14, 48:1, 48:4, 48:7, 48:13, 50:7, 50:14, 53:22, 64:5, 64:19, 74:9
Mel [1] - 52:6
members [1] - 41:1
memorialize [1] - 45:19
message [2] - 36:20, 36:21
messages [1] - 41:24
Microsoft [1] - 42:15
mid [1] - 45:10
Middle [2] - 1:2, 6:12
might [2] - 26:14, 26:20
minute [3] - 52:12, 65:11, 65:21
minutes [1] - 71:25
monitor [2] - 9:15, 10:17
Monitoring [3] - 25:13, 25:16, 25:23
month [1] - 47:1
monthly [1] - 67:8
months [4] - 16:9, 41:15, 67:11, 67:14
mortgage [19] - 10:19, 18:15, 20:4, 21:18, 21:22, 22:25, 56:22, 57:3, 57:6, 57:20, 57:24, 60:2, 60:20,

62:3, 62:8, 67:7,
67:10, 70:11, 72:12
mortgager [1] - 62:20
mortgages [5] - 16:3,
16:6, 16:14, 16:19,
17:1
most [7] - 15:25, 16:4,
21:25, 25:6, 26:25,
47:25, 53:12
motion [1] - 69:19
motions [2] - 10:20
moves [1] - 47:4
moving [2] - 41:12,
43:20
multi [1] - 38:25
multi-story [1] - 38:25
must [1] - 64:20

## N

name [23] - 7:21, 10:1,
12:16, 15:25, 19:2,
19:5, 19:6, 20:20,
21:1, 22:8, 22:11,
23:12, 23:14, 24:14,
25:9, 38:13, 42:11,
42:18, 43:14, 54:9,
54:14, 65:14, 68:5
nature [1] - 47:19
nearest [1] - 40:15
necessary [1] - 4:23
need [1] - 44:12
never [1] - 46:8
new [2] - 41:12, 43:21
next [5] - 36:7, 37:17,
47:4, 48:7, 55:13
Nicholas [1] - 2:4
Nick [1] - 7:12
Nine [2] - 58:14, 58:17
normally [1] - 15:15
North [2] - 2:10, 6:15
Norwest [1] - 65:12
note [4] - 49:2, 61:24,
62:5, 62:8
Notes [1] - 44:9
notes [8] - 24:5,
46:19, 68:13, 68:20,
68:24, 69:8, 70:15,
72:4
Nothing [1] - 71:10
nothing [1] - 48:16
notice [2] - 5:9, 57:18
notices [1] - 63:4
November [3] - 57:25,
67:12, 69:23
Number [14] - 3:4,
6:10, 28:8, 28:11,
30:21, 33:13, 44:20,
51:6, 51:14, 52:16,
57:14, 58:17, 62:12,

66:10
number [9] - 6:5,
15:24, 25:22, 26:7,
31:13, 44:4, 53:5,
56:7, 73:3
numbered [2] - 29:1,
30:15
numbers [1] - 29:3,
36:25, 42:4
numeric [1] - 36:4

## O

o'clock [1] - 6:4
oath [1] - 7:3
Object [4] - 49:7,
61:15, 63:15, 64:22
objection [2] - 63:25,
64:8
objections [2] - 4:24,
5:2
occurs [1] - 62:20
October [6] - 28:17,
29:23, 31:10, 59:4,
67:12, 69:23
Ocwen [13] - 12:23,
12:24, 13:3, 13:6,
13:10, 55:1, 55:4,
57:19, 59:14, 65:7,
65:18, 67:23
offered [1] - 5:5
Offices [2] - 1:20, 4:8
Ofq [1] - 55:15
One [5] - 25:13, 25:16,
25:23, 28:8, 28:11
one [11] - 6:5, 33:25,
34:4, 44:13, 50:10,
51:2, 51:9, 51:11,
73:3
one's [1] - 44:4
ones [3] - 34:2, 34:3,
41:10
open [1] - 40:19
Open [1] - 50:19
operate [1] - 24:25
operator [2] - 35:3,
52:6
opportunity [1] -
69:14
order [2] - 10:19,
13:23
organization [1] -
13:21
originals [1] - 34:1
Outlook [2] - 42:13,
42:15
outreach [1] - 13:22
outset [1] - 26:11
outside [1] - 40:19
owe [1] - 60:11

owed [1] - 10:15
own [6] - 39:11, 39:15,
39:17, 39:19, 40:22
Own [1] - 40:1
owned [1] - 38:3
ownership [1] - 65:18

## P

page [13] - 31:20,
32:1, 34:21, 37:18,
44:2, 44:23, 45:10,
48:24, 49:25, 50:10,
51:18, 52:11
Page [1] - 3:4
pages [3] - 28:18,
28:21, 28:23
paid [1] - 59:22
paper [1] - 58:22
paragraph [1] - 67:5
paralegal [4] - 9:23,
11:9, 11:21, 13:4
parenthesis [1] -
37:23
part [6] - 8:16, 15:15,
16:21, 30:14, 37:11,
63:5
particular [1] - 51:17
parties [4] - 4:4, 5:2,
8:5, 74:17
pay [2] - 61:23, 62:21
payable [1] - 67:7
payment [7] - 24:1,
28:23, 47:6, 55:5,
60:1, 65:5, 69:22
payments [4] - 18:14,
20:3, 47:1, 67:10
Pc [2] - 2:4, 2:9
Pencor [1] - 34:13
pending [1] - 32:20
people [2] - 10:10,
10:15, 39:4
Percent [3] - 25:13,
25:16, 25:23
period [2] - 14:8,
29:20, 67:23
person [21] - 6:22,
15:25, 16:3, 21:17,
21:24, 25:6, 26:24,
27:11, 32:10, 32:16,
36:19, 37:14, 46:5,
47:25, 48:19, 50:16,
53:3, 53:11, 55:15,
56:11, 64:3
person's [4] - 54:21,
63:24
personally [1] - 15:1
petition [5] - 64:10,
67:11, 67:13, 67:18,
69:13

physical [1] - 8:25
place [1] - 65:15
plaintiff [1] - 14:20
Plaintiff [2] - 1:7, 2:3
Plaintiff's [24] - 3:11,
3:12, 3:13, 3:14,
3:15, 3:16, 3:17,
3:18, 3:19, 3:20,
3:21, 28:10, 30:20,
33:12, 44:16, 44:19,
51:5, 51:13, 52:15,
57:13, 58:16, 62:11,
66:9, 69:12
plaintiff's [2] - 68:14,
69:7
Plaintiffs [1] - 7:14
plan [1] - 38:21
pleading [2] - 66:17,
66:24
point [1] - 50:22
policies [9] - 16:2,
16:5, 16:13, 16:18,
18:8, 19:25, 20:1,
20:14, 20:19
policy [3] - 20:10,
20:16, 43:8
portions [1] - 20:9
position [11] - 9:11,
11:4, 12:8, 12:9,
13:13, 29:15, 30:6,
59:13, 59:21, 60:19,
69:4
possible [3] - 45:15,
46:4, 46:7
Possibly [1] - 27:13
possibly [1] - 25:12
Post [2] - 67:13, 67:18
post [2] - 64:10, 67:11
Post-petition [2] -
67:13, 67:18
post-petition [2] -
64:10, 67:11
practice [1] - 11:24
practitioner [3] -
11:23, 12:1, 12:2
preceding [1] - 73:6
preparation [1] -
29:12, 59:6, 65:7
prepare [1] - 46:12
preparing [4] - 29:7,
56:2, 56:24, 60:6
Present [1] - 2:16
presently [1] - 9:7
president [1] - 27:7
previous [1] - 55:24
primarily [1] - 10:5
principle [1] - 67:9
print [2] - 20:9, 20:13
printable [1] - 38:11
printout [1] - 44:7

procedures [11] -
16:2, 16:5, 16:13,
16:18, 18:9, 20:1,
20:2, 20:10, 20:14,
20:17, 20:20
Procedures [1] - 30:2
processed [1] - 54:2
processing [1] - 53:24
produced [3] - 30:13,
34:2, 44:3
production [1] - 25:21
Productions [1] - 2:13
Program [3] - 13:17,
13:19
program [6] - 13:23,
20:25, 21:10, 21:15,
22:23, 22:24
proof [1] - 10:20
properly [2] - 56:22,
57:3
properties [1] - 40:2
property [1] - 28:23
propounded [1] -
15:21
protect [1] - 64:3
provide [3] - 9:18,
26:2, 70:25
provisions [1] - 61:6
pull [1] - 44:2
purchased [1] - 64:15
purchases [1] - 40:5
purchasing [1] - 55:2
purpose [1] - 55:7
pursuant [1] - 1:23
put [2] - 44:13, 61:1
puts [1] - 42:8

## Q

qualified [6] - 18:11,
28:15, 30:3, 31:9,
59:3, 61:13
quarters [1] - 52:3
questions [5] - 4:25,
5:1, 8:18, 64:12,
74:8
quite [1] - 18:18
Qwr [1] - 33:1

## R

Ramsburg [3] - 54:3,
54:5, 54:9
rather [1] - 8:15
Re [3] - 70:3, 71:12,
72:3
Reexamination [3] -
70:3, 71:12, 72:3
read [2] - 46:18, 70:5

reading [2] - 4:14, 45:18
reads [1] - 3:20
**Real**[2] - 30:1, 40:1
realized [1] - 60:8
really [1] - 48:23
reason [3] - 45:24, 59:25, 70:19
receipts [1] - 28:24
receive [9] - 10:18, 17:4, 17:13, 13:22, 23:3, 29:16, 29:18, 37:10, 41:23
received [9] - 17:22, 18:5, 23:7, 29:22, 31:9, 47:3, 55:11, 57:18, 59:2
**Received**[1] - 32:21
receptionist [1] - 11:22
recollection [1] - 70:24
record [10] - 6:2, 7:21, 26:9, 27:23, 42:3, 65:20, 65:23, 66:1, 66:4, 73:2
recorded [1] - 71:16
recording [5] - 25:1, 25:7, 25:10, 28:4, 45:16
recordings [3] - 24:9, 26:14, 26:20
recordkeeping [1] - 42:8
records [6] - 28:3, 68:20, 69:8, 70:17, 71:6, 71:14
recoverable [1] - 53:22
refer [1] - 9:16
referrals [1] - 10:18
referred [3] - 34:5, 36:14, 69:6
referring [1] - 31:23
reflect [1] - 54:24
reflected [1] - 54:6
reflects [1] - 29:2
refresh [1] - 70:24
refunded [1] - 59:16
refunding [1] - 60:24
regarding [5] - 16:17, 24:5, 32:21, 43:6, 55:1
**Regarding**[1] - 33:1
regular [1] - 38:17
relates [1] - 42:3
relating [1] - 4:19
relationship [2] - 12:25, 18:24
relief [1] - 10:20

rely [2] - 70:23, 71:4
remember [1] - 68:13
remove [1] - 60:21
**Req**[3] - 39:23, 39:24, 40:9
rep [2] - 63:18, 71:5
repeat [1] - 26:17
rephrase [1] - 18:20, 59:17, 61:18, 70:13
**Reported**[1] - 2:22
reporter [2] - 6:17, 6:20
**Reporter**[1] - 7:6
**Reporters** [2] - 3:24, 74:1
reporter's [1] - 8:13
repository [1] - 72:11
represent [7] - 7:13, 7:16, 28:14, 29:3, 44:5, 57:17, 58:25
representative [1] - 69:5
represented [1] - 10:8
represents [2] - 53:2, 74:11
request [5] - 25:21, 28:16, 30:3, 31:9, 59:3
requests [1] - 18:11
required [1] - 61:23
research [2] - 32:20, 55:12
reside [1] - 8:22
**Respa**[1] - 61:6
respect [5] - 70:10, 71:1, 71:7, 72:7, 72:11
respective [1] - 4:5
respirabilities [1] - 15:16
respond [3] - 30:2, 30:4, 30:10
responded [2] - 30:6, 68:16
responds [1] - 18:10
response [7] - 55:8, 55:10, 58:23, 59:1, 60:15, 68:17, 69:18
responsibilities [1] - 61:5
responsibility [1] - 30:1
responsible [1] - 56:12
rest [1] - 41:11
result [1] - 74:18
review [4] - 20:11, 56:1, 68:23, 69:14
reviewed [6] - 15:20, 59:9, 63:2, 63:7,

64:25, 65:5
reviewing [18] - 26:4, 29:5, 31:2, 31:16, 32:2, 33:21, 35:8, 44:6, 45:13, 49:16, 51:21, 52:24, 55:3, 57:21, 58:9, 62:17, 66:13, 66:22
rights [1] - 10:6
ring [1] - 17:18
**Risk**[2] - 37:7, 47:13
risk [1] - 47:18
rooms [1] - 41:9
roto [1] - 36:15
rules [1] - 4:18

## S

safe [1] - 56:4
sake [1] - 8:13
saw [1] - 22:11
**Score**[7] - 36:24, 37:4, 47:11, 47:14, 47:23, 49:21, 51:24
second [9] - 25:20, 36:22, 45:2, 46:18, 49:10, 49:15, 50:5, 67:6, 72:1
section [2] - 40:17, 40:18
**Secure**[1] - 67:1
security [1] - 40:22
see [4] - 36:18, 49:11, 57:25, 69:10
senior [2] - 9:22, 22:12
**Sent**[1] - 33:3
sent [12] - 34:3, 34:4, 43:13, 48:25, 50:23, 52:9, 53:23, 54:2, 59:4, 62:23, 63:4, 63:6
sentence [1] - 67:6
separate [3] - 19:7, 24:11, 27:17
separated [1] - 19:18
**September**[2] - 14:2, 14:3
**Ser**[2] - 32:1, 50:10
series [3] - 34:12, 36:25, 44:2
**Service**[1] - 19:1
service [11] - 32:3, 47:8, 50:11, 52:22, 52:23, 55:14, 56:22, 57:3, 57:6, 61:9, 67:23
serviced [2] - 55:13, 63:1
**Services**[1] - 6:9

**Servicing**[12] - 1:11, 18:9, 18:25, 19:9, 19:12, 28:17, 39:17, 59:20, 60:7, 65:6, 68:5, 72:6
servicing [17] - 16:2, 16:6, 16:13, 16:19, 17:1, 21:18, 21:22, 32:25, 35:19, 53:24, 54:15, 54:19, 57:24, 58:5, 61:5, 63:5, 64:15
serving [1] - 57:20
set [4] - 1:24, 38:20, 44:6, 53:8
**Settlement**[1] - 30:2
**Seven**[1] - 52:16
several [3] - 28:18, 28:21, 28:22
**Several**[4] - 20:18, 39:6, 39:7, 41:15
shall [1] - 4:23
**Shanabrook**[8] - 1:16, 1:18, 3:2, 4:6, 6:7, 7:1, 7:22, 8:21
share [1] - 41:8
**Shelly**[3] - 1:6, 26:16, 26:22
**Sherry**[1] - 6:8
show [9] - 25:18, 30:12, 31:22, 33:8, 49:13, 57:9, 62:4, 66:5, 67:21
sic [1] - 6:8
side [3] - 34:19, 34:20, 38:19
signature [1] - 4:14
signed [1] - 25:24
significance [1] - 47:22
simply [1] - 69:7
sit [2] - 59:13, 60:19
sitting [2] - 6:22, 69:21
situation [1] - 46:2
situations [1] - 10:13
**Six**[2] - 51:10, 51:14
sole [1] - 11:22
someone [1] - 50:23
sometime [1] - 67:22
sorry [6] - 13:18, 14:16, 26:17, 49:9, 59:17, 70:13
source [1] - 72:5
**South**[1] - 2:5
special [1] - 20:23
specialist [13] - 9:8, 9:14, 9:20, 11:6, 15:17, 16:23, 17:8, 21:10, 22:12, 22:16,

37:12, 39:11, 63:21
species [1] - 15:8
specific [2] - 11:25, 21:1
spell [1] - 22:8
spelled [1] - 21:7
stack [1] - 69:11
stamp [1] - 30:15
stamped [1] - 62:9
stand [6] - 21:5, 23:17, 32:1, 32:9, 35:7, 54:13
**Standby**[1] - 65:22
stands [3] - 33:7, 35:14, 35:17
staplers [1] - 58:23
start [2] - 12:12, 49:13
**State**[5] - 4:7, 13:12, 14:5, 14:11, 74:3
state [4] - 7:20, 13:22, 15:25, 54:16
statements [1] - 28:25
**States**[2] - 1:1, 6:11
states [2] - 46:24, 55:4
stenotype [1] - 74:7
still [1] - 64:1
**Stipulated**[4] - 4:3, 4:13, 4:22, 5:8
stipulations [2] - 1:24, 7:8
story [5] - 38:25, 39:1, 39:2, 39:5, 41:6
**Street**[2] - 2:10, 6:15
subdivision [1] - 19:19
sued [3] - 14:23, 56:21, 57:2
suit [1] - 57:2
**Suite**[2] - 2:10, 6:16
summons [1] - 55:19
supervisor [6] - 22:5, 22:13, 22:15, 22:20, 27:13, 38:15
swear [1] - 6:23
sworn [2] - 6:19, 7:2
system [21] - 22:1, 23:9, 23:11, 23:15, 24:11, 24:15, 24:18, 24:20, 24:22, 24:23, 25:1, 25:7, 25:10, 27:17, 36:12, 36:13, 42:8, 42:12, 43:5, 44:8, 47:16
**System**[2] - 25:13, 25:24

## T

tape [3] - 6:5, 71:22, 73:3

tax [1] - 28:23
technology [4] - 27:4, 27:8
telephone [1] - 26:9
ten [1] - 6:3
Ten [2] - 62:7, 62:12
term [4] - 19:16, 25:15, 47:22, 70:16
terms [4] - 35:6, 61:13, 61:24, 62:2
testified [1] - 7:3
testify [1] - 29:13
testimony [4] - 11:3, 15:11, 19:24, 74:12
Thatd [1] - 67:3
theft [1] - 15:8
themselves [2] - 6:21, 56:17
Theresa [1] - 7:22
thereto [2] - 5:6, 74:8
thick [1] - 20:18
thousand [1] - 13:8
three [6] - 17:18, 34:20, 36:8, 45:10, 52:3, 67:5
Three [2] - 33:9, 33:13
three-ring [1] - 17:18
title [1] - 22:18
titled [1] - 44:8
today [8] - 22:19, 29:13, 46:9, 56:25, 59:13, 59:20, 60:19, 69:22
Todays [1] - 6:2
took [1] - 68:1
top [10] - 34:21, 36:23, 44:2, 44:14, 46:17, 47:9, 50:5, 51:24, 52:22, 57:8
Trac [3] - 13:17, 13:19
track [1] - 38:20
trade [2] - 19:5, 19:6
trained [1] - 43:4
trainer [1] - 22:3
training [23] - 16:17, 16:22, 16:25, 17:3, 17:11, 18:6, 20:25, 21:10, 21:14, 21:17, 22:4, 22:21, 22:22, 23:2, 23:3, 23:6, 24:22, 37:10, 37:11, 38:5, 38:8, 48:9, 48:20
Training [1] - 23:8
trans [1] - 47:7
transcribed [1] - 74:9
transcript [1] - 74:11
transcription [1] - 74:10
transfers [1] - 36:19

trial [1] - 5:4
tried [1] - 47:7
triggered [1] - 63:23
true [1] - 74:11
try [2] - 10:14, 49:3
trying [1] - 35:25
Tuesday [2] - 1:20, 4:11
two [8] - 13:8, 15:24, 28:24, 33:18, 41:6, 54:19, 58:2, 67:14
Two [6] - 30:17, 30:21, 33:17, 34:6, 39:1, 39:2
type [5] - 10:9, 17:16, 20:22, 23:3, 23:4

## U

uh's [1] - 8:17
uh-huh's [1] - 8:17
ultimate [1] - 59:1
under [7] - 7:2, 30:1, 43:14, 61:5, 61:13, 61:23, 62:2
Under [1] - 68:4
unemployed [1] - 14:7
unidentified [1] - 45:21
unified [1] - 19:18
United [2] - 1:1, 6:11
unto [1] - 41:21
up [7] - 18:22, 38:20, 47:8, 52:20, 53:9, 59:19, 66:16
Up [2] - 47:9, 59:20
usual [1] - 7:7

## V

verses [1] - 6:9
vice [1] - 27:7
Video [1] - 2:13
videographer [1] - 6:18
Videographer [7] - 2:12, 6:1, 65:22, 66:3, 71:20, 71:24, 73:1
videotaped [1] - 6:6
Vks [1] - 37:18
vs [1] - 1:9

## W

waived [2] - 4:16, 5:10
waiver [1] - 55:19
Ward [3] - 9:23, 10:3, 12:17

web [6] - 17:25, 18:3, 20:2, 20:10, 38:8, 42:11
Wells [71] - 2:17, 9:9, 9:14, 10:25, 11:5, 11:12, 12:14, 12:25, 14:18, 16:3, 16:17, 17:1, 18:6, 18:21, 18:24, 19:2, 19:13, 19:19, 20:4, 20:8, 20:23, 21:14, 21:17, 21:25, 22:4, 26:24, 27:5, 27:9, 27:16, 29:15, 29:18, 29:22, 29:25, 30:5, 30:9, 30:25, 31:8, 32:15, 35:24, 37:15, 38:3, 38:4, 40:6, 40:9, 41:5, 43:14, 45:20, 45:24, 47:17, 48:9, 48:20, 53:12, 54:25, 56:8, 56:15, 56:20, 57:1, 57:5, 60:8, 60:18, 61:8, 63:18, 65:11, 65:17, 67:1, 68:1, 68:18, 70:8, 70:17, 72:13
Wellsfargo.com [2] - 43:1, 43:2
whole [3] - 20:13, 44:23, 48:15
Witness [17] - 26:4, 29:5, 31:2, 31:16, 32:2, 33:21, 35:8, 39:3, 45:13, 49:16, 51:21, 52:24, 55:3, 57:21, 62:17, 66:13, 66:22
witness [4] - 4:15, 6:19, 6:23, 74:12
Wooten [11] - 2:4, 2:4, 7:9, 7:12, 7:13, 7:19, 19:21, 70:3, 71:22, 72:1, 72:3
Wooten.....................
.6 [1] - 3:5
Word [1] - 3:25
works [1] - 42:24
world [1] - 8:16
write [1] - 52:19
written [6] - 8:6, 18:11, 28:15, 30:3, 31:9, 59:3
Wyman [2] - 2:14, 6:18

## Y

y'all [10] - 10:8, 34:3, 36:18, 41:8, 41:20, 42:14, 58:24, 62:23,

67:3, 69:11
years [2] - 9:25, 11:13
yourself [1] - 41:21
youth [1] - 13:23



**7485 NEW HORIZON WAY**
**FREDERICK, MD 21703**

July 18, 2005

Edward H Alewine
Shelly M Alewine
1102 Alewine Dr
Valley AL 36854

                                    RE:  Loan Number    1099003191
                                         Client 106

Dear Edward H Alewine and Shelly M Alewine :

A review of your account indicates that your account has an escrow
deficiency for the payment of taxes and/or lender placed insurance
in the amount of $636.90.  These funds were advanced by us on your
behalf.  We have adjusted your payment to spread this amount over
12 payments beginning with your payment due October 01, 2005.  Your new
payment amount is as follows:

        Principal & Interest            $      382.85
        Escrow Deficiency Spread               53.08

        Total Payment                   $      435.93

We have not established an escrow account for future payments of
taxes and/or insurance.  If you would like to have an escrow account
for the payment of these items, please forward a written request
along with copies of your tax bills and insurance policy to the
following address:

        ASC
        PO Box 10388
        Des Moines  IA  50306-0388

Should you have additional questions, please call our Customer
Relations Department at 800-842-7654.  A representative will be able
to assist you 9:00 AM to 6:00 PM, Eastern Time, Monday through
Friday.  You may also obtain information about your loan through
our automated Personal Mortgage Information Line, 24 hours a day,
365 days a year.

Sincerely,

ASC

                                    AN005/VS1





**FOREMOST**
INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN
A Stock Company

Policy Number: **103 - 0647377706 - 02**

# MOBILE HOME
## DECLARATIONS PAGE

**YOU AS NAMED INSURED AND YOUR ADDRESS:**

EDWARD ALEWINE
1102 ALEWINE DR
VALLEY AL 36854-4353

| POLICY INFORMATION | Policy Period: From 08/20/02 To 08/20/03 12:01 A.M. STANDARD TIME |
|---|---|
| Policy Number: 103-0647377706-02 | Renewal Of: |

| MOBILE HOME LOCATION | Park Name: | |
|---|---|---|
| Address: 1102 ALEWINE DR VALLEY AL 36854 | In City Limits: YES | |
| | County: CHAMBERS | |

| MOBILE HOME INFORMATION | Width: 24 | Length: 60 | Serial Number: 4116 |
|---|---|---|---|
| Model Year: 1986 | Manufacturer/ Model: HORTON | | |

| RATING INFORMATION | Use: PRIMARY | | Customer Age Group: UNDER 50 |
|---|---|---|---|
| Approved Park: NO | Auxiliary Heating Device: NO | Tied Down: YES | Age Of Home: 16 Years |

**YOUR POLICY IS SERVICED BY:**

TELEPHONE: (334) 749-7200

Agency Code: 01-9200-161-0

JAMES ANTHONY ROGERS
2104 FREDERICK RD
OPELIKA AL 36801-7216

**LIENHOLDER #1**
Loan Number
OCWEN FED BANK
ISAOA
PO BOX 57002
IRVINE CA 92619

EXHIBIT
B-1

HOME OFFICE - 5600 BEECH TREE LANE P.O. BOX 2450 CALEDONIA MI 49316

**FOREMOST**
INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN
A Stock Company

Policy Number: **103 - 0647377706 - 03**

# MOBILE HOME
## DECLARATIONS PAGE

**YOU AS NAMED INSURED AND YOUR ADDRESS:**

EDWARD ALEWINE
1102 ALEWINE DR
VALLEY AL 36854-4353

| POLICY INFORMATION | Policy Period: From 08/20/03 To 08/20/04 12:01 A.M. STANDARD TIME |
|---|---|
| Policy Number: 103-0647377706-03 | Renewal Of: 103-0647377706-02 |

| MOBILE HOME LOCATION | Park Name: | |
|---|---|---|
| Address: 1102 ALEWINE DR VALLEY AL 36854 | In City Limits: YES | |
| | County: CHAMBERS | |

| MOBILE HOME INFORMATION | Width: 24 | Length: 60 | Serial Number: 4116 |
|---|---|---|---|
| Model Year: 1986 | Manufacturer/ Model: HORTON | | |

| RATING INFORMATION | Use: PRIMARY | Customer Age Group: 50 OR OVER | |
|---|---|---|---|
| Approved Park: NO | Auxiliary Heating Device: NO | Tied Down: YES | Age Of Home: 17 Years |

**YOUR POLICY IS SERVICED BY:**

TELEPHONE: (334) 749-7200
Agency Code: 01-9200-161-0

JAMES ANTHONY ROGERS
2104 FREDERICK RD
OPELIKA AL 36801-7216

**LIENHOLDER #1**
**Loan Number**
OCWEN FED BANK
ISAOA
PO BOX 57002
IRVINE CA 92619

IF PAYMENT IS RECEIVED BY 08/20/03 THIS WILL BE YOUR RENEWAL DECLARATIONS PAGE.

EXHIBIT
B-2
Blumberg No. 5119



**FOREMOST**
INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN
A Stock Company

Policy Number:  **103 - 0647377706 - 04**

# MOBILE HOME
## DECLARATIONS PAGE

**YOU AS NAMED INSURED AND YOUR ADDRESS:**

EDWARD ALEWINE
1102 ALEWINE DR
VALLEY AL 36854-4353

| POLICY INFORMATION | Policy Period: From 08/20/04 To 08/20/05 12:01 A.M. STANDARD TIME |
|---|---|
| Policy Number: 103-0647377706-04 | Renewal Of: 103-0647377706-03 |

| MOBILE HOME LOCATION | Park Name: | |
|---|---|---|
| Address: 1102 ALEWINE DR VALLEY AL 36854 | In City Limits: YES | |
| | County: CHAMBERS | |

| MOBILE HOME INFORMATION | Width: 24 | Length: 60 | Serial Number: 4116 |
|---|---|---|---|
| Model Year: 1986 | Manufacturer/ Model: | HORTON | |

| RATING INFORMATION | Use: PRIMARY | Customer Age Group: 50 OR OVER |
|---|---|---|
| Approved Park: NO | Auxiliary Heating Device: NO | Tied Down: YES | Age Of Home: 18 Years |

**YOUR POLICY IS SERVICED BY:**

TELEPHONE: (334) 749-7200
Agency Code: 01-9200-161-0

JAMES ANTHONY ROGERS
2104 FREDERICK RD
OPELIKA AL 36801-7216

**LIENHOLDER #1**
**Loan Number**
OCWEN FED BANK
ISAOA
PO BOX 57002
IRVINE CA 92619

IF PAYMENT IS RECEIVED BY 08/20/04 THIS WILL BE YOUR RENEWAL DECLARATIONS PAGE.

EXHIBIT
B-3
Blumberg No. 5119



**FOREMOST**
INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN
A Stock Company

Policy Number:  **103 - 0647377706 - 05**

# MOBILE HOME
## DECLARATIONS PAGE

**YOU AS NAMED INSURED AND YOUR ADDRESS:**

EDWARD ALEWINE
1102 ALEWINE DR
VALLEY AL 36854-4353

| POLICY INFORMATION | Policy Period: From  08/20/05 To 08/20/06 12:01 A.M. STANDARD TIME | |
|---|---|---|
| Policy Number:  103-0647377706-05 | Renewal Of:  103-0647377706-04 | |

| MOBILE HOME LOCATION | Park Name: | |
|---|---|---|
| Address: 1102 ALEWINE DR VALLEY AL 36854 | In City Limits: YES | |
| | County: CHAMBERS | |

| MOBILE HOME INFORMATION | Width:  24 | Length: 60 | Serial Number:  4116 |
|---|---|---|---|
| Model Year:  1986 | Manufacturer/ Model:  HORTON | | |

| RATING INFORMATION | Use: PRIMARY | | Customer Age Group: 50 OR OVER |
|---|---|---|---|
| Approved Park: NO | Auxiliary Heating Device: NO | Tied Down:  YES | Age Of Home:  19 Years |

**YOUR POLICY IS SERVICED BY:**

JAMES ANTHONY ROGERS
2104 FREDERICK RD
OPELIKA AL 36801-7216

**TELEPHONE:**  (334) 749-7200
**Agency Code:** 01-9200-161-0

**LIENHOLDER #1**
**Loan Number**
OCWEN FED BANK
ISAOA
PO BOX 6723
SPRINGFIELD OH 45501

IF PAYMENT IS RECEIVED BY 08/20/05 THIS WILL BE YOUR RENEWAL DECLARATIONS PAGE.

EXHIBIT
B-4

Wendy Williams
Revenue Commissioner
#2 LaFayette Street
LaFayette                    Al        36862

*Decal # 1 8 3 2 0*

# PAID

Address Service Requested

Alewine, Edward H. Jr. &

Shelly M.

P.O. Box 855

Valley          Al      36854

| | |
|---|---|
| Tax Bill For Year | 2000 |
| Receipt/Bill Number | 15,104 |
| Account Number | 000328 |
| Assessed Value | 3,160 |
| State & County Tax | $38.61 |
| Municipal Tax | $0.00 |
| School Tax | $12.96 |
| Exemptions | $51.14 |
| Other Fees | 0.00 |
| Timber | 0.00 |
| **TOTAL AMOUNT DUE** | $51.57 |

| Paid Tax Receipt |
|---|
| 12/29/2000 |
| 11:09:35 AM |
| Clerk: Ruth |
| Check No.: |
| Amt Paid: 51.57 |
| Account Number |
| 000328 |
| Receipt/Bill Number |
| 15,104 |
| **Total Amount Due** |
| $51.57 |

Please tell us if your address or your
exemption status has changed so we
can update your account.

IF YOUR ADDRESS, EXEMPTION STATUS CHANGED OR YOU HAVE A MOBILE HOME ON YOUR PROPERTY PLEASE TELL
**CUSTOMER COPY**
1809292001003002

---

Wendy Y. Williams
Revenue Commissioner
#2 LaFayette Street
LaFayette Al   36862

# PAID

Address Service Requested

Alewine, Edward H. Jr. &

Shelly M.
P.O. Box 855
Valley  Al  36854

| | |
|---|---|
| Tax Bill For Year | 2001 |
| Receipt Number | 9489 |
| Account Number | 000336 |
| Assessed Value | 3,160 |
| State & County Tax | $38.61 |
| Municipal Tax | $0.00 |
| School Tax | $12.96 |
| Exemptions | $51.14 |
| Other Fees | 0.00 |
| Timber | $0.00 |
| TOTAL AMOUNT DUE | $51.57 |

| PAID TAX RECEIPT |
|---|
| 12/7/2001  9:18:37 AM |
| Clerk:  Dru |
| Check No.: |
| PaidBy : |
| Alewine, Edward H. Jr. & |
| Amount Paid |
| $51.57 |
| Payments |
| $51.57 |
| Balance Due |
| $0.00 |

IF YOUR ADDRESS , EXEMPTION STATUS OR YOU HAVE A MANUFACTURED HOME ON YOUR PROPERTY PLEASE TELL US
**CUSTOMER COPY**    PN:  / 1809292001003002              MH:   017463

---

Wendy Williams
Revenue Commissioner
#2 LaFayette Street
LaFayette AL 36862

# PAID

Address Service Requested

Alewine, Edward H. Jr. &

Shelly M.
P.O. Box 855
Valley  AL  36854

| | |
|---|---|
| Tax Bill For Year | 2002 |
| Receipt Number | 12127 |
| Account Number | 000336 |
| Assessed Value | 3,140 |
| State & County Tax | $17.44 |
| Municipal Tax | $0.00 |
| School Tax | $33.59 |
| Exemptions | $51.01 |
| Other Fees | 0.00 |
| Timber | $0.00 |
| TOTAL AMOUNT DUE | $51.03 |

| PAID TAX RECEIPT |
|---|
| 12/19/2002  9:14:44 AM |
| Clerk:  Dru |
| Check No.: |
| PaidBy : |
| Alewine, Edward H. Jr. & |
| Amount Paid |
| $51.03 |
| Payments |
| $51.03 |
| Balance Due |
| $0.00 |

IF YOUR ADDRESS , EXEMPTION STATUS OR YOU HAVE A MANUFACTURED HOME ON YOUR PROPERTY PLEASE TELL US
**CUSTOMER COPY**    PN:  / 1809292001003002              MH:   017858

EXHIBIT
C-1

**WENDY Y. WILLIAMS, REVENUE COMMISSIONER, CHAMBERS COUNTY**
**CHAMBERS COUNTY COURTHOUSE**
**#2 LAFAYETTE ST**
**LAFAYETTE, AL 36862**

Parcels: 18-09-29-2-001-003.002-0

| | | MUNICIPAL CODES | OTHER TAXES & FEES<br>FT Forest Tax<br>FF Fire Tax<br>AF Assessor Fee | Receipt No. | 10619 |
|---|---|---|---|---|---|
| TAX YEAR | 2003 | 01 Rural 03 Lanett 04 LaFayette 06 Waverly | | Account No. | 336 |

| | TOTAL STATE COUNTY | HOMESTEAD EXEMPT VALUE ST. & CO. TAX | NET STATE COUNTY TAX | DISTRICT SCHOOL | MUNICIPAL | | OTHER TAXES & FEES | TOTAL TAXES & FEES |
|---|---|---|---|---|---|---|---|---|
| ST | 20.02 | 3080 | 20.02 | 0.00 1 | 12.63 3 | 0.00 | 0.00 AF 0 | 49.49 |
| CO | 47.13 | 2000 | 30.60 | 16.53 2 | 0.00 4 | 0.00 | | |
| CW | 20.33 | 0 | 0.00 | 20.33 3 | 0.00 6 | 0.00 | | |

Beg Decal 19385      End Decal 0           Tax Year 2003

| Value        3080 | Owner Name and Address | Interest | 0.00 |
|---|---|---|---|
| | ALEWINE, EDWARD H. JR. & | Citation | 0.00 |
| Description in Revenue | SHELLY M. | Del. Fee | 0.00 |
| Commissioner's Office | P.O. BOX 855 | Advertising | 0.00 |
| | | P.J. Fee | 0.00 |
| | VALLEY, AL 36854 | Excess Tax | 0.00 |

12/09/2003
DATE PAID
Teller# 60 Paid By ALEWINE, EDWARD

[x] CHECK    [ ] CASH    [ ] MONEY ORDER
Check# 940

GRAND TOTAL    49.49

---

**WENDY Y. WILLIAMS, REVENUE COMMISSIONER, CHAMBERS COUNTY**
**CHAMBERS COUNTY COURTHOUSE**
**#2 LAFAYETTE ST**
**LAFAYETTE, AL 36862**

Parcels: 18-09-29-2-001-003.002-0

| | | MUNICIPAL CODES | OTHER TAXES & FEES<br>FT Forest Tax<br>FF Fire Tax<br>AF Assessor Fee | Receipt No. | 10766 |
|---|---|---|---|---|---|
| TAX YEAR | 2004 | 01 Rural 03 Lanett 04 LaFayette 06 Waverly | | Account No. | 336 |

| | TOTAL STATE COUNTY | HOMESTEAD EXEMPT VALUE ST. & CO. TAX | NET STATE COUNTY TAX | DISTRICT SCHOOL | MUNICIPAL | | OTHER TAXES & FEES | TOTAL TAXES & FEES |
|---|---|---|---|---|---|---|---|---|
| ST | 19.89 | 3060 | 19.89 | 0.00 1 | 12.55 3 | 0.00 | 0.00 AF 0 | 61.33 |
| CO | 56.00 | 2000 | 36.60 | 19.40 2 | 0.00 4 | 0.00 | | |
| CW | 29.38 | 0 | 0.00 | 29.38 3 | 0.00 6 | 0.00 | | |

Beg Decal 0 C20020      End Decal 0           Tax Year 2004

| Value        3060 | Owner Name and Address | Interest | 0.00 |
|---|---|---|---|
| | ALEWINE, EDWARD H. JR. & | Citation | 0.00 |
| Description in Revenue | SHELLY M. | Del. Fee | 0.00 |
| Commissioner's Office | P.O. BOX 855 | Advertising | 0.00 |
| | | P.J. Fee | 0.00 |
| | VALLEY, AL 36854 | Excess Tax | 0.00 |

12/15/2004
DATE PAID
Teller# 19 Paid By ALEWINE, EDWARD

[x] CHECK    [ ] CASH    [ ] MONEY ORDER
Check# 1119

GRAND TOTAL    61.33

EXHIBIT
C-2



Return Mail Operations
America's Servicing Company
P.O. Box 10388
Des Moines, IA 50306-0388

**Monthly Mortgage Statement**

Customer Service
8:00am - 6:00pm M-F (EST)    *Loan Number*
1099003191

*Phone*
(800) 842-7654

*Regular mail payments*
P.O. Box 37297
Baltimore, MD 21297-3297

*Fax*
(866) 453-6315

*Correspondence*
PO Box 10328
Des Moines, IA 50306-0328

#BWNDXCT
#1061099003191091#          001643

EDWARD H ALEWINE
SHELLY M ALEWINE
1102 ALEWINE DR
VALLEY   AL   36854-4353

*Property address*
1102 ALEWINE DR
VALLEY AL 36854

*Principal balance as of 09/22/05* **Important Messages**
$35,687.14

Contact Customer Service
for your payoff balance.

*Interest rate*
11.900%

*Interest paid - year-to-date*
$3,554.16

*DISPUTING ACCOUNT
INFORMATION REPORTED
TO CREDIT BUREAUS:
As your loan servicer, we
furnish information about your
account to credit bureaus. You
have the right to dispute the
accuracy of the information
reported by writing us at the
Correspondence Address noted
on the top of this statement.*

| | |
|---|---|
| Payment (Principal and/or Interest) | **$382.85** |
| Optional Product(s)* | $ .00 |
| Current Monthly Payment | **$382.85** |
| Overdue Payment(s) | $ .00 |
| Unpaid Late Charge(s) | **$18.99** |
| Other Charges | $ .00 |
| **Total Payment Due  09/29/05** | **$401.84** |

**Activity Since Your Last Statement**

| Date | Description | Total | Principal | Interest | Escrow | Late charge | Misc |
|---|---|---|---|---|---|---|---|
| 09/22 PAYMENT | | | $28.67 | $354.18 | | $ .15 | |
| | | | | | | SUSPENSE | $383.00- |
| 09/14 PAYMENT | | $83.00 | | | | SUSPENSE | $83.00 |
| 09/12 PMT REVERSAL | | | | | | SUSPENSE | $300.00 |
| 09/12 PMT REVERSAL | | | $300.00- | | | | |

(Keep upper portion for your records.)

---
Please include this portion with your payment



EDWARD H ALEWINE
SHELLY M ALEWINE
1102 ALEWINE DR
VALLEY   AL   36854

| | |
|---|---|
| **Total Payment Due 09/29/05** | **$401.84** |
| After 10/10/05 Add Late Fee | **$19.14** |
| Total Amount Due After 10/10/05: | **$420.98** |

Please check this
box if changes are
indicated on the
reverse side.

106 Loan Number: 1099003191

Customer Service:  (800) 842-7654

AMERICA'S SERVICING COMPANY
PO BOX 37297
BALTIMORE MD 21297-3297

Please specify additional
funds. Any additional
funds not specified will be
applied first to any
outstanding charges.

| | |
|---|---|
| Monthly Payment ____ x pmt amt | $ ☐☐☐☐☐☐ |
| Late Charges | $ ☐☐☐☐☐☐ |
| Additional Principal | $ ☐☐☐☐☐☐ |
| Additional Escrow | $ ☐☐☐☐☐☐ |
| Other Charges | $ ☐☐☐☐☐☐ |
| Total Amount Enclosed | $ ☐☐☐☐☐☐ |
| (PLEASE DO NOT SEND CASH) | |

106 1099003191 0 10 00 00038285 00040199 00040184 00000000 4

EXHIBIT
D-1



Return Mail Operations
America's Servicing Company
P.O. Box 10388
Des Moines, IA 50306-0388

Monthly Mortgage Statement

Customer Service
8:00am - 6:00pm M-F (EST)

*Phone*
(800) 842-7654

*Fax*
(866) 453-6315

*Loan Number*
1099003191

*Regular mail payments*
P.O. Box 37297
Baltimore, MD 21297-3297

*Correspondence*
PO Box 10328
Des Moines, IA 50306-0328

#BWNDXCT
#1061099003191091#                    005277

EDWARD H ALEWINE
SHELLY M ALEWINE
1102 ALEWINE DR
VALLEY  AL  36854-4353

lullullullullullullullullullullullullulllullull

*Property address*
1102 ALEWINE DR
VALLEY AL 36854

*Principal balance as of 09/26/05*
$35,658.19

Contact Customer Service
for your payoff balance.

**Important Messages**
*DISPUTING ACCOUNT
INFORMATION REPORTED
TO CREDIT BUREAUS:
As your loan servicer, we
furnish information about your
account to credit bureaus. You
have the right to dispute the
accuracy of the information
reported by writing us at the
Correspondence Address noted
on the top of this statement.*

| | |
|---|---|
| Payment (Principal and/or Interest, Escrow) | $435.93 |
| Optional Product(s)* | $ .00 |
| Current Monthly Payment | $435.93 |
| Overdue Payment(s) | $ .00 |
| Unpaid Late Charge(s) | $18.99 |
| Other Charges | $ .00 |
| **Total Payment Due   10/29/05** | **$454.92** |

*Interest rate*
11.900%

*Interest paid - year-to-date*
$3,908.06

*Taxes paid - year-to-date*
$ .00

*Escrow balance*
$636.60-

Activity Since Your Last Statement

| Date | Description | Total | Principal | Interest | Escrow | Late charge | Misc |
|---|---|---|---|---|---|---|---|
| 09/26 | PAYMENT | $383.00 | $28.95 | $353.90 | $ .15 | | |

(Keep upper portion for your records.)

Please Include This Portion With Your Payment



EDWARD H ALEWINE
SHELLY M ALEWINE
1102 ALEWINE DR
VALLEY  AL  36854

| | |
|---|---|
| Total Payment Due 10/29/05 | $454.92 |
| After 11/09/05 Add Late Fee | $19.14 |
| Total Amount Due After 11/09/05: | $474.06 |

Please check this box if changes are indicated on the reverse side.

106 Loan Number: 1099003191

Customer Service:  (800) 842-7654

lullulllllullullullullullullulllulllulllullullullu

AMERICA'S SERVICING COMPANY
PO BOX 37297
BALTIMORE MD 21297-3297

lullullullullullullullullullullullullu

Please specify additional funds. Any additional funds not specified will be applied first to any outstanding charges.

| | |
|---|---|
| Monthly Payment _____ x pmt amt | $ |
| Late Charges | $ |
| Additional Principal | $ |
| Additional Escrow | $ |
| Other Charges | $ |
| Total Amount Enclosed (PLEASE DO NOT SEND CASH) | $ |

106 1099003191 0 10 00 00043593 00045507 00045492 00000000 5

EXHIBIT
D-2

# Wooten Law Firm, P.C.

Nick Wooten

## Trial Lawyers

Mailing Address:
P.O. Drawer 290
LaFayette, Alabama 36862

Tax ID #: 63-1251905
Office: (334) 864-2132
Toll Free 1-877-864-2132
Fax: (334) 864-2133

Street Address:
10 Second Avenue S.E.

October 3, 2005

America's Servicing Company
Qualified Written Request Department
P.O. Box 10328
Des Moines, IA 50306-0388



**In re: Edward H. Alewine, Shelly M. Alewine**
**Property located at 1102 Alewine Drive Valley, Al. 36854-4353**
**Loan Number: 1099003191**

To Whom It May Concern:

    I am writing on behalf of my clients Edward H. Alewine and Shelly M. Alewine. This is a qualified written request pursuant to RESPA (section 2605(e)).

    My clients received a letter dated July 18, 2005 from your offices in Maryland indicating an escrow deficiency. My clients' loan has never had an escrow account. Further, your letter indicates that you charged this previously nonexistent escrow account for force placed insurance. However, my clients have maintained and continue to maintain full coverage insurance on this loan.

    I have enclosed the following items for your consideration: Exhibit "A" is a copy of your letter dated July 18, 2005. Exhibit "B1-B4" are my clients declarations pages for their last four years of insurance which includes coverage through 8/20/2006. Exhibit "C1-C2" are copies of my clients payments of their taxes for the last five years. I note that taxes are not yet due for 2005. Lastly, as Exhibit "D1-D2" I have enclosed for your consideration a copy of the last two months billings on this account which tends to show that the payment amount has been increased by $53.08.

    I make the following requests on behalf of my client:

1.     Please provide me with a complete payment history since you began servicing the loan in question.
2.     Please provide me with a transaction history which shows all actions taken by your firm in regards to this account.
3.     Please provide me with a complete explanation of why you contend that there is not insurance coverage on this loan.
4.     Please provide me with all documentation regarding the insurance placed on this loan by you, including from whom it was purchased, a declarations page, as well as a copy of any agreements between yourself and the insurance company providing said coverage.
5.     As these documents show conclusively that coverage is and has been in effect on this loan since before your company became involved in servicing this mortgage and that there are no taxes due I am requesting on behalf of my clients that you reverse the charges you have made to this

previously nonexistent escrow account and that you return their payment to its appropriate amount of $382.85. Also, I would expect that any charges you posted to their account as a result of these fraudulent charges would be reversed as well.

I would expect that you would provide me this information and make the requested corrections within the time allowed by law. Further, I would expect that you would confirm this to me in writing within the time allowed by law. Thank you in advance for your response that is in conformance with the legal requirements of the RESPA (section 2605(e)).

Sincerely,

Nick Wooten

age: 29 Document Name: untitled

```
NOTS 1099003191          CONSOLIDATED NOTES LOG          02/21/07  11:19:18
CH ALEWINE       L:  F:  B:  R:        DUE 12/29/06   TYPE CONV. RES.
     ANA Y ARM Y ASM Y BLN Y BNK Y CCN Y COL Y ELC Y FOR Y HAZ Y LMT Y
     MIP Y PIF Y PMT Y REO Y SER Y TAX Y TSK Y DATE SELECT: MMDDYY  PRINT:
-----------------------------* PF8 FOR MORE *-----------------------------
HAZ 072006 BJV ID 3011291 DOC ID 7     HIPC                        4INFAX
SER 072006 ENW PENDING CORRESPONDENCE RESEARCH REGARDING:         PENCOR
               LOAN TRANS TO ASC WITH A NEGATIVE ESC BAL IAO $637
               .50, CONTACTED OCWEN TO DETERMINE WHAT ADVANCES WE
               RE FOR AND EFFECTIVE DATES - ALSO FAXED PRROF OF I
               NS TO HIPC SO GAP CAN BE CANCELLED
SER 072006 ENW PENDING CORRESPONDENCE RESEARCH REGARDING:         PENCOR
               RECD LTR FWDED FRM DOS REGARDING QWR DATED 10/3/05
                THAT WAS IMAGED ON 10/17/05 BUT APPEARS WAS NOT A
               DDRESSED - SNT BWU LTR TO ATTY, PULLING HISTS IN O
               RDER TO RESEARCH
COL 071906 DVX DIALR RESIDNT LMTC ANSWER MACH
COL 071106 *** SCORE 007   071106 AGT E16S DAYS DEL 012 RISK E
COL 070306 DVX DIALR RESIDNT LMTC ANSWER MACH
COL 062306 DVX DIALR RESIDNT LMTC ANSWER MACH
COL 062206 VKS DIALR RESIDNT NO ANSWER
COL 062206 (D) DIALR RESIDNT NO ANSWER
```

EXHIBIT
2
Blumberg No. 5119

Alewine v. ASC
**ASC 000261**
ASC Production

ASC

AMERICA'S SERVICING COMPANY

**7495 NEW HORIZON WAY**
**FREDERICK, MD 21703**

EXHIBIT
5
Blumberg No. 5119

July 20, 2006

Wooten Law Firm, P.C.
Nick Wooten
PO Drawer 290
LaFayette, AL 36862

Dear Sir:

RE: Mortgagors: Edward H Alewine / Shelly M Alewine
     Client 106

We have received your request for information on the above
homeowner(s).  While we aim to complete our research requests
within 10 business days, on occasion we are not able to meet
our goal.  Your request should be completed within the next
15 business days.

We sincerely appreciate your patience and understanding while
your request is being processed and researched.  If you have any
questions in the interim, please contact our Customer Relations
department at 800-842-7654, 8 AM to 6 PM, in your time zone,
Monday through Friday.

Sincerely,

ASC

RS255/ENW

age: 1 Document Name: untitled

```
NOTS 1099003191          CONSOLIDATED NOTES LOG          02/21/07  11:17:43
EH ALEWINE      L:  F:  B:  R:      DUE 12/29/06   TYPE CONV. RES.
     ANA Y ARM Y ASM Y BLN Y BNK Y CCN Y COL Y ELC Y FOR Y HAZ Y LMT Y
     MIP Y PIF Y PMT Y REO Y SER Y TAX Y TSK Y DATE SELECT: MMDDYY  PRINT:
----------------------------------------------------------------------------
COL 040505 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 040505 *** SCORE 222   040405 AGT E30S DAYS DEL 035 RISK E
COL 040505 ***  CL747 DAY 35 DEFAULT NOTICE     LETTER SENT
COL 040105 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 033005 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 033005 *** SCORE 168   032905 AGT E30S DAYS DEL 060 RISK F
COL 032805 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 032805 C32 DIALR RESIDNT MRTGR HUNG UP
COL 032805 C32 BWR STTS THAT HE SHOULD BE CURRENT BECAUSE HE MKS H
               IS PYMTS EVERYMONTH BUT I ADV THAT HIS LOAN HAS BEE
               N BEHIND PROBABLY SINCE WE REC HE STTD HE ALREADY
COL 032805 C32 HAD PYMT HIST AND COULDNT UNDERSTAND IT...I TRIED T
               RANS TO C/S BUT BWR H/U
COL 032805 (D) DIALR RESIDNT MRTGR HUNG UP
COL 032505 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 032305 *** SCORE 222   032205 AGT E30S DAYS DEL 053 RISK E
COL 032205 ***  ORIGINAL OWNER      CONDITION ON 031905    MCS
```

EXHIBIT

4

Blumberg No. 5119

Alewine v. ASC
**ASC 000233**
ASC Production

Date: 2/21/2007 Time: 10:20:09 AM

age: 2 Document Name: untitled

```
NOTS 1099003191          CONSOLIDATED NOTES LOG          02/21/07  11:18:19
EH ALEWINE      L:  F:  B:  R:      DUE 12/29/06   TYPE CONV. RES.
      ANA Y ARM Y ASM Y BLN Y BNK Y CCN Y COL Y ELC Y FOR Y HAZ Y LMT Y
      MIP Y PIF Y PMT Y REO Y SER Y TAX Y TSK Y DATE SELECT: MMDDYY  PRINT:
-------------------------------* PF8 FOR MORE *-------------------------------
COL 050505 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 050505 *** SCORE 222   050405 AGT E30S DAYS DEL 037 RISK E
COL 050405 *** SCORE 222   050305 AGT E30S DAYS DEL 036 RISK E
COL 050305 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 050305 *** CL747 DAY 35 DEFAULT NOTICE    LETTER SENT
COL 050205 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 042905 ***  ORIGINAL OWNER        CONDITION ON 042905    MCS
COL 042805 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 042505 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 042505 *** SCORE 222   042205 AGT E30S DAYS DEL 055 RISK E
SER 042105 DL3 OPENED COL24B FOR BK HISTORY.
COL 041805 MEL ACCELERATION  DEMAND LTR SENT    EXPIRES IN 30 DAYS
COL 041805 *** SCORE 222   041505 AGT E30S DAYS DEL 048 RISK E
COL 041305 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 041105 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 041105 *** SCORE 222   040805 AGT E30S DAYS DEL 041 RISK E
COL 040705 DVX DIALR RESIDNT LMTC ON ANS. MACH
```



EXHIBIT
S

Alewine v. ASC
ASC 000234
ASC Production

```
NOTS 1099003191          CONSOLIDATED NOTES LOG           02/21/07  11:18:22
EH ALEWINE      L:  F:  B:  R:       DUE 12/29/06  TYPE CONV. RES.
    ANA Y ARM Y ASM Y BLN Y BNK Y CCN Y COL Y ELC Y FOR Y HAZ Y LMT Y
    MIP Y PIF Y PMT Y REO Y SER Y TAX Y TSK Y DATE SELECT: MMDDYY  PRINT:
-----------------------------* PF8 FOR MORE *--------------------------------
COL 060305 *** CL747 DAY 35 DEFAULT NOTICE   LETTER SENT
COL 053105 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 052705 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 052605 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 052605 *** SCORE 222   052505 AGT E30S DAYS DEL 058 RISK E
COL 052505 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 052505 *** ORIGINAL OWNER      CONDITION ON 052405   MCS
COL 052405 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 052305 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 051905 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 051905 *** SCORE 222   051805 AGT E30S DAYS DEL 051 RISK E
COL 051805 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 051605 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 051605 MEL ACCELERATION  DEMAND LTR SENT    EXPIRES IN 30 DAYS
COL 051305 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 051205 *** SCORE 222   051105 AGT E30S DAYS DEL 044 RISK E
COL 051105 DVX DIALR RESIDNT LMTC ON ANS. MACH
```

EXHIBIT

6

Blumberg No. 5119

Alewine v. ASC
ASC 000235
ASC Production

Date: 2/21/2007 Time: 10:20:09 AM

age: 4 Document Name: untitled

```
IOTS 1099003191         CONSOLIDATED NOTES LOG           02/21/07  11:18:24
CH ALEWINE    L:  F:  B:  R:      DUE 12/29/06   TYPE CONV. RES.
      ANA Y ARM Y ASM Y BLN Y BNK Y CCN Y COL Y ELC Y FOR Y HAZ Y LMT Y
      MIP Y PIF Y PMT Y REO Y SER Y TAX Y TSK Y DATE SELECT: MMDDYY  PRINT:
-------------------------* PF8 FOR MORE *--------------------------------
SER 062405 46T LITC - $4.11 - 01R01) - SENT TO DORIS FOR
               PROCESSING - D. RAMSBURG/DOS/MD
COL 062305 DVX DIALR RESIDNT LMTC ON ANS. MACH
SER 062105 FSD PENDING CORRESPONDENCE RESEARCH REGARDING:        PENCOR
               WORKING TASK- EMAILED OCWEN FOR HISTORY FROM 7/27/
               1999-12/08/2000.  SENT REQUEST FOR HISTORY FROM 11
               /2002-2/2006 TO BE PULLED FROM CD.
COL 062005 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 061705 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 061505 DVX DIALR RESIDNT LMTC ON ANS. MACH
COL 061505 *** SCORE 222   061405 AGT E30S DAYS DEL 047 RISK E
SER 061405 OFQ WRITTEN RESPONSE - CUSTOMER SERVICE              WRTCUS
               SENT TO LEGAL AND SENT LETTER CONFIRMING ANOTHER D
               EPT IS WORKING ON THE WAIVER OF SUMMONS
SER 061405 OFQ PENDING CORRESPONDENCE RESEARCH REGARDING:        PENCOR
COL 061405 *** SCORE 222   061305 AGT E30S DAYS DEL 046 RISK E
COL 061305 MEL ACCELERATION DEMAND LTR SENT    EXPIRES IN 30 DAYS
```

EXHIBIT
1

Alewine v. ASC
ASC 000236
ASC Production

Date: 2/21/2007 Time: 10:20:09 AM





October 16, 2002

Edward H Alewine Jr
Shelly M Alewine
1102 Alewine Drive
Valley, AL 36854-0855

RE:    NOTICE OF ASSIGNMENT, SALE OR TRANSFER OF SERVICING RIGHTS
       OCWEN FEDERAL BANK LOAN NUMBER: 30117055

Property Address:  1102 Alewine Drive
                   Valley, AL 36854

**Ocwen Federal Bank FSB is a debt collector attempting to collect a debt; any information obtained will be used for that purpose.**

Dear Mortgagor(s):

In accordance to Section 6 of the Real Estate Settlement Act ("RESPA") (12 U.S.C. Section 2605), we are informing you that effective November 1, 2002 the servicing of your mortgage loan, that is the right to collect payments from you, will be assigned, sold and transferred to America's Servicing Company (ASC). Except in limited circumstances, the law requires that your new servicer must send you notice no later than 15 days after this effective date. ASC will be contacting you in the near future to welcome you and to inform you about the servicing of your loan.

This change does not affect any other loan or account relationships you may have with Ocwen Federal Bank FSB.  The assignment, sale, or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than terms directly related to the servicing of your loan.  The transfer of servicing rights, however, may effect the terms of, or the continued availability of, mortgage life or disability insurance or any other type of optional insurance. If you currently have mortgage life, disability insurance, or any other type of optional insurance, you will receive a separate letter with further information. Ocwen Federal Bank FSB will furnish you a statement reflecting the amount of mortgage interest and real estate property taxes paid for the period of time we serviced your loan in 2002.

Effective November 1, 2002 direct your payments to your new servicer, ASC. Ocwen Federal Bank FSB will process payments received through October 31, 2002.  Payments received by Ocwen Federal Bank FSB after October 31, 2002, will be forwarded to ASC. Please be advised that any ACH / Automatic Payment arrangements with Ocwen will be discontinued effective November 1, 2002, however, ASC will continue this service with a slight delay in drafting the November payment. Drafts due between the 1st and the 10th of November may be delayed.  No draft will occur before its regularly scheduled date.  Drafts scheduled between the 11th and the last day of the month will not change.  All draft dates will return to the **normal drafting schedule** in December 2002.  The address for ASC follows:

| Payment Address | Correspondence Address |
|---|---|
| **America's Servicing Company** | **America's Servicing Company** |
| **PO Box 4392** | **P.O. Box 981** |
| **Woburn, MA  01888-4392** | **Frederick, MD  21705-0981** |

If you currently have your payments sent through Allison Payment Systems, this service will not continue.  Please contact ASC Customer Service for further information.

If you have any questions relating to the transfer of servicing from Ocwen Federal Bank FSB prior to November 1, 2002, please call our Customer Relations Department at 1-800-74-OCWEN between 9:00 A.M. and 9:00 P.M. (EST) Monday through Thursday and 9:00 A.M. to 6:30 P.M. (EST) on Friday.

If you have any questions after the effective date, please call ASC's Customer Service Department at 1-800-842-7654 toll free, between 9:00 a.m. and 6:00 p.m., Monday through Friday Eastern Time.  It has been a pleasure serving you.

Ghw ltr01



7495 New Horizon Way
Frederick, MD 21703

August 7, 2006

Wooten Law Firm, P.C.
Nick Wooten
PO Box 290
LaFayette, AL 36862



Dear Sir:

RE: Loan Number 1099003191                    Client 106
    Edward and Shelly Alewine

Thank you for contacting America's Servicing Company (ASC) regarding the above
referenced loan.

Our records reflect that the servicing of this loan was transferred to ASC on
November 1, 2002. At the time of transfer, an escrow advance balance existed on the loan,
in the amount of $637.50. This balance was the result of two advances made by the
previous mortgage company for the payment of lender placed insurance. The first
disbursement in the amount of $323.00, made on October 25, 2000, was for lender placed
insurance coverage effective from August 3, 2000 through August 3, 2001. Then on August
8, 2001, funds in the amount of $314.50 were advanced as payment for coverage effective
from August 3, 2001 through August 3, 2002.

An escrow account is not currently in effect for the payment of property taxes and insurance
for this loan. However, the escrow advance balance remains due, as reflected in the
enclosed Mortgage document and communicated in the correspondence issued to the above
referenced mortgagors on July 18, 2005 and March 30, 2006, respectively. If evidence of
existing insurance coverage for the time period of August 3, 2000 through August 3, 2002 is
available, please contact ASC. Once this documentation is received and reviewed, we will
work with the previous mortgage company, Ocwen Federal Bank, to obtain a refund of the
necessary lender placed insurance premiums that were advanced from the loan. Please be
assured, if the refund amount exceeds the advance balance, the excess funds will be
refunded to the mortgagors.

Also enclosed is a transaction history of the loan from August 1, 2004 to the present date,
for your review.



7495 New Horizon Way
Frederick, MD 21703

Page 2

Should you have additional questions, please call our Customer Relations Department at
800-842-7654. A representative will be able to assist you Monday through Friday between
the hours of 8:00 AM and 6:00 PM, in your time zone.

Sincerely,

America's Servicing Company

Enclosures



7495 New Horizon Way
Frederick, MD  21703


July 18, 2005



Edward H Alewine
Shelly M Alewine
1102 Alewine Dr
Valley AL 36854

                              RE:  Loan Number    1099003191
                                   Client 106
Dear Edward H Alewine and Shelly M Alewine :

A review of your account indicates that your account has an escrow
deficiency for the payment of taxes and/or lender placed insurance
in the amount of $636.90.  These funds were advanced by us on your
behalf.  We have adjusted your payment to spread this amount over
12 payments beginning with your payment due October 01, 2005.  Your new
payment amount is as follows:

            Principal & Interest        $      382.85
            Escrow Deficiency Spread            53.08
                                         _____
            Total Payment               $      435.93

We have not established an escrow account for future payments of
taxes and/or insurance.  If you would like to have an escrow account
for the payment of these items, please forward a written request
along with copies of your tax bills and insurance policy to the
following address:

            ASC
            PO Box 10388
            Des Moines  IA  50306-0388

Should you have additional questions, please call our Customer
Relations Department at 800-842-7654.  A representative will be able
to assist you 9:00 AM to 6:00PM, Eastern Time, Monday through
Friday.  You may also obtain information about your loan through
our automated Personal Mortgage Information Line, 24 hours a day,
365 days a year.

Sincerely,

ASC


                                        AN005/VS1



7495 New Horizon Way
Frederick, MD  21703

March 30, 2006

Edward H Alewine
Shelly M Alewine
1102 Alewine Dr
Valley AL 36854

                              RE:  Loan Number   1099003191
                                   Client 106

Dear Edward H Alewine and Shelly M Alewine :

A review of your account indicates that your account has an escrow
deficiency for the payment of taxes and/or lender placed insurance
in the amount of $605.57.  These funds were advanced by us on your
behalf.  We have adjusted your payment to spread this amount over
12 payments beginning with your payment due April 1, 2006.  Your new
payment amount is as follows:

            Principal & Interest          $      382.85
            Escrow Deficiency Spread              50.47

            Total Payment                 $      433.32

We have not established an escrow account for future payments of
taxes and/or insurance.  If you would like to have an escrow account
for the payment of these items, please forward a written request
along with copies of your tax bills and insurance policy to the
following address:

            ASC
            PO Box 10388
            Des Moines  IA  50306-0388

Should you have additional questions, please call our Customer
Relations Department at 800-842-7654.  A representative will be able
to assist you 8:00 AM to 6:00 PM, Eastern Time, Monday through
Friday.  You may also obtain information about your loan through
our automated Personal Mortgage Information Line, 24 hours a day,
365 days a year.

Sincerely,

ASC

                                               AN005/FSN

Return to:
O. Wayne Spence, P.C.
2945 Gardenia Street
Columbus, Georgia 31906

Please Return To:
MORCAP, INC.
7000 CENTRAL PARKWAY, STE 1570
ATLANTA, GA 30328

————————————— [Space Above This Line For Recording Data] —————————————

# MORTGAGE

LOAN NO.: 6218003450

THIS MORTGAGE ("Security Instrument") is given on          May 23          , 19 98 .

The mortgagor is  EDWARD H. ALEWINE and SHELLY M. ALEWINE, HUSBAND AND WIFE

("Borrower").

This Security Instrument is given to  MORCAP, INC.

whose address is 7000 CENTRAL PARKWAY, STE. 1570, Atlanta, GA 30328

("Lender").

Borrower owes Lender the principal sum of     thirty seven thousand five hundred and NO/100ths

Dollars (U.S. $      37,500.00          ).  This debt is evidenced by Borrower's note dated the same date as
this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on
    May 29, 2028          . This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by
the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with
interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's
covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage,
grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in
          CHAMBERS   County, Alabama:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which has the address of          1102 ALEWINE DRIVE, VALLEY
                                                    [Street]                                    [City]

Alabama          36854               ("Property Address");
                        [Zip Code]

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the
improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part
of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred
to in this Security Instrument as the "Property."
       BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and
convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will
defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
       THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited
variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials: EHA  SA.

ALABAMA—Single Family— Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                              Form 3001 9/90
                                        Page 1 of 4                                          SAALC1 (3/91)

PAGE #: 0001 OF 0005
JUDGE DOC #: 1998 2684

06/09/1998  12:30  REC FEE: $77.00
CHAMBERS COUNTY, AL  JOHN T CROWDER - PROBATE JUDGE

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost

Initials _EHA_ _SA_

SIC2 12/96

PAGE #: 0002 OF 0005
INST DOC #: 1998 2684
PROBATE JUDGE
AL JOHN T CROWDER
REC FEE: $77.00
06/09/1998 12:30 COUNTY, CHAMBERS

to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance by Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

Initials: EHA SA

06/09/1998 12:30 REC FEE: $77.00 PAGE #: 0003 OF 0005
CHAMBERS COUNTY, AL, JOHN T CROWDER PROBATE JUDGE DOC #: 1998 2684

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in CHAMBERS                County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

23. **Waivers.** Borrower waives all right of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

24. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)].

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Graduated Payment Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☐ Other(s) [specify] | | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                                    EDWARD H. ALEWINE SR. 72        -Borrower

_____    _____ (Seal)
                                    SHELLY M. ALEWINE                -Borrower

                                    _____ (Seal)
                                                                     -Borrower

                                    _____ (Seal)
                                                                     -Borrower

_____ [Space Below This Line For Acknowledgment] _____

STATE OF ALABAMA,              CHAMBERS              County ss:

On this   23RD   day of   MAY 1998   , I,   O. WAYNE SPENCE
_____, a Notary Public in and for said county and in said state, hereby certify that
EDWARD H. ALEWINE SR. and SHELLY M. ALEWINE
whose name(s)   IS   signed to the foregoing conveyance, and who   IS   known to me, acknowledged before me that, being informed of the contents of the conveyance,   T he  Y  executed the same voluntarily and as _____ act on the day the same bears date.
Given under my hand and seal of office this   23RD   day of   MAY 1998   .

My Commission Expires:
┌─────────────────────────────────┐
│        O. WAYNE SPENCE          │       Notary Public  O. WAYNE SPENCE
│ –NOTARY PUBLIC – OFFICIAL SEAL– │
│     MUSCOGEE COUNTY, GA         │              Page 4 of 4                    SIALC4 07/95
└─────────────────────────────────┘
My Commission Expires October 17, 2000

PAGE #: 0004 OF 0005
JUDGE DOC #: 1998 2684
REC FEE: $77.00
JOHN T CROWDER - PROB
COUNTY, AL
06/09/1998 12:30
CHAMBERS

EXHIBIT "A"

COMMENCING AT THE NORTHWEST CORNER OF SECTION 29, TOWNSHIP 21 NORTH, RANGE 29
EAST, CHAMBERS COUNTY, ALABAMA; THENCE NORTH 85 DEGREES 56 MINUTES 15 SECONDS
EAST 30.44 FEET; THENCE NORTH 86 DEGREES 59 MINUTES 31 SECONDS EAST 629.32 FEET;
THENCE NORTH 86 DEGREES 54 MINUTES 16 SECONDS EAST 316.55 FEET TO THE
NORTHWESTERLY R/W LINE OF OLD CHATTAHOOCHEE VALLEY RAILROAD BEDS THENCE LEAVING
SAID R/W LINE SOUTH 30 DEGREES 37 MINUTES 29 SECONDS EAST 30.06 FEET TO THE
SOUTHEASTERLY R/W LINE OF SAID  OLD CHATTAHOOCHEE VALLEY RAILROAD BEDS SAID
POINT BEING THE TRUE POINT OF BEGINNING OF THE PARCEL OF LAND HEREIN DESCRIBED;
THENCE IN A NORTHEASTERLY AND SOUTHEASTERLY DIRECTION, ALONG SAID R/W LINE, THE
COURSES OF WHICH ARE AS FOLLOWS:  NORTH 62 DEGREES 62 MINUTES 49 SECONDS EAST
121.17 FEET; NORTH 78 DEGREES 01 MINUTE 08 SECONDS EAST 200.22 FEET; NORTH 87
DEGREES 27 MINUTES 32 SECONDS EAST 20.23 FEET; SOUTH 80 DEGREES 36 MINUTES 30
SECONDS EAST 401.38 FEET; SOUTH 88 DEGREES 07 MINUTES 00 SECONDS EAST 139.27
FEET TO THE CENTERLINE OF A CREEK; THENCE SOUTH 12 DEGREES 55 MINUTES 31 SECONDS
WEST, ALONG SAID CENTERLINE 103.41 FEET; THENCE SOUTH 19 DEGREES 9 MINUTES 36
SECONDS WEST 48.79 FEET; THENCE LEAVING SAID CENTERLINE SOUTH 79 DEGREES 48
MINUTES 14 SECONDS WEST 1160.67 FEET TO THE SOUTHEASTERLY R/W LINE OF SAID OLD
CHATTAHOOCHEE VALLEY RAILROAD BED; THENCE NORTH 47 DEGREES 55 MINUTES 58 SECONDS
EAST, ALONG SAID R/W LINE 203.96 FEET; THENCE NORTH 50 DEGREES 06 MINUTES 14
SECONDS EAST 162.21 FEET; THENCE NORTH 55 DEGREES 42 MINUTES 30 SECONDS EAST
50.09 FEET TO THE TRUE POINT OF BEGINNING.  SAID PARCEL OF LAND LYING IN
SECTIONS 20 AND 29, TOWNSHIP 21 NORTH, RANGE 29 EAST, CHAMBERS COUNTY, ALABAMA,
AND CONTAINING 3,000 ACRES, ACCORDING TO THAT CERTAIN SURVEY PREPARED FOR EDWARD
H. ALEWINE, JR. AND SHELLY M. ALEWINE BY DAVID H. MILLER, REGISTERED SURVEYOR,
ALA. REG. NO. 6259, DATED DECEMBER 8, 1992.

```
                    CUSTOMER ACCOUNT ACTIVITY STATEMENT          DATE 08/04/06
REQ BY ENW                                                       PAGE   1


EDWARD H ALEWINE
SHELLY M ALEWINE
1102 ALEWINE DR
VALLEY            AL 36854


LOAN NUMBER: 1099003191
**************************************************************************
------------------------- CURRENT ACCOUNT INFORMATION ------------------------
  DATE        TOTAL       PRINCIPAL       LOAN        CURRENT
 PAYMENT     PAYMENT     & INTEREST     INTEREST     PRINCIPAL         ESCROW
  DUE         AMOUNT       PAYMENT        RATE        BALANCE         BALANCE
08-29-06      433.32       382.85      11.90000      35,352.39        596.82-
**************************************************************************

                ACTIVITY FOR PERIOD 08/01/04 - 08/03/06
PROCESS   DUE    TRANSACTION          TRANSACTION                  EFFECTIVE DATE
 DATE    DATE    CODE                 DESCRIPTION                  OF TRANSACTION
--------------------------------------------------------------------------------
 TRANSACTION  PRIN. PAID/      ESCROW PAID/ -----------OTHER-------------
  AMOUNT       BALANCE    INTEREST   BALANCE   AMOUNT   CODE/DESCRIPTION
--------------------------------------------------------------------------------
08-03-06  08-06  168  REPAY OF ESCROW ADVANCE
          0.00        0.00      0.00     8.00-     8.00
08-03-06  08-06  163  INS REFUND
          8.00        0.00      0.00     8.00
                                        596.82-  NEW PRINCIPAL/ESCROW BALANCES
08-01-06  07-06  168  REPAY OF ESCROW ADVANCE
          0.00        0.00      0.00     0.15-     0.15
08-01-06  07-06  174  PAYMENT                                        07-31-06
          0.00       31.96    350.89     0.15    383.00-
               35,352.39                604.82-  NEW PRINCIPAL/ESCROW BALANCES
07-31-06  07-06  172  PAYMENT
        383.00        0.00      0.00     0.00    383.00
07-20-06  07-06  132  LATE CHARGE ADJUSTMENT
          0.00        0.00      0.00     0.00     19.14 1 LATE CHARGE
07-20-06  06-06  168  REPAY OF ESCROW ADVANCE
          0.00        0.00      0.00     0.15-     0.15
07-20-06  06-06  174  PAYMENT                                        06-26-06
          0.00       31.64    351.21     0.15    383.00-
               35,384.35                604.97-  NEW PRINCIPAL/ESCROW BALANCES
07-20-06  06-06  132  LATE CHARGE ADJUSTMENT
          0.00        0.00      0.00     0.00     19.14 1 LATE CHARGE
07-10-06  06-06  152  LATE CHARGE ASSESSMENT
          0.00        0.00      0.00     0.00     19.14-1 LATE CHARGE
06-26-06  06-06  172  PAYMENT
        383.00        0.00      0.00     0.00    383.00
```



REQ BY ENW
CUSTOMER ACCOUNT ACTIVITY STATEMENT
DATE 08/04/06
PAGE    2

EDWARD H ALEWINE
LOAN NUMBER: 1099003191

```
                    ACTIVITY FOR PERIOD 08/01/04 - 08/03/06
PROCESS    DUE    TRANSACTION              TRANSACTION                   EFFECTIVE DATE
 DATE      DATE   CODE                     DESCRIPTION                   OF TRANSACTION
-----------------------------------------------------------------------------------------
  TRANSACTION   PRIN. PAID/      ESCROW PAID/ ------------OTHER-------------
   AMOUNT         BALANCE      INTEREST   BALANCE    AMOUNT  CODE/DESCRIPTION
-----------------------------------------------------------------------------------------
06-23-06  06-06  132  LATE CHARGE ADJUSTMENT
          0.00          0.00       0.00      0.00     19.14 1 LATE CHARGE
06-23-06  05-06  168  REPAY OF ESCROW ADVANCE
          0.00          0.00       0.00      0.15-     0.15
06-23-06  05-06  174  PAYMENT                                            04-26-06
          0.00         31.33     351.52      0.15    383.00-
                     35,415.99             605.12-  NEW PRINCIPAL/ESCROW BALANCES
06-09-06  05-06  152  LATE CHARGE ASSESSMENT
          0.00          0.00       0.00      0.00     19.14-1 LATE CHARGE
05-24-06  05-06  132  LATE CHARGE ADJUSTMENT
          0.00          0.00       0.00      0.00     19.14 1 LATE CHARGE
05-24-06  04-06  168  REPAY OF ESCROW ADVANCE
          0.00          0.00       0.00      0.15-     0.15
05-24-06  04-06  174  PAYMENT                                            04-26-06
          0.00         31.02     351.83      0.15    383.00-
                     35,447.32             605.27-  NEW PRINCIPAL/ESCROW BALANCES
05-24-06  04-06  172  PAYMENT
        383.00          0.00       0.00      0.00    383.00
05-10-06  04-06  152  LATE CHARGE ASSESSMENT
          0.00          0.00       0.00      0.00     19.14-1 LATE CHARGE
04-26-06  04-06  172  PAYMENT
        383.00          0.00       0.00      0.00    383.00
04-05-06  03-06  173  PAYMENT                                            04-04-06
          0.00         30.72     352.13      0.00    382.85-
                     35,478.34             NEW PRINCIPAL/ESCROW BALANCES
04-04-06  03-06  168  REPAY OF ESCROW ADVANCE
          0.00          0.00       0.00      0.15-     0.15
04-04-06  03-06  170  BEG ESC DEPOSIT
          0.00          0.00       0.00      0.15      0.15-
                                          605.42-  NEW PRINCIPAL/ESCROW BALANCES
03-27-06  03-06  172  PAYMENT
        383.00          0.00       0.00      0.00    383.00
03-14-06  03-06  132  LATE CHARGE ADJUSTMENT
          0.00          0.00       0.00      0.00     19.14 1 LATE CHARGE
03-14-06  02-06  168  REPAY OF ESCROW ADVANCE
          0.00          0.00       0.00      0.15-     0.15
```

```
                    CUSTOMER ACCOUNT ACTIVITY STATEMENT          DATE 08/04/06
REQ BY ENW                                                       PAGE    3


EDWARD H ALEWINE
LOAN NUMBER: 1099003191

                 ACTIVITY FOR PERIOD 08/01/04 - 08/03/06
PROCESS    DUE    TRANSACTION            TRANSACTION                EFFECTIVE DATE
DATE      DATE    CODE                   DESCRIPTION                OF TRANSACTION
-------------------------------------------------------------------------------
  TRANSACTION  PRIN. PAID/        ESCROW PAID/ ------------OTHER-------------
   AMOUNT       BALANCE    INTEREST   BALANCE   AMOUNT  CODE/DESCRIPTION
-------------------------------------------------------------------------------
03-14-06  02-06  174  PAYMENT                                        01-24-06
       0.00        30.42     352.43      0.15     383.00-
                35,509.06                        605.57-  NEW PRINCIPAL/ESCROW BALANCES
03-13-06  02-06  152  LATE CHARGE ASSESSMENT
       0.00         0.00       0.00      0.00      19.14-1 LATE CHARGE
02-27-06  02-06  132  LATE CHARGE ADJUSTMENT
       0.00         0.00       0.00      0.00      19.14 1 LATE CHARGE
02-27-06  01-06  168  REPAY OF ESCROW ADVANCE
       0.00         0.00       0.00     19.29-     19.29
02-27-06  01-06  174  PAYMENT                                        01-24-06
       0.00        30.12     352.73     19.29     402.14-
                35,539.48                        605.72-  NEW PRINCIPAL/ESCROW BALANCES
02-27-06  01-06  172  PAYMENT
     383.00         0.00       0.00      0.00     383.00
02-27-06  01-06  147  PAYMT REVERSAL
       0.00         0.00       0.00      0.00      19.14-1 LATE CHARGE
                                                  19.14
02-09-06  01-06  152  LATE CHARGE ASSESSMENT
       0.00         0.00       0.00      0.00      19.14-1 LATE CHARGE
01-24-06  01-06  172  PAYMENT
     383.00         0.00       0.00      0.00     383.00
01-18-06  01-06  132  LATE CHARGE ADJUSTMENT
       0.00         0.00       0.00      0.00      19.14 1 LATE CHARGE
01-18-06  12-05  168  REPAY OF ESCROW ADVANCE
       0.00         0.00       0.00      0.15-      0.15
01-18-06  12-05  174  PAYMENT                                        12-27-05
       0.00        29.82     353.03      0.15     383.00-
                35,569.60                        625.01-  NEW PRINCIPAL/ESCROW BALANCES
01-09-06  12-05  152  LATE CHARGE ASSESSMENT
       0.00         0.00       0.00      0.00      19.14-1 LATE CHARGE
12-27-05  12-05  172  PAYMENT
     383.00         0.00       0.00      0.00     383.00
11-29-05  11-05  168  REPAY OF ESCROW ADVANCE
       0.00         0.00       0.00      0.15-      0.15
11-29-05  11-05  174  PAYMENT                                        11-28-05
       0.00        29.53     353.32      0.15     383.00-
                35,599.42                        625.16-  NEW PRINCIPAL/ESCROW BALANCES
```



```
                    CUSTOMER ACCOUNT ACTIVITY STATEMENT           DATE 08/04/06
REQ BY ENW                                                        PAGE    4


EDWARD H ALEWINE
LOAN NUMBER: 1099003191

               ACTIVITY FOR PERIOD 08/01/04 - 08/03/06
PROCESS   DUE    TRANSACTION            TRANSACTION                   EFFECTIVE DATE
 DATE    DATE    CODE                   DESCRIPTION                   OF TRANSACTION
------------------------------------------------------------------------------------
 TRANSACTION  PRIN. PAID/      ESCROW PAID/ ------------OTHER-------------
   AMOUNT       BALANCE    INTEREST  BALANCE   AMOUNT  CODE/DESCRIPTION
------------------------------------------------------------------------------------
11-28-05  11-05  172  PAYMENT
      383.00       0.00      0.00      0.00     383.00
10-28-05  10-05  168  REPAY OF ESCROW ADVANCE
        0.00       0.00      0.00     19.29-     19.29
10-28-05  10-05  174  PAYMENT                                              10-27-05
        0.00      29.24    353.61     19.29     402.14-
               35,628.95            625.31-  NEW PRINCIPAL/ESCROW BALANCES
10-27-05  10-05  172  PAYMENT
      402.14       0.00      0.00      0.00     402.14
10-11-05  10-05  161  ESCROW ADVANCE
        8.00       0.00      0.00      8.00
10-05  08-05  351  HAZ INS
        8.00-      0.00      0.00      8.00-
                                    644.60-  NEW PRINCIPAL/ESCROW BALANCES
09-26-05  09-05  168  REPAY OF ESCROW ADVANCE
        0.00       0.00      0.00      0.15-      0.15
09-26-05  09-05  172  PAYMENT
      383.00      28.95    353.90      0.15
               35,658.19            636.60-  NEW PRINCIPAL/ESCROW BALANCES
09-22-05  08-05  173  PAYMENT
        0.00      28.67    354.18      0.00      0.15 1 LATE CHARGE
                                                383.00-
               35,687.14            NEW PRINCIPAL/ESCROW BALANCES
09-14-05  08-05  172  PAYMENT
       83.00       0.00      0.00      0.00      83.00
09-12-05  08-05  147  PAYMT REVERSAL
        0.00       0.00      0.00      0.00     300.00
09-12-05  08-05  147  PAYMT REVERSAL
        0.00     300.00-     0.00      0.00
               35,715.81            NEW PRINCIPAL/ESCROW BALANCES
09-09-05  08-05  152  LATE CHARGE ASSESSMENT
        0.00       0.00      0.00      0.00      19.14-1 LATE CHARGE
08-29-05  08-05  175  PRINCIPAL PAYMENT                                    08-26-05
        0.00     300.00      0.00      0.00     300.00-
               35,415.81            NEW PRINCIPAL/ESCROW BALANCES
08-29-05  00-00  632  STATUTORY EXPENSES
       58.63       0.00      0.00      0.00
```

```
                    CUSTOMER ACCOUNT ACTIVITY STATEMENT          DATE 08/04/06
REQ BY ENW                                                       PAGE   5


EDWARD H ALEWINE
LOAN NUMBER: 1099003191


              ACTIVITY FOR PERIOD 08/01/04 - 08/03/06
PROCESS   DUE    TRANSACTION              TRANSACTION                  EFFECTIVE DATE
 DATE    DATE    CODE                     DESCRIPTION                  OF TRANSACTION
--------------------------------------------------------------------------------
  TRANSACTION  PRIN. PAID/       ESCROW PAID/ ------------OTHER-------------
   AMOUNT       BALANCE    INTEREST  BALANCE   AMOUNT  CODE/DESCRIPTION
--------------------------------------------------------------------------------
08-29-05  00-00  630  ATTORNEY ADVANCES
   2,251.00        0.00        0.00       0.00
08-26-05  08-05  172  PAYMENT
     300.00        0.00        0.00       0.00      300.00
08-04-05  00-00  632  STATUTORY EXPENSES
       7.37        0.00        0.00       0.00
08-04-05  00-00  630  ATTORNEY ADVANCES
   1,240.00        0.00        0.00       0.00
07-29-05  07-05  168  REPAY OF ESCROW ADVANCE
       0.00        0.00        0.00       0.15-      0.15
 29-05  07-05  172  PAYMENT
     383.00       28.39      354.46       0.15
                35,715.81             636.75-  NEW PRINCIPAL/ESCROW BALANCES
07-28-05  06-05  173  PAYMENT
       0.00       28.11      354.74       0.00
                35,744.20                      NEW PRINCIPAL/ESCROW BALANCES
07-28-05  05-05  173  PAYMENT
     765.70       27.83      355.02       0.00
                35,772.31                      NEW PRINCIPAL/ESCROW BALANCES
07-28-05  00-00  766  MISC. REPAYMENT
   2,978.16        0.00        0.00       0.00
07-22-05  00-00  630  ATTORNEY ADVANCES
  11,243.86        0.00        0.00       0.00
07-22-05  05-05  132  LATE CHARGE ADJUSTMENT
       0.00        0.00        0.00       0.00      984.11 1 LATE CHARGE
07-11-05  05-05  152  LATE CHARGE ASSESSMENT
       0.00        0.00        0.00       0.00       19.14-1 LATE CHARGE
06-27-05  04-05  168  REPAY OF ESCROW ADVANCE
       0.00        0.00        0.00       0.15-      0.15
06-27-05  04-05  172  PAYMENT
     383.00       27.56      355.29       0.15
                35,800.14             636.90-  NEW PRINCIPAL/ESCROW BALANCES
06-27-05  00-00  632  STATUTORY EXPENSES
       4.11        0.00        0.00       0.00
06-27-05  00-00  630  ATTORNEY ADVANCES
     183.00        0.00        0.00       0.00
```



EDWARD H ALEWINE
LOAN NUMBER: 1099003191

```
                      ACTIVITY FOR PERIOD 08/01/04 - 08/03/06
PROCESS   DUE    TRANSACTION              TRANSACTION                    EFFECTIVE DATE
 DATE    DATE    CODE                     DESCRIPTION                    OF TRANSACTION
-----------------------------------------------------------------------------------
   TRANSACTION  PRIN. PAID/      ESCROW PAID/ ------------OTHER-------------
    AMOUNT       BALANCE    INTEREST   BALANCE    AMOUNT  CODE/DESCRIPTION
-----------------------------------------------------------------------------------
06-09-05  04-05  152  LATE CHARGE ASSESSMENT
         0.00       0.00      0.00      0.00     19.14-1 LATE CHARGE
05-26-05  03-05  168  REPAY OF ESCROW ADVANCE
         0.00       0.00      0.00      0.15-     0.15
05-26-05  03-05  172  PAYMENT
       383.00      27.29    355.56      0.15
                35,827.70             637.05- NEW PRINCIPAL/ESCROW BALANCES
05-10-05  03-05  152  LATE CHARGE ASSESSMENT
         0.00       0.00      0.00      0.00     19.14-1 LATE CHARGE
04-26-05  02-05  168  REPAY OF ESCROW ADVANCE
         0.00       0.00      0.00      0.15-     0.15
26-05  02-05  172  PAYMENT
       383.00      27.02    355.83      0.15
                35,854.99             637.20- NEW PRINCIPAL/ESCROW BALANCES
04-21-05  00-00  630  ATTORNEY ADVANCES
       669.50       0.00      0.00      0.00
04-11-05  02-05  152  LATE CHARGE ASSESSMENT
         0.00       0.00      0.00      0.00     19.14-1 LATE CHARGE
03-30-05  01-05  168  REPAY OF ESCROW ADVANCE
         0.00       0.00      0.00      0.15-     0.15
03-30-05  01-05  172  PAYMENT
       383.00      26.75    356.10      0.15
                35,882.01             637.35- NEW PRINCIPAL/ESCROW BALANCES
03-17-05  00-00  630  ATTORNEY ADVANCES
         0.80       0.00      0.00      0.00
03-17-05  00-00  630  ATTORNEY ADVANCES
     1,677.75       0.00      0.00      0.00
03-16-05  00-00  633  MISC. F/C AND B/R EXPENSES
       125.00       0.00      0.00      0.00
03-15-05  12-04  173  PAYMENT                                           03-14-05
       383.00      26.49    356.36      0.00        0.15 1 LATE CHARGE
                35,908.76             NEW PRINCIPAL/ESCROW BALANCES
03-14-05  12-04  152  LATE CHARGE ASSESSMENT
         0.00       0.00      0.00      0.00     19.14-1 LATE CHARGE
02-09-05  12-04  152  LATE CHARGE ASSESSMENT
         0.00       0.00      0.00      0.00     19.14-1 LATE CHARGE
```

```
                    CUSTOMER ACCOUNT ACTIVITY STATEMENT        DATE 08/04/06
REQ BY ENW                                                     PAGE   7


EDWARD H ALEWINE
LOAN NUMBER: 1099003191

              ACTIVITY FOR PERIOD 08/01/04 - 08/03/06
PROCESS   DUE    TRANSACTION              TRANSACTION              EFFECTIVE DATE
DATE      DATE   CODE                     DESCRIPTION              OF TRANSACTION
-----------------------------------------------------------------------------
  TRANSACTION   PRIN. PAID/       ESCROW PAID/ ------------OTHER-------------
   AMOUNT        BALANCE   INTEREST   BALANCE   AMOUNT  CODE/DESCRIPTION
-----------------------------------------------------------------------------
01-31-05  11-04  173  PAYMENT
     383.00       26.23    356.62     0.00      0.15 1 LATE CHARGE
                  35,935.25                 NEW PRINCIPAL/ESCROW BALANCES
01-10-05  11-04  152  LATE CHARGE ASSESSMENT
       0.00        0.00      0.00     0.00    19.14-1 LATE CHARGE
12-30-04  10-04  173  PAYMENT
     383.00       25.97    356.88     0.00      0.15 1 LATE CHARGE
                  35,961.48                 NEW PRINCIPAL/ESCROW BALANCES
12-10-04  10-04  152  LATE CHARGE ASSESSMENT
       0.00        0.00      0.00     0.00    19.14-1 LATE CHARGE
  29-04  09-04  173  PAYMENT
     383.00       25.72    357.13     0.00      0.15 1 LATE CHARGE
                  35,987.45                 NEW PRINCIPAL/ESCROW BALANCES
11-09-04  09-04  152  LATE CHARGE ASSESSMENT
       0.00        0.00      0.00     0.00    19.14-1 LATE CHARGE
10-29-04  08-04  173  PAYMENT
     383.00       25.47    357.38     0.00      0.15 1 LATE CHARGE
                  36,013.17                 NEW PRINCIPAL/ESCROW BALANCES
10-11-04  08-04  152  LATE CHARGE ASSESSMENT
       0.00        0.00      0.00     0.00    19.14-1 LATE CHARGE
09-28-04  07-04  173  PAYMENT
     383.00       25.22    357.63     0.00      0.15 1 LATE CHARGE
                  36,038.64                 NEW PRINCIPAL/ESCROW BALANCES
09-09-04  07-04  152  LATE CHARGE ASSESSMENT
       0.00        0.00      0.00     0.00    19.14-1 LATE CHARGE
09-01-04  06-04  173  PAYMENT
     383.00       24.97    357.88     0.00      0.15 1 LATE CHARGE
                  36,063.86                 NEW PRINCIPAL/ESCROW BALANCES
08-31-04  00-00  633  MISC. F/C AND B/R EXPENSES
     125.00        0.00      0.00     0.00
08-09-04  06-04  152  LATE CHARGE ASSESSMENT
       0.00        0.00      0.00     0.00    19.14-1 LATE CHARGE
```

**NOTE**

LOAN NO.: 6218003450

May 23, 1998           COLUMBUS                    Alabama
[Date]                 [City]                      [State]

1102 ALEWINE DRIVE, VALLEY, AL 36854
[Property Address]



EXHIBIT
10

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 37,500.00     (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is
MORCAP, INC.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 11.900 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the 29th day of each month beginning on June 29, 1998        . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I owe under this Note. My monthly payments will be applied to interest before principal. If, on May 29, 2028        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."

I will make my monthly payments at SOUTHERN PACIFIC FUNDING CORPORATION      ATTN: CASHIERS, P.O. BOX 808019, PETALUMA, CA 94975-8019                          or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 382.85

### BORROWER'S RIGHT TO PREPAY

I have the right to make prepayments of principal at any time before they are due without penalty. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my monthly payments unless the Note Holder agrees in writing to those changes.

Alewine v. ASC
ASC 000098
ASC Production

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    10    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

INITIALS EHH  INITIALS JR  INITIALS_____  INITIALS_____

FIXED RATE NOTE - Single Family - FNMA/FHLMC Uniform Instrument
Page 1 of 2

FNBLPMU1 05/96

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address. Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CAUTION: It is important that you thoroughly read the contract before you sign it.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
EDWARD H. ALEWINE SR. JR.          -Borrower

SSN:   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

_____ (Seal)
SHELLY M. ALEWINE          -Borrower

SSN:   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

_____ (Seal)
          -Borrower

SSN:

_____ (Seal)
          -Borrower

SSN:

*[Sign Original Only]*

Pay to the Order of

Without Recourse
MORCAP, INC.

_____
Name
Title

Alewine v. ASC
ASC 000099
ASC Production

FIXED RATE NOTE - Single Family - FNMA/FHLMC Uniform Instrument
Alabama - Form 3200  12/83 (Amended 5/91)          Page 2 of 2          FNBLPMU2  05/96

A CERTIFIED TRUE COPY

Please Return To:
MORCAP, INC.
7000 CENTRAL PARKWAY, STE 1570
ATLANTA, GA 30328

——————— [Space Above This Line For Recording Data] ———————

# MORTGAGE

LOAN NO.: 6218003450

THIS MORTGAGE ("Security Instrument") is given on                    May 23        , 19 98 .

The mortgagor is   EDWARD H. ALEWINE   and SHELLY M. ALEWINE, HUSBAND AND WIFE

("Borrower").

This Security Instrument is given to   MORCAP, INC.

whose address is 7000 CENTRAL PARKWAY, STE. 1570, Atlanta, GA 30328

("Lender").

Borrower owes Lender the principal sum of    thirty seven thousand five hundred and NO/100ths

Dollars (U.S. $     37,500.00            ). This debt is evidenced by Borrower's note dated the same date as
this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on
       May 29, 2028              . This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by
the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with
interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's
covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage,
grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in
              CHAMBERS  County, Alabama:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Alewine v. ASC
ASC 000100
ASC Production

which has the address of          1102 ALEWINE DRIVE, VALLEY
                                                    [Street]
                                                                                    [City]

Alabama            36854              ("Property Address");
                  [Zip Code]

    TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the
improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part
of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred
to in this Security Instrument as the "Property."
    BORROWER  COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and
convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will
defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY  INSTRUMENT  combines uniform covenants for national use and non-uniform covenants with limited
variations by jurisdiction to constitute a uniform security instrument covering real property.

Initials

ALABAMA—Single Family— Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3001 9/90

Page 1 of 4

UNIFORM COVENANTS.    ower and Lender covenant and agree as fo  ws:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender  y, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage  n may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from   ne to time, 12 U.S.C. Section 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods  s flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that    der requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which   Il not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**7. Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of   bursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

**8. Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost

Initials: _____

SIC2 12/96

to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

**9. Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**10. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

**14. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**15. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**16. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

**19. Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

**20. Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

Alewine v. ASC
ASC 000102
ASC Production

Page 3 of 4

Initials: _EHA_ _SA._ ___

SIC3 12/96

EXHIBIT "A"

COMMENCING AT THE NORTHWEST CORNER OF SECTION 29, TOWNSHIP 21 NORTH, RANGE 29
EAST, CHAMBERS COUNTY, ALABAMA; THENCE NORTH 85 DEGREES 56 MINUTES 15 SECONDS
EAST 30.44 FEET; THENCE NORTH 86 DEGREES 59 MINUTES 31 SECONDS EAST 629.32 FEET;
THENCE NORTH 86 DEGREES 54 MINUTES 16 SECONDS EAST 316.55 FEET TO THE
NORTHWESTERLY R/W LINE OF OLD CHATTAHOOCHEE VALLEY RAILROAD BEDS THENCE LEAVING
SAID R/W LINE SOUTH 30 DEGREES 37 MINUTES 29 SECONDS EAST 30.06 FEET TO THE
SOUTHEASTERLY R/W LINE OF SAID  OLD CHATTAHOOCHEE VALLEY RAILROAD BEDS SAID
POINT BEING THE TRUE POINT OF BEGINNING OF THE PARCEL OF LAND HEREIN DESCRIBED;
THENCE IN A NORTHEASTERLY AND SOUTHEASTERLY DIRECTION, ALONG SAID R/W LINE, THE
COURSES OF WHICH ARE AS FOLLOWS:  NORTH 62 DEGREES 62 MINUTES 49 SECONDS EAST
121.17 FEET; NORTH 78 DEGREES 01 MINUTE 08 SECONDS EAST 200.22 FEET; NORTH 87
DEGREES 27 MINUTES 32 SECONDS EAST 20.23 FEET; SOUTH 80 DEGREES 36 MINUTES 30
SECONDS EAST 401.38 FEET; SOUTH 88 DEGREES 07 MINUTES 00 SECONDS EAST 139.27
FEET TO THE CENTERLINE OF A CREEK; THENCE SOUTH 12 DEGREES 55 MINUTES 31 SECONDS
WEST, ALONG SAID CENTERLINE 103.41 FEET; THENCE SOUTH 19 DEGREES 9 MINUTES 36
SECONDS WEST 48.79 FEET; THENCE LEAVING SAID CENTERLINE SOUTH 79 DEGREES 48
MINUTES 14 SECONDS WEST 1160.67 FEET TO THE SOUTHEASTERLY R/W LINE OF SAID OLD
CHATTAHOOCHEE VALLEY RAILROAD BED; THENCE NORTH 47 DEGREES 55 MINUTES 58 SECONDS
EAST, ALONG SAID R/W LINE 203.96 FEET; THENCE NORTH 50 DEGREES 06 MINUTES 14
SECONDS EAST 162.21 FEET; THENCE NORTH 55 DEGREES 42 MINUTES 30 SECONDS EAST
50.09 FEET TO THE TRUE POINT OF BEGINNING.  SAID PARCEL OF LAND LYING IN
SECTIONS 20 AND 29, TOWNSHIP 21 NORTH, RANGE 29 EAST, CHAMBERS COUNTY, ALABAMA,
AND CONTAINING 3,000 ACRES, ACCORDING TO THAT CERTAIN SURVEY PREPARED FOR EDWARD
I. ALEWINE, JR. AND SHELLY M. ALEWINE BY DAVID H. MILLER, REGISTERED SURVEYOR,
ALA. REG. NO. 6259, DATED DECEMBER 8, 1992.

Alewine v. ASC
ASC 000104
ASC Production

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in CHAMBERS County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

23. **Waivers.** Borrower waives all right of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

24. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)].

☐ Adjustable Rate Rider    ☐ Condominium Rider              ☐ 1-4 Family Rider
☐ Graduated Payment Rider  ☐ Planned Unit Development Rider ☐ Biweekly Payment Rider
☐ Balloon Rider            ☐ Rate Improvement Rider         ☐ Second Home Rider
☐ Other(s) [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____                _____ (Seal)
                                                EDWARD H. ALEWINE SR.            -Borrower

                                                _____ (Seal)
                                                SHELLY M. ALEWINE               -Borrower

_____                _____ (Seal)
                                                                                -Borrower

                                                _____ (Seal)
                                                                                -Borrower

——————————————————— [Space Below This Line For Acknowledgment] ———————————————————

Alewine v. ASC
ASC 000103
ASC Production

**STATE OF ALABAMA,**      CHAMBERS          **County ss:**

On this ___23RD___ day of ___MAY 1998___ , I, ___O. WAYNE SPENCE___
_____, a Notary Public in and for said county and in said state, hereby certify that

EDWARD H. ALEWINE SR. and SHELLY M. ALEWINE

whose name(s) ___IS___ signed to the foregoing conveyance, and who ___IS___ known to me, acknowledged before me that, being informed of the contents of the conveyance, __T__ he __Y__ executed the same voluntarily and as _____ act the day the same bears date.

Given under my hand and seal of office this ___23RD___ day of ___MAY 1998___ .

My Commission Expires: _____

┌─────────────────────────────┐
│  O. WAYNE SPENCE            │          Notary Public  O. WAYNE SPENCE
│ –NOTARY PUBLIC – OFFICIAL SEAL– │
│  MUSCOGEE COUNTY, GA        │          Page 4 of 4
└─────────────────────────────┘

SIALC4 07/95

EXHIBIT

[ \

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| EDWARD H. ALEWINE, JR. and SHELLY M. ALEWINE, | ) ) ) ) | CHAPTER 13 |
| Debtors. | | CASE NO. 99-05963-DHW-13 |

MOTION FOR TERMINATION OF AUTOMATIC STAY
TO PERMIT FORECLOSURE OF REAL ESTATE MORTGAGE

Secured Creditor, Wells Fargo Bank Minnesota, as Trustee, f/k/a Norwest Bank Minnesota, N.A. ("Wells Fargo"), hereby moves the Court for termination of the automatic stay to permit the foreclosure of the real estate mortgage hereinafter described upon the following grounds:

1.    Wells Fargo is the owner of that certain mortgage duly recorded in the records in the Judge of Probate of Chambers County, Alabama, mentioned in the schedules, more specifically described in a copy thereof which is attached hereto and made a part hereof.

2.    The realty subject to said mortgage is a Debtor principal residence within the meaning of Section 1322(b)(2) of the United States Bankruptcy Code, 11 U.S.C. § 1322(b)(2).  Said mortgage secures a promissory note of like date, a copy of which is also attached hereto and made a part hereof.

3.    Said mortgage is payable in monthly installments which include principal, interest and escrow.  The payments upon such mortgage are currently post-petition delinquent for the months of October through November, 2000.

4.    The security for the debt is in jeopardy.  The real estate is declining in value, and the debt is increasing in amount.  There is no substantial equity in the realty above the mortgage indebtedness to which it is subject.  Furthermore, debtors have failed to keep hazard insurance in place on said property.  Wells Fargo is not adequately protected.

5.      Wells Fargo is unable to foreclose said mortgage pursuant to the power of sale contained therein by virtue of the automatic stay against such foreclosure pursuant to the law relating to bankruptcy.

WHEREFORE,   Wells Fargo moves the Court to annul the stay against foreclosure and to allow it to foreclose said mortgage pursuant to the terms thereof and reserve the right of Wells Fargo to file an unsecured proof of claim for any deficiency which may arise from said foreclosure.

Respectfully submitted,

W. PERRY HALL (HALLW9043)
JOY A. JAYE (JAYEJ6455)
Counsel for Wells Fargo

OF COUNSEL:

PIERCE, LEDYARD, LATTA
 & WASDEN, P.C.
Post Office Box 16046
Mobile, Alabama 36616
Telephone (334) 344-5151

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on this the _12th_ day of _December_, 2000, served a copy of the foregoing pleading by depositing the same in the United States Mail, properly addressed and first-class postage prepaid as follows:

B. Paul Sherling, Esquire
P. O. Box 1586
Opelika, AL 36803

Curtis C. Reding, Trustee
P. O. Box 173
Montgomery, AL 36101

Edward H. Alewine, Jr. and
Shelly M. Alewine
1102 Alewine Drive
Valley, AL 36854

COUNSEL

# EXHIBIT B
# (1 of 2)

# EXHIBIT B

1

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3

4   CIVIL ACTION NO. 3:06cv886-MHT

5

6   EDWARD H. ALEWINE, et al.,

7           Plaintiffs,

8   vs.

9   AMERICA'S SERVICING COMPANY,

10          Defendant.

11

12

13

14

15          DEPOSITION

16            OF

17        EDWARD H. ALEWINE

18         August 24, 2007

19

20

21   REPORTED BY:  Susan B. Treadaway

22            Certified Shorthand Reporter

23            and Notary Public

ORIGINAL

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1         S T I P U L A T I O N

2        IT IS STIPULATED AND AGREED,

3 by and between the parties, through their

4 respective counsel, that the deposition of

5 EDWARD H. ALEWINE may be taken before

6 Susan B. Treadaway, Commissioner,

7 Certified Shorthand Reporter and Notary

8 Public;

9        That the signature to and

10 reading of the deposition by the witness

11 is waived, the deposition to have the same

12 force and effect as if full compliance had

13 been had with all laws and rules of Court

14 relating to the taking of depositions;

15        That it shall not be necessary

16 for any objections to be made by counsel

17 to any questions, except as to form or

18 leading questions, and that counsel for

19 the parties may make objections and assign

20 grounds at the time of trial, or at the

21 time said deposition is offered in

22 evidence, or prior thereto.

23

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1              A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4         Mr. Nicholas H. Wooten

5         Attorney at Law

6         Wooten Law Firm, P.C.

7         10 2nd Avenue Southeast

8         Post Office Drawer 290

9         Lafayette, Alabama 36862

10

11   FOR THE DEFENDANT:

12        Mr. D. Keith Andress

13        Attorney at Law

14        Baker, Donelson, Bearman,

15        Caldwell & Berkowitz, P.C.

16        420 North 20th Street, Suite 1600

17        Birmingham, Alabama 35203

18

19   OTHERS PRESENT:

20        Ms. Shelly M. Alewine

21

22

23
```

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1                      I N D E X

2

3                                        P A G E :

4     BY MR. ANDRESS.......................5

5

6                   E X H I B I T S

7

8     DEFENDANT'S NO.                      P A G E :

9     Exhibit 1..........................42

10    Exhibit 2..........................65

11    Exhibit 3..........................70

12    Exhibit 4..........................70

13

14

15

16

17

18

19

20

21

22

23

One Federal Place   •   Suite 1020   •   1819 Fifth Avenue North   •   Birmingham, Alabama 35203
(205) 252-9152   •   Toll-Free (800) 458-6031   •   Fax (205) 252-0196   •   www.TylerEaton.com

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1              I, Susan B. Treadaway, a

2    Shorthand Reporter of Birmingham, Alabama,

3    and a Notary Public for the State of

4    Alabama at Large, acting as Commissioner,

5    certify that on this date, as provided by

6    the Federal Rules of Civil Procedure of

7    the United States District Court, and the

8    foregoing stipulation of counsel, there

9    came before me at 10 2nd Avenue Southeast,

10   Lafayette, Alabama, on the 24th day of

11   August, 2007, commencing at 9:45 A.M.,

12   EDWARD H. ALEWINE, witness in the above

13   cause, for oral examination, whereupon the

14   following proceedings were had:

15

16              EDWARD H. ALEWINE,

17   being first duly sworn, was examined and

18   testified as follows:

19

20   EXAMINATION BY MR. ANDRESS:

21        Q.    Mr. Alewine, will you state

22   your full name?

23        A.    It's Edward H. Alewine, Jr.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1     Q.    And your address?

2     A.    1102 Alewine Drive.

3     Q.    And how long have you lived at

4 that address?

5     A.    About eighteen --

6 eighteen years, I guess.

7     Q.    And is that the house at that

8 address that was mortgaged when you took

9 the first loan?

10    A.    Yes, sir.  Yes.

11    Q.    And the lady to your right,

12 this is your wife, I presume?

13    A.    Yes, sir.

14    Q.    And how long have y'all been

15 married?

16    A.    Thirty-six, right?

17    Q.    Thirty-six years.

18 Congratulations.

19    A.    My memory is not really good

20 either.

21    Q.    That's all right.

22    MR. ANDRESS:  This is a bench

23 trial, right, Nick, and am I correct on

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    that?

2            MR. WOOTEN:  I can't remember.

3    I think we've been -- I can't remember

4    whether we ever decided whether it was or

5    it wasn't.

6            MR. ANDRESS:  I think it is.

7    And, so, I'm going to skip all of the

8    juror questions.  If I'm incorrect on

9    that, will you just give me a list of all

10    of the relatives in the counties that

11    we -- Montgomery is where we will sit?

12            MR. WOOTEN:  (Nods head.)

13        Q.    Mr. Alewine, where do you

14    work?

15        A.    Right now, I'm not.

16        Q.    Where?

17        A.    They've got me out on

18    disability right now --

19        Q.    Okay.

20        A.    -- with regard to the cancer.

21    Now, I was working at Hollis Propane Gas

22    Company, I've worked there since 2000.

23        Q.    Okay.  Since 2000 until when,

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  when did you go?

2      A.      They took me out in March of

3  this year.

4      Q.      March of '07?

5      A.      '07, yes.

6      Q.      Okay.  And then what did you

7  do at the gas company?

8      A.      I delivered propane, propane

9  gas to peoples' houses, you know.

10      Q.      And what did you do before

11  that?

12      A.      I worked at West Point

13  Stevens.

14      Q.      And how long?

15      A.      Textile mill.  Seventeen

16  years, I believe.

17      Q.      What did you do there?

18      A.      Weave.

19      Q.      Weave?

20      A.      Weave, yes, sir.

21      Q.      Can you tell me about your

22  educational background?

23      A.      Well, I went to the twelfth

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1   grade at Valley High, but I quit in the

2   middle of the twelfth, I got married.

3        Q.    You ought to finish up if you

4   have some time and can do that.

5        A.    I need to.

6        Q.    I know there was -- y'all

7   filed a lawsuit with ASC before.  Other

8   than that, have you ever been involved in

9   any other lawsuits as a party or a

10  witness?

11       A.    No, sir.

12       Q.    Is this the first time you

13  have ever given a deposition?

14       A.    Yes.

15       Q.    Okay.  You probably have

16  already heard this from your lawyer, but

17  I'm going to ask you some questions about

18  your lawsuit and there are things that we

19  do in depositions that in an ordinary

20  conversation people don't do, like in

21  ordinary conversation, I may ask you --

22  start to ask a question and then you'll

23  understand what I'm saying and then you

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1  will go ahead and answer it and I don't

2  have to ask the full question because

3  we're completely communicating.  In the

4  deposition, the lady to my right is the

5  court reporter, and she is typing up every

6  word anybody says, you know, if your wife

7  speaks out or your lawyer speaks out, then

8  that will be on a transcript just like a

9  movie script, so let me ask my full

10  question just so it will be clear on the

11  transcript what the question was and then

12  I'll let you give the full answer so it

13  will read better.  If I ask you a question

14  you don't understand, just let me know, I

15  won't do that intentionally, just

16  sometimes it happens and I'll try to

17  rephrase it.  And any time you need to

18  take a break, take off, okay?

19      A.      Okay.

20      Q.      Tell me about your loan

21  history with Wells Fargo for any loan

22  other than the loan involved in this

23  lawsuit, have you had any other loans with

# ⅡⅬ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   Wells Fargo in the last five, ten years?
2       A.    No, sir.
3       Q.    Okay.  And ASC is the
4   defendant, America's Servicing Company,
5   and that's -- are you aware that that's
6   who is servicing your loan?
7       A.    Well, Wells Fargo?
8       Q.    No, just --
9       A.    American Service Company?
10      Q.    Yes.
11      A.    You have to excuse me.  Yes, I
12  am.
13      Q.    Okay.  All right.  So, there's
14  no other loan or there's no other issue
15  with Wells Fargo or ASC other than this
16  one loan that we're going to talk about
17  today?
18      A.    Yes, sir.
19      Q.    All right.  Now, I understand
20  that there was a lawsuit filed against ASC
21  and it was settled.  Do you remember that?
22      A.    Yes, sir.
23      Q.    Do you remember the

12

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   approximate date it was settled or the

2   release, and I'm not sure if I've seen a

3   signed copy of the release, but I want to

4   say it was sometime in October of '05,

5   but, Nick, you may know.

6           MR. WOOTEN:  It was August of

7   '05.

8           MR. ANDRESS:  Okay.  All

9   right.

10      Q.      August '05.  And that's when

11  it was signed and --

12          MR. WOOTEN:  Uh-huh.

13          MR. ANDRESS:  Okay.

14      Q.      Mr. Alewine, if you will, can

15  you tell me your understanding of what the

16  issues were in that first lawsuit, the

17  problems with your loan?

18      A.      I don't understand you.

19      Q.      The reasons that y'all filed

20  the first lawsuit, you know, I presume you

21  alleged that ASC messed up your loan

22  somehow or didn't credit payments right or

23  that sort of thing.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          A.      Oh.

2          Q.      Just can you give me a summary

3    of what the problems were?

4          A.      Well, they kept saying we owed

5    two payments, but we didn't.

6          Q.      And, so, I mean, it was two

7    payments?

8          A.      Two payments.

9          Q.      And then I guess there were

10   late charges and that sort of thing --

11         A.      Yes.

12         Q.      -- that came with that?

13         A.      Yes, sir.

14         Q.      Was there any issue about

15   reporting, credit reporting or anything in

16   the first lawsuit that you know of?

17         A.      Yes, sir.

18         Q.      Had your credit been reported

19   as being delinquent on the loan?

20         A.      Yes, sir.

21         Q.      And was all of that taken care

22   of with the settlement?

23         A.      Yes, sir.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Q.    All right.  So, other than the
2    two payments and what sprung from that,
3    was there anything else that you are aware
4    of that was an issue in that first
5    lawsuit?
6         A.    No, sir.
7         Q.    Okay.
8         A.    Just those two payments.
9         Q.    Did y'all ever figure out what
10   happened or what caused the two payments
11   to be reported as not being received by
12   the company?
13        A.    Well, the two payments, as far
14   as I know, come from the other company
15   because we had to file bankruptcy and then
16   when they bought it, I think it was in
17   '02, it was -- you know, I don't know how
18   they do the bankruptcy thing.  And I
19   remember getting letters.
20        Q.    So, y'all had --
21        A.    October and November they said
22   we owed or something like that when they
23   first bought it.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1        Q.      In October or November?

2        A.      Of '02.

3        Q.      '02.  Okay.  So, you got

4    letters saying that you were two payments

5    behind and these letters came from ASC; is

6    that right?

7        A.      Yes, sir.

8        Q.      And then that ended up in a

9    lawsuit being filed that was settled in

10   August of '05?

11       A.      Yes, sir.

12       Q.      Okay.

13       A.      I'm hoping I'm right.  That

14   stuff got me kind of woozy, and I'm not

15   really nervous, I know I seem like it.

16       Q.      No, you're doing fine.  You're

17   doing fine.  And, you know, right now I

18   want information, so if you can't answer

19   something and if your lawyer will let you,

20   you know, you can get information from

21   your wife or I can just get it from her,

22   anyway, just do your best.  All right.

23   So, in August of 2005, the lawsuit was

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    settled and you received, I think,

2    seventy-five hundred dollars from the

3    released cash and then whatever else was

4    supposed to happen in the release?

5         A.    I think so, yes, sir.

6         Q.    And to your knowledge, had the

7    defendant, had ASC, did it -- strike all

8    of that.  Did ASC do what it said it would

9    do in the release as far as you know?

10        A.    As far as I know, the credit

11   stuff, yes, sir.

12        Q.    All right.  Now, let's go from

13   August 2005 forward, okay, to the present.

14   Now we're going to talk about the second

15   lawsuit, okay.  What prompted you to bring

16   this lawsuit, I mean, what are the issues

17   that y'all have in this lawsuit?

18        A.    Well, they say it's going back

19   to insurance, the same thing, you know,

20   and it started back this year, or maybe a

21   little before this year.  I'm not really

22   sure.

23        Q.    Okay.  And by the insurance,

# TYLER EATON
## TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  you're talking about the forced place

2  insurance --

3          A.    Yes, sir.

4          Q.    -- that Ocwen put on y'all's

5  loan in 2000 and 2001?

6          A.    '05, right?

7              MR. WOOTEN:  What did ASC tell

8  you?

9          A.    '5.  That's what it was, '5,

10  it was supposed to have been placed in '5,

11  '05.

12          Q.    Okay.  All right.  I just want

13  to get your understanding.  In 2005, that

14  was the first time that ASC tried to

15  collect this insurance from you and your

16  wife, right?

17          A.    I'm thinking.  I'm not sure.

18          Q.    Okay.

19          A.    I'm thinking it was 2005.

20          Q.    How did you learn about this

21  insurance issue in 2005, how did you first

22  hear about it?

23          A.    Well, they sent us -- seems

## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    like they sent us a letter saying so.  And

2    then I sent them -- you know, wanting

3    proof.  They might have called us on the

4    phone, but, anyway, I sent them proof back

5    that it was paid.

6        Q.    You did send proof.  So, ASC

7    sent you a letter saying that there's

8    insurance?

9        A.    They -- you know, and they

10   didn't pay it, so they paid it, six

11   hundred and something dollars.

12       Q.    It was like six hundred and

13   thirty-seven dollars?

14       A.    Yes, something like that.

15       Q.    Something around there?

16       A.    But we had paid it.

17       Q.    And, so, you sent proof to ASC

18   that you had paid this insurance?

19       A.    Yes, sir.

20       Q.    Do you remember what you sent

21   ASC to prove this?

22       A.    Seems like I got -- I'm not

23   really sure, but seems like I got the

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    insurance company to call them or send
2    them a letter and then I did, too.
3        Q.    Which insurance company was
4    it?
5        A.    I don't remember if it was
6    Foremost or --
7            MS. ALEWINE:  It was Foremost.
8        A.    Foremost, yes.  It's Alabama
9    Insurers is where I pay it at.
10       Q.    And you're saying this
11   insurance was from 2005 or was it -- I
12   mean, did they -- you know what forced
13   place insurance is, Mr. Alewine?
14       A.    Well, I don't pay it now, they
15   put it on there to cover it.
16       Q.    Right.  Is that the kind of
17   insurance we are talking about?
18       A.    As far as I know, that's what
19   they're talking about.
20       Q.    All right.
21       A.    See, I've always paid my
22   insurance and taxes and all of that stuff,
23   you know.

**TE TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       Q.      And y'all paid the insurance

2   and taxes outside of your mortgage

3   payment --

4       A.      Yes, sir.

5       Q.      -- right?

6       A.      Yes, sir.

7       Q.      You don't pay that in your

8   mortgage and there's no escrow on taxes

9   and insurance on y'all's loan?

10      A.      No, no escrow.

11      Q.      Why did y'all set it up that

12  way?

13      A.      Just always done it.

14      Q.      Just would rather have done it

15  outside --

16      A.      Yes, sir.

17      Q.      -- your bank payment?  Okay.

18  All right.  Now, the letter, I've got the

19  documents that y'all produced to me, and

20  Nick, if you've got other documents that

21  you want to produce, I guess maybe at a

22  break, you can give them to me and I can

23  go over those with the witness.  Let me

## TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    see if I can point to you or show you a

2    letter that may be what we're talking

3    about.  It's an exhibit to the deposition,

4    I believe.  All right.  I'm going to show

5    you a document dated July 18th, 2005 and

6    ask you is this the letter, and it is

7    Exhibit 9 to Ms. Cindy Shanabrook's

8    deposition?

9              MR. WOOTEN:  Is this the

10   letter that showed you that they were

11   changing your payment?

12        A.    It looks like it.

13              MR. WOOTEN:  Okay.

14        Q.    All right.  So --

15              MR. WOOTEN:  Can you tell the

16   date of that letter?

17        A.    July the 18th.

18              MR. WOOTEN:  Of '05?

19        A.    '05.

20              MR. WOOTEN:  Okay.

21        Q.    All right.  So, Mr. Alewine,

22   am I pronouncing your name correctly?

23        A.    Yes, sir.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1        Q.      Okay.  I knew a Boyd Alewine
2    down in Daphne, Alabama.  I don't know if
3    y'all were related or not.
4        A.      Probably.
5        Q.      Was this the letter that put
6    you on notice that your payments were
7    going to change because of insurance?
8        A.      Yes, sir, that's it.
9        Q.      Okay.  And when you received
10   the letter, what did you do?
11       A.      Well, actually, my insurance
12   is not even due until August, so, you
13   know, and I paid it and seemed to me like
14   I called them or they called me, maybe,
15   and sent proof that I had paid the
16   insurance.
17       Q.      And, so, is it your
18   understanding that ASC didn't think that
19   you had paid your 2005 insurance?
20       A.      That's what, you know, I
21   thought, what it led me to believe.
22       Q.      All right.  And, so, then, you
23   say you called your insurance company and

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   said -- just tell me what you said with

2   your insurance company.

3        A.    Well, it seemed like they

4   called me back then, you know, and then I

5   went to the place where I paid my

6   insurance, and they were supposed to have

7   faxed a letter to them and I'm thinking I

8   sent them one, too.  I'm not sure.

9        Q.    All right.  Have you seen the

10  letter -- if you did send a letter to ASC

11  about insurance, do you still have it?

12       A.    I don't know.  I mean, it

13  would have just been proof of where I paid

14  it, you know, that's just --

15       Q.    All right.  But you think that

16  Foremost sent ASC proof that you paid your

17  2005 insurance?

18       A.    Yes, I am.

19       Q.    And how did you come to that

20  understanding?

21       A.    Well, I've had insurance with

22  them for years and I, you know --

23       Q.    I mean, did anybody at

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   Foremost tell you that they sent ASC proof

2   that you paid your 2005 insurance, I mean,

3   do you know that Foremost ever called ASC?

4          A.      For a fact, I don't, but it

5   seemed to me like I sent them a letter,

6   too.

7          Q.      Okay.  That you sent ASC --

8          A.      I'm not really sure.  But I

9   would have to -- you know, but it just

10  seemed to me like I did because of that,

11  because I try to keep up with everything I

12  can, you know what I'm saying?

13         Q.      Uh-huh.

14         A.      And make sure everything is

15  right, but --

16         Q.      Okay.  All right.  So, it was

17  your understanding that it was the 2005

18  insurance that caused this letter, you

19  know, to be written that your payments

20  were going to go up fifty or so dollars,

21  right?

22         A.      Yes, sir.

23         Q.      All right.  Tell me how you or

# ☰ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    your wife contacted ASC after that to

2    discuss this insurance issue.

3         A.    Seemed to me like they called

4    me because -- you know, and I just told

5    them I paid it.  I sent them proof I paid

6    it.

7         Q.    Okay.

8         A.    And then they upped my

9    payments after I sent them proof, you

10   know.

11        Q.    All right.  Did you make the

12   extra payments, or did you just say I paid

13   it, I'm not going to pay any extra?

14        A.    I just sent the same.

15        Q.    The same.  So, you continued

16   to send in your same payments.  Okay.  And

17   this is sometime the July, August '05 time

18   frame?

19        A.    Yes, sir.

20        Q.    All right.

21             MR. WOOTEN:  I think this

22   letter says that it starts due on

23   October 1st of 2005 when the new amount is

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    due the first time.

2         MR. ANDRESS:  Okay.

3    October 1st, 2005.

4         Q.    Do you remember whether or not

5    your conversations with ASC were before

6    October 1st, 2005?

7         A.    I really don't remember.

8         Q.    Do you think when you got this

9    letter dated July of 2005, that you would

10    have called them sometime in close

11    proximity to that?

12         A.    I'm pretty sure I did, yes.  I

13    tell you what, where I pay it is not too

14    far from where I live, so, you know --

15         Q.    Who is your insurance agent at

16    Foremost?

17         A.    Well, I pay it through a place

18    called Alabama Insurers.

19         Q.    All right.  Keep telling me

20    about, you know, this issue, you know,

21    just kind of run me through the story from

22    receiving this letter to contacting

23    Mr. Wooten, just kind of tell me the

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1   story.

2       A.    Okay.  Well, after I sent them

3   proof, you know, they just kept calling

4   and they sent me letters and, well, I

5   wasn't missing much, I don't know, and it

6   got to be two payments behind and I didn't

7   know why, you know, so I just -- I don't

8   know, they called me and I didn't have to

9   call them, they called me, and I would

10   tell them, and then they never could

11   really get it all straightened out and I

12   got different stories from different

13   people I talked to, so I just kept making

14   the same payment.

15       Q.    Okay.

16       A.    And still are.

17       Q.    Do you remember any specific

18   conversations that you had with ASC people

19   about this or just general that they would

20   call you and then you would talk to them

21   and you would keep getting these letters?

22       A.    Well, I've talked to people

23   and most all of them put me over to --

28

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    what do they call it, the resource.

2            MS. ALEWINE:   Customer

3    service.

4        A.     Customer service.  Most all of

5    them would do that and I've had people

6    telling me whether I paid it, you know,

7    and people telling me to send it where I

8    proved I paid it and it's just like that,

9    just constantly back and forth all the

10   time.

11       Q.     Okay.  The calls, when they

12   would call you, what time did they call

13   you, was it, you know, 8:00 to 5:00 or --

14       A.     Well, somebody called me at

15   8:00 this morning.

16       Q.     Somebody from ASC called you?

17       A.     Yes, sir.  Somebody called me

18   after 9:00 the night before last.  But my

19   phone won't ring but like four times

20   before the machine picks up and I didn't

21   get to it.

22       Q.     Somebody called you at 9:00

23   last night?

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      A.      The night before last, I
2  believe it was.  But now, I talked to
3  somebody first of the week, I guess,
4  wasn't it, yes, but I don't know, Monday
5  or Tuesday one I talked to somebody.
6      Q.      What did they --
7      A.      They wanted proof that I paid
8  the insurance back in '05.
9      Q.      In '05.  All right.
10     MR. WOOTEN:  They're still
11 asking you for proof of insurance from
12 2005?
13     A.      From 2005.  This was last -- I
14 forgot just what day, first of the week.
15     MR. WOOTEN:  Today is Friday.
16 Was it Monday or Tuesday?
17     A.      Monday or Tuesday one, yes,
18 sir.  I don't know, like I said, this --
19 see, I had to put this stuff on Tuesday,
20 but it was the first of the week.  And I
21 remember talking to them.
22     Q.      Do you remember who you spoke
23 with, did they --

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

```
 1        A.      I don't remember.
 2        Q.      When you spoke with people,
 3   were they polite or --
 4        A.      Yes, sir, most of them were,
 5   you know, polite.
 6        Q.      I mean, nobody used cuss
 7   words --
 8        A.      Oh, no.
 9        Q.      -- or was ugly or anything
10   like that, were they?
11        A.      No, sir.  No.
12        Q.      All right.  Were you -- you
13   were working in 2005, weren't you --
14        A.      Yes, sir.
15        Q.      -- for a while?
16        A.      (Witness nods head.)
17        Q.      Did anybody ever call you at
18   work or anything?
19        A.      No, sir.
20        Q.      So, you were only called at
21   home?
22        A.      (Witness nods head.)
23        Q.      Okay.  Did anybody ever call
```

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1   you at an offensive time, you know, like

2   3:00 in the morning would be offensive to

3   me or 10:00 at night, I would be angry if

4   somebody called me at 10:00 at night.

5   Were you ever called at times that you

6   felt were unreasonable?

7       A.      Well, I've been called around

8   9:30 or 10:00 before, but --

9       Q.      By ASC?

10      A.      -- not many times, yes, sir,

11  it hasn't been many times that late.

12  Haven't been called that early until this

13  morning.

14      Q.      What time, 8:00?

15      A.      Yes, it was just a little bit

16  after 8:00.

17      Q.      How many times do you think

18  that you were called at 9:30 or 10:00?

19      A.      I couldn't tell you.

20      Q.      Just a couple?

21      A.      Just several times over the

22  last, I don't know, three years.

23      Q.      And I understand that there

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   were several calls over the last three

2   years, but as far as calls that late?

3         A.      That late, it wasn't that many

4   of them.  It wasn't that many.

5         Q.      One or two or a few?

6         A.      Might have been a half a

7   dozen.

8         Q.      Okay.

9         A.      They usually call between

10  dinner and, you know, like 12:00 and 5:00,

11  something like that.

12        Q.      12:00 p.m. to 5:00 p.m.?

13        A.      Yes, sir, somewhere in there.

14        Q.      Okay.  Now, did they -- strike

15  that.  Do y'all have an answering machine?

16        A.      Yes, sir.

17        Q.      Did they call and leave

18  messages on the answering machine?

19        A.      Yes, sir.

20        Q.      And then were those messages,

21  you know, please call ASC at the following

22  number?

23        A.      Yes, sir.

33

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Q.    They weren't, you know, your
2    account is -- they didn't say why they
3    called, did they?
4    A.    (Witness shakes head.)
5    Q.    They just left who they were
6    and the number to call?
7    A.    Well, it was usually a
8    machine, you know, like a recording.
9    Q.    Okay.  All right.  So, did
10   this continue to a point where you went to
11   see Mr. Wooten?
12   A.    Yes, sir.
13   Q.    When was the first time that
14   you went to Mr. Wooten to talk about this
15   second lawsuit and we'll just call that
16   the insurance issue?
17   A.    I don't remember when that
18   was.  I guess right after it happened.
19   Yes, right after it happened.
20   Q.    Now, you got this bill in July
21   18, 2005 -- not a bill, I'm sorry, but you
22   got this notice that your payment was
23   going to increase.  And that's Exhibit 1.

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    MR. WOOTEN:  I flipped back to
2    that other.
3    MR. ANDRESS:  I'm sorry,
4    that's cool.
5    MR. WOOTEN:  9 is the one you
6    were using.
7    Q.    So, you received this
8    July 18th, 2005, and this being
9    Plaintiff's Exhibit 9.  And it says
10   payments are going to start in
11   October 10th --
12   MR. WOOTEN:  1st.
13   Q.    October 1st, I'm reading
14   upside-down.  Let's keep the transcript
15   clear.  Plaintiff's Exhibit 9 shows that
16   your payments will increase by fifty-three
17   dollars and eight cents on October 1st,
18   2005, right, did I read that okay?
19   A.    Yes, sir.
20   Q.    The calls and saying that you
21   were behind or didn't make a full payment,
22   those didn't begin until after
23   October 2005, did they?

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       A.     I don't believe they did, no,
2    sir, after then.
3       Q.     Because according to this,
4    your payment was to remain the same until
5    October 1st, 2005.  You met with
6    Mr. Wooten at some point, I guess, some
7    point around that time frame or somewhere
8    between July and October, didn't you?
9              MR. WOOTEN:  Well, without
10   invading our privilege, I will say that we
11   were in the process of wrapping up the
12   first lawsuit when this came up.
13             MR. ANDRESS:  Okay.
14             MR. WOOTEN:  As a matter of
15   fact, I can go pull the file, but we may
16   have just signed the documents when this
17   letter came.  And this was almost
18   immediately behind the agreement to settle
19   the first lawsuit.
20             MR. ANDRESS:  All right.  And
21   I don't mind, Nick, you telling me what
22   you remember on this.
23             MR. WOOTEN:  Well, Eddie

# TE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    brought this to me, like I say we had just

2    reached an agreement with Steve Geisler at

3    Sirote to settle the first lawsuit.  I

4    mean, I'm not even sure if the

5    paperwork -- I think maybe the paperwork

6    had been signed, but they had not sent me

7    back their executed portion.  But it was

8    all just immediately after the end of the

9    first lawsuit this came out, so --

10           MR. ANDRESS:  Okay.  And

11    that's when you were apprised of this?

12           MR. WOOTEN:  Uh-huh.

13           MR. ANDRESS:  So, it would be

14    sometime in very close proximity to --

15           MR. WOOTEN:  The resolution of

16    the first lawsuit.

17       Q.    Right.  Okay.  It would be

18    after -- sometime very soon after you

19    signed the release?

20           MR. WOOTEN:  (Nods head.)

21       Q.    Okay.  Is that right,

22    Mr. Alewine?

23       A.    Yes, sir.

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1      Q.     I'll show you a document

2  that's already an exhibit to the

3  plaintiff's deposition.

4          MR. WOOTEN:  1?

5      Q.     This is Exhibit 1.  And you'll

6  see that that was a letter written on your

7  behalf by Mr. Wooten.  Have you ever seen

8  that before?

9          MR. WOOTEN:  And this has got

10  all of those documents that you brought me

11  that I had you go round up.

12      A.     Okay.

13          MR. WOOTEN:  The copy of that

14  letter and then, you know, remember we

15  talked about going and getting all of your

16  insurance things so I could send that in

17  for you.

18      A.     I've got you now.

19          MR. WOOTEN:  Do you remember

20  this, do you remember going and getting

21  all of this for me now?

22      A.     I remember it now.

23          MR. WOOTEN:  Got all of your

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   four years of declarations on your

2   homeowners policy showing it was from '05

3   to '06 it was in effect?

4        A.    Yes, I remember now.

5              MR. ANDRESS:  All right.

6              MR. WOOTEN:  And then that's

7   your attached payments, I had you go get

8   those, too, because they couldn't tell you

9   what was going on with it.  And then

10  there's your two statements where they

11  changed your payment amount.  Do you

12  remember?

13       A.    I remember that.

14             MR. WOOTEN:  All right.

15       A.    Yes, I remember that now.

16       Q.    Okay.  So, how long did it

17  take you to gather that information for

18  Mr. Wooten?

19       A.    Oh, we keep it.  We keep

20  everything.  My wife does.

21       Q.    Okay.  All right.  Well, so

22  you spoke with Mr. Wooten sometime before

23  October 3rd and I guess before -- is it

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    fair to say that you spoke with Mr. Wooten

2    before October 1st, 2005?

3         A.    I would think so.

4         Q.    Then -- and don't tell me what

5    you and Mr. Wooten talked about, but after

6    you met with Mr. Wooten, then you went and

7    gathered the documents that are attached

8    to Plaintiff's Exhibit 1, right?

9         A.    Yes, sir.

10        Q.    And then you brought them to

11   Mr. Wooten's office?

12        A.    Yes, I did.

13        Q.    Okay.

14             MR. WOOTEN:    And just to

15   clarify the timeline, I think he actually

16   called them -- and I think y'all's records

17   show this, but I think he called them

18   after this July letter, the one they sent

19   saying the payment was going to change and

20   I think there's some ASC records that show

21   that call record, too, but calling to find

22   out about why the payment was changing and

23   saying that they would provide proof of

## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1    insurance and that sort of thing.
 2              MR. ANDRESS:  Okay.
 3              MR. WOOTEN:  So, before we had
 4    went to the point of actually writing that
 5    letter.
 6         Q.    All right.  Now that we've
 7    kind of got a timeline established,
 8    Mr. Alewine, this letter is dated
 9    October 3rd, 2005.  All right.  From
10    October 3rd, 2005 until August 7th, 2006,
11    I need to know how much out-of-pocket
12    expenses you had to come up with to
13    receive the information that you
14    requested, you know, your lawyer requested
15    on October 3rd.  And it may sound like a
16    strange question, but other than going to
17    your records and getting the information
18    that you've provided Mr. Wooten, did you
19    do anything else that ended up costing
20    money in order to try to get the
21    information requested on that October 3rd
22    letter?
23         A.    No, sir.
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1        Q.    All right.  And this is going
 2   to be kind of a hard question, I
 3   understand that I'm about to ask.  The --
 4   you know, this is a lawsuit for damages
 5   and part of the damages I believe y'all
 6   are seeking are called mental anguish
 7   damages.  Do you remember receiving this
 8   August 7th, 2006 letter?  I know it's
 9   addressed to Mr. Wooten, but did you ever
10   get a copy of that letter from Mr. Wooten?
11        A.    I really don't remember.
12        Q.    Okay.  Let me ask it to you
13   this way.  You don't dispute that you got
14   a copy of that from Mr. Wooten, do you?
15        A.    No, sir.
16        Q.    Okay.  You could have gotten
17   it and then just can't remember sitting
18   here today, I know it's August 2007, it's
19   almost a year.
20        A.    Can we stop for a minute?
21        Q.    Sure.
22        A.    I think I need to go out of
23   the room for a minute.
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          MR. ANDRESS:  Sure.  Take your

2    time.

3          (Whereupon, a break was had

4          from 10:20 a.m. until 10:25

5          a.m.)

6      Q.    (BY MR. ANDRESS:)  All right.

7    Now, back to this letter, and it's -- I

8    will go ahead and just offer it.  I know

9    it's in here somewhere, but let's make

10   this Defendant's Exhibit 1 unless you want

11   to point it out, Nick.

12         MR. WOOTEN:  I will find it

13   right quick.  I'm pretty sure that was in

14   there because we talked about that, I

15   know.  Maybe we talked about it and didn't

16   mark it.

17         MR. ANDRESS:  That's all

18   right.

19         MR. WOOTEN:  I don't see it.

20         MR. ANDRESS:  All right.  Make

21   this Defendant's Exhibit 1.

22         (Whereupon, Defendant's

23         Exhibit 1 was marked

43

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1           for identification.)

2       Q.      All right.  So, you don't

3   remember getting this, but you don't

4   dispute that you may have gotten it from

5   Mr. Wooten or his office?

6       A.      No, sir, I probably got it.

7       Q.      All right.  Do you see in this

8   letter where it talks about what the

9   charges are, that the insurance issues

10  are?

11      A.      Yes, sir.

12      Q.      And I will just read it to

13  you.  It says in the second paragraph, our

14  records reflect that the servicing of this

15  loan was transferred to ASC on

16  November 1st, 2002.  At the time of

17  transfer, an escrow advanced balance

18  existed on the loan in the amount of six

19  hundred thirty-seven dollars and fifty

20  cents.  This balance was the result of two

21  advances made by the previous mortgage

22  company for payment of lender placed

23  insurance.  The first disbursement in the

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    amount of three hundred and twenty-three

2    dollars made on October 25th, 2000 was for

3    lender placed insurance coverage effective

4    August 3rd, 2000 through August 3rd, 2001.

5    Then on August 8, 2001, funds in the

6    amount of three hundred and fourteen

7    dollars and fifty cents were advanced as

8    payment for coverage effective from

9    August 3rd, 2001 through August 3rd, 2002.

10   Do you see where I read that from, the

11   second paragraph in the letter?

12            MR. WOOTEN:   He is talking

13   about that right there (indicating).

14        A.    I don't remember nothing about

15   no insurance back in -- I just thought it

16   was two payments.

17        Q.    Yes.

18        A.    I mean, I'm talking about

19   regular payment payments.

20        Q.    This is -- this letter is

21   saying that there's six hundred and

22   thirty-seven dollars and fifty cents of

23   forced placed insurance that was in years

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    2000 and 2001.  Do you see where it says

2    that?

3        A.    Yes, sir.

4        Q.    And the number of -- that the

5    cost of the insurance of six hundred and

6    thirty-seven dollars and fifty cents, is

7    that the same amount that you were told

8    was owed in 2005 when you were talking

9    with ASC?

10       A.    It was six something.  I don't

11   really remember the total.

12       Q.    But it was pretty --

13       A.    It was about the same thing,

14   yes, sir.

15       Q.    Okay.  Now, let's talk about,

16   you know, the emotional damages and that

17   sort of thing from the period of

18   October 3rd through August 7th, 2006, and

19   it's October 3rd, 2005.  Are you

20   claiming -- and you may not know this, but

21   are you claiming mental anguish damages,

22   like are you claiming that this insurance

23   issue caused you to be emotionally

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    disturbed?

2         A.    Well, you know, I mean, they

3    called all the time and it did mess my

4    credit up.

5         Q.    All right. That's --

6         A.    And which still is.

7         Q.    But other than the calls that

8    we talked about and the credit issue, this

9    issue didn't cause you any depression

10   or --

11        A.    Well, you know, when somebody

12   calls you on the phone and you stay on the

13   phone for an hour sometimes, sometimes

14   longer than that, and they send you to

15   this person and that person and that

16   person and then nobody really tell you

17   nothing, yes.

18        Q.    So, it was aggravating?

19        A.    Yes, sir.

20        Q.    But it didn't cause you

21   serious emotional damages, did it, I mean,

22   such that you would -- such like you would

23   have to go see a doctor and go to

# ⅡΞ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  counseling?

2      A.    No, sir, it didn't do that,

3  but, you know --

4      Q.    Just aggravating?

5      A.    Just aggravating, I was

6  already going to doctors.

7      Q.    Yes.  Let's see, Mr. Alewine,

8  did you talk with people on the phone from

9  ASC or your wife or both of y'all, or do

10  you remember?

11          MS. ALEWINE:  Both of us have.

12      A.    Yes, we've both talked.

13      Q.    All right.  All right.  Now,

14  we've talked about the emotional issues.

15  Would you characterize the aggravation as,

16  you know, annoying but not substantial?

17      A.    Well, you know, it was

18  aggravating, a lot of times I would be

19  home for lunch and have to go back to work

20  and they wanted to keep you on the phone

21  and, look, I've got to go and they want to

22  just keep on, and then they still --

23      Q.    Did y'all have caller ID?

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    A.    Yes, sir.

2    Q.    So, I mean, were there times

3    when you would see who was calling and

4    just didn't answer it?

5    A.    Well, they had -- there were

6    so many phone numbers until I really

7    didn't know.  There were several phone

8    numbers.

9    Q.    Okay.  As far as, you know,

10    messing up your credit, you're saying that

11    your credit -- it was reported onto your

12    credit that you were past due on your loan

13    payment?

14    A.    Oh, yes.

15    Q.    Did that cause you to not get

16    any loans or --

17    A.    Yes, sir.

18    Q.    Okay.

19    A.    It still is.

20    Q.    What loans have you applied

21    for that you haven't been able to get?

22    A.    Well, I tried to buy a truck

23    back last year, maybe a year and a half

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ago now.  And that was about the time they
2    finally cleared it up and I did get the
3    truck.
4         Q.    Okay.
5         A.     But I also tried to get a
6    Sears charge card from Sears and it hadn't
7    been a year, well, right before Christmas
8    and I didn't get it.  And now I'm four
9    months behind.
10        Q.    Oh, on your loan?
11        A.    On --
12        Q.    On this Morcap loan, you're
13   four months behind -- you're being shown
14   as four months behind?
15        A.    That's what they told me
16   yesterday -- not yesterday, but the first
17   of the week.
18        Q.    Okay.  So, Sears wouldn't give
19   you a credit card because they told you --
20        A.    I don't owe anything except
21   for that and that truck payment, that's
22   all I owe.
23        Q.    Oh, is the truck payment

# EXHIBIT B
# (2 of 2)

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    behind, too, right now?

2          A.    No.

3          Q.    So, are y'all current on all

4    of your bills?

5                MS. ALEWINE:  Yes.

6          A.    Yes, sir.

7          Q.    And, so, tell me again what

8    Sears said, why they wouldn't give you a

9    credit card.

10         A.    Seems like I was going to buy

11   a washer and dryer, they don't tell you

12   why, they just turn you down.

13         Q.    All right.  Do y'all have

14   other credit cards other than the Sears

15   card?

16         A.    I don't even have one.

17         Q.    So, no credit cards?

18         A.    No credit cards.

19         Q.    All right.  And when did you

20   try to buy the washer and dryer?

21         A.    Do you remember the last --

22               MS. ALEWINE:  I don't remember

23   exactly when it was.

# ⅡⅬ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       A.      About a year ago.

2       Q.      Were you able to get a washer

3   and dryer after that?

4       A.      I paid for it, yes.  Yes, sir,

5   I paid cash for it.

6       Q.      All right.  From Sears?

7       A.      Yes, sir.

8       Q.      All right.  How long was it

9   that you were not able to buy the truck

10  until you bought the truck?

11      A.      Well, I went several times and

12  looked and then finally, after they

13  cleared it off, I bought the truck.

14      Q.      And how long did it take for

15  them to clear up and make you the loan to

16  buy the truck?

17      A.      It was, I don't remember,

18  three or four months.  I'm not rightly

19  sure, but it was a little while.

20      Q.      All right.  Did you pick out a

21  truck and say I want to buy this truck and

22  I'm ready to sign today and then they

23  said, well, your credit's not good enough

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    and then it took three months later?

2         A.    Oh, no.  No, sir.  I just

3    looked different places.

4         Q.    Okay.

5         A.    I knew what I wanted, but, you

6    know --

7         Q.    When you found the truck that

8    you ended up buying, how long did it take

9    you to tell the salesperson, I want to buy

10   this truck and how long did it go from

11   that point until, you know, you were

12   signing paperwork to buy the truck?

13        A.    Probably three hours.

14        Q.    Okay.  Are there any other

15   loans that you were denied or any other

16   financial damages to your credit that you

17   know about?

18        A.    Well, you know, just like they

19   do when they check -- you know, like

20   you're going to buy the truck from King

21   Ford or something, they check different

22   places and several of them still turned me

23   down, but I did get the truck.

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    Q.    Okay.  All right.  Anything
2    else other than the Sears issue and the
3    truck issue?
4    A.        No, sir.
5    Q.        All right.
6    A.        Not that I remember.
7    Q.        All right.  Now, let's go back
8    to this letter, Defendant's Exhibit 1 says
9    that Ocwen was -- Ocwen forced placed some
10   insurance on y'all in 2000 and 2001.  And,
11   I mean, it says the prior loan servicer,
12   but you knew that was Ocwen, right?
13   A.        Yes, sir.
14   Q.        Sitting here today, have you
15   or Ms. Alewine called Ocwen and disputed
16   that y'all did not have insurance in
17   effect at that time?
18   A.        I really don't remember that.
19            MS. ALEWINE:  No, we never
20   talked to them about that, that I
21   remember.
22            MR. WOOTEN:  They never told
23   y'all y'all didn't pay insurance, did

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  they?

2           MS. ALEWINE:   No.   Not in 2000

3  and 2001.

4      A.     We thought it was two

5  payments, regular payments like one month

6  payment and the next month payment.

7           MR. WOOTEN:   Isn't the dollar

8  amount in that letter approximately the

9  same as what they said you were behind in

10 payments back when you filed bankruptcy?

11          MS. ALEWINE:   Yes.

12     A.     Exactly.

13          MR. WOOTEN:   Almost to the

14 dollar?

15     A.     Almost to the dollar.

16     Q.     All right.   Let's keep going.

17 All right.   So, after August 7th, 2006,

18 you're not aware of any communication

19 between you, your wife and Ocwen disputing

20 that y'all didn't have insurance at that

21 time?

22     A.     After -- no, sir.   No, sir.

23     Q.     All right.   And you didn't, to

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  your knowledge -- strike that.  Neither

2  you nor your wife has provided Ocwen with

3  proof that y'all had insurance in effect

4  at 2000 or 2001?

5          A.    Not that I remember, but I've

6  got proof of it.

7          Q.    All right.  You have -- okay.

8  And I believe we've seen it and I think it

9  was produced in this lawsuit, proof that

10  you had insurance at that time, but you

11  just hadn't given that to Ocwen at this

12  time?

13          MS. ALEWINE:   They hadn't

14  requested it.

15          A.    Yes, nobody asked for it.  It

16  was just two payments.

17          Q.    All right.  Now, from

18  August 7th to before the lawsuit was

19  filed, which I think was in October of

20  2006, y'all didn't have any conversations

21  with ASC where you said the Ocwen forced

22  placed insurance was paid, right?

23          A.    No, sir, it's never come up.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Q.    All right.  But you had in
2    your possession proof that the Ocwen
3    insurance was paid, right?
4    A.    Yes, sir.
5    Q.    If you --
6    A.    I mean, it's at home, you
7    know, I've got proof of it.
8    Q.    And y'all did have insurance
9    in 2000 and 2001 on your house, right?
10    MS. ALEWINE:  Yes.
11    A.    Yes, sir.
12    Q.    All right.  If Wells -- strike
13    that.  If ASC -- strike that, too.  If you
14    would have known that this whole insurance
15    issue was about, you know, this 2000, 2001
16    Ocwen insurance, would you have
17    communicated that to ASC?
18    A.    If I knew it.
19    Q.    Yes.  If you would have known
20    that that was what this was all about,
21    would you have told ASC, I had proof -- I
22    had insurance and I have proof of it and
23    I'll send it to you, would you have done

## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  that?

2      A.      Yes, sir, I would have.

3      Q.      And if ASC would have received

4  that information and said, okay, you've

5  proven that to us, we will work with Ocwen

6  to get your money back and you don't owe

7  that extra fifty bucks, would that have

8  satisfied you, you know, after August of

9  2006?

10      A.      I don't understand.

11      Q.      That could be a bad question.

12  I told you I was going to ask some.  If

13  ASC would have heard from you that you had

14  proof that insurance was in place during

15  2000 and 2001, and if ASC would have at

16  that time said we've seen what you have

17  and we agree and, so, now don't worry

18  about the fifty dollars anymore, just you

19  keep making your standard payment and

20  everything will be like you paid the

21  normal amount the whole time, would that

22  have satisfied you?

23      A.      I don't know.  I honestly

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   don't know.

2        Q.    Well, think about it, I guess.

3   I mean, if you don't know, you don't know.

4        A.    There's basically a lot right

5   in there I don't understand.

6        Q.    I know.  I guess, Mr. Alewine,

7   what I'm saying is --

8              MR. WOOTEN:  I think what he's

9   saying is if they had corrected your

10  account based on the letter I wrote, would

11  you have wanted to sue them again.

12             MS. ALEWINE:  I think I would

13  because they wouldn't -- they still

14  wouldn't leave us alone, and we've showed

15  them proof.  I don't know how many times

16  they've asked for it, every time they

17  asked for it, every year, including 2000,

18  2001 on up to 2000 -- as far as now, 2007.

19             MR. ANDRESS:  Yes.

20  Ms. Alewine, I do appreciate that, and I

21  don't mind y'all --

22             MS. ALEWINE:  I'm sorry.

23             MR. ANDRESS:  I know, we've

# ∏ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    got to swear you in and that sort of
2    thing, and you can tell me everything you
3    want to tell me.
4              MS. ALEWINE:  I understand.
5         Q.    All right.  I'll ask it to you
6    this way, Mr. Alewine.  If ASC would have
7    received your information on this 2000 and
8    2001 insurance and said, okay, we
9    understand that you've paid it now, the
10   issues are over, your loan is current, if
11   they would have done that, would that have
12   made you satisfied in October of 2005?
13        A.    I don't think so.
14        Q.    And why not?
15        A.    Because that would have been
16   several years right there.
17        Q.    All right.  You understand
18   that there was a release, okay, that was
19   sometime earlier in 2005, and, so, as far
20   as, you know, what happened before the
21   release, you know, we don't need to talk
22   about that.  That's a separate issue.  But
23   from the date of the release through

## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   October of 2005, nobody had required you
2   to pay any extra money at that point,
3   right?
4           A.      I think that's when they
5   started the escrow.
6           Q.      Yes, the escrow, we saw
7   earlier that the escrow was going to start
8   in October of 2005.  So, before October of
9   2005, ASC had not tried to collect the
10  escrow, the fifty dollar extra payments?
11          A.      Not before that, no, sir.
12          Q.      All right.  So, if ASC would
13  have called you in October of 2005 and you
14  two would have discussed that you had
15  insurance in effect and then ASC would
16  have said, okay, thanks for the
17  information, this issue is corrected,
18  we're not going to try to collect the
19  extra payment because you don't owe it, at
20  that time, would that have satisfied you
21  at least in regards to the insurance
22  issue?
23          A.      I can't answer that because to

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    tell you the truth, I still don't
2    understand it.  I don't understand the
3    insurance way back then compared to now,
4    you know.
5          Q.    Okay.  All right.
6          A.    I really don't -- I really
7    don't know.
8          Q.    All right.  I asked you
9    questions about out-of-pocket amounts that
10   you and your wife made between
11   October 3rd, 2005 and August 7th, 2006.
12   Now I want to ask you what out-of-pocket
13   payments, if any, did you and your wife
14   make after August 7th, 2006, you know, in
15   order to get ASC to provide you with
16   information, you know, about the
17   insurance?
18         A.    Out-of-pocket, no, no
19   out-of-pocket.
20         Q.    Okay.  And then as far as, you
21   know, your testimony about the mental
22   anguish and the calls and all of that,
23   were you testifying about the entire time

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1   that this has been going on?

2       A.    Yes, sir.

3       Q.    All right.  The loan was from

4   Morcap, right, Morcap, it's -- let's see

5   here.

6             MR. WOOTEN:  I think I've got

7   it right here.  It's Exhibit 10.

8       Q.    All right.  Plaintiff's

9   Exhibit 10.

10            MR. WOOTEN:  That's your

11  original mortgage note.

12      Q.    Who is Morcap?  I mean, I've

13  never heard of that bank before or that

14  lender.

15      A.    They were a place in Columbus,

16  Georgia.

17      Q.    All right.

18      A.    I don't -- I don't remember

19  how we even got it started, to tell you

20  the truth.

21      Q.    That's fine.  But what you're

22  looking at, Plaintiff's Exhibit 10, does

23  appear to be the loan and the mortgage

**ΙΕ TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  that we're talking about here today?

2        A.      Yes, sir.

3        Q.      Now, y'all filed for

4  bankruptcy in 1999; is that right?

5        A.      I think it was '99.

6        Q.      And was this loan something

7  that y'all were going to pay for outside

8  of your bankruptcy plan?

9        A.      Yes, sir.

10        Q.      And did y'all do that, did you

11  make your required loan payments, you

12  know --

13        A.      Yes, sir.

14        Q.      -- outside your bankruptcy

15  plan?

16        A.      Yes, sir.

17        Q.      And after you filed for

18  bankruptcy, did y'all remain current on

19  your loan obligations?

20        A.      Yes, sir.

21        Q.      All right.  And is it your

22  testimony that y'all have timely made all

23  payments that you owe on this loan after

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  1999 all the way until today?

2       A.    Yes, sir, all but I was

3  thinking there was two payments to the

4  other company, you know, that we was

5  behind, that when we went into the

6  bankruptcy, they paid.  And that's what I

7  thought.

8       Q.    All right.

9       A.    I didn't know about insurance.

10      Q.    But in --

11      A.    I could be wrong.

12      Q.    But just as far as you know --

13      A.    As far as I know.

14      Q.    -- y'all made all of your

15  payments.  Now, in November of 2002, were

16  you current on your loan payments?

17      A.    Yes, sir.

18      Q.    You were not behind at all?

19      A.    No, sir.

20      Q.    All right.  Okay.  Have you

21  paid any money to Mr. Wooten's firm for

22  filing fees, lawsuit filing fees or

23  anything?

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      A.      No, sir.

2      Q.      And when y'all were going to

3  make insurance payments outside of the

4  loan, did you understand that you had to

5  let the lender know that you had insurance

6  on the home if they --

7      A.      Oh, yes, sir.

8      Q.      And you're not aware of any

9  discussions that you had with Ocwen about

10  this escrow insurance amount, right?

11      A.      No, sir, not with Ocwen.

12              (Whereupon, Defendant's

13              Exhibit 2 was marked

14              for identification.)

15      Q.      All right.  I'm going to show

16  you a document marked Defendant's

17  Exhibit 2.  This was produced to us by

18  Mr. Wooten.  I don't know if all of this

19  goes together or not.  But, obviously, it

20  was stapled the way we received it.  Have

21  you ever seen that before?

22      A.      Yes, sir, I've seen it before.

23      Q.      Do you remember if everything

# ⅢⒺ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    in Defendant's Exhibit 2 was received

2    together when you got it?

3            A.    I'm pretty sure it was.  I

4    really don't remember.

5            Q.    Okay.  Do you mind if I come

6    over here and point something out to you?

7    Let's see.  This is your address, isn't

8    it, on Defendant's Exhibit 2?

9            A.    Yes, sir.

10           Q.    And then this is the letter

11   that tells y'all that ASC will start

12   servicing your loan, right?

13           A.    Yes, sir.

14           Q.    All right.  This payment

15   history --

16           MR. WOOTEN:  The payment

17   history did not come with that letter.

18           MR. ANDRESS:  All right.

19           MR. WOOTEN:  Steve Geisler got

20   the payment history in the first lawsuit

21   and sent it to me.

22           MR. ANDRESS:  All right.

23           MR. WOOTEN:  They requested

# ᆩᄐ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  that from Ocwen and got that.

2          MR. ANDRESS:  Okay.

3      A.    Yes, I remember now.  Yes.

4          MR. ANDRESS:  Let's do this,

5  then, let's break --

6          MR. WOOTEN:  Do you want to

7  separate those two into two separate

8  exhibits?

9          MR. ANDRESS:  Yes.

10          MR. WOOTEN:  Fine.  This is

11  actually a front and back page, two.

12  Let's just use that, that's actually one

13  of the exhibits, Exhibit 8, in my

14  deposition, there's a front and back of

15  that.

16          MR. ANDRESS:  All right.

17  Let's do that.

18          MR. WOOTEN:  Refer to that?

19          MR. ANDRESS:  Yes.

20          MR. WOOTEN:  And do you want

21  to just make the payment history

22  Exhibit 2?

23          MR. ANDRESS:  Yes.  Let the

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    record reflect that we're going to

2    substitute Defendant's Exhibit 2 for the

3    Ocwen payment history.

4            Q.    All right.  Defendant's

5    Exhibit 2, Mr. Alewine, have you ever seen

6    this before?  I know it's addressed to

7    your home address, Mr. Wooten says he may

8    have gotten that directly from a different

9    law firm handling the first lawsuit.  So,

10   do you know whether or not you have ever

11   seen this before?

12           A.    It's from Ocwen?

13           MR. WOOTEN:  Yes, that's the

14   payment history from Ocwen.

15           A.    Yes, I've seen that.

16           Q.    I will show you -- page one,

17   which is the second page of this exhibit,

18   shows you this escrow amount of six

19   thirty-seven point fifty.  And it just

20   shows that in July of 2001, three hundred

21   and twenty-three dollars was paid, which

22   moved the balance up to six thirty-seven

23   fifty.  So, anyway, this is the six

TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    hundred and thirty-seven dollars and fifty

2    cents that was referred to in the

3    August 7th, 2006 letter, which is

4    Defendant's Exhibit 1.  Does that appear

5    correct to you?

6              MR. WOOTEN:  Are you asking

7    him if that's the same escrow balance here

8    that's showing in Defendant's Exhibit 1,

9    dollar amount?

10             MR. ANDRESS:  Yes.

11       Q.    Does that seem logical to you,

12   Mr. Alewine?

13       A.    I guess.

14       Q.    If you don't know, it's okay.

15       A.    I really don't know.

16       Q.    All right.  Fair enough.  But

17   you have -- you've seen that document

18   before and received it, right?

19       A.    Yes, sir.

20             MR. ANDRESS:  I'm going to

21   show you another letter.  Let's mark this

22   Defendant's Exhibit 3.

23             (Whereupon, Defendant's

70

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1           Exhibit 3 was marked

2           for identification.)

3      Q.    This is a letter addressed to

4  Mr. Wooten's office from ASC, which

5  basically says we're looking into the

6  information you requested and we'll

7  respond to you shortly.  Do you remember

8  seeing that letter?

9      A.    I don't.

10     Q.    Okay.

11     A.    No, sir.

12     Q.    All right.  You could have,

13  you just don't remember it?

14     A.    Oh, yes, I saw so many.

15     Q.    All right.  Your house hasn't

16  been published for foreclosure or anything

17  like that, has it?

18     A.    No, sir.

19           (Whereupon, Defendant's

20           Exhibit 4 was marked

21           for identification.)

22     Q.    All right.  This is other

23  information that -- what I'm marking as

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Defendant's Exhibit 4 is other information

2    that y'all produced pursuant to this

3    lawsuit, which is a collection of

4    documents appearing to be, you know, proof

5    of insurance payments.  And that's

6    Defendant's Exhibit 4.  Will you look

7    through that and identify it?

8         A.    (Reviewing document.)

9         Q.    Mr. Alewine, could you

10   identify all of the documents in

11   Defendant's Exhibit 4, is that your proof

12   of insurance payments?

13        A.    It's proof of insurance is

14   what it looks like.

15        Q.    And were those documents that

16   you had in your possession before the

17   lawsuit was filed?

18        A.    Yes, sir.

19        Q.    And are you aware of providing

20   ASC any proof of insurance payments for

21   the years 2000 or 2001 before the lawsuit

22   was filed?

23        A.    No, sir.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      Q.      When you -- well, you don't
2    remember receiving -- all right.
3    Defendant's Exhibit 3, okay.  Other than
4    the October 3rd, 2005 letter from
5    Mr. Wooten, you're not aware of any
6    follow-up letters that you or your wife or
7    Mr. Wooten sent to ASC to check on the
8    status of this, are you?
9      A.      No, sir, I'm not.
10     Q.      As far as you know, there was
11   just one letter that was responded to,
12   apparently July 20th, '06, and then
13   further on, August 7th, 2006, right?
14     A.      Yes, sir.
15     Q.      Is sitting here today the
16   first time that you were aware that the
17   insurance issue was 2001 and 2000?
18     A.      The first I had heard about
19   it, they kept telling me 2005.
20     Q.      All right.
21     A.      They said --
22          MR. WOOTEN:  Did anybody you
23   talked to from ASC ever tell you that it

# TYLER EATON
## TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    was insurance from 2000 and 2001?

2         A.    No, 2005.

3              MR. WOOTEN:  Okay.

4              MR. ANDRESS:  If you could

5    give me just a second, that may be all

6    I've got for you.  Let me look at my notes

7    real quick.

8              MR. WOOTEN:  Do you need to go

9    to the bathroom or anything and give him a

10   minute to look at that, drink or anything?

11        A.    No, I'm all right.

12             (Off-the-record discussion.)

13        Q.    (BY MR. ANDRESS:)  If you

14   would have read this August 7th, 2006

15   letter, you would have understood what the

16   issue was, wouldn't you?

17        A.    (Reviewing document.)  Well,

18   yes, sir, I would have understood it.

19        Q.    Okay.  Mr. Alewine, let's see

20   that.  The letter also asks if you have

21   any documentation, you know, provide it

22   and we'll look into it or words to that

23   effect, doesn't it?

# ⅉℇ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1        A.      Yes, sir.

2        Q.      Okay.  And before the lawsuit,

3   no Ocwen 2000 or 2001 insurance

4   information was provided as far as you

5   know, right?

6        A.      As far as I know.

7             MR. ANDRESS:  Okay.

8   Mr. Alewine, thank you, that's all I have.

9        A.      Well, all right.

10

11       FURTHER THE DEPONENT SAITH NOT

12

13   (Deposition concluded at 11:00 a.m.)

14

15

16

17

18

19

20

21

22

23

# ⅡE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1              C E R T I F I C A T E

 2

 3

 4    STATE OF ALABAMA

 5    JEFFERSON COUNTY

 6

 7              I hereby certify that the

 8    above and foregoing deposition was taken

 9    down by me in stenotypy, and the questions

10    and answers thereto were reduced to

11    typewriting under my supervision, and that

12    the foregoing represents a true and

13    correct transcript of the deposition given

14    by said witness upon said hearing.

15              I further certify that I am

16    neither of counsel nor of kin to the

17    parties to the action, nor am I in anywise

18    interested in the result of said cause.

19

20

21              Susan Treadaway

22

23    COMMISSIONER-NOTARY PUBLIC
```

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com



7495 New Horizon Way
Frederick, MD 21703

August 7, 2006

Wooten Law Firm, P.C.
Nick Wooten
PO Box 290
LaFayette, AL 36862

Dear Sir:

RE: Loan Number 1099003191                          Client 106
    Edward and Shelly Alewine

Thank you for contacting America's Servicing Company (ASC) regarding the above
referenced loan.

Our records reflect that the servicing of this loan was transferred to ASC on
November 1, 2002. At the time of transfer, an escrow advance balance existed on the loan,
in the amount of $637.50. This balance was the result of two advances made by the
previous mortgage company for the payment of lender placed insurance. The first
disbursement in the amount of $323.00, made on October 25, 2000, was for lender placed
insurance coverage effective from August 3, 2000 through August 3, 2001. Then on August
8, 2001, funds in the amount of $314.50 were advanced as payment for coverage effective
from August 3, 2001 through August 3, 2002.

An escrow account is not currently in effect for the payment of property taxes and insurance
for this loan. However, the escrow advance balance remains due, as reflected in the
enclosed Mortgage document and communicated in the correspondence issued to the above
referenced mortgagors on July 18, 2005 and March 30, 2006, respectively. If evidence of
existing insurance coverage for the time period of August 3, 2000 through August 3, 2002 is
available, please contact ASC. Once this documentation is received and reviewed, we will
work with the previous mortgage company, Ocwen Federal Bank, to obtain a refund of the
necessary lender placed insurance premiums that were advanced from the loan. Please be
assured, if the refund amount exceeds the advance balance, the excess funds will be
refunded to the mortgagors.

Also enclosed is a transaction history of the loan from August 1, 2004 to the present date,
for your review.



DEFENDANT'S
EXHIBIT
|
E. Alewine



AMERICA S SERVICING COMPANY

7495 New Horizon Way
Frederick, MD 21703

Page 2

Should you have additional questions, please call our Customer Relations Department at
800-842-7654. A representative will be able to assist you Monday through Friday between
the hours of 8:00 AM and 6:00 PM, in your time zone.

Sincerely,

America's Servicing Company

Enclosures



O C W E N

DEFENDANT'S
EXHIBIT
2
PENGAD 800-631-6989

Edward H. Alewine
1102 Alewine Dr.
Valley, AL. 36854

Dear Requestor:

Enclosed please find the information that was requested for the above Account.

Loan Document Request _____
Payment History _____
Verification of Mortgage _____

If you should have any questions, please call 1-800-74OCWEN (746-2936).

Sincerely,
Customer Service
Ocwen Federal Bank FSB

This message is intended for the use of the individual or entity to which it is addressed. This message may contain information that is PRIVILEGED and CONFIDENTIAL. If the recipient of this message is not the intended recipient, or employee, or agent responsible for delivering the message to the intended recipient, you are hereby notified that any communication in error please notify the sender immediately by telephone and return the original to the mailing address provided. Thank you.

Ocwen Federal Bank FSB is a debt collector attempting to collect a debt. Any information obtained will be used for that purpose.

Detail Transaction History

MSR-SHEET
Ocean Federal Bank FSB

LOAN#: 30117055    INVESTOR#: 347    POOL#: 2
BORR#: Edward M Alewine
PPMT#: 1102 Alewine Drive
        Valley AL 36854

Mail: 1102 Alewine Drive
      Valley AL 36854-0855

NEXT DUE DT:10/29/2002          INTEREST RATE%: 11.90000          PRIN BAL:          .00
                                                                  ESC BAL:           .00

| TRANSACTION EFFECTIVE TIME | BY TRN DESCRIPTION | NXT DUE/REF REVERSED | AFTER TRANS. PRINCIPAL BALANCES-ESCROW | TOTAL INTEREST AMOUNT% | PRINCIPAL | INTEREST | APPLIED ESCROW | SUSPENSE | OTHER |
|---|---|---|---|---|---|---|---|---|---|
| 11/01/2002 16:44:19 | PVT Payoff - Transfer Se | | 0.80 | 37,170.15 | 36,539.27 | .00 | 637.50 | 7.12- | 0.00 |
| 11/01/2002 16:44:16 | LCN Late Charge Waive | | 637.50- | 75.00 | .00 | .00 | .00 | 0.00 | 574.29 |
| 11/01/2002 16:44:13 | FEW Fee Waive | FEE02 | 637.50- | 75.00 | .00 | .00 | .00 | 0.00 | 75.00 |
| 11/01/2002 16:44:13 | EEW Expense Waive | FEA2 | 637.50- | 195.00 | .00 | .00 | .00 | 0.00 | 195.00 |
| 10/30/2002 23:36:55 | BSF Regular/Spread | 107/29/2002 | 631.50- | 383.00 | .00 | 364.52 | .00 | 0.15 | 18.33 |
| 10/30/2002 23:21:35 | BSF Regular/Spread | 09/29/2002 | 636.576.30 | 382.85 | 18.33 | 364.70 | .00 | .05 | .77 |
| 09/23/2002 23:59:40 | SPR Spread Payment | | 636,576.25 | .00 | 6.69 | .00 | .00 | 6.69- | 0.00 |
| 09/23/2002 23:59:07 | SPR Spread Payment | | 636,582.94 | .00 | 6.69 | .00 | .00 | 6.69- | 0.00 |
| 09/23/2002 23:59:04 | PAS Altplan Suspense Adj | | 636,582.94 | .00 | .00 | .00 | .00 | 6.69 | 6.69- |
| 09/23/2002 23:59:01 | RSF Regular/Spread | 08/29/2002 | 636,582.94 | 393.00 | 17.98 | 364.57 | .00 | 0.00 | 21.15 |
| 08/28/2002 16:39:19 | RSF Regular/Spread | | 636,600.92 | .00 | 21.15 | .00 | .00 | 0.00 | 21.15- |
| 08/28/2002 16:39:23 | SPR Spread Payment | | 636,622.07 | .00 | .00 | .00 | .00 | 21.15 | 21.15 |
| 08/28/2002 16:39:20 | BIF Bankruptcy Plan Inte | | 636,622.07 | .00 | .00 | .00 | .00 | 0.00 | 0.00 |
| 08/28/2002 16:39:12 | APR Prepetition Payment | | 636,622.07 | 21.15 | .00 | .00 | .00 | 21.15- | 0.00 |
| 08/02/2002 23:23:47 | RSF Regular/Spread | 017/29/2002 | 636,622.07 | 383.00 | 12.86 | 365.65 | .00 | .00 | 21.15 |
| 07/24/2002 13:55:45 | SPR Spread Payment | | 636,634.87 | .00 | 21.27 | .00 | .00 | 21.27- | 0.00 |
| 07/24/2002 13:53:56 | SPR Spread Payment | | 636,640.24 | .00 | .37 | .00 | .00 | 6.37- | 6.37 |
| 07/24/2002 13:53:54 | PAS Altplan Suspense Adj | | 636,661.91 | .00 | .37 | .00 | .00 | 0.37 | 0.37- |
| 07/24/2002 13:53:53 | APR Prepetition Payment | | 636,661.91 | 21.27 | 21.27 | .00 | .00 | 21.27- | 21.67- |
| 07/24/2002 13:55:47 | PAS Altplan Suspense Adj | | 636,661.91 | .00 | 71.67 | .00 | .00 | 71.67 | 71.67- |
| 07/24/2002 13:55:47 | SPR Spread Payment | | 636,661.91 | .00 | .00 | .00 | .00 | 21.67 | 21.67 |
| 07/24/2002 13:55:47 | APR Prepetition Payment | | 636,661.94 | .00 | .62 | .00 | .00 | 0.15 | 0.15 |
| 07/01/2002 23:38:01 | HSF Regular/Spread | | 636,661.94 | 383.59 | 17.62 | 365.23 | .00 | 0.69 | 0.59- |
| 06/24/2002 17:08:41 | SPR Spread Payment | 06/29/2002 | 636,679.53 | .00 | 29.67 | .00 | .00 | 0.59 | 0.59- |
| 06/24/2002 16:40:07 | RSF Regular/Spread | | 636,708.20 | 26.67 | .00 | .00 | .00 | 28.67- | 28.67- |
| 06/24/2002 16:40:04 | PAS Altplan Suspense Adj | | 636,708.20 | .79 | 17.45 | 365.46 | .00 | 0.00 | 6.79 |
| 05/24/2002 15:16:47 | BIF Bankruptcy Plan Inte | | 636,725.65 | .00 | 27.05 | .00 | .00 | 27.05- | 27.05- |
| 05/24/2002 15:15:52 | RSF Regular/Spread | 05/29/2002 | 636,752.70 | 362.85 | .00 | .00 | .00 | 0.00 | 27.05- |
| 05/24/2002 15:15:40 | PAS Altplan Suspense Adj | | 636,752.70 | .00 | 27.05 | 365.53 | .00 | 0.00 | 27.05 |
| 05/24/2002 15:13:27 | APR Prepetition Payment | | 636,752.70 | 18.11 | 17.11 | .00 | .00 | 27.05- | 27.05- |
| 04/29/2002 22:47:19 | SPR Spread Payment | | 631,657.85 | .00 | 17.78 | .00 | .00 | 43.02 | 1.11 |
| 04/23/2002 12:39:59 | SPR Spread Payment | 04/29/2002 | 636,769.99 | .00 | 43.02 | .00 | .00 | 43.02- | 43.02 |
| 04/23/2002 12:56:01 | PAS Altplan Suspense Adj | | 636,813.01 | 43.02 | .00 | .00 | .00 | 43.02- | 43.02 |
| 04/23/2002 12:55:38 | APR Prepetition Payment | | 636,813.00 | 43.02 | .00 | .00 | .00 | 0.00 | 0.00 |
| 03/23/2002 14:14:42 | BIF Bankruptcy Plan Inte | 03/29/2002 | 636,830.11 | 1.14 | .06 | 365.74 | .00 | 0.06 | 1.14 |

Case 3:06-cv-00886-MHT-SRW     Document 37-6     Filed 08/31/2007     Page 32 of 55

Green Federal Bank FSB
MSR-SHEET

Retail Transaction History

LOAN#: 30117055
POOL#1: Federal H Alewine
POOL#2:
9801: 1102 Alewine Drive
Valley AL 36854

INVESTOR#: 347     POOL#: 2     NEXT DUE DT: 10/29/2002

MAIL: 1102 Alewine Drive
Valley AL 36854-9655

INTEREST RATE: 11.95000

PRIN BAL:     .00
ESC BAL:     .00

| TRANSACTION EFFECTIVE | TIME | BY | TRN | DESCRIPTION | NXT DUE/REV | REVERSED | AFTER TRANS BALANCES — PRINCIPAL | ESCROW | TOTAL AMOUNT | PRINCIPAL | INTEREST | APPLIED ESCROW | SUSPENSE | OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/26/2002 | 14:23:21 | | SPR | Spread Payment | | | 36,930.11 | 637.50- | .60 | 4.37 | .00 | .00 | 0.00 | 4.37- |
| 07/26/2002 | 14:20:06 | | PAS | Altplan Suspense Adj | | | 36,834.48 | 637.50- | .00 | .00 | .00 | .00 | 4.37 | 4.37- |
| 07/26/2002 | 14:20:03 | | APR | Prepetition Payment | | | 36,834.48 | 637.50- | 4.37 | 4.37 | .00 | .00 | 4.37 | 0.00 |
| 07/26/2002 | 01:58:12 | | RSP | Regular/Spread | | | 36,834.48 | 637.50- | 382.85 | 16.94 | 365.91 | .00 | 382.85- | 0.00 |
| 02/26/2002 | 10:55:07 | | BHP | Bankruptcy Plan Inte | 02/29/2002 | | 36,834.48 | 637.50- | 1.94 | .60 | .00 | .00 | 1.94 | 1.94 |
| 02/26/2002 | 10:54:36 | | SPR | Spread Payment | | | 36,951.42 | 637.50- | .90 | 26.20 | .00 | .00 | 26.20- | 26.20- |
| 02/26/2002 | 10:52:44 | | PAS | Altplan Suspense Adj | | | 36,977.62 | 637.50- | .00 | .00 | .00 | .00 | 26.20 | 26.20- |
| 02/26/2002 | 10:52:33 | | APR | Prepetition Payment | | | 36,977.62 | 637.50- | 26.20 | 26.20 | .00 | .00 | 26.20 | 0.00 |
| 11/29/2002 | 23:53:34 | | RSP | Regular/Spread | 01/29/2002 | | 36,977.62 | 637.50- | 382.85 | 16.78 | 366.07 | .00 | 382.85- | 0.00 |
| 11/29/2002 | 23:53:33 | | BHP | Bankruptcy Plan Inte | | | 36,898.40 | 637.50- | 1.49 | .00 | .00 | .00 | 1.49 | 1.49 |
| 11/29/2002 | 16:25:35 | | SPR | Spread Payment | | | 36,914.83 | 637.50- | .00 | 20.43 | .00 | .00 | 20.43- | 20.43- |
| 11/29/2002 | 16:21:29 | | PAS | Altplan Suspense Adj | | | 36,914.83 | 637.50- | .00 | .00 | .00 | .00 | 20.43 | 20.43- |
| 11/29/2002 | 16:21:27 | | APR | Prepetition Payment | 12/29/2001 | | 36,914.83 | 637.50- | 20.43 | 20.43 | .00 | .00 | 20.43 | 0.00 |
| 11/02/2002 | 16:21:24 | | RSP | Regular/Spread | | | 36,914.83 | 637.50- | 382.85 | 16.61 | 366.24 | .00 | 382.85- | 0.00 |
| 11/02/2002 | 18:37:34 | | SPR | Spread Payment | | | 36,931.44 | 637.50- | .64 | .00 | .00 | .00 | 1.41 | 1.41- |
| 11/02/2002 | 08:07:33 | | PAS | Altplan Suspense Adj | | | 36,931.44 | 637.50- | .06 | 14.83 | .00 | .00 | 14.83 | 14.83- |
| 12/31/2001 | 18:13:23 | | SPR | Spread Payment | | | 36,946.27 | 637.50- | 14.83 | 16.45 | 366.40 | .00 | 14.83- | 14.83- |
| 12/31/2001 | 18:12:06 | | RSP | Regular/Spread | 11/29/2001 | | 36,946.27 | 382.85- | 1.92 | .00 | .00 | .00 | 1.92 | 1.92 |
| 11/26/2001 | 18:13:23 | | SPR | Spread Payment | | | 36,962.72 | 637.50- | .00 | .00 | .00 | .00 | .00 | 0.00 |
| 11/26/2001 | 13:51:36 | | PAS | Spread Payment | | | 36,962.72 | 637.50- | .00 | .00 | .00 | .00 | 0.00 | 0.00 |
| 11/29/2001 | 13:51:19 | | SPR | Spread Payment | | | 36,962.72 | 637.50- | 41.91 | .00 | .00 | .00 | 41.91 | 41.91- |
| 11/29/2001 | 13:51:08 | | APR | Prepetition Payment | | | 36,962.72 | 637.50- | .00 | .00 | .00 | .00 | 0.00 | 0.00 |
| 11/26/2001 | 11:49:34 | | RSP | Regular/Spread | 10/29/2001 | | 36,962.72 | 382.85- | .00 | 16.29 | 366.56 | .00 | 0.00 | 0.00 |
| 07/31/2001 | 23:13:52 | | BHP | Bankruptcy Plan Inte | | | 36,979.01 | 637.50- | 1.99 | .00 | .00 | .00 | 1.99 | 1.99 |
| 07/31/2001 | 16:55:56 | | SPR | Spread Payment | | | 36,979.01 | 637.50- | .09 | .00 | .00 | .00 | 0.00 | 0.00 |
| 07/23/2001 | 16:55:16 | | PAS | Altplan Suspense Adj | | | 36,979.01 | 637.50- | .90 | .00 | .00 | .00 | 14.49 | 14.49- |
| 07/23/2001 | 16:55:09 | | APR | Prepetition Payment | | | 36,979.01 | 637.50- | .09 | .00 | .00 | .00 | 0.00 | 0.00 |
| 07/23/2001 | 16:02:39 | | RSP | Regular/Spread | | | 36,979.01 | 637.50- | 2.14 | .00 | .00 | .00 | 2.14 | 2.14 |
| 09/29/2001 | 13:02:47 | | SPR | Spread Payment | 09/29/2001 | | 36,993.48 | 637.50- | .60 | 14.47 | 368.38 | .00 | 0.00 | 0.00 |
| 09/29/2001 | 13:01:42 | | PAS | Regular/Spread | | | 36,993.48 | 637.50- | .00 | .00 | .00 | .00 | 382.85- | 382.85- |
| 09/29/2001 | 13:01:31 | | RSP | Altplan Suspense Adj | | | 36,993.48 | 637.50- | 20.00 | .00 | .00 | .00 | 0.00 | 0.00 |
| 09/14/2001 | 16:31:48 | | BHP | Bankruptcy Plan Inte | 06/29/2001 | | 37,009.61 | 637.50- | 16.13 | 16.13 | 366.72 | .00 | 382.85- | 382.85- |
| 09/25/2001 | 09:15:44 | | SPR | Spread Payment | | | 37,009.61 | 637.50- | 2.29 | .00 | .00 | .00 | 2.29 | 2.29 |
| 09/25/2001 | 09:15:33 | | APR | Prepetition Payment | | | 37,009.61 | 637.50- | 1.00 | .00 | .00 | .00 | 0.00 | 0.00 |
| 08/29/2001 | 09:55:20 | | BHP | Bankruptcy Plan Inte | | | 37,025.58 | 637.50- | 14.97 | 15.97 | 366.88 | .00 | 0.00 | 0.00 |
| 08/28/2001 | 16:31:59 | | EIC | Insurance Escrow Dis | SE EXPENSE Ms | | 37,025.58 | 343.45- | 342.45 | .00 | .00 | 342.45- | 0.00 | 0.00 |
| 07/31/2001 | 16:12:46 | | RSP | Regular/Spread | 07/29/2001 | | 37,025.58 | 323.00- | 314.50- | 15.42 | 367.04 | 314.50- | 0.00 | 0.00 |
| 07/30/2001 | 13:34:59 | | RSP | Regular/Spread | | | 37,025.58 | 723.00+ | .00 | .00 | .00 | .00 | 0.00 | 0.00 |
| 07/30/2001 | 15:12:04 | | BHP | Bankruptcy Plan Inte | 06/29/2004 | | 37,041.79 | 723.00+ | 2.46 | .00 | .00 | .00 | 0.00 | 2.46 |

Case 3:06-cv-00886-MHT-SRW   Document 37-6   Filed 08/31/2007   Page 33 of 55

Detail Transaction History

Joseph Federal Bank FSB
G5X-SRST

LOAN#: 30117655
OBLIG: 304821   Edward H Albecine
BORR:   1102 Alexcine Drive
        Valley AL 36854

INVESTOR#: 347        POOL#: 2        NEXT DUE DT:10/29/2002        INTEREST RATE: 11.900000        PRIN BAL:        ESC BAL:

MAIL: 1102 Alexcine Drive
      Valley AL 36854-0845

| -TRANSACTION- | | | | --AFTER TRANS. BALANCES-- | | --------TOTAL--------- | | | APPLIED | | |
| EFFECTIVE | TIME | BY TRN | DESCRIPTION | NET DUE/REF | REVERSED | PRINCIPAL | ESCROW | AMOUNT | PRINCIPAL | INTEREST | ESCROW | SUSPENSE | OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/30/2003 | 15:09:47 | | APR Prepetition Payment | 05/29/2001 | | 37,041.39 | 323.00- | 25.21 | .00 | .00 | .00 | 25.21 | 0.00 |
| 07/03/2003 | 00:19:54 | | RSP Regular/Spread | | | 37,041.39 | 323.00- | 382.85 | 15.66 | 367.19 | .00 | 0.00 | 0.00 |
| 06/29/2003 | 14:25:46 | | RIF Bankruptcy Plan Late | | | 37,057.05 | 323.00- | 2.62 | .00 | .00 | .00 | 0.00 | 2.62 |
| 06/29/2003 | 14:23:56 | | APR Prepetition Payment | | | 37,057.05 | 323.00- | 19.42 | .00 | .00 | .00 | 19.42 | 0.00 |
| 06/04/2001 | 13:43:51 | | RSP Regular/Spread | 04/29/2001 | | 37,057.05 | 323.00- | 382.85 | 15.59 | 367.85 | .00 | 0.00 | 0.00 |
| 06/04/2001 | 13:43:48 | | RIF Bankruptcy Plan Late | | | 37,072.55 | 323.00- | 2.83 | .00 | .00 | .00 | 0.00 | 2.83 |
| 06/04/2001 | 13:43:43 | | APR Prepetition Payment | | | 37,072.55 | 323.00- | 24.89 | .06 | .00 | .00 | 24.89 | 0.00 |
| 05/02/2001 | 11:48:43 | | RIF Bankruptcy Plan Late | | | 37,072.55 | 323.00- | .00 | .00 | .00 | .00 | 0.00 | 0.00 |
| 05/02/2001 | 11:06:39 | | APR Prepetition Payment | | | 37,072.55 | 323.00- | 19.21 | .00 | .00 | .00 | 19.21 | 0.00 |
| 05/30/2003 | 00:01:11 | | RSP Regular/Spread | 03/29/2001 | | 37,072.55 | 323.00- | 382.85 | 15.35 | 367.50 | .00 | 0.00 | 0.00 |
| 04/17/2001 | 18:58:04 | | RIF Bankruptcy Plan Late | | | 37,087.90 | 323.00- | 3.19 | .00 | .00 | .00 | 0.00 | 3.19 |
| 04/17/2001 | 18:42:25 | | APR Prepetition Payment | | | 37,087.90 | 323.00- | 19.17 | .00 | .00 | .00 | 19.17 | 0.00 |
| 03/29/2001 | 23:59:55 | | RSP Regular/Spread | 02/28/2001 | | 37,087.90 | 323.00- | 382.85 | 15.20 | 367.65 | .00 | 0.00 | 0.00 |
| 03/23/2001 | 11:25:09 | | RIF Bankruptcy Plan Late | | | 37,103.10 | 323.00- | 3.28 | .00 | .00 | .00 | 0.00 | 3.28 |
| 03/23/2001 | 11:06:25 | | APR Prepetition Payment | | | 37,103.10 | 323.00- | 24.56 | .00 | .00 | .00 | 24.56 | 0.00 |
| 01/12/2001 | 14:40:17 | | RIF Bankruptcy Plan Late | | | 37,103.10 | 323.00- | 3.56 | .00 | .00 | .00 | 0.00 | 3.56 |
| 01/12/2001 | 14:40:15 | | MSA Miscellaneous Suspen | | | 37,103.10 | 323.00- | 3.56 | .00 | .00 | .00 | 3.56 | 0.00 |
| 01/12/2001 | 10:32:58 | | RSP Regular/Spread | 01/29/2001 | | 37,103.10 | 323.00- | 382.85 | 15.05 | 367.80 | .00 | 0.00 | 0.00 |
| 01/08/2001 | 10:32:15 | | RIF Bankruptcy Plan Late | | | 37,118.15 | 323.00- | 18.62 | .00 | .00 | .00 | 18.62 | 0.00 |
| 01/08/2001 | 10:32:52 | | APR Prepetition Payment | | | 37,118.15 | 323.00- | 18.62 | .00 | .00 | .00 | 18.62 | 0.00 |
| 02/21/2001 | 10:32:19 | | MS  Misc Susp Payment | | | 37,118.15 | 323.00- | 3.56 | .00 | .00 | .00 | 3.56 | 0.00 |
| 02/21/2001 | 10:32:10 | | MS  Misc Susp Payment | | | 37,118.15 | 323.00- | 3.56 | .00 | .00 | .00 | 3.56 | 0.00 |
| 01/31/2001 | 01:03:52 | | RSP Regular/Spread | 12/29/2000 | | 37,118.15 | 323.00- | 382.85 | 14.90 | 367.95 | .00 | 0.00 | 0.00 |
| 01/07/2001 | 09:42:49 | | RSP Regular/Spread | 11/29/2000 | | 37,133.05 | 323.00- | 382.85 | 14.76 | 368.09 | .00 | 0.00 | 0.00 |
| 11/01/2001 | 00:00:01 | | PAS Altplan Suspense Adj | | | 37,147.81 | 323.00- | .00 | .00 | .00 | .00 | 0.00 | 0.00 |

**ASC**
AMERICA'S SERVICING COMPANY

7495 NEW HORIZON WAY
FREDERICK, MD 21703

July 20, 2006

Wooten Law Firm, P.C.
Nick Wooten
PO Drawer 290
LaFayette, AL 36862

Dear Sir:

RE: Mortgagors: Edward H Alewine / Shelly M Alewine
    Client 106

We have received your request for information on the above
homeowner(s). While we aim to complete our research requests
within 10 business days, on occasion we are not able to meet
our goal. Your request should be completed within the next
15 business days.

We sincerely appreciate your patience and understanding while
your request is being processed and researched. If you have any
questions in the interim, please contact our Customer Relations
department at 800-842-7654, 8 AM to 6 PM, in your time zone,
Monday through Friday.

Sincerely,

ASC

RS255/ENW



DEFENDANT'S
EXHIBIT
3
E. Alewine

PENGAD 800-631-6989

**PREMIUM FINANCING SPECIALISTS, INC.**
A MISSOURI CORPORATION HOME OFFICE, KANSAS CITY, MISSOURI
P.O. BOX 33049
TULSA, OK 74153-1049
Phone (918)663-6565 - Fax (918)663-9393

| NOTICE OF ACCEPTANCE AND OF ASSIGNMENT | |
|---|---|
| REFER TO THIS ACCOUNT NO. IN ALL CORRESPONDENCE | ACCOUNT NUMBER |
| | OKT-94265 |

DEAR CUSTOMER,
THANK YOU FOR THE OPPORTUNITY TO FINANCE YOUR INSURANCE. AS AGREED, WE HAVE PAID THE BALANCE DUE ON YOUR BEHALF. A PAYMENT SCHEDULE IS SHOWN BELOW. FOR YOUR CONVENIENCE WE HAVE ENCLOSED COUPONS; DETAILED PAYMENT INSTRUCTIONS ARE SHOWN BELOW.

**PAYMENT INSTRUCTIONS:**

1. YOUR PREMIUM FINANCE AGREEMENT HAS BEEN ASSIGNED TO PREMIUM FINANCING SPECIALISTS, INC.
2. TO ENSURE PROPER CREDIT TO YOUR ACCOUNT, WRITE YOUR ACCOUNT NUMBER ON YOUR CHECK AND RETURN THE PROPER COUPON WITH YOUR PAYMENT.
3. BE SURE YOUR PAYMENT IS MAILED IN TIME TO REACH OUR OFFICE BY YOUR DUE DATE.
4. MAIL YOUR PAYMENT TO THE ADDRESS ON THE COUPON.
5. IF YOU HAVE NOT RECEIVED YOUR PREMIUM FINANCE AGREEMENT NOTIFY US IMMEDIATELY.

INSURED
EDWARD ALEWINE
PO BOX 855
VALLEY, AL 36854

AGENT
ALABAMA INSURERS
2104 FREDERICK ROAD
OPELIKA, AL 36801

| DISCLOSURE | |
|---|---|
| TOTAL PREMIUMS | $476.00 |
| DOWN PAYMENT | $119.00 |
| AMOUNT FINANCED | $357.00 |
| FINANCE CHARGE | $32.84 |
| ASSESSMENTS | $0.00 |
| TOTAL PAYMENTS | $389.84 |
| NUMBER OF PAYMENTS | 8 |
| PAYMENT AMOUNT | $48.73 |
| ANNUAL % RATE | 23.980 |
| ACCEPTANCE DATE | 09/05/00 |

| SCHEDULE OF PAYMENTS | | |
|---|---|---|
| PYMT NO. | DUE DATE | AMOUNT |
| 1 | 09/03/00 | $48.73 |
| 2 | 10/03/00 | $48.73 |
| 3 | 11/03/00 | $48.73 |
| 4 | 12/03/00 | $48.73 |
| 5 | 01/03/01 | $48.73 |
| 6 | 02/03/01 | $48.73 |
| 7 | 03/03/01 | $48.73 |
| 8 | 04/03/01 | $48.73 |

WE HAVE PAID THE BALANCE OF YOUR PREMIUM BELIEVING THE PREMIUM FINANCE AGREEMENT TO BE GENUINE AND IN FULL EFFECT AND THE SIGNATURE THEREON AUTHORIZED BY THE INSURED. IF FOR ANY REASON THIS IS NOT TRUE, NOTIFY US IMMEDIATELY AT THE ADDRESS OR TELEPHONE NUMBER AS SHOWN ABOVE.

## SCHEDULE OF POLICIES

| POLICY PREFIX AND NUMBER | EFFECTIVE DATE | FULL NAME OF INSURER AND GENERAL AGENT OTHER THAN SUBMITTING PRODUCER TO WHOM COPY OF THIS NOTICE WAS SENT | COVERAGE FIRE AUTO MAR, I.M., CAS | POLICY TERM IN MONTHS COVERED | PREMIUM FINANCED |
|---|---|---|---|---|---|
| JMH0084453-01 | 08/03/00 | JEFFERSON INSURANCE GROUP BARCLAY (2000) | MOBHM | 12 | $476.00 |

DEFENDANT'S
EXHIBIT
4
E. Alewine

1(09/99) Copyright 1998 Premium Financing Specialists, Inc.

**PREMIUM FINANCING SPECIALISTS, INC.**
A MISSOURI CORPORATION HOME OFFICE, KANSAS CITY, MISSOURI
P.O. BOX 35408
TULSA, OK 74153-0408
Phone (918)663-6565 · Fax (918)663-9393

| NOTICE OF ACCEPTANCE AND OF ASSIGNMENT | |
|---|---|
| REFER TO THIS ACCOUNT NO. IN ALL CORRESPONDENCE | ACCOUNT NUMBER |
| | OKT-109119 |

DEAR CUSTOMER,
THANK YOU FOR THE OPPORTUNITY TO FINANCE YOUR INSURANCE. AS AGREED, WE HAVE PAID THE BALANCE DUE ON YOUR BEHALF. A PAYMENT SCHEDULE IS SHOWN BELOW. FOR YOUR CONVENIENCE WE HAVE ENCLOSED COUPONS; DETAILED PAYMENT INSTRUCTIONS ARE SHOWN BELOW.

**PAYMENT INSTRUCTIONS:**
1. YOUR PREMIUM FINANCE AGREEMENT HAS BEEN ASSIGNED TO PREMIUM FINANCING SPECIALISTS, INC.
2. TO ENSURE PROPER CREDIT TO YOUR ACCOUNT, WRITE YOUR ACCOUNT NUMBER ON YOUR CHECK AND RETURN THE PROPER COUPON WITH YOUR PAYMENT.
3. BE SURE YOUR PAYMENT IS MAILED IN TIME TO REACH OUR OFFICE BY YOUR DUE DATE.
4. MAIL YOUR PAYMENT TO THE ADDRESS ON THE COUPON.
5. IF YOU HAVE NOT RECEIVED YOUR PREMIUM FINANCE AGREEMENT NOTIFY US IMMEDIATELY.

INSURED
EDWARD ALEWINE
1102 ALEWINE DR.
VALLEY, AL 36854

AGENT
ALABAMA INSURERS (*)
2104 FREDERICK ROAD
OPELIKA, AL 36801

| DISCLOSURE | |
|---|---|
| TOTAL PREMIUMS | $453.00 |
| DOWN PAYMENT | $115.00 |
| AMOUNT FINANCED | $338.00 |
| FINANCE CHARGE | $31.84 |
| ASSESSMENTS | $0.00 |
| TOTAL PAYMENTS | $369.84 |
| NUMBER OF PAYMENTS | 8 |
| PAYMENT AMOUNT | $46.23 |
| ANNUAL % RATE | 24.540 |
| ACCEPTANCE DATE | 09/10/01 |

| SCHEDULE OF PAYMENTS | | |
|---|---|---|
| PYMT NO. | DUE DATE | AMOUNT |
| 1 | 09/03/01 | $46.23 |
| 2 | 10/03/01 | $46.23 |
| 3 | 11/03/01 | $46.23 |
| 4 | 12/03/01 | $46.23 |
| 5 | 01/03/02 | $46.23 |
| 6 | 02/03/02 | $46.23 |
| 7 | 03/03/02 | $46.23 |
| 8 | 04/03/02 | $46.23 |

WE HAVE PAID THE BALANCE OF YOUR PREMIUM BELIEVING THE PREMIUM FINANCE AGREEMENT TO BE GENUINE AND IN FULL EFFECT AND THE SIGNATURE THEREON AUTHORIZED BY THE INSURED. IF FOR ANY REASON THIS IS NOT TRUE, NOTIFY US IMMEDIATELY AT THE ADDRESS OR TELEPHONE NUMBER AS SHOWN ABOVE.

## SCHEDULE OF POLICIES

| POLICY PREFIX AND NUMBER | EFFECTIVE DATE | FULL NAME OF INSURER AND GENERAL AGENT OTHER THAN SUBMITTING PRODUCER TO WHOM COPY OF THIS NOTICE WAS SENT | COVERAGE FIRE, AUTO MAR, I.M., CAS | POLICY TERM IN MONTHS COVERED | PREMIUM FINANCED |
|---|---|---|---|---|---|
| MHP0014575 | 08/03/01 | REPUBLIC WESTERN INSURANCE CO BARCLAY (2000) | MOBHM | 12 | $453.00 |

(09/90) Copyright 1988 Premium Financing Specialists, Inc.

# SOUTHEAST PREMIUM FINANCE CO., L.L.C.

P.O. BOX 230998
MONTGOMERY, AL 36123-0998

Telephone: (334) 279-0730
Facsimile: (334) 279-5516
WATS: (888)701-0730

"Service First"
26 July 2000

Edward Alewine Jr.
1102 Alewine Dr.
Samson,   AL    36854

RE:  SEPF Acct No. 52705

Thank you for your payment. However, your account is paid in full, and you do not owe anything until your insurance policy renews on 03 Aug 00. We are, therefore, returning your money order no. 85584432835 with this letter. You should receive something from your agent regarding your renewal sometime in July. If you have any questions, please feel free to call us at the above number.

Thank you for your attention to this matter, and for your business.

Sincerely,
Suzanne Strength
CSR

**Premium Financing Specialists**
5800 E. Skelly Drive, Suite 450
P. O. Box 33049
Tulsa, Oklahoma  74153

Phone 918-663-6565    WATS 800-727-1717    FAX 918-663-9393

DATE  SEPTEMBER 5, 2000

INSURED  EDWARD ALEWINE

ACCOUNT NUMBER  OKT-94265

Our company has purchased your premium finance agreement from *Southeast Premium Finance*. The terms and conditions of your agreement remains the same. The amount financed has been paid to your insurance company by Premium Financing Specialists.

Attached you will find an account acknowledgment and set of payment coupons. All payments should be made payable to Premium Financing Specialists, Inc., and mailed directly to our office in Tulsa, Oklahoma.

Please feel free to contact our office with any questions you might have concerning your account.

Sincerely,


Rita Briscoe
Branch Manager
fg/PFS

**Premium Financing Specialists**
5800 E. Skelly Drive, Suite 450
P. O. Box 35408
Tulsa, Oklahoma  74153-0408

Phone 918-663-6565  WATS 800-727-1717  FAX 918-663-9393

DATE _____ 09/10/01 _____

INSURED ___ Edward Alewine _____

ACCOUNT NUMBER OKT-*109119*

Our company has purchased your premium finance agreement from *Southeast Premium Finance*. The terms and conditions of your agreement remains the same. The amount financed has been paid to your insurance company by Premium Financing Specialists.

Attached you will find an account acknowledgment and set of payment coupons. All payments should be made payable to Premium Financing Specialists, Inc., and mailed directly to our office in Tulsa, Oklahoma.

Please feel free to contact our office with any questions you might have concerning your account.

Sincerely,

Rita Briscoe
Branch Manager

fg/PFS

# PREMIUM FINANCING SPECIALISTS
5800 E. Skelly Drive Ste. 450
PO Box 35408
Tulsa, OK  74153-0408
Phone: 918-663-6565    Watts: 800-727-1717

APRIL 12, 2002

EDWARD ALEWINE
1102 ALEWINE DR.
VALLEY, AL 36854

## PFS ACCT # 109119

Enclosed please find your CHECK OR MONEY ORDER # <u>90357670530 020330</u>
<u>368540</u> in the amount of <u>$46.33</u>

We are unable to accept it for the following reason:

( )    WE RECEIVED CHECK CANNOT FIND ACCOUNT NUMBER

(X)    ACCOUNT PAID IN FULL

( )    CHECK IS NOT MADE PAYABLE TO PREMIUM FINANCING SPECIALISTS
       CHECK NOT ENDORSED OVER TO PFS

( )    CHECK DID NOT HAVE SIGNATURE

( )    CHECK SENT TO US IN ERROR

( )    IT HAS BEEN DAMAGED BY THE US POSTAL SERVICE

If you have any questions, please contact our office.

Sincerely,

FRANCES GREGOROVIC
SECRETARY

CUSTOMER'S RECEIPT

8594635912? 001026   368540   **48*73

Premium Finance Service
P.C. Box 52049
Tulsa, OK 74153-739
OKT 4426

**48*73

Edward H Cleven Jr
1103 Glenwood Dr
Valley, AL 36854

---

CUSTOMER'S RECEIPT — DO NOT SEND THIS RECEIPT FOR PAYMENT. KEEP IT FOR YOUR RECORDS

8559137B743 001124   368540   **51*17

Premium Finance Service
P.O. Box 52049
Tulsa, OK 74153-1044
OKT 44265

**51*17

Edward H Cleven Jr
1103 Glenwood Dr
Valley, AL 36854

---

CUSTOMER'S RECEIPT — DO NOT SEND THIS RECEIPT FOR PAYMENT. KEEP IT FOR YOUR RECORDS

8635365267b 001226   368540   **51*17

Premium Finance Service
P.O. Box 52049
Tulsa, OK 74153-1044
OKT 44265

**51*17

Edward H Cleven Jr
1103 Glenwood Dr
Valley, AL 36854

**RECEIPT**

ALABAMA ~~UTILITIES~~
~~P.O. Box 280~~
Valley, AL 36854

No. 428492

Date *1-3-00*

Received From *Eddie Alewine*    $ *55.13*

~~Ramus~~ *Seventeen*    DOLLARS

○ For Rent
○ For _____

| ACCOUNT | | |
|---|---|---|
| PAYMENT | | |
| BALANCE DUE | *55* | *13* |

○ Cash
○ Check
● Money Order

From _____    To _____

By _____    SC1188

RECEIPT

No. 198216

Date 8-21-00
Received From Eddie Albwine
$ 119.00
DOLLARS

Barclay - JMA0054453

For Rent
For
ACCOUNT
PAYMENT    119 -
BALANCE DUE

Cash
Check
Money Order

From
To
By

SC118J

84730205744 000203 368540 **57*88

CUSTOMER'S RECEIPT

85165402915 000308 368540 **57*88

85165411241 000327 363540 **55*13

CUSTOMER'S RECEIPT

85165437486  000427  368540  **55*13

Southeast Premium Finance
Co, LLC   P.O. Box 230418
Montgomery, AL 36123-0418
36705

$55.13

Edward H. Alewine Jr.
1102 Alewine DR.
Valley AL 36854

CUSTOMER'S RECEIPT

85165418248  000525  368540  **55*13

Southeast Premium Finance
Co, LLC   P.O. Box 230418
Montgomery, AL 36123-0418
36705

$55.13

Edward H. Alewine Jr.
1102 Alewine DR
Valley AL 36854

CUSTOMER'S RECEIPT

85591373310  000925  368540  **51*17

$51.17

Edelward Alewine
1102 Alewine
Valley Ale

86459668198  010924  368540  **49*89

$49.89

RECEIPT

No. 077171

DATE _8/27/01_

$ 15⁰⁰

RECEIVED FROM _Edward A. Lewne_

_Down Pay MH Renewal_ DOLLARS

○ FOR RENT
○ FOR _____

| ACCOUNT | | | ⊘ CASH | FROM _____ | TO _____ |
| PAYMENT | 115 | 00 | ○ CHECK | | |
| BAL. DUE | | | ○ MONEY ORDER | BY _3_ | 1182 |



CUSTOMER'S RECEIPT

9004550577  011227  368540  **46*23

HORSE:

C.O.D. NO. OR
USED FOR  OKT-109114

CUSTOMER'S RECEIPT

8692039372  011126  368540  **46*23

Premium Ever

ADDRESS

Tijuan, FL 7913-0402

C.O.D. NO. OR
USED FOR  OKT-109114

CUSTOMER'S RECEIPT    DO NOT SEND THIS RECEIPT FOR PAYMENT
KEEP IT FOR YOUR RECORDS

8b353bb78b4  010124    3b8540    **51*17

SERIAL NUMBER          GL/FL BENCH DAY          CERT OFFICE          U.S. DOLLARS AND CENTS

PAY TO

ADDRESS

COD NO. OR
USED FOR

**RECEIPT**

No. 032009

date 9-26 02                                    $

received from Edward Albert Allwine                    dollars

for payment of 103-06473-7706

| | | | |
|---|---|---|---|
| amount due | | ○ cash | from |
| amount paid | 124 37 | ○ money order  ○ credit card | |
| balance | | ○ check # 819 | signature |

SC1188UV

CUSTOMER'S RECEIPT — KEEP THIS FOR YOUR RECORDS

9004356134 020202 368540 **46*23

CUSTOMER'S RECEIPT — KEEP THIS FOR YOUR RECORDS

9004859543 020228 368540 **46*23

CUSTOMER'S RECEIPT   DO NOT SEND THIS RECEIPT FOR PAYMENT
KEEP IT FOR YOUR RECORDS

7086603294 02102 368540 **73*07

CUSTOMER'S RECEIPT   DO NOT SEND THIS RECEIPT FOR PAYMENT
KEEP IT FOR YOUR RECORDS

912896057 02223 368540 **73*07



**FOREMOST**
INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN
A Stock Company

Policy Number: **103 - 0647377706 - 02**

# MOBILE HOME
## DECLARATIONS PAGE

**YOU AS NAMED INSURED AND YOUR ADDRESS:**

EDWARD ALEWINE
1102 ALEWINE DR
VALLEY AL 36854-4353

| POLICY INFORMATION | Policy Period: From 08/20/02 To 08/20/03 12:01 A.M. STANDARD TIME |
|---|---|
| Policy Number: 103-0647377706-02 | Renewal Of: |

| MOBILE HOME LOCATION | Park Name: | |
|---|---|---|
| Address: 1102 ALEWINE DR VALLEY AL 36854 | In City Limits: YES | |
| | County: CHAMBERS | |

| MOBILE HOME INFORMATION | Width: 24 | Length: 60 | Serial Number: 4116 |
|---|---|---|---|
| Model Year: 1986 | Manufacturer/ Model: | HORTON | |

| RATING INFORMATION | Use: PRIMARY | | Customer Age Group: UNDER 50 | |
|---|---|---|---|---|
| Approved Park: NO | Auxiliary Heating Device: NO | Tied Down: YES | Age Of Home: 16 Years | |

**YOUR POLICY IS SERVICED BY:**

**TELEPHONE:** (334) 749-7200
**Agency Code:** 01-9200-161-0

JAMES ANTHONY ROGERS
2104 FREDERICK RD
OPELIKA AL 36801-7216

**LIENHOLDER #1**
**Loan Number**
OCWEN FED BANK
ISAOA
PO BOX 57002
IRVINE CA 92619

HOME OFFICE - 5600 BEECH TREE LANE - P. O. BOX 2450 - CALEDONIA, MI 49316
**AGENT COPY**
09/12/02

Form 82000 03/97



**FOREMOST**
INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN
A Stock Company

Policy Number: **103 - 0647377706 - 02**
DECLARATIONS PAGE (CONTINUED)

**COVERAGES:** This policy provides only the coverages as shown below and your additional coverages described in the policy.

|  | AMOUNT OF INSURANCE* |
|---|---|
| **SECTION I YOUR PROPERTY COVERAGES** |  |
| A. DWELLING | $ 34,000 |
| B. OTHER STRUCTURES | $ 3,400 |
| C. PERSONAL PROPERTY | $ 17,000 |
| D. ADDITIONAL LIVING EXPENSE | $ 6,800 |

*REFER TO SECTION I "OUR PAYMENT METHODS" TO SEE HOW THESE AMOUNTS WILL BE APPLIED

|  | LIMIT OF LIABILITY |  |
|---|---|---|
| **SECTION II YOUR LIABILITY COVERAGES** |  |  |
| E. PERSONAL LIABILITY | EACH ACCIDENT | $ 50,000 |
| F. MEDICAL PAYMENTS TO OTHERS | EACH PERSON | $ 500 |
| | **TOTAL SECTION I AND II COVERAGES PREMIUM** | $ 686.00 |

**SECTION I DEDUCTIBLE**
SECTION I LOSSES OR AMOUNTS OF INSURANCE ARE SUBJECT TO A DEDUCTIBLE OF $ 250
UNLESS STATED OTHERWISE IN YOUR POLICY AND ENDORSEMENTS.

|  |  |  | POLICY PREMIUM |
|---|---|---|---|
| **FORMS AND ENDORSEMENTS** |  |  |  |
| 3825 | 03/97 | MOBILE HOME INSURANCE POLICY | NO ADDED CHARGE |
| 5503 | 01/01 | REQUIRED CHANGE - ALABAMA | NO ADDED CHARGE |
| 5640 | 06/99 | REPLACEMENT COST PERSONAL PROPERTY | $ 46.00 |
|  |  | **TOTAL FORMS AND ENDORSEMENTS PREMIUM** | $ 46.00 |

| **TOTAL POLICY PREMIUM AND OTHER CHARGES** | $ 732.00 |
|---|---|

MINIMUM EARNED PREMIUM   $50



**FOREMOST**
INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN
A Stock Company

Policy Number: **103 - 0647377706 - 05**

# MOBILE HOME
## DECLARATIONS PAGE

**YOU AS NAMED INSURED AND YOUR ADDRESS:**

EDWARD ALEWINE
1102 ALEWINE DR
VALLEY AL 36854-4353

| POLICY INFORMATION | Policy Period: From 08/20/05 To 08/20/06 12:01 A.M. STANDARD TIME |
|---|---|
| Policy Number: 103-0647377706-05 | Renewal Of: 103-0647377706-04 |

| MOBILE HOME LOCATION | Park Name: | |
|---|---|---|
| Address: 1102 ALEWINE DR VALLEY AL 36854 | In City Limits: YES | |
| | County: CHAMBERS | |

| MOBILE HOME INFORMATION | Width: 24 | Length: 60 | Serial Number: 4116 |
|---|---|---|---|
| Model Year: 1986 | Manufacturer/ Model: HORTON | | |

| RATING INFORMATION | Use: PRIMARY | | Customer Age Group: 50 OR OVER |
|---|---|---|---|
| Approved Park: NO | Auxiliary Heating Device: NO | Tied Down: YES | Age Of Home: 19 Years |

**YOUR POLICY IS SERVICED BY:**

TELEPHONE: (334) 749-7200

Agency Code: 01-9200-161-0

JAMES ANTHONY ROGERS
2104 FREDERICK RD
OPELIKA AL 36801-7216

**LIENHOLDER #1**
**Loan Number**
OCWEN FED BANK
ISAOA
PO BOX 6723
SPRINGFIELD OH 45501

IF PAYMENT IS RECEIVED BY 08/20/05 THIS WILL BE YOUR RENEWAL DECLARATIONS PAGE.

Form 82000 03/97
%79



**FOREMOST**
INSURANCE COMPANY
GRAND RAPIDS, MICHIGAN
A Stock Company

Policy Number:  **103 - 0647377706 - 05**

# MOBILE HOME
## DECLARATIONS PAGE

**YOU AS NAMED INSURED AND YOUR ADDRESS:**

EDWARD ALEWINE
1102 ALEWINE DR
VALLEY AL 36854-4353

| POLICY INFORMATION | Policy Period: From  08/20/05  To 08/20/06 **12:01 A.M. STANDARD TIME** | |
|---|---|---|
| Policy Number:  103-0647377706-05 | **Renewal Of:**         0647377706 | |

| MOBILE HOME LOCATION | Park Name: | |
|---|---|---|
| Address: 1102 ALEWINE DR  VALLEY AL 36854 | **In City Limits:** YES | |
| | **County:** CHAMBERS | |

| MOBILE HOME INFORMATION | Width: 24 | Length: 60 | Serial Number: 4116 |
|---|---|---|---|
| Model Year:  1986 | Manufacturer/ Model: | HORTON | |

| RATING INFORMATION | Use: PRIMARY | | Customer Age Group: 50 OR OVER | |
|---|---|---|---|---|
| Approved Park: NO | Auxiliary Heating Device: NO | Tied Down: YES | Age Of Home: 19 Years | |

**YOUR POLICY IS SERVICED BY:**

**TELEPHONE:** (334) 749-7200

**Agency Code:** 01-9200-161-0

JAMES ANTHONY ROGERS
2104 FREDERICK RD
OPELIKA AL 36801-7216

**LIENHOLDER #1**
**Loan Number** 1099003191
AMERICA'S SERVICING CO
ISAOA ATIMA
PO BOX 5106
SPRINGFIELD OH 45501

YOUR POLICY CHANGED EFFECTIVE 10/05/05. THIS REPLACES ANY PRIOR DECLARATIONS PAGE.

# EXHIBIT C

DschDebt, CLOSED

# U.S. Bankruptcy Court
## MIDDLE DISTRICT OF ALABAMA (Opelika)
## Bankruptcy Petition #: 99-05963

*Assigned to:* William R. Sawyer
Chapter 13
Previous chapter 13
Voluntary
Asset

*Date Filed:* 12/02/1999
*Date Terminated:* 05/17/2004
*Date Discharged:* 05/14/2004

**Debtor**
**Edward H. Alewine, Jr**
1102 ALEWINE DRIVE
VALLEY, AL 36854
SSN: xxx-xx-9934

represented by **Braxton Paul Sherling**
B. Paul Sherling
PO Box 311244
Enterprise, AL 36331-1244
334-393-3660
Fax : 334-393-6992
Email: PaulSherling@yahoo.com

**Joint Debtor**
**Shelly M Alewine**
1102 ALEWINE DRIVE
VALLEY, AL 36854
SSN: xxx-xx-4190

represented by **Braxton Paul Sherling**
(See above for address)

**Trustee**
**Curtis C. Reding**
P. O. Box 173
Montgomery, AL 36101
334 262-8371

| Filing Date | # | Docket Text |
|---|---|---|
| 12/02/1999 | 1 | VOLUNTARY petition under chapter 13 , [HN], ORIGINAL NIBS DOCKET ENTRY #1 (Entered: 12/02/1999) |
| 12/02/1999 | 2 | SCHEDULES and Statement of Affairs [Entered: 12/02/99], [HN] ENTERED IN ERROR , [CO], ORIGINAL NIBS DOCKET ENTRY #2 (Entered: 12/20/1999) |
| 12/02/1999 | 3 | ATTORNEY Statement of Compensation , [HN], ORIGINAL NIBS DOCKET ENTRY #3 (Entered: 12/02/1999) |
| 12/02/1999 | 4 | NOTICE of 341 meeting on 01/25/00 at 09:00 A.M. at U.S. Bankruptcy Court, Federal Courthouse, Opelika, AL, [HN], ORIGINAL NIBS DOCKET ENTRY #4 |

| | | |
|---|---|---|
| | | (Entered: 12/02/1999) |
| 12/02/1999 | 5 | CLAIMS Bar Date due on 04/25/99, [HN], ORIGINAL NIBS DOCKET ENTRY #5 (Entered: 12/02/1999) |
| 12/02/1999 | 6 | NOTICE of Confirmation Hearing on 02/02/00 at 09:00 A.M. at U.S. Bankruptcy Court, Federal Courthouse, Opelika, AL, [HN], ORIGINAL NIBS DOCKET ENTRY #6 (Entered: 12/02/1999) |
| 12/17/1999 | 7 | CERTIFICATE OF SERVICE for 341 Meeting & Confirmation Hearing , [CO], ORIGINAL NIBS DOCKET ENTRY #7 (Entered: 12/17/1999) |
| 12/20/1999 | 8 | SCHEDULES and Statement of Affairs , [CO], ORIGINAL NIBS DOCKET ENTRY #8 (Entered: 12/20/1999) |
| 12/20/1999 | 9 | APPLICATION/ORDER FOR FEES , [CO], ORIGINAL NIBS DOCKET ENTRY #9 (Entered: 12/20/1999) |
| 01/27/2000 | 10 | 341 Meeting was Held [Proceeding Memo] , [CO], ORIGINAL NIBS DOCKET ENTRY #10 (Entered: 01/31/2000) |
| 01/28/2000 | 11 | AMENDED CERTIFICATE OF SERVICE for 341 Mtg and CFM Hearing [Filing of CH. 13 Plan] , [CO], ORIGINAL NIBS DOCKET ENTRY #11 (Entered: 01/31/2000) |
| 02/14/2000 | 12 | ORDER to Debtor's Employer [Wage Order] , [DH], ORIGINAL NIBS DOCKET ENTRY #12 (Entered: 02/14/2000) |
| 02/14/2000 | 13 | ORDER Confirming Plan , [DH], ORIGINAL NIBS DOCKET ENTRY #13 (Entered: 02/14/2000) |
| 05/05/2004 | 14 | Trustee's Order Releasing Wages. (Reding, Curtis-EC) (Entered: 05/05/2004) |
| 05/13/2004 | 15 | Final Report and Final Account of Ch 13 Trustee (Payments to Creditors) and Motion to Discharge Debtor After Completion of Ch 13 Plan. (Reding, Curtis-EC) (Entered: 05/13/2004) |
| 05/14/2004 | 16 | Order Discharging Both Debtors After Completion of Ch 13 Plan. (Certificate of Service will be filed within 5 days) Entered On 5/14/2004 (RE: related document(s) 15 Final Report and Final Account of Ch 13 Trustee (Payments to Creditors) and Motion to Discharge Debtor After Completion of Ch 13 Plan). (DS, ) (Entered: 05/14/2004) |
| 05/16/2004 | 17 | BNC Certificate of Service - Order of Discharge - (RE: related document(s)16 Discharging Both Debtors After Completion of Ch 13 Plan, ). No. of Notices: 10. Service Date 05/16/2004. (Admin.) (Entered: 05/17/2004) |

| 05/17/2004 | 18 | Order Discharging Standing Trustee,Releasing Bond Liability and Closing Case: It appearing to the Court that the trustee in this case has performed all of the duties required of him in the administration of this case; that he has made distribution by order of this Court, and has rendered a full and complete account thereof, and no adverse interest being represented; It is therefore ORDERED that the Ch 13 trustee be discharged and relieved of his trust, and that he and the sureties on this bond be released from further liability thereunder; It is further Ordered that this case be, and the same is hereby CLOSED. U.S. Bankruptcy Judge (Non-Image Entry). (CO, ) (Entered: 05/17/2004) |
| 05/17/2004 | 19 | Bankruptcy Case Closed (Non-Image Entry). (CO, ) (Entered: 05/17/2004) |

<table>
<tr><th colspan="3">PACER Service Center</th></tr>
<tr><th colspan="3">Transaction Receipt</th></tr>
<tr><td colspan="3">08/17/2007 11:20:50</td></tr>
<tr><td>PACER Login:</td><td>hd0020</td><td>Client Code:</td></tr>
<tr><td>Description:</td><td>Docket Report</td><td>Search Criteria:</td><td>99-05963 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: HTML</td></tr>
<tr><td>Billable Pages:</td><td>2</td><td>Cost:</td><td>0.16</td></tr>
</table>

# EXHIBIT D

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE MIDDLE DISTRICT OF ALABAMA

3

4  CIVIL ACTION NO. 3:06cv886-MHT

5

6  EDWARD H. ALEWINE, et al.,

7            Plaintiffs,

8  vs.

9  AMERICA'S SERVICING COMPANY,

10          Defendant.

11

12

13

14

15          DEPOSITION

16             OF

17      SHELLY M. ALEWINE

18      August 24, 2007

19

20

21  REPORTED BY:  Susan B. Treadaway

22             Certified Shorthand Reporter

23             and Notary Public

ORIGINAL

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          S T I P U L A T I O N

2

3          IT IS STIPULATED AND AGREED,

4    by and between the parties, through their

5    respective counsel, that the deposition of

6    SHELLY M. ALEWINE may be taken before

7    Susan B. Treadaway, Commissioner,

8    Certified Shorthand Reporter and Notary

9    Public;

10          That the signature to and

11   reading of the deposition by the witness

12   is waived, the deposition to have the same

13   force and effect as if full compliance had

14   been had with all laws and rules of Court

15   relating to the taking of depositions;

16          That it shall not be necessary

17   for any objections to be made by counsel

18   to any questions, except as to form or

19   leading questions, and that counsel for

20   the parties may make objections and assign

21   grounds at the time of trial, or at the

22   time said deposition is offered in

23   evidence, or prior thereto.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1           A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4           Mr. Nicholas H. Wooten

5           Attorney at Law

6           Wooten Law Firm, P.C.

7           10 2nd Avenue Southeast

8           Post Office Drawer 290

9           Lafayette, Alabama 36862

10

11    FOR THE DEFENDANT:

12           Mr. D. Keith Andress

13           Attorney at Law

14           Baker, Donelson, Bearman,

15           Caldwell & Berkowitz, P.C.

16           420 North 20th Street, Suite 1600

17           Birmingham, Alabama 35203

18

19    OTHERS PRESENT:

20           Mr. Edward H. Alewine

21

22

23

TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          I N D E X

2

3                                    P A G E

4  BY MR. ANDRESS.......................5

5  BY MR. WOOTEN.......................52

6

7          E X H I B I T S

8

9  DEFENDANT'S. NO.              P A G E

10  Exhibit 5..........................11

11

12

13

14

15

16

17

18

19

20

21

22

23

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

```
 1              I, Susan B. Treadaway, a

 2    Shorthand Reporter of Birmingham, Alabama,

 3    and a Notary Public for the State of

 4    Alabama at Large, acting as Commissioner,

 5    certify that on this date, as provided by

 6    the Federal Rules of Civil Procedure of

 7    the United States District Court, and the

 8    foregoing stipulation of counsel, there

 9    came before me at 10 2nd Avenue Southeast,

10    Lafayette, Alabama, on the 24th day of

11    August, 2007, commencing at 11:00 A.M.,

12    SHELLY M. ALEWINE, witness in the above

13    cause, for oral examination, whereupon the

14    following proceedings were had:

15

16              SHELLY M. ALEWINE,

17    being first duly sworn, was examined and

18    testified as follows:

19

20    EXAMINATION BY MR. ANDRESS:

21         Q.    Ms. Alewine, good morning, as

22    you heard during Mr. Alewine's deposition,

23    my name is Keith Andress, and I represent
```

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    ASC in this case.  I'm going to ask you

2    some questions today about the lawsuit and

3    if I ask you a question that doesn't make

4    any sense, just let me know and I will try

5    to rephrase it in a more understandable

6    manner.

7         A.    Okay.

8         Q.    If you need to take a break,

9    whatever, do it, okay?

10        A.    All right.

11        Q.    State your full name.

12        A.    Shelly M. Alewine.

13        Q.    And where do you live?

14        A.    1102 Alewine Drive, Valley,

15    Alabama.

16        Q.    And you heard Mr. Alewine's

17   testimony about how long y'all have been

18   married, is that pretty close?

19        A.    Thirty-six years.

20        Q.    Congratulations.  Do y'all

21   have any kids?

22        A.    Three.

23        Q.    Three.  What are their ages?

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    A.    Thirty-six, thirty-five, and
2    twenty-eight.
3    Q.    Where do they live?
4    A.    In the Valley.
5    Q.    I went to school, Auburn, and
6    had a friend from Lafayette and I can't
7    remember his name, it was Ed somebody and
8    his nickname was Big Money and Nick can't
9    figure out who it is either.  I will
10   figure it out and let you know.
11          MR. WOOTEN:  I can call
12   somebody and I'll bet you they will know.
13   Q.    Tell me about your work
14   experience the last fifteen years or so
15   forward.
16   A.    Fifteen years or so forward.
17   Well, I've always worked for West Point
18   Stevens, I've worked for them for
19   thirty years.
20   Q.    Okay.  Do you still work for
21   them today?
22   A.    Well, I got laid off in '06,
23   but I've went back this year in another

# TYLER EATON
## TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  plant.

2          Q.     Okay.  And what was your

3  position at West Point?

4          A.     A weaver.

5          Q.     All right.  And tell me about

6  your education.

7          A.     Well, I went to the tenth

8  grade in high school, but I didn't finish.

9          Q.     And where did you go, which

10  high school?

11          A.     I went to high school in

12  Georgia.  Right up around Atlanta.

13          Q.     Other than the first lawsuit

14  and this one, have you been a party to any

15  other lawsuits?

16          A.     No, sir.

17          Q.     And I guess you were a party

18  to the 1999 bankruptcy; is that right?

19          A.     Yes, sir.

20          Q.     Any other bankruptcies before

21  then?

22          A.     No.

23          MR. WOOTEN:  Did we have to

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    file your car wreck case, we had to file
2    it, didn't we?
3         A.    Yes.
4              MR. WOOTEN:  Yes.  Tell him
5    about -- she got hit from behind and we
6    had to file the UM portion of her case, it
7    was in Chambers County.
8         A.    I forgot about that.
9         Q.    What year was that?
10        A.    It was '04, wasn't it?
11        Q.    Okay.
12              MR. WOOTEN:  I think it was
13   earlier than that.
14        A.    It might have been in '02.
15   I'm not for sure, but it was --
16              MR. WOOTEN:  It may have been
17   '02.  It's been a while.
18        A.    Yes, because I had to have
19   surgery.
20              MR. WOOTEN:  That's right.
21        Q.    That's over now, isn't it?
22        A.    Oh, yes, sir.
23        Q.    Okay.  Other than the

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    insurance issues in this lawsuit, and I
2    understand the calls and the collection
3    efforts and that sort of thing, you don't
4    have any other problems with Wells Fargo
5    or ASC?
6         A.     No, sir.
7         Q.     And do you remember the
8    release that was signed in -- when was it,
9    Nick?
10              MR. WOOTEN:  I can go pull
11   that.  I know it was prior to that July
12   letter when we signed it.  But it was in
13   mid '05, I'd say.
14              MR. ANDRESS:  All right.
15        Q.     You were a party to the
16   release and you signed the release?
17        A.     Yes, sir.
18              MR. ANDRESS:  Nick, if you
19   have a copy of it or something, we can
20   just go ahead --
21              MR. WOOTEN:  Yes, let's take a
22   break and I will walk down the hall and
23   get it.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    (Whereupon a break was had from

2    11:10 A.M. until 11:13 A.M.)

3    MR. WOOTEN:  It was July 25th.

4    MR. ANDRESS:  Okay.

5    MR. WOOTEN:  It's on that

6    letterhead, three days after we signed the

7    release.

8    MR. ANDRESS:  All right.

9    (Whereupon, Defendant's

10    Exhibit 5 was marked

11    for identification.)

12    Q.    (BY MR. ANDRESS:)

13    Ms. Alewine, I'm going to show you

14    Defendant's Exhibit 5 and ask you if

15    that's the release, a copy of the release

16    that you and Mr. Alewine signed to end the

17    first lawsuit?

18    A.    (Reviewing document.)  Yes,

19    sir.

20    Q.    And that's your husband's

21    signature as well on it?

22    A.    Yes, sir.

23    Q.    You recognize the signature

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    and that's his signature, right?

2         A.    Yes, sir.

3         Q.    I forgot one other thing, as

4    far as just the general deposition things,

5    you heard me tell Mr. Alewine about

6    answering questions, full questions, full

7    answers, there's one other thing we do in

8    normal conversation that's hard on the

9    court reporter and that's uh-huhs and

10   uh-uhs and nodding, and even though in

11   normal conversation, I would completely

12   understand you, so try to answer out loud

13   yes or no.

14        A.    Okay.

15        Q.    But you're doing fine.  All

16   right.

17        A.    Well, I have been awake all

18   night, too.

19        Q.    I hope not worrying about

20   this?

21        A.    No, I was at work.

22        Q.    Okay.  The second lawsuit, the

23   one about this insurance issue, when was

13

# ᅚᄃ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1    the first time that you became aware that
 2    ASC was going to increase your loan
 3    payments?  And feel free to use any
 4    documents that we discussed in
 5    Mr. Alewine's deposition.  Was it sometime
 6    around July of 2005?
 7         A.     Yes.
 8         Q.     And when you received that
 9    letter, what did you do to investigate it?
10         A.     Well, I went back and pulled
11    my records.
12         Q.     Uh-huh.
13         A.     And got to looking through
14    them and I come across where I had all of
15    my insurance payments and everything, and
16    when these people call you on the phone
17    and you try to explain to them, they don't
18    want to listen to you, they ask you for
19    proof and I sent them the proof and then
20    they still call you back and tell you that
21    you're still behind on it, so I just
22    got -- they wouldn't talk to me and listen
23    to me, so I just got Mr. Wooten, that's
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    the only thing I knew to do.

2         Q.    Okay.  You say that you sent

3    in proof of insurance before you saw

4    Mr. Wooten?

5         A.    Yes.

6         Q.    And what insurance did you

7    send in, what years?

8         A.    The ones that they asked for.

9    They always asked for different years.

10        Q.    So, what years did you send

11   in -- or let me ask it to you this way.

12   You didn't go back as far as 2000 or 2001,

13   did you?

14        A.    I'm pretty sure I did.  I went

15   back through -- because I've always kept

16   all of the receipts and everything on

17   everything I sent in.

18        Q.    And are you saying that you

19   sent in proof of insurance from 2001 and

20   2000 after you received that letter from

21   ASC?

22        A.    I'm saying I sent in the proof

23   that they -- for the months that they

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    asked for.  They always asked for

2    different ones.  So, I'm pretty sure if

3    they asked for that month, I would have

4    sent it in.

5        Q.    But you're not sure that they

6    did ask you for that year, right?

7        A.    As much as I've talked to them

8    and as much as they've requested, I

9    really -- it's hard to say.

10       Q.    You --

11       A.    They have asked for so much

12   proof on so many different dates until --

13       Q.    I understand.  So, you sent in

14   proof of insurance for whatever years they

15   asked for?

16       A.    Exactly.

17       Q.    All right.  Sitting here

18   today, is today the first time that you

19   understood that the insurance issue went

20   back to 2000 and 2001?

21       A.    Yes, sir.

22       Q.    So, before today, you did not

23   know that the 2000 and 2001 insurance is

# Ⅱⴹ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    what this situation is all about?

2          A.      Nobody never told me it was

3    2000.

4          Q.      Okay.  And if you would have

5    known that it was 2000 and 2001, would you

6    have sent in proof of insurance to them?

7          A.      Yes, sir.

8          Q.      And you had that information

9    in your possession, didn't you?

10         A.      Yes.

11         Q.      Okay.  So, you went to

12    Mr. Wooten.  Do you remember about what

13    time it was when you first went to him?

14         A.      Not right offhand, no, sir, I

15    don't.

16         Q.      All right.  You saw that

17    letter that said beginning October 1st,

18    2005, your payments were going up fifty

19    dollars, right?

20         A.      Yes, sir.

21         Q.      And then do you see

22    Mr. Wooten's letter dated October 3rd

23    2005, and that's in front of you, right?

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      A.      Uh-huh.  Yes, sir.

2      Q.      And does that refresh your

3  recollection of when you would have first

4  seen Mr. Wooten, and it would have had to

5  have been sometime before October 3rd,

6  2005, right?

7      A.      Yes, sir, but I don't remember

8  exactly what date.

9      Q.      No.  And I'm not asking you

10  that specific, I don't think you would be

11  able to remember that without some record

12  or something.  But do you have just a

13  general time frame, I mean, within a week

14  or a month or so before then?

15      A.      I would say probably about a

16  month or so.

17      Q.      Because apparently y'all had

18  to gather up some documents so Mr. Wooten

19  could send a letter to ASC.  Okay.  When

20  did the telephone calls start saying y'all

21  are fifty dollars behind on your payments,

22  that sort of thing, was it sometime after

23  October of 2005?

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    A.    I would say it would be right
2  after the first lawsuit, sometime right
3  after that.
4    Q.    But you do see where that
5  letter says that the payments aren't going
6  to be due until after October 1st, 2005,
7  right?
8    A.    Yes, sir.
9    Q.    So, I'm presuming, and correct
10 me if I'm wrong, that you would not have
11 gotten any calls saying you are behind on
12 your loan payment until after October of
13 2005, because that's when the fifty dollar
14 insurance issue was to begin?
15   A.    Well, I really don't know
16 because the phone calls have never
17 stopped, period.
18   Q.    So, you're saying
19 continuously, even after the first lawsuit
20 was settled, you've gotten phone calls?
21   A.    I've gotten phone calls saying
22 that we're behind on the payments and the
23 insurance payments and stuff like that.

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      Q.    All right.  I need to just get
2   as much specific recollection as you have.
3   So, after --
4      A.    Well, when they called me --
5   when they call and I answer the telephone,
6   they can never tell me exactly what I'm
7   behind on, why I'm behind on it, what
8   month, they transfer you from
9   person-to-person and the person they
10  transfer you to don't know anything about
11  it either.  Then they send you over to
12  management and you have to be on hold for
13  thirty minutes or more.  And then when
14  they come back, they can't tell you
15  anything, they're going to get it
16  straightened out and call you back in a
17  couple of days and the next time the phone
18  rings, it's somebody saying that you're
19  behind again or that you're behind on two
20  payments back this time or two months back
21  in this year or either -- and I've tried
22  to get them to tell me what the escrow was
23  about.  One time it's about insurance, the

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    next time it's about two payments behind

2    on the house.

3         Q.    All right.  Did the calls

4    change after July of 2005, I mean, did the

5    nature of the calls change?  I know you

6    said sometimes it's about payments and

7    other times it's about escrow.  I'm just

8    trying to get whatever you remember about

9    the telephone calls.

10        A.    Well, like I said, you're

11   always talking to a different person when

12   they call and they will go back through

13   the record and they will say, well, you

14   are behind two payments on your house

15   payment and then I will say no, sir, I've

16   got proof of that and then they say, well,

17   it's behind on the insurance and I say,

18   I've got proof of that, too.  They ask me

19   to send the proof in so they can get it

20   cleared up on the insurance, I send it in,

21   the next month, it's the same thing, phone

22   calls start every week, two or three times

23   a week wanting to know why you're behind.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   If you send them proof that the insurance
2   is being paid and their part of it is to
3   clear it up, I don't understand why they
4   keep calling me telling me I hadn't paid
5   it.
6       Q.    Okay.   The phone calls that
7   you received, when did the majority of
8   them occur, like hours of the day, 12:00
9   to 5:00 or so?
10      A.    Well, when they -- well, I
11  would say so, yes.
12      Q.    And you heard Mr. Alewine say
13  that there were a handful of calls at 9:30
14  at night or at 10:00?
15      A.    Yes, sir, there were, and
16  there was even one call on Sunday.
17      Q.    What time was the call on
18  Sunday, during the --
19      A.    I don't remember exactly what
20  time, but it was on a Sunday.
21      Q.    It was during the day on
22  Sunday?
23      A.    It was during the day on

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Sunday.

2        Q.    When you spoke with people on

3    the phone, they weren't rude or using bad

4    language or anything like that, were they?

5        A.    As far as being rude and using

6    bad language, not that, they just wouldn't

7    give you time to explain anything.  They

8    wanted to do all of the talking and you

9    listen.

10        Q.    Uh-huh.  Okay.  Do you have

11    any recollection of a particularly bad

12    experience other than just getting

13    transferred around?

14        A.    No, sir.

15        Q.    And did anybody ever call you

16    at your job?

17        A.    No, sir.

18        Q.    And when messages were left on

19    your answering machine, was it from a

20    computer just saying call this number?

21        A.    Yes.

22        Q.    And, I mean, it didn't say

23    anything about you're past due or you owe

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  this amount, right?

2      A.    No.

3      Q.    Did you see Mr. Alewine's

4  October 3rd, 2005 letter before it went

5  out just to look at it and see if it was

6  correct?

7      A.    I think we got copies of all

8  of this.

9      Q.    Was it before or after it was

10  mailed?

11     A.    I'm not sure.  I don't know

12  exactly, I don't know when he mailed it.

13     Q.    Okay.  All right.  From

14  October 3rd, 2005 through August 7th,

15  2006, is it correct that y'all didn't have

16  any out-of-pocket expenses in order to

17  obtain information on your loan?

18     A.    No, sir, we didn't.  I had all

19  of the information at home.

20     Q.    And you didn't have to pay --

21  let me ask you this.  Did you have to pay

22  Mr. Wooten a fee for that letter on

23  October the 3rd?

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1        A.      I'm not for sure.
 2        Q.      Okay.  You're not aware right
 3   now of --
 4        A.      No, sir.
 5        Q.      -- having to pay for that?
 6   Okay.  I want to ask you about, you know,
 7   the mental anguish claim in the lawsuit.
 8   Is it fair to say that the calls were
 9   aggravating and irritating, but not to the
10   degree where you had to go see a counselor
11   or psychologist or get on medication for
12   the stress of this situation?
13        A.       I didn't have to see a doctor
14   or take medications, but it's mighty
15   aggravating when you have to go through
16   with somebody that's dealing with cancer
17   and having to work and having to worry
18   about these people calling you every day
19   and explaining things to them or trying
20   to, and it's still the same thing every
21   time they call.  And you can't -- it's
22   just an ongoing thing, it don't seem like
23   it's ever going to stop.  You don't want
```

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   to answer the telephone, you don't want

2   to -- you know, because they won't listen

3   to you.

4        Q.    This aggravation, I mean, did

5   it -- it didn't rise to the level where

6   you said I've got to go get on some kind

7   of medication to deal with this, right?

8        A.    Not so far.  I'm not going to

9   say it won't, but --

10       Q.    Good.  Well, I hope it will

11   not.

12       A.    I hope so, too.

13       Q.    All right.  Let's talk about

14   your loan.  Y'all filed for bankruptcy in

15   1999, right?

16       A.    Yes.

17       Q.    And you were going to pay for

18   your house payment and the taxes and

19   insurance outside of your bankruptcy,

20   right?

21       A.    Yes.

22       Q.    Did y'all file a Chapter 13?

23       A.    Yes.

# TE TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      Q.    Okay.  And is it your

2   testimony that y'all made all of your

3   payments that you were required to on time

4   after 1999 forward?

5      A.    On time and before time.

6      Q.    Okay.  All right.  So,

7   according to you, y'all have not missed a

8   payment ever on this loan --

9      A.    No.

10     Q.    -- is that right?

11     A.    That's right.  I've never

12  missed one.

13     Q.    All right.  And other than

14  this insurance issue, there hadn't been

15  any other attempts since the lawsuit, the

16  second lawsuit, to collect money other

17  than this escrowed amount, right?

18     A.    No.

19     Q.    And I guess I asked you a

20  question that had a double negative.

21  Probably just to make sure the record's

22  clear.  As far as you know, after the

23  second -- strike that.  As far as you

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    know, after the first lawsuit was settled,

2    the only outstanding issue that ASC has

3    tried to collect from y'all has been for

4    this insurance?

5         A.    Yes, as far as I know.

6         Q.    All right.  And ASC did not

7    begin trying to collect that insurance or

8    claiming that you owed it until sometime

9    in 2005, right?

10        A.    Yes.

11        Q.    And y'all understood that

12   under the mortgage, you had to keep the

13   house insured, that the bank required

14   that?

15        A.    Yes.

16        Q.    And that was, I guess, for

17   your protection and the bank's protection?

18        A.    Yes.

19        Q.    And did you understand that if

20   y'all did not keep your insurance

21   obligations, that the bank could put

22   insurance on the house and charge y'all

23   for it?

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    A.    Yes, I understood that.

2    Q.    And did you understand that if

3    the bank didn't know that y'all had put

4    insurance on the house, that they, you

5    know, could do it and then call you and if

6    you had proof that you had insurance, then

7    the bank would take the charges away?

8    A.    I understood that, but I don't

9    think they did.

10    Q.    Okay.  Do you remember any

11    discussions with Ocwen about 2000 or 2001

12    insurance when Ocwen was the loan

13    servicer?

14    A.    No.

15    Q.    Do you remember getting a

16    letter from Ocwen saying that ASC was

17    going to become the loan servicer?

18    A.    Yes.

19    MR. WOOTEN:  It seems like

20    it's about four or five in there, maybe

21    later than that.

22    MR. ANDRESS:  Okay.

23    MR. WOOTEN:  It's the next

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   one.   8.

2        Q.   I'm going to show you a

3   document that's been marked Plaintiff's

4   Exhibit 8.   Is that the letter from Ocwen

5   that you received saying that ASC was now

6   going to be the servicer?

7        A.   Yes.

8        Q.   And did the dates -- strike

9   that.  Does the date on that letter appear

10  to be consistent with your recollection of

11  when ASC was going to take over the loan

12  servicing?

13       A.   Yes.

14       Q.   November of 2002?

15       A.   Yes.

16       Q.   Okay.  I'm going to show you a

17  document marked Defendant's Exhibit 2.   I

18  will just ask you to turn to the second

19  page.  And first of all, I'm going to ask

20  you if you have ever seen that document

21  before?

22       MR. WOOTEN:   That's the

23  payment history?

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1        A.     Yes.
 2        Q.     From Ocwen?
 3        A.     Yes.
 4        Q.     Do you remember when you first
 5   saw it?
 6        A.     Not exactly, no, not when I
 7   first saw it.
 8        Q.     Do you know, was it in
 9   conjunction with the first lawsuit?
10        A.     I think it was.  Like I said,
11   I'm not for sure.
12        Q.     May I see that?
13        A.     (Witness complies.)
14        Q.     Okay.  If you will take a look
15   at the top, that's your right-hand corner,
16   it shows a date of October 2004.
17        A.     Yes.
18        Q.     So, when you saw it, you
19   believe it would have been sometime after
20   October of 2004?
21        A.     Yes.
22        Q.     Okay.  Do you see the escrow
23   column on the second page?
```

## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1           MR. WOOTEN:   Escrow.

2      A.      Yes, sir.

3      Q.      And you're seeing that number,

4  six hundred and thirty-seven dollars and

5  fifty cents?

6      A.      Yes.

7      Q.      Is that number consistent with

8  what ASC told you was owed on the escrow?

9      A.      Yes, sir.

10      Q.      And would this be from calls

11  that you were on?

12      A.      Yes.

13      Q.      And I want to show you a

14  document marked Defendant's Exhibit 1.

15      A.      Yes.

16      Q.      Have you ever seen that

17  before?

18      A.      Yes.

19      Q.      Do you remember when you first

20  saw it?

21      A.      No, sir.

22      Q.      Do you think you saw it

23  sometime around August of 2006?

# TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1       A.       I'm pretty sure I did.

2       Q.       Do you remember reading it?

3       A.       Yes, sir.

4       Q.       And you see where it describes

5    how the six hundred and thirty-seven

6    dollars was calculated, right?

7       A.       Yes, sir.

8       Q.       When you read that letter, did

9    you do anything to communicate to ASC that

10   you had paid the 2000 and 2001 Ocwen

11   forced placed insurance?

12      A.       I don't understand.

13      Q.       Okay.  Let me ask it a

14   different way.  When you got this letter,

15   you didn't call up ASC and say y'all have

16   got it wrong, I have paid the insurance on

17   the house and I can give you proof of

18   that, right?

19      A.       No, sir, I didn't call them up

20   and tell them that because I'm pretty sure

21   I have told them that before when they

22   called, that I've had the insurance on it

23   all the time.  I don't understand, that's

## TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   what I don't understand.  I have paid it
2   every time it was due ever since we owned
3   the place and they've had proof of every
4   time that they've asked for, and this --
5   back as far as Ocwen went, I didn't know
6   anything about, nobody ever contacted me
7   about this.
8        Q.    Okay.  So, is it fair to say
9   that you did not provide ASC with proof of
10  2000, 2001 insurance in response to this
11  letter?
12       A.    Not -- probably not in
13  response to this letter, but in response
14  if they had requested --
15       Q.    Specific?
16       A.    Yes, because like I said, they
17  always asked for different years,
18  different months.  So, I'm pretty sure
19  that they had it sometime or another.
20       Q.    After October 3rd, 2005 when
21  Mr. Wooten wrote that letter, did y'all
22  turn over the responsibility of
23  communicating with ASC to him other than

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    the calls that they would make to your
2    house?
3         A.    Yes.
4         Q.    So, you didn't provide ASC any
5    documents or any information after you
6    turned this matter over to Mr. Wooten,
7    right?
8         A.    I turned all of my information
9    over to Mr. Wooten.
10        Q.    All right.  And then that was
11   the end of you providing records and
12   documents to ASC?
13        A.    Yes, sir.
14        Q.    After that, Mr. Wooten handled
15   everything?
16        A.    Yes, sir.
17        Q.    So, you haven't called Ocwen
18   since August 2006 and disputed to it that
19   y'all have paid the 2000 and 2001
20   insurance, right?
21        A.    I haven't been in touch with
22   Ocwen at all.
23        Q.    Okay.

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    A.    Like I said, I didn't know

2 that.

3    Q.    Okay.  Are you aware of any

4 provision in your loan or your mortgage

5 that makes bankruptcy a term of default?

6         MR. WOOTEN:  If you know.

7    A.    Yes.  You mean like if I don't

8 make the payments, I get behind on them,

9 they --

10    Q.    Yes, that's default.

11    A.    Yes.

12    Q.    Now, are you aware of any

13 statement in your loan or in your mortgage

14 that says if you declare bankruptcy, you

15 are in default of your mortgage?

16    A.    No, sir.  I don't think I am.

17    Q.    And when Ocwen was the

18 servicer, that's who you made your

19 payments to, right?

20    A.    Yes, sir.

21    Q.    And other than Mr. Wooten's

22 October 3rd, 2005 letter, you're not aware

23 of any other letters written to ASC

# TYLER EATON
## TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    requesting information about your loan,

2    right?

3         A.    I don't -- I don't know how to

4    answer that.  I don't know.

5              MR. WOOTEN:   Are you saying

6    are you aware of any letters that I've

7    written to America Servicing Company since

8    this letter to today; is that right?

9              MR. ANDRESS:   Yes.

10        Q.    And Mr. Wooten or you or your

11   husband, is this the last letter written

12   to ASC as far as you know?

13        A.    Yes, sir.  Like I said, I'm

14   about half asleep, I can't think.

15        Q.    I saw some Diet Cokes in

16   there.

17        A.    I don't need any of those.

18        Q.    All right.  Do you see

19   Mr. Wooten's letter, October 3rd, 2005?

20        A.    Yes, sir.

21        Q.    You don't see any reference in

22   that letter to the 2000 or 2001 insurance,

23   do you?

37

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1            MR. WOOTEN:  You can start

2    reading right there and it tells you

3    what's in there.

4            A.      (Reviewing document.)

5            MR. WOOTEN:  The answer is no.

6            A.      I was busy reading.  No.

7            MR. WOOTEN:  I'm picking on

8    you.

9            A.      I told you I was asleep.

10            MR. WOOTEN:  Well, I didn't

11    want you to spend too much time on that.

12            A.      I know.  I need to be at home

13    in bed.

14            Q.      I hope that you'll be heading

15    that way shortly.  I'm not going to be

16    long-winded.  And this July 20th, 2006

17    letter, Defendant's Exhibit --

18            MR. WOOTEN:  3.

19            Q.      -- 3.  Do you remember getting

20    that?

21            A.      Yes, sir.

22            Q.      Did you get it sometime around

23    when it was dated?

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    A.    I think so.

2    Q.    You don't remember --

3    A.    I don't remember exact dates.

4    Q.    And you didn't call ASC or

5    write ASC and say it's unacceptable for,

6    you know, you to wait this long to respond

7    to us or anything like that, did you?

8    A.    No, sir, I didn't call them

9    and ask them anything like that, but I

10   have asked them when they called me why

11   they added the escrow and stuff like that

12   and they couldn't answer me.

13   Q.    Do you remember about how many

14   times you personally have spoken to an ASC

15   person about your loan, and this is after

16   the first lawsuit, this is just --

17   A.    After the first one?

18   Q.    Yes.  Or probably from

19   sometime in October or November to the

20   current time.

21   A.    Probably about -- it's hard to

22   say.  They call so much, it's hard to say

23   exactly how many times you've talked to

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   them.

2            MR. WOOTEN:   How many times do

3   you normally talk to them in a week?

4        A.     Well, when I talk to them,

5   it's usually about once or twice a week.

6        Q.     So, one to two times a week?

7        A.     That's when I talk to them.

8   That's not how many times they call.

9        Q.     Right.  Right.  Do you

10  recognize their numbers or if it's a

11  number you don't recognize, do you not

12  answer the phone?

13       A.     Well, I recognize some of the

14  numbers they call from and some of them

15  that I don't recognize, I don't answer.  I

16  do that with everybody.

17       Q.     I do, too.  You had possession

18  of information showing that you had paid

19  the 2000 and 2001 insurance before

20  October 2005, right?

21       A.     Yes.

22       Q.     Just in records that you kept

23  at home?

## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      A.      Yes.

2      Q.      If ASC would have received

3  information from you on the 2000 and 2001

4  insurance and then said something to the

5  effect, thank you for providing us with

6  that insurance, we were mistaken that it

7  hadn't been paid and then they would have

8  said don't worry about the fifty dollars,

9  that's done and over, would that have been

10  an acceptable resolution to you by, let's

11  say, November of 2005?

12      A.      No.

13      Q.      And why not?

14      A.      Because I had talked to a

15  person on the telephone from them and he

16  said it was the -- the escrow stemmed from

17  the insurance and I told him that I had

18  already sent them proof of insurance and

19  everything, and he told me that they would

20  get that straightened out and they would

21  take that off and I never got anything

22  back from them, no phone call, no

23  paperwork or nothing saying that they had

TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    took that off my payment.

2         Q.    Did y'all specifically discuss

3    the 2000 or 2001 insurance?

4         A.    No.

5         Q.    And you don't know whether or

6    not that could have been a different

7    period of insurance that they were

8    discussing, I mean, it could have been,

9    you just don't know?  Do you want me to

10   try again?

11        A.    See, that's what I'm not

12   understanding, they had proof of all of my

13   insurance, so when they tell me what dates

14   that they wanted and I would tell them I

15   already sent it to them, then they would

16   go back and say, well, they're going to go

17   back through the records and if they find

18   the mistake, they're going to take it off

19   my records and they never did.

20        Q.    And, Ms. Alewine, I'm not

21   trying to --

22        A.    I know, I'm getting ill.

23        Q.    No, you're doing fine and I'm

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  not trying to nitpick you, I just have to
2  find out what you know.
3       A.    I understand.
4       Q.    All right.  Here's really the
5  specific question.  Do you specifically
6  remember sending in proof to ASC that
7  y'all paid the 2000 and 2001 insurance?
8       A.    I can't say that I
9  specifically sent those in.  I have sent
10 so many in that I can't remember, you
11 know, every one of them that I sent in.  I
12 have sent them everything that they've
13 asked for.
14      Q.    We talked about out-of-pocket
15 damages and attorney's fees and the
16 aggravation from the calls.  Do you
17 remember any other type of damages that
18 y'all are claiming in the lawsuit, like
19 hurting your credit or, you know, problems
20 getting loans or higher interest rates on
21 credit cards or anything like that?
22      A.    Just the loans, like when he
23 tried to buy the truck and stuff like

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    that.  My car is paid for, so I don't need
2    another one.
3        Q.    And the trying to find the
4    truck, were y'all denied -- did -- strike
5    that.  When you were looking for a truck
6    for Mr. Alewine, was there ever an
7    occasion after October of 2005 where y'all
8    said I want this truck and then told the
9    salesperson that and then the salesperson
10   took your credit information, then came
11   back and said I can't sell you the truck
12   on credit, do you remember any situation
13   like that?
14       A.    Yes.
15       Q.    After October of 2005?
16       A.    Yes.
17       Q.    Tell me about that.
18       A.    After 2005, didn't you just
19   try to get a truck out here at King Ford
20   just here a few months back and they
21   turned you down?
22           MR. ALEWINE:  Yes, but that
23   ain't been but a few months ago.

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      A.      Well, it was after 2005, isn't
2  it?
3              MR. ALEWINE:  Well, actually I
4  forgot about that.
5      A.      He tried to buy a new truck at
6  King Ford and they turned him down.
7              MR. ALEWINE:  Not new, just
8  smaller.
9              MR. WOOTEN:  New to you,
10 right?
11             MR. ALEWINE:  New to me,
12 better gas mileage, but they wouldn't let
13 me, they wouldn't even talk to me.
14     Q.      And King Ford, where is that?
15             MR. WOOTEN:  In the Valley.
16     Q.      And y'all picked out a truck
17 and then --
18     A.      He did.
19     Q.      And then they wouldn't sell it
20 to you?
21             MR. ALEWINE:  That's right.
22     Q.      And that's okay, it happens,
23 people forget about things.  No problem

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    there.  All right.  So, tell me, were you
2    present for conversations when the
3    salesperson said I can't sell it to you?
4        A.    No, sir.
5        Q.    All right.  So, I guess, do
6    you remember what Mr. Alewine said to you?
7        A.    I don't think you want to hear
8    that.
9        Q.    You can clean it up for me.
10       A.    He just couldn't understand
11   why they denied him when we're not behind
12   on any payments on anything that we've
13   got.  And it should have been -- that
14   shouldn't have been showing on our credit
15   either, and then when we got the credit
16   reports back, it was.
17       Q.    And did Mr. Alewine -- and
18   Mr. Alewine, if Mr. Wooten will let you,
19   you can pipe in and you can tell this
20   story.  I know this isn't your deposition,
21   but, you know, if Mr. Wooten doesn't mind,
22   I don't care.  Just what did the
23   salesperson tell you the reason was that

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1  he couldn't sell you the truck?

2          MR. ALEWINE:  What, the last

3  time she was talking about?

4      Q.    Yes.

5          MR. ALEWINE:  Well, that one I

6  had about a year and a half, it's a big

7  Dodge and I decided I wanted something

8  smaller, better on gas, so he went out

9  there and found one, I think it was about

10  two years old.  He told me I couldn't get

11  it, I said why, he said, well, because

12  it's too much money, can't get nobody to

13  touch it.  And I actually mentioned

14  something, I said something about my

15  mortgage payments and --

16      Q.    Did anybody --

17          MR. ALEWINE:  Just off the

18  wall talking.

19      Q.    Did anybody say the reason

20  that we're not selling you this car is

21  because you have bad credit?

22          MR. ALEWINE:  Oh, that's what

23  it was.

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    Q.    But did they tell you that,

2    that your credit --

3              MR. ALEWINE:  My credit

4    wouldn't go through, yes.

5    Q.    I understand that they said

6    that the credit wasn't approved --

7              MR. ALEWINE:  Yes.

8    Q.    -- but did they tell you why?

9              MR. ALEWINE:  They won't tell

10   you why, but I did send off to find out,

11   but that didn't do no good because they

12   didn't know why either, not that I could

13   understand, you know.

14   Q.    Okay.  Have y'all contacted

15   any credit bureaus, the TransUnion,

16   Experian, Equifax --

17   A.    Yes.

18   Q.    -- and disputed their

19   reporting of your credit?

20   A.    Not this time, we didn't

21   because we just got this one a few months

22   back, so we didn't.

23   Q.    So, after --

TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1              MR. WOOTEN:   A few weeks ago?

2         A.      Well, a few weeks ago.

3              MR. WOOTEN:   Yes.

4         Q.      After October of 2005, you

5    haven't called any of the credit bureaus

6    and disputed the way that your credit was

7    being reported?

8              MR. WOOTEN:   You can't call

9    them.

10         Q.      You're right, thank you for

11   the clarification.   You haven't written

12   them a letter disputing your credit

13   reporting at this time?

14         A.      No.

15         Q.      Do you remember anything about

16   trying to buy a washer or a dryer at

17   Sears?

18         A.      Yes.

19         Q.      Tell me what you remember

20   about that.

21         A.      Well, we just applied for the

22   credit card so we could get the washer and

23   dryer and they called, the manager called

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    and he said it wouldn't go through.  They
2    did it from the store, so I don't really
3    know who he called.
4         Q.    Uh-huh.
5         A.    He just said it wouldn't go
6    through.
7         Q.    And you don't know --
8         A.    He wouldn't --
9         Q.    -- why?
10        A.    -- tell, even if they told
11   him, he wouldn't tell.
12        Q.    Okay.  Would you be less
13   irritated with ASC if ASC -- if you knew
14   that ASC had communications with Ocwen and
15   Ocwen said that y'all hadn't paid the 2000
16   and 2001 insurance?
17        A.    What do you mean would I be
18   less --
19        Q.    If you believed that ASC
20   investigated to find out if y'all had paid
21   your insurance and Ocwen said that you
22   hadn't, would that make you less irritated
23   with ASC?

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      A.    That's hard to answer, so I
2   really don't know how to answer that.    I
3   mean, if they investigated and that's what
4   they found, then they should have let me
5   know.
6      Q.    Okay.  But they did put that
7   information in that letter dated
8   August 7th, 2006, right?
9          MR. WOOTEN:   That's -- I think
10   I got that.
11      A.    And, you know, I've done read
12   so much that I forgot what I read, they
13   send so much stuff to me.
14          MR. WOOTEN:   Here it is.
15      A.    (Reviewing document.)  Yes.
16      Q.    So, they did tell you that
17   that was the problem, right?
18      A.    Yes, sir.
19      Q.    And then they also asked for
20   any proof that you had paid that
21   insurance, right?
22      A.    Yes.
23      Q.    And this was after the time

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    that you had turned it over to Mr. Wooten,
2    right?
3         A.    Yes.
4         Q.    So, you did not send them any
5    information that y'all -- proving that
6    y'all did pay Ocwen, right?
7         A.    Yes.
8         MR. ANDRESS:  All right.  Let
9    me check my notes and --
10         Q.    Sitting here today, y'all
11    haven't paid any money out-of-pocket to
12    Mr. Wooten or his law firm for his
13    services in this lawsuit, right?
14         A.    No, sir.
15         MR. ANDRESS:  Thank you.
16         A.    I don't think.  Have I paid
17    you anything?
18         MR. ANDRESS:  He's like no,
19    you haven't.  Ms. Alewine, thank you.
20    Have a good night's sleep.
21         MR. WOOTEN:  Let me ask her a
22    couple of questions.
23

## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    EXAMINATION BY MR. WOOTEN:

2         Q.    Let me ask you a couple of

3    questions before we go off the record.

4         A.    Okay.

5         Q.    This August 7th, 2006 letter,

6    is that the first time that you recall

7    anybody saying that the six -- the amount

8    that was part of your escrow that they had

9    created came from Ocwen?

10        A.    Yes.

11        Q.    Is it your testimony, just so

12   the record is completely clear, that every

13   time you discussed the escrow balance with

14   America's Servicing Company, that you

15   provided them anything they asked you for?

16        A.    Yes.

17        Q.    Is it also your testimony that

18   they could never basically give you the

19   same reason two times in a row for why

20   they had an escrow?

21        A.    Yes.

22        Q.    And do you have an estimate of

23   how many hours you spent on the phone with

## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  them over the time from October of 2005

2  until August of 2006 trying to find out

3  why they had created this escrow account?

4        A.     Estimated hours?

5        Q.     Uh-huh.

6        A.     From 2005 up until this.

7        Q.     From October of 2005 up until

8  August of 2006, do you have a guesstimate

9  of how many hours you would have spent on

10  the phone?  And that can be a ballpark.

11        A.     I would probably say about --

12  probably about twenty hours.  That's

13  ballpark between me and him.

14        Q.     On the phone?

15        A.     On the phone.

16        Q.     Trying to find out why you had

17  an escrow balance of six hundred and

18  thirty-seven dollars and fifty cents?

19        A.     Yes, sir.

20        Q.     Okay.

21        MR. WOOTEN:    That's all I've

22  got, Keith.  I know you probably want to

23  follow up with that.

54

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          MR. ANDRESS:  I really don't.

2          MR. WOOTEN:  Okay.  Well,

3    then, we're through.

4          MR. ANDRESS:  Thanks.  I offer

5    all of the exhibits to the deposition.

6          MR. WOOTEN:  That will be

7    fine.

8

9       FURTHER THE DEPONENT SAITH NOT

10

11     (Deposition concluded at 12:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

## TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1           C E R T I F I C A T E

2

3

4    STATE OF ALABAMA

5    JEFFERSON COUNTY

6

7              I hereby certify that the

8    above and foregoing deposition was taken

9    down by me in stenotypy, and the questions

10   and answers thereto were reduced to

11   typewriting under my supervision, and that

12   the foregoing represents a true and

13   correct transcript of the deposition given

14   by said witness upon said hearing.

15             I further certify that I am

16   neither of counsel nor of kin to the

17   parties to the action, nor am I in anywise

18   interested in the result of said cause.

19

20

21   *Susan Treadaway*

22

23   COMMISSIONER-NOTARY PUBLIC

## CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE

This Confidential Settlement Agreement and Release (hereinafter referred to as the "Agreement") is entered into as of the $\underline{25th}$ day of July, 2005, by and among Edward H. Alewine, Jr. and Shelly M. Alewine (hereinafter collectively referred to as "Plaintiffs"), and America's Servicing Company (hereinafter referred to as "Defendant").

### RECITALS

WHEREAS, Plaintiffs commenced a civil action against Defendant in the United States District Court for the Middle District of Alabama, Eastern Division, alleging various causes of action, and which civil action was styled Edward H. Alewine, Shelly M. Alewine v. America's Servicing Company, Case No.: 3:05-CV-16-C (hereinafter referred to as the "Lawsuit").

WHEREAS, Plaintiffs and Defendant (hereinafter collectively referred to as the "Parties") are desirous, in consideration of the foregoing and of the matters set forth herein, of reaching a final and global settlement of any and all claims that have been made or could have been made by Plaintiffs against Defendant in the Lawsuit; and

WHEREAS, the Parties desire to enter into the Agreement in order to provide for the release set forth herein and for a certain payment in full and final settlement and discharge of all claims which are, might have been, or could have been made the subject of the Lawsuit, upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual undertakings herein expressed and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:



## A G R E E M E N T

### Release and Discharge by Plaintiffs of Defendant:

In consideration of the covenants contained herein, including, without limitation, the payment called for herein and the dismissal with prejudice of the Lawsuit, Plaintiffs hereby release and forever discharge Defendant, its insurers, predecessors and successors in interest, assignees, nominees, and their past, present and future subsidiaries, affiliates, divisions, officers, directors, employees, stockholders, attorneys, servants, representatives, partners, agents, authorized dealers, personal representatives, administrators, executors, heirs, and all other parties, of and from all claims, demands, obligations, actions, or causes of action, however denominated, that were or that could have been asserted in the Lawsuit. Without limiting the forgoing, Plaintiffs waive and release Defendant as to all claims under the Fair Credit Reporting Act that were or could have been asserted in the Lawsuit. Plaintiffs do not waive any future claims arising and accruing after the execution of the Agreement.

### Acknowledgement of Resolution of Disputed Claims

The Parties acknowledge that the payment and promises provided for by this Agreement are being made to compromise and settle claims disputed as to both liability and amount and are being made in settlement and release of all claims that Plaintiffs asserted or could have asserted against Defendant in the Lawsuit. Nothing contained herein, including payment of the sum reflected herein, nor any statements or communications made by Defendant or its agent during the negotiations leading to the Agreement, shall be considered admissions of liability by or on behalf of Defendant.

### Payment and Other Consideration

In consideration of the covenants contained herein, including, without limitation, the

release set forth and the dismissal of the Lawsuit, with prejudice, the Parties hereby agree to the following:

Defendant will pay the total sum of SEVEN THOUSAND, FIVE HUNDRED AND NO/100 DOLLARS ($7,500.00) to Plaintiffs within fourteen (14) days of the execution of the Agreement.

Defendant agrees to waive the following: $984.11 in late charges; $25.00 NSF fee; $200.00 in other fees; and $2,978.16 in corporate advances.

Defendant agrees to make Plaintiffs' account current to the August 29, 2005 payment.

Plaintiffs agree they are responsible for making the August 29, 2005 payment and all payments thereafter.

Plaintiffs agree they will be responsible for any and all late charges, advances, fees and mortgage payments due after the execution of the Agreement.

Defendant agrees to complete the necessary forms instructing Experian, Equifax and Trans Union to delete Defendant's negative reporting from Plaintiffs' credit files. Completion of the necessary forms requesting that said credit reporting agencies remove Defendant's negative reporting from Plaintiffs' credit files will satisfy Defendant's obligations under this Agreement. Deletion of negative reporting information is reasonably expected to be completed by the credit reporting agencies within ninety (90) days of the date of execution of the Agreement. Plaintiffs acknowledge that it is their responsibility to contact the credit reporting agencies to verify that these agencies have taken action consistent with Defendant's request, and that no cause of action can or will be stated against Defendant in the event any credit reporting agency fails to take action consistent with Defendant's request. In the event that Defendant's negative reporting information reappears on one or more of Plaintiffs' credit reports on file with Experian, Equifax,

3

or Trans Union, Plaintiffs may contact the law firm of Sirote & Permutt, P.C., 2311 Highland Avenue South, Birmingham, Alabama 35205 (Post Office Box 55727, Birmingham, Alabama 35255-5727), telephone: 205.930.5100, and inform it of the reinstatement.  Sirote & Permutt, P.C. in turn will notify Defendant of the reporting.

### Each Party to Bear Its Own Attorneys' Fees and Costs

The Parties shall separately bear all attorneys' fees, costs and expenses arising from the actions of their own respective counsel in connection with the matters referred to in the Agreement.

### Dismissal of the Lawsuit With Prejudice

Upon the execution of the Agreement in full by all Parties and the payment of the sum called for hereunder, the Parties will jointly stipulate to the dismissal of this Lawsuit, with prejudice, with each party to bear its own costs.

### Entire Agreement

The Agreement contains the entire agreement by and between the Parties with regard to the matters set forth herein, and shall be binding upon and inure to the benefit of the undersigned, their successors, assigns, heirs, agents, representatives, executors, administrators, or any entity of which any of the undersigned may now or hereafter be a part.

### Applicable Law

The Agreement is made and shall be construed and enforced pursuant to the laws of the State of Alabama.

### Execution

The Agreement may be executed in several counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties hereto have executed the Agreement on the 25th day of July, 2005, as set forth below:

*Edward H. Alewine Jr.*
Edward H. Alewine, Jr.

STATE OF ALABAMA )
                 )
COUNTY OF Chambers )

    I, the undersigned, a Notary Public in and for said County and State, hereby certify that Edward H. Alewine, Jr., individually, whose name is signed to the foregoing document and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he voluntarily executed the same on the day the same bears date.

    Given under my hand and seal this the 25th day of July , 2005.

    Amy Carlton
    Notary Public

    My Commission Expires: 10/30/05

_Shelly M. Alewine_
Shelly M. Alewine

STATE OF ALABAMA    )
    )
COUNTY OF Chambers )

    I, the undersigned, a Notary Public in and for said County and State, hereby certify that Shelly M. Alewine, individually, whose name is signed to the foregoing document and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he voluntarily executed the same on the day the same bears date.

    Given under my hand and seal this the 25th day of ___July___, 2005.

_Tony Carlta_
Notary Public

My Commission Expires: _10/30/05_

Wells Fargo Home Mortgage D/B/A
America's Servicing Company

By: _Dixie R Teagle_
Its Vice President

STATE OF _MARYLAND_          )
                            )
COUNTY OF _FREDERICK_        )

        I, the undersigned authority, a Notary Public in and for said County in said State,
hereby certify that _Dixie L. Teagle_ whose name as _Vice President_ of
America's Servicing Company is signed to the foregoing document, and who is known to me,
acknowledged before me on this day that, being informed of the contents of the document, he, as
such officer and with full authority, executed the same voluntarily for and as the act of said
corporation.

        Given under my hand and official seal, this _21st_day of _July_          , 2005.

                                    _B.J. Beauchamp_
                                    Notary Public
                                    My Commission Expires:_____

                        ┌─────────────────────────────────┐
                        │      B.J. BEAUCHAMP              │
                        │   NOTARY PUBLIC - MARYLAND      │
                        │       FREDERICK COUNTY          │
                        │ My Commission Expires Nov. 1, 2008 │
                        └─────────────────────────────────┘

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

EDWARD H. ALEWINE, *et al.*,          )
                                       )
        Plaintiffs,                    )
                                       )
v.                                     )          Case No. 3:06cv886-MHT
                                       )
AMERICA'S SERVICING                    )
COMPANY,                               )
                                       )
        Defendant.                     )

## AFFIDAVIT OF CINDY T. SHANABROOK

STATE OF  Maryland            )

COUNTY OF  Frederick          )

Before me, the undersigned notary public in and for said county and state, personally appeared Cindy T. Shanabrook, who, after being first duly sworn, deposes as follows:

1.      My name is Cindy T. Shanabrook. I am over the age of 21 and have first hand knowledge of all statements made in my affidavit.

2.      I was designated America's Servicing Company's ("ASC") corporate representative for the purposes of providing testimony regarding ASC's servicing of the subject loan. Pursuant to this designation, I conducted an investigation into ACS's servicing of the loan and reviewed ASC's file on the loan.

B DKA 756714 v1
2780973-000281 8/29/2007

3.    From my review of ASC's file, I have determined that ASC did not have proof of insurance for the mortgaged property for the time period beginning August 3, 2000 and ending August 3, 2002, at any time prior to the filing of the instant lawsuit.

4.    ASC began servicing the loan in November 2002. Ocwen Federal Bank FSH was the prior servicer. When ASC began servicing the loan in November 2002, the Plaintiffs were current on their payment obligations – that is, they were paying the monthly installments of principal and interest as they came due. The loan was not in default, and ASC did not take the position that the loan was in default.

5.    Had ASC been provided with information that Plaintiffs had insurance for the mortgaged property for the period during which force-placed insurance was in effect (August 3, 2000 to August 3, 2002), ASC would have had the opportunity to work with Plaintiffs to obtain a refund and to reverse the charges. However, without proof of insurance for the relevant time period, ASC was not in a position to obtain a refund or to reverse the charges.

6.    ASC did not receive information that Plaintiffs had proof of insurance for the relevant period until after the lawsuit was filed. The information was produced during the course of document discovery in this case.

Further affiant sayeth not.

2

CINDY T. SHANABROOK

SWORN TO AND SUBSCRIBED
BEFORE ME THIS _29_ DAY OF
_August_____, 2007.

NOTARY PUBLIC

MY COMMISSION EXPIRES:

BEVERLY DECARO
Notary Public
Frederick County
Maryland
My Commission Expires Apr 1, 2010

3

# EXHIBIT F

FW: Ocwen loan #30117055 (Alewine)/ASC In #1099003191

### Allen, Carrisa

**From:**   James.Melton@ocwen.com
**Sent:**   Sunday, July 30, 2006 9:08 AM
**To:**   Gabriel.A.Shipley@wellsfargo.com
**Subject:** RE: Ocwen loan #30117055 (Alewine)/ASC In #1099003191

10/25/2000

James R. Melton
Manager - Tax, Insurance, and Escrow
Ocwen Loan Servicing, LLC
(561)682-8054


**From:** Gabriel.A.Shipley@wellsfargo.com [mailto:Gabriel.A.Shipley@wellsfargo.com]
**Sent:** Friday, July 28, 2006 5:28 PM
**To:** Melton, James
**Subject:** RE: Ocwen loan #30117055 (Alewine)/ASC In #1099003191

Thank you. Can you confirm what date the $323.00 disbursement was made?

**From:** Melton, James [mailto:James.Melton@ocwen.com]
**Sent:** Friday, July 28, 2006 5:27 PM
**To:** Vega, John; Colon, Jose
**Cc:** Shipley, Gabriel A
**Subject:** RE: Ocwen loan #30117055 (Alewine)/ASC In #1099003191

8/3/2000 - 8/3/2001 LPI Policy LRE420433421 $323.00

8/3/2001 - 8/3/2002 LPI Policy LRE420501171 $314.50

James R. Melton
Manager - Tax, Insurance, and Escrow
Ocwen Loan Servicing, LLC
(561)682-8054


**From:** Vega, John
**Sent:** Friday, July 28, 2006 4:46 PM
**To:** Colon, Jose; Melton, James
**Cc:** 'Gabriel.A.Shipley@wellsfargo.com'
**Subject:** RE: Ocwen loan #30117055 (Alewine)/ASC In #1099003191

Please help Wellsfargo on the below Escrow issue.

Thanks.

*John Vega*

Ocwen
Cashiering Specialist
6/28/2007

Alewine v. ASC
ASC 000274
ASC Production

FW: Ocwen loan #30117055 (Alewine)/ASC In #1099003191                    Page 2 of 3

Tel: (407) 737-5268
Fax: (407) 737-6246

-----Original Message-----
**From:** Gabriel.A.Shipley@wellsfargo.com [mailto:Gabriel.A.Shipley@wellsfargo.com]
**Sent:** Friday, July 28, 2006 3:18 PM
**To:** Vega, John
**Subject:** FW: Ocwen loan #30117055 (Alewine)/ASC In #1099003191
**Importance:** High


Please advise on the status of this request if possible.

Thanks!!

Gabe

---
**From:** Shipley, Gabriel A
**Sent:** Thursday, July 20, 2006 11:32 AM
**To:** 'John.Vega@Ocwen.com'
**Subject:** Ocwen loan #30117055 (Alewine)/ASC In #1099003191
**Importance:** High

Hi John,

I'm hoping you can assist me with this issue or direct me to the appropriate contact.

We have received a written request from these borrowers' attorney, in which he disputes the escrow
advance balance on the loan. The loan transferred to ASC from Ocwen in 11/2002 with a escrow
advance balance in the amount of $637.50. I have the Ocwen history beginning in 12/2000, which reflects
a insurance disbursement in the amount of $314.50 on 8/8/2001, before which there was an escrow
advance balance of $323.00. Can you advise on what date the prior disbursement occurred, and confirm
if they both were for lender-placed insurance? If so, I need to know the effective dates for the insurance
as well.

Thank you very much for your help,

*Gabe Shipley*
*Written Correspondence*
*ASC/Client 106*
*mac X3902-022*
*phone 301 696 7160*
*fax 301 846 8929*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This E-mail message and its attachments, if any are intended solely for the use of the addressee hereof.
In addition, this message and the attachments, if any may contain information that is confidential,
privileged and exempt from disclosure under applicable law. If you are not the intended recipient of this
message, you are prohibited from reading, disclosing, reproducing, distributing, disseminating or
otherwise using this transmission.

Alewine v. ASC
ASC 000275
ASC Production

6/28/2007

Delivery of this message to any person other than the intended recipient is not intended to waive any right or privilege. If you have received this message in error, please promptly notify the sender by reply E-mail and immediately delete this message from your system. Instructions transmitted over this system are not binding on us until they are confirmed by us. Message transmission is not guaranteed to be secure or free of software virus. While Ocwen Financial Corporation and its subsidiaries collectively "Ocwen" takes every reasonable precaution to minimize such risks, Ocwen cannot accept liability for any damage sustained by you or any third party as a result of software viruses.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Alewine v. ASC
ASC 000276
ASC Production

FW: 3018468928 106-106-1099003191 Alewine                                          Page 1 of 2

### Allen, Carrisa

| | |
|---|---|
| **From:** | EscrowInsuranceEscalatedIssues@wellsfargo.com |
| **Sent:** | Tuesday, August 01, 2006 2:56 PM |
| **To:** | Gabriel.A.Shipley@wellsfargo.com |
| **Cc:** | EscrowInsuranceEscalatedIssues@wellsfargo.com |
| **Subject:** | FW: 3018468928 106-106-1099003191 Alewine |
| **Attachments:** | MTGSMNMI024_0608011856520143.PDF |

Hi Gabe,

Attached are the two letters that the Escrow Dept mailed to the customer spreading the negative escrow balance on a non escrowed loan over 12 months and increasing the payment.

Kathy

Kathy Hauer
Operations Analyst - Servicing
Executive Complaints and Litigation
Wells Fargo Home Mortgage
MAC X9903-04N
2650 Wells Fargo Way
Minneapolis, MN 55408
PH: 612-312-6822
Fax: 866-359-3925
E-Mail kathy.hauer@wellsfargo.com

-----Original Message-----
From: Enterprise Electronic Fax Services
Sent: Tuesday, August 01, 2006 1:57 PM
To: Escrow Insurance Escalated Issues
Subject: FAX: 3018468928 106-106-1099003191 Alewine

This message was received via FAXCOM, a product from Biscom Inc. http://www.biscom.com/

-------Fax Reception Report-------

Received Time:   08/01/2006 13:56
Result:      OK
Description:    All pages received OK
Result Code:   0000
Pages Received:  3
Remote TSI:    3018468928
Connect Time:   0 minutes, 37 seconds
Routing ID:    8663593925
Caller ID:
Unique ID:    MTGSMNMI024_0608011856520143
Fax Line:     15

Alewine v. ASC
ASC 000277
ASC Production

6/28/2007

FW: 3018468928 106-106-1099003191 Alewine                                    Page 2 of 2

Fax Server:    mtgsmnmi024

The fax is included as a PDF image attachment

Alewine v. ASC
**ASC 000278**
ASC Production

6/28/2007