**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EDWARD H. ALEWINE,** | ) | |
| **SHELLY M. ALEWINE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 3:06cv886-MHT** |
| | ) | |
| **AMERICA'S SERVICING COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MOTION TO COMPEL PURSUANT TO RULE 37

COMES NOW the plaintiffs and moves Your Honor for an Order compelling the defendant to respond to certain discovery and to make available certain witnesses for the purposes of discovery in this action. In support of this motion and as grounds therefore, the plaintiffs state as follows:

1. This lawsuit was filed on or about October 2, 2006.

2. On or about July 26, 2007, the parties jointly moved for an extension of the scheduling order in this case which was denied, with the exception of the Court extending the discovery cutoff until September 28, 2007.

3. On the 9th day of August 2007, the plaintiff's served their third consolidated discovery requests upon the defendants.

4. The defendant responded to those requests on the 12th day of September, 2007 by failing to provide meaningful answers and by objecting to the discovery. (The subject discovery is attached to this motion as exhibit "a").

5. Counsel for the plaintiff has attempted to negotiate with the counsel for the defendant regarding this material but the defendant contends that the material is either not discoverable or should be shielded by a blanket confidentiality order.

6.  Counsel for the plaintiff has offered a confidentiality order which would allow the subject documents to be shared only with attorneys involved in litigation with Wells Fargo. The defendant seeks a complete confidentiality order without showing that the documents should be protected. Further, the defendant has not moved for a protective order.

7.  On July 10, 2007, the plaintiffs conducted a 30b6 deposition of the defendants.

8.  The corporate representative of the defendant, Cindy Shanabrook, could not fully or adequately testify regarding the areas of inquiry propounded in the 30b6 notice. (A copy of the deposition notice is attached as exhibit "b", a copy of the Shanabrook deposition is attached as exhibit "c")

9.  Counsel for the plaintiff discussed this with the defendants and sought an agreement that would provide for the defendants to produce additional witnesses who could fulfill the obligations of the defendant with respect to testimony needed for discovery. However, counsel for the defendant has intimated that the defendant may not be willing to produce these witnesses in Birmingham, Alabama for their depositions.

10. Because of the discovery cutoff in this case (Sep. 28, 2007) the plaintiff cannot complete the depositions without an order from the Court requiring the defendant to produce its witnesses in Birmingham, Alabama prior to the discovery cutoff.

11. Because of the actions of the defendant in failing to answer deposition questions in a meaningful way, the plaintiffs will be irreparably harmed if the defendant is not forced to produce witnesses who can adequately and fully testify regarding the plaintiffs' areas of inquiry.

12. To remedy the discovery failures of the defendant, the plaintiffs propose that the Court order the defendant to answer fully the plaintiffs' third consolidated discovery and further order the defendant to produce witnesses in Birmingham, Alabama at the defendant's counsel's office prior to the discovery cutoff for depositions in accordance with the notice of deposition that the plaintiffs propounded on the defendant.

13. Counsel for the plaintiff certifies to the Court that he has made a good faith effort to resolve these disputes without the necessity of Court intervention.

WHEREFORE, PREMISES CONSIDERED, the plaintiffs pray that this Court will compel the defendant to answer the discovery and order the defendant to produce witnesses who can provide meaningful testimony regarding the dispute.

Done and filed this the 13th day of September 2007.


_/s/_ Nick Wooten_____
Nick Wooten
Attorney for the Plaintiffs



CERTIFICATE OF SERVICE

**I hereby certify that on the 13th day of September, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  All counsel of record.**


/s/ Nick Wooten_____
Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

EXHIBIT A

| | |
|---|---|
| EDWARD H. ALEWINE, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  Case No. 3:06cv886-MHT |
| | ) |
| AMERICA'S SERVICING COMPANY,) | |
| | ) |
| Defendant. | ) |

## DEFENDANT'S RESPONSES TO PLAINTIFFS' THIRD CONSOLIDATED DISCOVERY REQUESTS

COMES NOW Defendant and responds to Plaintiffs' Third Consolidated Discovery Requests as follows:

### INTERROGATORIES

25.    Please state how many loans the defendant purchased the servicing rights to on November 1, 2002 from Ocwen, which included the plaintiffs' loan.

**RESPONSE:**  Defendant objects to this interrogatory on the grounds that it calls for information that is immaterial, irrelevant not reasonably calculated to lead to the discovery of admissible evidence.

Other loans, if any, that Defendant purchased on November 1, 2002 from Ocwen have no bearing on the status of the subject loan. The status of any other loan purchased from Ocwen has no bearing on whether the subject loan was in default at the time Defendant became the loan servicer.

26.    Please state how many loans of the loans purchased from Ocwen, referenced in 26 above, were considered to be in default at the time they were purchased.

**RESPONSE:**  Defendant objects to this interrogatory on the grounds that it calls for information that is immaterial, irrelevant not reasonably calculated to lead to the discovery of admissible evidence.

Other loans that Defendant purchased on November 1, 2002 from Ocwen have no bearing on the status of the subject loan. The status of any other loan purchased from Ocwen has no bearing on whether the subject loan was in default at the time Defendant became the loan servicer.

27.    Please state how many loans Wells Fargo services in the name of America's Servicing Company which are in default as of the date of answering this interrogatory.

**RESPONSE:**  Defendant objects to this interrogatory on the ground that it calls for immaterial and irrelevant information that is not reasonably calculated to lead to the discovery of admissible evidence and it is not reasonably limited in time and scope. The subject loan is the only loan that has any consequence in this lawsuit.

28.    Please state how many total loans Wells Fargo services in the name of America's Servicing Company as of the date of answering this interrogatory.

**RESPONSE:**  Defendant objects to this interrogatory on the grounds that it is confidential, proprietary, not reasonably restricted in time and scope, and calls for information that is immaterial, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

29.    Please state whether America's Servicing Company or Wells Fargo has ever been found to be a debt collector within the meaning of the FDCPA in any

2

B DKA 757910 v1
2780973-000281 9/12/2007

litigation within the last ten years. For each such litigation, list the style, case

number and court so holding.

**RESPONSE:** Defendant objects to this interrogatory on the grounds that it calls
for information that is immaterial, irrelevant, not reasonably
calculated to lead to the discovery of admissible evidence and is not
reasonably limited in time and scope. Whether or not Defendant
was found to be a debt collector in a different case involving
different circumstances has no bearing on whether the FDCPA
governs it in this case. Defendant is a loan servicer and is not
subject to the FDCPA except in rare, factually specific
circumstances. *See Brumberger v. Sallie Mae Serv. Corp.*, 84 Fed.
App. 458 (5th Cir. 2004).

30.    Please state the names and titles of the person who is most familiar

with the ALEX database reference in Cindy Shanabrook's deposition.

**RESPONSE:** Defendant shall provide a 30(b)(6) witness who is familiar with the
ALEX database and the FIDELITY database as they pertain to loan
servicing and loan collections.

31.    Please state the names and titles of the person who is most familiar

with the FIDELITY database referenced in Cindy Shanabrook's deposition.

**RESPONSE:** Defendant shall provide a 30(b)(6) witness who is familiar with the
ALEX database and the FIDELITY database as they pertain to loan
servicing and loan collections.

32.    Please state the name, alias, acronym or identification of the

defendant's collections training manual.

**RESPONSE:**  See Defendant's Responses to Plaintiffs' Request for Production.

33.    Please state the name and titles of the person who is most familiar

with the defendant's collections training manual.

B DKA 757910 v1
2780973-000281 9/12/2007

**RESPONSE:** Defendant shall provide a 30(b)(6) witness who is familiar with the ALEX database and the FIDELITY database as they pertain to loan servicing and loan collections.

34.   Please state the name and title of the person who is most familiar with

the defendant's mortgage servicing policies and procedures.

**RESPONSE:** Defendant has provided a 30(b)(6) representative to testify to servicing of the Plaintiffs' loan. Defendant will tender another representative to provide testimony pertaining to collections policies and procedures as they pertain to the subject loan.

35.   Please state the name and title of the person who is most familiar with

the defendant's collections policies and procedures.

**RESPONSE:** Defendant has provided a 30(b)(6) representative to testify to servicing of the Plaintiffs' loan. Defendant will tender another representative to provide testimony pertaining to collections policies and procedures as they pertain to the subject loan.

36.   Please state the number of times this defendant has been sued for

failing to respond to a Qualified Written Request or to make corrections to a

mortgage account pursuant to a Qualified Written Request in the last ten years.

**RESPONSE:** Defendant objects to this interrogatory on the grounds that it requests immaterial and irrelevant information, is not reasonably limited in time and scope and is not reasonably calculated to lead to the discovery of admissible evidence. The facts of this case are all that is relevant under RESPA in regards to the Defendant's response to the Plaintiffs' Qualified Written Request letter. It is undisputed in this case that the Plaintiffs sent only one letter and that this one letter was responded to.

37.   For each such suit, provide the style of the action including the case

number and the jurisdiction of the action.

4

**RESPONSE:** Please refer to response to Interrogatory No. 36.

38.   Please state the number of times either Wells Fargo or America's Servicing Company has been sued wherein it was alleged that the defendant violated the Fair Debt Collection Practices Act.

**RESPONSE:** Defendant objects to this request on the grounds that it calls for immaterial and irrelevant information, information that is not reasonably calculated to lead to the discovery of admissible evidence and it is not reasonably limited in time and scope. Please refer to response to Interrogatory No. 29.

39.   For each such suit, provide the style of the action including the case number and the jurisdiction of the action.

**RESPONSE:** Please refer to response to Interrogatory No. 38.

## REQUEST FOR PRODUCTION

40.   Please produce a complete copy of the training manual for the FIDELITY database system as referenced in Cindy Shanabrook's deposition.

**RESPONSE:** Defendant objects to producing any internal training manuals or policy and procedure manuals absent a confidentiality order prohibiting disclosure of such information outside of this lawsuit. Defendant has provided a confidentiality order that is reasonable which, to date, has not been agreed to by Plaintiffs. Defendant further objects to producing portions of any manuals that are not specifically related to loan collections or servicing on the grounds that such materials are immaterial, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Clearly, employee manuals discussing vacation policies, sick leave and the like have nothing to do with this lawsuit.

5

41.   Please produce a complete copy of the policies and procedures manual

contained in the FIDELITY database as referenced in Cindy Shanabrook's

deposition.

**RESPONSE:** Defendant objects to producing any internal training manuals or policy and procedure manuals absent a confidentiality order prohibiting disclosure of such information outside of this lawsuit. Defendant has provided a confidentiality order that is reasonable which, to date, has not been agreed to by Plaintiffs. Defendant further objects to producing portions of any manuals that are not specifically related to loan collections or servicing on the grounds that such materials are immaterial, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Clearly, employee manuals discussing vacation policies, sick leave and the like have nothing to do with this lawsuit.

42.   Please produce a complete copy of the policies and procedures manual

contained in the ALEX database as referenced in Cindy Shanabrook's deposition.

**RESPONSE:** Defendant objects to producing any internal training manuals or policy and procedure manuals absent a confidentiality order prohibiting disclosure of such information outside of this lawsuit. Defendant has provided a confidentiality order that is reasonable which, to date, has not been agreed to by Plaintiffs. Defendant further objects to producing portions of any manuals that are not specifically related to loan collections or servicing on the grounds that such materials are immaterial, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Clearly, employee manuals discussing vacation policies, sick leave and the like have nothing to do with this lawsuit.

43.   Please produce a complete copy of the collections training manual for

the defendant as referenced in Cindy Shanabrook's deposition.

**RESPONSE:** Defendant objects to producing any internal training manuals or policy and procedure manuals absent a confidentiality order

6

prohibiting disclosure of such information outside of this lawsuit. Defendant has provided a confidentiality order that is reasonable which, to date, has not been agreed to by Plaintiffs. Defendant further objects to producing portions of any manuals that are not specifically related to loan collections or servicing on the grounds that such materials are immaterial, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Clearly, employee manuals discussing vacation policies, sick leave and the like have nothing to do with this lawsuit.

44.    Please produce any e-mails from the WellsFargo.com domain which reference or mention the plaintiffs or their loan number.

**RESPONSE:** Such information has been previously produced.

7

As to objections:

_Keith Andress_

D. KEITH ANDRESS
JAMES H. WHITE, IV

Attorneys for America's Servicing Company

OF COUNSEL:

BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, P.C.
420 North 20th Street, Ste. 1600
Birmingham, Alabama 35203
(205) 328-0480 – telephone
(205) 322-8007 -- facsimile
kandress@bakerdonelson.com
jwhite@bakerdonelson.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2007, the foregoing has been served upon the following counsel of record by U.S. mail and facsimile:

Mr. Nicholas H. Wooten
Mr. Anjali Kamath
Wooten Law Firm, P.C.
P.O. Drawer 290
Lafayette, AL  36862

_K Andress_

Of Counsel

8

EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| EDWARD H. ALEWINE, | ) |
| SHELLY M. ALEWINE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    CASE NO.: 3:06cv886-MHT |
| | ) |
| AMERICA'S SERVICING COMPANY, | ) |
| | ) |
| Defendant. | ) |

<u>NOTICE OF TAKING DEPOSITIONS</u>

NOTICE TO:    America's Servicing Company
C/O Keith Andress
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
420 N. 20th Street, Ste. 1600
Wachovia Tower
Birmingham, AL 35203

PLEASE TAKE NOTICE that, pursuant to Federal Rules of Civil Procedure, Plaintiff will take the **<u>video</u>** deposition of the 30(b)(6) representative of the defendant, all employees of the Defendant, upon oral examination before an officer authorized by law to administer oaths. The matters on which examination is requested are:

    i.  Issues with respect to Forced Placed Insurance placed by the defendant.

    ii. The defendant's knowledge of the plaintiffs' prior bankruptcy.

    iii. Information regarding the defendant's policies and procedures for receiving, processing and responding to Qualified Written Requests by their servicing consumers.

    iv. Issues with respect to this defendant's attempts to collect amounts allegedly owed to prior servicing entities.

v. The defendant's status as a debt collector in this action.

vi. This defendant's actions with respect to the servicing of the plaintiffs' loan.

vii. This defendant's servicing policies and procedures for similarly situated loans with this defendant.

viii. Any other matter germane to this lawsuit.

Said deposition shall be taken at:

> The law offices of:
> Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
> 420 N. 20th Street, Ste. 1600
> Wachovia Tower
> Birmingham, AL 35203

Said depositions shall commence at 10:00 am on June 26, 2007 and shall continue until completed, you are invited to attend and cross-examine.

Filed this the 22nd day of May 2007.

> _/s/ Nick Wooten_____
> Nicholas H. Wooten (WOO084)
> Attorney for the Plaintiff

OF COUNSEL:

WOOTEN LAW FIRM, P.C.
ATTORNEYS AT LAW
P.O. Drawer 290
Lafayette, Alabama 36862
(334) 864-2132

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that I have served a copy of the foregoing upon the Defendants by providing an electronic copy on this the 22nd day of May 2007 to

Keith Andress
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
420 N. 20th Street, Ste. 1600
Wachovia Tower
Birmingham, AL 35203


      /s/ Nick Wooten 
     OF COUNSEL

3

EXHIBIT C

```
0001
  1        IN THE UNITED STATES DISTRICT COURT
  2        FOR THE MIDDLE DISTRICT OF ALABAMA
  3                   EASTERN DIVISION
  4
  5    EDWARD H. ALEWINE,
  6    SHELLY M. ALEWINE,
  7
           Plaintiff,
  8
  9        vs.                CIVIL ACTION #:
                              3:06cv886-MHT
 10
 11    AMERICA'S SERVICING COMPANY,
 12        Defendant.
 13
 14
 15                   VIDEOTAPED
 16        DEPOSITION OF CINDY SHANABROOK
 17
 18        The Videotaped Deposition of CINDY
 19    SHANABROOK was taken before Lori E.
 20    Defnall, on Tuesday, July 10, 2007, at
 21    the Offices of Baker, Donelson, Bearman,
 22    Caldwell & Berkowitz, Birmingham,
 23    Alabama, commencing at 9:57 a.m.,
 24    pursuant to the stipulations set forth
 25    herein:
0002
  1              A P P E A R A N C E S
  2
  3    APPEARING FOR THE PLAINTIFF:
  4        WOOTEN LAW FIRM, P.C.
           BY:  Mr. Nicholas H. Wooten
  5        10 2nd Avenue South East
           Lafayette, Alabama 36862
  6
  7
  8    APPEARING FOR THE DEFENDANT:
  9        BAKER, DONELSON, BEARMAN, CALDWELL
           & BERKOWITZ, P.C.
 10        BY:  Mr. Keith Andress
           420 North 20th Street, Suite 1600
 11        Birmingham, Alabama 35203
 12
       VIDEOGRAPHER:
 13
           ALABAMA VIDEO PRODUCTIONS
 14        BY:  Mr. Wyman Higgins
 15
 16    ALSO PRESENT:
 17        Beverly DeCaro with Wells Fargo
 18
 19
 20
 21
 22
```

```
         Reported by:
23
             Lori E. Defnall
24
25
0003
 1                    I N D E X
 2
     EXAMINATION OF CINDY SHANABROOK
 3
 4   EXAMINATION BY:              PAGE NUMBER
 5
     Mr. Wooten......................7,70,72
 6
     Mr. Andress.....................68,71
 7
 8
 9
10               E X H I B I T S
11
     Plaintiff's Exhibit 1............28
12
     Plaintiff's Exhibit 2............30
13
     Plaintiff's Exhibit 3............33
14
     Plaintiff's Exhibit 4............44
15
     Plaintiff's Exhibit 5............51
16
     Plaintiff's Exhibit 6............51
17
     Plaintiff's Exhibit 7............52
18
     Plaintiff's Exhibit 8............57
19
     Plaintiff's Exhibit 9............58
20
     Plaintiff's Exhibit 10...........62
21
     Plaintiff's Exhibit 11...........66
22
23
24   Reporter's Certificate..........74
25   Word Index......................75
0004
 1         S T I P U L A T I O N S
 2
 3       IT IS STIPULATED AND AGREED by and
 4   between the parties through their
 5   respective counsel, that the deposition
 6   of CINDY SHANABROOK to be taken before
 7   LORI E. DEFNALL, State of Alabama at
 8   Large at the Offices of Baker,
 9   Donelson, Bearman, Caldwell &
10   Berkowitz, Birmingham, Alabama on
11   Tuesday, July 10, 2007.
```

```
12
13        IT IS FURTHER STIPULATED AND AGREED
14   that the signature to and the reading
15   of the deposition by the witness is
16   waived, the deposition to have the same
17   force and effect as if full compliance
18   had been with all laws and rules of
19   Court relating to the taking of
20   depositions.
21
22        IT IS FURTHER STIPULATED AND AGREED
23   that is shall not be necessary for any
24   objections to be made by counsel to any
25   questions, except as to the form or
0005
1    leading questions, and that counsel for
2    the parties may make objections and
3    assign grounds at the time of the
4    trial, or at the time said deposition
5    is offered in evidence, or prior
6    thereto.
7
8         IT IS FURTHER STIPULATED AND AGREED
9    that notice of filing of the deposition
10   by the Commissioner is waived.
11
12
13
14        *       *       *       *       *
15
16
17
18
19
20
21
22
23
24
25
0006
1         VIDEOGRAPHER:  We're on the
2    record.  Today's date is July the 10th,
3    2007.  The time is approximately ten
4    o'clock a.m., central daylight time.  We
5    now commence tape number one for the
6    videotaped deposition of Cindy
7    Shanabrook, in the matter of Edward H.
8    Alewine, and Sherry (sic) M. Alewine,
9    verses America's Services Company.  Case
10   Number 3:06cv886-MHT, filed in the
11   United States District Court for the
12   Middle District of Alabama Eastern
13   Division.  We're located at the law firm
14   of Baker, Donelson, Bearman, Caldwell &
15   Berkowitz, at 420 North 20th Street,
16   Suite 1600, Birmingham, Alabama.  The
```

```
17   court reporter is Lori Defnall.  The
18   videographer is Wyman Higgins.  The
19   witness will now be sworn in by the
20   court reporter, and then the attorneys
21   may introduce themselves and begin.  We
22   also have a person sitting in, Beverly
23   DeCaro.  You may swear the witness.
24
25
0007
 1               CINDY SHANABROOK,
 2   after having been first duly sworn under
 3   oath, was examined and testified as
 4   follows:
 5
 6               COURT REPORTER:  Would
 7       you like the usual
 8       stipulations?
 9               MR. WOOTEN:  Yes.
10               MR. ANDRESS:  Yes.
11
12               MR. WOOTEN:  I'm Nick
13       Wooten, and I represent the
14       Plaintiffs.
15               MR. ANDRESS:  I'm Keith
16       Andress, and I represent ASC.
17
18               EXAMINATION BY MR.
19       WOOTEN:
20          Q.   Ma'am, if you would, state your
21   full name for the record, please.
22          A.   Cindy Theresa Shanabrook.
23          Q.   And I assume this is not your
24   first deposition?
25          A.   No, sir.  It is my first
0008
 1   deposition.
 2          Q.   This is your first deposition?
 3          A.   Yes, sir.
 4          Q.   All right.  The deposition is a
 5   chance for the parties to gather evidence
 6   in the form of a written communication.
 7   So, the way this is going to work is, I'm
 8   going to ask you a question, and then I'm
 9   going to allow you to give me an answer,
10   okay?
11          A.   Yes, sir.
12          Q.   Generally, for the court
13   reporter's sake, it's helpful if we don't
14   speak over each other.  And it's helpful
15   if your answer is a yes or a no, rather
16   than, in this part of the world, we get a
17   lot of uh-huh's and the huh-uh's.  Are you
18   have any questions about this before we
19   begin?
20          A.   No, sir.
21          Q.   Ms. Shanabrook, where do you
```

```
22      currently reside?
23          A.   Frederick, Maryland.
24          Q.   Okay.  And what is your
25      physical address there?
0009
 1          A.   5252 Earl's Court, Frederick,
 2      Maryland 21703.
 3          Q.   Okay.  And what is your date of
 4      birth, ma'am?
 5          A.   August 30th, 1963.
 6          Q.   All right.  And how are you
 7      presently employed?
 8          A.   I'm a litigation specialist
 9      with Wells Fargo.
10          Q.   And how long have you had that
11      position?
12          A.   Since March 26th, 2007.
13          Q.   What is the job of a litigation
14      specialist at Wells Fargo?
15          A.   To monitor the loans when they
16      are in litigation, to refer the loans to
17      the attorneys for the cases to be worked,
18      and to provide them information.
19          Q.   And prior to becoming a
20      litigation specialist, what was your --
21      how were you employed?
22          A.   I was a senior bankruptcy
23      paralegal with Bierman, Geesing & Ward in
24      Bethesda, Maryland, for a little over five
25      years.
0010
 1          Q.   And what was the name of that
 2      firm?
 3          A.   Bierman, Geesing & Ward.
 4          Q.   Okay.  And did you work
 5      primarily in the area of creditor's
 6      rights?
 7          A.   Yes, I did.
 8          Q.   So y'all represented banks and
 9      finance companies, and those type of
10      people, against consumers?
11          A.   Yes, sir.
12          Q.   Okay.  And what your goal in
13      those situations would have been, would be
14      to try to collect the debts that were
15      owed, even for the people that had filed
16      bankruptcy, right?
17          A.   We would monitor the loans for
18      compliance and receive referrals from the
19      mortgage companies, in order to file any
20      motions or -- motions for relief, proof of
21      claim.
22          Q.   Okay.  And you worked
23      exclusively for creditors?
24          A.   Yes, sir.
25          Q.   Did you work for Wells Fargo,
0011
```

```
 1     in that capacity?
 2          A.   No, sir.
 3          Q.   Okay.  Is it your testimony
 4     that you left that position and went
 5     directly to Wells Fargo as a litigation
 6     specialist?
 7          A.   Yes, sir.
 8          Q.   Okay.  When did your employment
 9     begin as a paralegal?
10          A.   In 1997.
11          Q.   Okay.  You said you worked the
12     job, before Wells Fargo, for approximately
13     five years?
14          A.   Yes, sir, I did.
15          Q.   Okay.  Where did you work
16     before that job?
17          A.   I worked for Joel Carpenter, an
18     attorney in Baltimore.
19          Q.   Okay.  And what did your work
20     for Mr. Carpenter involve?
21          A.   I was a paralegal and a
22     receptionist.  He was the sole
23     practitioner.
24          Q.   Okay.  Was his practice focused
25     in any specific area, or was he a general
0012
 1     practitioner?
 2          A.   General practitioner, sir.
 3          Q.   Okay.  And how long -- what
 4     were the dates of your employment with Mr.
 5     Carpenter?
 6          A.   April of 1997, until April of
 7     1998.
 8          Q.   And then you left that position
 9     to take the position with the other law
10     firm?
11          A.   No, sir.
12          Q.   Okay.  Let's start with the
13     firm you were working for immediately
14     before Wells Fargo.
15          A.   Yes, sir.
16          Q.   Tell me their name again.
17          A.   Bierman, Geesing & Ward.
18          Q.   Be all right if I called them
19     Bierman?
20          A.   Yes, sir.
21          Q.   Who did you work for before
22     Bierman?
23          A.   Ocwen Federal Bank.
24          Q.   Ocwen?  Does Ocwen have any
25     relationship to Wells Fargo?
0013
 1          A.   No, sir.
 2          Q.   Okay.  What did you do for
 3     Ocwen?
 4          A.   I was a bankruptcy paralegal.
 5          Q.   And what were your dates of
```

```
 6    employment with Ocwen?
 7         A.   Approximately, February of
 8    2001, until two thousand -- February of
 9    2002.
10         Q.   Immediately prior to Ocwen, who
11    did you work for?
12         A.   Maryland State Highway.
13         Q.   What was your position with
14    them?
15         A.   I was a Administrative
16    Assistant II, and co-coordinator of the
17    Maryland Trac Program.
18         Q.   I'm sorry, the Maryland what?
19         A.   Trac Program, T-R-A-C.
20         Q.   Okay.  And what was that?
21         A.   It's an organization within
22    state highway, which is an outreach
23    program for Baltimore City youth, in order
24    to get them interested in engineering.
25         Q.   All right.  What were the dates
0014
 1    of that employment?
 2         A.   Approximately, September of
 3    '98, until, approximately, September of
 4    2000.
 5         Q.   And prior to Maryland State
 6    Highway, where did you work?
 7         A.   I was unemployed.
 8         Q.   Okay.  And was that the period
 9    of time between when you left
10    Mr. Carpenter and when you went to work
11    for Maryland State Highway?
12         A.   Yes, sir.
13         Q.   Okay.  What were the dates of
14    your employment with Bierman?
15         A.   From February of 2002 -- I'm
16    sorry, March of 2002, until March of 2007.
17         Q.   Okay.  And you went directly
18    from their employment to Wells Fargo?
19         A.   Yes, sir, I did.
20         Q.   Have you ever been a plaintiff
21    in a lawsuit?
22         A.   No, sir.
23         Q.   Have you ever been sued,
24    individually?
25         A.   No, sir.
0015
 1         Q.   Have you personally ever filed
 2    bankruptcy or Chapter 13?
 3         A.   No, sir.
 4         Q.   Have you ever been convicted of
 5    any felony?
 6         A.   No, sir.
 7         Q.   Have you ever been convicted of
 8    any species of theft, that was not a
 9    felony?
10         A.   No, sir.
```

```
11          Q.   And your testimony is that this
12  is the first time, ever, that you've given
13  a deposition?
14          A.   Yes, sir.
15          Q.   Is that normally part of the
16  job respirabilities of a litigation
17  specialist?
18          A.   Yes, sir.
19          Q.   It's my understanding that you
20  reviewed and answered interrogatories that
21  I propounded in this lawsuit; is that
22  correct?
23          A.   Yes, sir.
24          Q.   Interrogatory number two said,
25  "please state the name of the person most
0016
 1  knowledgeable concerning this defendant's
 2  policies and procedures for servicing
 3  mortgages."  Are you the person at Wells
 4  Fargo who is most knowledgeable concerning
 5  your defendant's policies and procedures
 6  for servicing mortgages?
 7          A.   No, sir.
 8          Q.   No?  In fact, you've been
 9  employed there for less than four months,
10  right?
11          A.   Correct.
12          Q.   And you have no experience with
13  the policies and procedures with servicing
14  mortgages?
15          A.   No, sir.
16          Q.   Okay.  Have you had any
17  training from Wells Fargo, regarding Wells
18  Fargo's policies and procedures for
19  servicing mortgages?
20          A.   Yes, sir, I have.
21          Q.   Okay.  Is that part of your
22  initial training for becoming a litigation
23  specialist?
24          A.   Yes, sir, it is.
25          Q.   Is that your only training in
0017
 1  servicing mortgages at Wells Fargo?
 2          A.   Yes, sir, it is.
 3          Q.   And how much training did you
 4  receive?
 5          A.   Approximately, 30 days.
 6          Q.   Okay.  Was that prior to
 7  actually beginning to work as a litigation
 8  specialist and handling files?
 9          A.   Yes, sir.
10          Q.   Now, was that classroom
11  training?
12          A.   Yes, sir.
13          Q.   Did you receive a manual for
14  that?
15          A.   Yes, sir.
```

```
16          Q.   A handbook of some type?
17          A.   No, sir.
18          Q.   Was it like a three-ring
19     binder?
20          A.   No, sir.
21          Q.   Okay.  Describe the manual that
22     you received.
23          A.   It's a manual that is contained
24     within our internet.
25          Q.   So it's web based?
0018
 1          A.   Yes, sir, it is.
 2          Q.   So it's available to anyone who
 3     has access to your corporate web?
 4          A.   Yes, sir.
 5          Q.   And that's how you received
 6     your training at Wells Fargo?
 7          A.   Yes, sir.
 8          Q.   Do these policies and
 9     procedures govern how America's Servicing
10     Company responds to customer inquiries and
11     forms of qualified written requests?
12          A.   Yes, sir.
13          Q.   Okay.  Does this manual
14     describe and control how payments are
15     credited to customer's mortgage accounts?
16          A.   No, sir.
17          Q.   How is that controlled?
18          A.   That is -- I'm not quite sure I
19     understand the question.
20          Q.   Okay.  Let me rephrase the
21     question.  You said that Wells Fargo --
22     let me back up a little bit further, and
23     we'll come back to that.  What is
24     relationship between Wells Fargo and
25     America's Servicing Company?
0019
 1          A.   America's Service Company is a
 2     fictitious name for Wells Fargo.
 3          Q.   Is that what -- when you say
 4     fictitious, would you consider that a
 5     trade name?
 6          A.   Yes, sir, it's a trade name.
 7          Q.   So there is no separate entity,
 8     there is no legal entity, no other
 9     corporation, called America's Servicing
10     Company?
11          A.   No, sir.
12          Q.   So, America's Servicing Company
13     is Wells Fargo?
14          A.   Yes, sir.
15          Q.   It is, for lack of a better
16     term, an alter ego?
17          A.   Yes, sir.
18          Q.   Is it a unified or separated
19     subdivision of Wells Fargo?
20          A.   I don't know.
```

```
21              MR. ANDRESS:  Mr. Wooten, we
22    disclosed all this in the corporate
23    disclosures.  And just to keep the
24    testimony completely accurate.
25         Q.   Okay.  As to your policies and
0020
 1    procedures, are there policies and
 2    procedures on this corporate web, that
 3    dictate how payments are applied, to a
 4    mortgage account by Wells Fargo?
 5         A.   I don't know.
 6         Q.   Do not know?
 7         A.   No, sir.
 8         Q.   Do employees of Wells Fargo
 9    have the capacity to print off portions of
10    this policy and procedures manual, as web
11    based, for review?
12         A.   Yes, sir.
13         Q.   Could you print off the whole
14    policies and procedures manual?
15         A.   Yes, sir.
16         Q.   About how long is that policy
17    and procedures manual?
18         A.   Several inches thick.
19         Q.   Okay.  Does that policies and
20    procedures manual have a name?
21         A.   I don't know.
22         Q.   Does it have any type of
23    special designation within Wells Fargo?
24         A.   I don't know.
25         Q.   Did your training program have
0021
 1    a specific name?
 2         A.   Yes, sir.
 3         Q.   What was it?
 4         A.   ALEX.
 5         Q.   And what does ALEX stand for?
 6         A.   I don't recall.
 7         Q.   And is that spelled A-L-E-X?
 8         A.   Yes, sir.
 9         Q.   Okay.  And that is a litigation
10    specialist training program?
11         A.   No, sir.
12         Q.   Okay.  What is that; what is
13    ALEX?
14         A.   Wells Fargo employee training
15    program.
16         Q.   Okay.  So this is what every
17    person at Wells Fargo takes as training on
18    mortgage servicing?
19         A.   Yes, sir.
20         Q.   Okay.  And that is irrespective
21    of what department that they work in, as
22    long as they work with mortgage servicing?
23         A.   Yes, sir.
24         Q.   Who would be the person at
25    Wells Fargo most knowledgeable of the ALEX
```

```
0022
 1    system?
 2          A.   I don't know.
 3          Q.   Did you have a trainer or a
 4    director of training at Wells Fargo?
 5          A.   My supervisor.
 6          Q.   And who is that?
 7          A.   Marc Kline.
 8          Q.   How do you spell Marc's name?
 9          A.   M-A-R-C.  Kline, K-L-I-N-E.
10          Q.   All right.  And I think the
11    last time I saw Marc's name, he was a
12    senior litigation specialist?
13          A.   He's now my supervisor.
14          Q.   Okay.  So now he is a
15    supervisor?  And is that within the
16    litigation specialist department?
17          A.   Yes, sir, it is.
18          Q.   So what is his full title
19    today?
20          A.   Litigation supervisor.
21          Q.   After your initial training,
22    did you receive any additional training on
23    this program?
24          A.   On which program?
25          Q.   On ALEX?
0023
 1          A.   No, sir.
 2          Q.   After the ALEX training, did
 3    you receive any other type of training of
 4    any type?
 5          A.   Yes, sir.
 6          Q.   Okay.  Explain what training
 7    you received beyond ALEX.
 8          A.   Training within the database
 9    system.
10          Q.   All right.  Let me ask you
11    this:  Does the database system have a
12    name?
13          A.   Yes, sir.
14          Q.   What is the name of the
15    database system?
16          A.   Fidelity.
17          Q.   Does Fidelity stand for
18    anything?
19          A.   No, sir.
20          Q.   What is the job of Fidelity?
21          A.   It contains the information on
22    the loan.
23          Q.   Does it contain all of the loan
24    information?
25          A.   Yes, sir.
0024
 1          Q.   All payment histories?
 2          A.   Yes, sir.
 3          Q.   All internal codes?
 4          A.   Yes, sir.
```

```
 5          Q.   All notes regarding
 6    communications with debtors?
 7          A.   Yes, sir.
 8          Q.   Does it contain any audio
 9    recordings of conversations with debtors?
10          A.   No, sir.
11          Q.   Is there a separate system
12    which does that?
13          A.   Yes, sir.
14          Q.   What is the name of that
15    system?
16          A.   I do not know.
17          Q.   Okay.  Have you ever used that
18    system before?
19          A.   No, sir.
20          Q.   How is that system
21    differentiated between ALEX and Fidelity?
22          A.   ALEX is a training system.
23    Fidelity is the database system, which
24    contains the loan information.
25          Q.   How do you operate the
0025
 1    recording system?
 2          A.   I don't have that information.
 3          Q.   Is that something that is
 4    computer based?
 5          A.   I don't know.
 6          Q.   Who would be the person most
 7    knowledge about the recording system?
 8          A.   I don't know.
 9          Q.   You don't know the name of the
10    recording system?
11          A.   No, sir.
12          Q.   Would it possibly be called the
13    One Hundred Percent Monitoring System?
14          A.   I don't know.
15          Q.   Have you ever heard of the term
16    One Hundred Percent Monitoring?
17          A.   No, sir.
18          Q.   I'm going to show you, but I'm
19    not going to mark this as an exhibit.
20    That was my second interrogatories in
21    request for production.  The first
22    question is number 22.  It ask a question
23    about the One Hundred Percent Monitoring
24    System.  Now you signed the answer to
25    those interrogatories, correct?
0026
 1          A.   Yes, sir.
 2          Q.   Did you provide that
 3    information to your attorney?
 4          A.   (Witness reviewing document.)
 5    Yes, sir.
 6          Q.   Okay.  And what is your answer
 7    to question number 22?
 8          A.   "Defendant has the capability
 9    to record certain telephone conversations
```

```
10    with it's customers.  This ability is
11    disclosed to customers at the outset of
12    the conversation."
13         Q.   So, how do you determine what
14    recordings you might have of any
15    conversations with my clients, Edward and
16    Shelly Alewine?
17         A.   I'm sorry, could you repeat
18    that?
19         Q.   How do you determine what
20    conversations and recordings you might
21    have of any conversations with my clients,
22    Edward and Shelly Alewine?
23         A.   I don't know.
24         Q.   Who is the person at Wells
25    Fargo who would be most knowledgeable
0027
 1    about determining that information?
 2         A.   I don't know.
 3         Q.   Do you have a director of
 4    technology, or information technology, at
 5    Wells Fargo?
 6         A.   I don't have that information.
 7         Q.   You have a vice president of
 8    technology, or information technology, at
 9    Wells Fargo?
10         A.   I don't know.
11         Q.   Who would be a person who would
12    know that information?
13         A.   Possibly, my supervisor.
14         Q.   Mr. Kline?
15         A.   Yes, sir.
16         Q.   Okay.  Does Wells Fargo
17    maintain a separate computer base system
18    for collections?
19         A.   No, sir.
20         Q.   Is that all handled through
21    Fidelity?
22         A.   Yes, sir.
23         Q.   Would Fidelity have a record of
24    every call or correspondence, made to my
25    clients, in this case?
0028
 1         A.   Yes, sir.
 2         Q.   Okay.  Would Fidelity have any
 3    records indicating whether or not a
 4    recording was made of any of those
 5    conversations?
 6         A.   I don't know.
 7         Q.   I'm going to mark a cumulative
 8    exhibit as Number One.
 9
10         (Whereupon, Plaintiff's Exhibit
11      Number One was marked for
12      identification.)
13
14         And I'll represent to you it is
```

```
15          a copy of a qualified written
16          request that I mailed to America's
17          Servicing Company on October 3rd,
18          2005.  And it includes several pages
19          of attachments, including a letter
20          from ASC to my clients.  As well as
21          several pages of insurance
22          declarations.  As well as several
23          pages of property tax payment
24          receipts.  As well as two copies of
25          mortgage statements from ASC.  And
0029
 1          all of those are numbered.  And the
 2          document itself reflects what those
 3          numbers represent.  I'm going to ask
 4          you to take a look at that, please.
 5          A.   Yes, sir.  (Witness reviewing
 6     document.)  Yes, sir.
 7          Q.   Prior to preparing for this
 8     deposition, have you seen that document
 9     before?
10          A.   No, sir.
11          Q.   Okay.  So what you know about
12     that document is from your preparation to
13     testify today?
14          A.   Yes, sir.
15          Q.   Is it Wells Fargo's position
16     that they did not receive that document?
17          A.   No, sir.
18          Q.   When did Wells Fargo receive
19     that document?
20          A.   Approximately, the time period
21     after the date of the letter.
22          Q.   So Wells Fargo received that
23     document in October of 2005, correct?
24          A.   Yes, sir.
25          Q.   What is Wells Fargo's
0030
 1     responsibility, under the Real Estate
 2     Settlement and Procedures Act, to respond
 3     to a qualified written request?
 4          A.   To respond within 20 days.
 5          Q.   Okay.  Is it Wells Fargo's
 6     position that they responded within 20
 7     days in this case?
 8          A.   No, sir.
 9          Q.   Okay.  When did Wells Fargo
10     first respond to that document?
11          A.   Approximately, August of 2006.
12          Q.   Okay.  I'm going to show you a
13     document that was produced by your
14     attorney as part of this litigation.  It's
15     numbered ASC 261, Bate stamp.
16          A.   Yes, sir.
17          Q.   I've marked it as Exhibit Two
18     to this case.
19
```

```
20              (Whereupon, Plaintiff's Exhibit
21         Number Two was marked for
22         identification.)
23
24              Ask you, is that in fact an
25         internal document generated by Wells
0031
 1         Fargo?
 2              A.   (Witness reviewing document.)
 3         Yes, sir.
 4              Q.   And is that the document from
 5         the Fidelity database?
 6              A.   Yes, sir.
 7              Q.   All right.  Now, does that
 8         document indicate that Wells Fargo
 9         received my qualified written request on
10         behalf of my clients, on or about October
11         17th of 2005?
12              A.   No, sir.
13              MR. ANDRESS:  What number is
14         this?
15              Q.   261.
16              A.   (Witness reviewing document.)
17         Oh.  Yes, sir.
18              Q.   It does?
19              A.   Yes, sir.
20              Q.   On that page, there is entry on
21         July 20th of 2006, it appears, what does
22         the designation -- let me show you what
23         entry I'm referring to.  This letter
24         (indicating), that identifies when the
25         letter was imaged.  What does the initials
0032
 1         or letters SER stand for, on that page?
 2              A.   (Witness reviewing document.)
 3         That's customer service.
 4              Q.   Okay.  So does that designate
 5         the department who would have been making
 6         this entry?
 7              A.   Yes, sir.
 8              Q.   Okay.  And what do the letters
 9         ENW stand for?
10              A.   That is the person that made
11         the entry.
12              Q.   Okay.  So that would have been
13         the employee who made the entry?
14              A.   Yes, sir.
15              Q.   And I'm assuming that Wells
16         Fargo could identify that person by those
17         initials?
18              A.   Yes, sir.
19              Q.   Okay.  Now, that actual entry
20         reads, "pending correspondence research
21         regarding:  Received letter forwarded from
22         DOS."  Who is that?
23              A.   That is our department.
24              Q.   Okay.
```

```
25          A.    Default servicing.
0033
 1          Q.    Okay.  "Regarding QWR, dated
 2   10/3/05.  It was imaged on 10/17/05 but
 3   appears was not addressed.  Sent BWU
 4   letter."  Is that the -- explain what that
 5   is.
 6          A.    I don't know what the BWU
 7   stands for.
 8          Q.    Let me show you the document
 9   that I'm going to mark as Exhibit Three to
10   this deposition.
11
12             (Whereupon, Plaintiff's Exhibit
13          Number Three was marked for
14          identification.)
15
16          MR. ANDRESS:  Is ASC 261
17      Exhibit Two?
18          Q.    It is two?  I'm going to ask
19   you if you've ever seen that document
20   before?
21          A.    (Witness reviewing document.)
22   No, sir.
23             MR. ANDRESS:  Do you have
24   copies for me?
25          Q.    No.  I only made one copy to
0034
 1   mark.  I've got my originals.  These are
 2   the ones you produced, I think.  Or are
 3   those the ones that's y'all sent -- okay.
 4   That's the one you sent to me.  Does that
 5   appear to be the letter referred to in
 6   this entry on ASC 261 or Exhibit Two?
 7          A.    Yes, sir.
 8          Q.    Okay.  And it bears the same
 9   date as this entry?
10          A.    Yes, sir, it does.
11          Q.    Okay.  Now, off to the right of
12   that entry, there are a series of letters,
13   PENCOR.  What do those letters mean?
14          A.    I don't know.
15          Q.    Okay.  So you don't have any
16   idea what that entry is for?
17          A.    No, sir.
18          Q.    Okay.  On this -- back to this
19   document, onto the right side -- the left
20   side, where it has these three letter
21   designations.  At the top of that page it
22   says HAZ.  What department is that?
23          A.    That's hazard insurance.
24          Q.    Okay.  And what -- can you
25   explain that entry, that continues to the
0035
 1   right, this the hazard entry, what are
 2   those -- is BJV the initials of the
 3   operator again?
```

```
 4           A.   Yes, sir, they are.
 5           Q.   Okay.  Now, what do the actual
 6      entries, there, in those terms, what do
 7      they stand for?
 8           A.   (Witness reviewing document.)
 9      I don't know.
10           Q.   Okay.  So it says ID 3011291.
11      You don't know what that means?
12           A.   No, sir.
13           Q.   And then it says DOC ID 7.  You
14      don't know what that stands for?
15           A.   No, sir, I don't.
16           Q.   And HIPC, you don't know what
17      that stands for?
18           A.   No, sir.
19           Q.   Down below the servicing
20      entries, it has some entries that say COL.
21      I'm assuming that's collections?
22           A.   Yes, sir.
23           Q.   Okay.  And that is where folks
24      from Wells Fargo collection department are
25      trying to contact, or are contacting my
0036
 1      clients, correct?
 2           A.   Yes, sir.
 3           Q.   Okay.  And so, each of those
 4      entries, the numeric entries beside
 5      collection, that would be the date?
 6           A.   Yes, sir.
 7           Q.   Okay.  And then, these next
 8      entries that are three letters, in some
 9      instances, would that be employees again?
10           A.   No, sir.
11           Q.   Okay.  What is DVX?
12           A.   That is the dialing system.
13      It's an automated system.
14           Q.   What's commonly referred to as
15      a roto dialer, an auto dialer?
16           A.   Yes, sir.
17           Q.   Okay.  So that is something
18      that y'all do, just to see if someone's
19      home, and it transfers to a live person,
20      or leaves a message?
21           A.   It'll leave a message.
22           Q.   Okay.  The second collection
23      entry from the top, that is 7/11/06, it
24      does not have any initials.  It says Score
25      007.  And then it has a series of numbers,
0037
 1      07/11/06, which I assume is the date; does
 2      that look right to you?
 3           A.   Yes, sir.
 4           Q.   What does Score 7 mean?
 5           A.   I don't know.
 6           Q.   Then it has the letters AGT
 7      E16S Days DEL 012 Risk E.  Do you know
 8      what any of that means?
```

```
 9          A.   No, sir, I do not.
10          Q.   Did you receive any training on
11    collections as part of your training as a
12    litigation specialist?
13          A.   No, sir.
14          Q.   Who is the person who is in
15    charge of collections for Wells Fargo?
16          A.   I don't know.
17          Q.   Down at the next to last entry
18    on that page, the initials there are VKS.
19    Is that an employee or is that some other
20    designation?
21          A.   I don't know.
22          Q.   Okay.  And then the last entry
23    has D in parenthesis.  Do you know what
24    that designation means?
25          A.   No, sir, I do not.
0038
 1          Q.   Is there any document that
 2    explains what these entries mean, that is
 3    owned by Wells Fargo, or controlled by
 4    Wells Fargo?
 5          A.   In the collections training
 6    manual.
 7          Q.   Okay.  Let's talk about that.
 8    Is the collections training manual web
 9    based?
10          A.   Yes, sir.
11          Q.   Is it printable?
12          A.   Yes, sir.
13          Q.   Does it have a name?
14          A.   Not that I'm aware of.
15          Q.   Is there a supervisor of the
16    collections department who you work with
17    on a regular basis?
18          A.   No, sir.
19          Q.   I'm going to take a brief side
20    track.  Explain to me the set up, or the
21    floor plan, of the building where you
22    work?
23          A.   Okay.
24          Q.   All right.  Tell me, is it a
25    multi-story building?
0039
 1          A.   Two story.
 2          Q.   Two story?
 3          A.   (Witness nods head.)
 4          Q.   Approximately, how many people
 5    work on each story?
 6          A.   Several hundred.
 7          Q.   Several hundred?  Okay.  Are
 8    the floors divided into departments?
 9          A.   Yes, sir, they are.
10          Q.   Okay.  So the litigation
11    specialist department, you have your own
12    area?
13          A.   Yes, sir.
```

```
14          Q.    Okay.  And collections has
15     their own area?
16          A.    Yes, sir.
17          Q.    Servicing has their own area?
18          A.    Yes, sir.
19          Q.    And hazard has their own area?
20          A.    Yes, sir.
21          Q.    What other areas are their
22     within that department?
23          A.    REO department.
24          Q.    All right.  Explain what REO
25     is?
0040
 1          A.    Real Estate Own, where
 2     properties are --
 3          Q.    Foreclosed?
 4          A.    -- foreclosed, and the bank
 5     purchases it back.
 6          Q.    All right.  And that's Wells
 7     Fargo Bank?
 8          A.    Yes, sir.
 9          Q.    So is Wells Fargo Bank's REO
10     division?
11          A.    Yes, sir.
12          Q.    What other departments?
13          A.    Within our building, that's it.
14          Q.    Okay.  What departments are
15     nearest to your department?
16          A.    It's all litigation on our
17     section.
18          Q.    Okay.  So, does your section
19     open to the outside?
20          A.    Yes, it does.
21          Q.    Okay.  So you go through your
22     own doors and your own security to go into
23     the litigation department?
24          A.    Yes, sir.
25          Q.    Do you have any contact with
0041
 1     any other members of any other department?
 2          A.    No, sir.
 3          Q.    All right.  So, the litigation
 4     department has no interaction with any
 5     other employees of Wells Fargo, who are in
 6     that two story building?
 7          A.    No, sir.
 8          Q.    So y'all don't share bathrooms
 9     or break rooms, or anything?
10          A.    We're the only ones left in the
11     building.  The rest have actually begun
12     moving to the new facility.
13          Q.    Okay.  All right.  And how long
14     has that been the case?
15          A.    Several months.
16          Q.    Okay.  Prior to that, did you
17     have interaction with any of these other
18     departments?
```

```
19            A.   No, sir.
20            Q.   So y'all are, more or less, an
21    island unto yourself?
22            A.   Yes, sir.
23            Q.   Do you receive e-mails or
24    instance messages from these other
25    departments?
0042
 1            A.   E-mails.
 2            Q.   Okay.  And does the company
 3    keep any record of e-mails, as it relates
 4    to loan numbers or individual account
 5    holders?
 6            A.   No, sir.
 7            Q.   Okay.  So, there is no internal
 8    recordkeeping system that puts certain
 9    e-mails with certain files?
10            A.   No, sir.
11            Q.   Do you have a name for your web
12    -- your e-mail system?
13            A.   Outlook.
14            Q.   Okay.  So y'all just use
15    Microsoft Outlook?
16            A.   Yes, sir.
17            Q.   Okay.  Do you have a domain
18    name, such as:
19    CindyShanabrook@WellsFargo.com?
20            A.   That would be my e-mail
21    address.
22            Q.   That's what I'm saying.
23            A.   Yes, sir.
24            Q.   So everybody who works there
25    has an e-mail that ends in --
0043
 1            A.   WellsFargo.com.
 2            Q.   -- WellsFargo.com?
 3            A.   Yes, sir.
 4            Q.   Are you trained or instructed
 5    to use the companies e-mail system to make
 6    all communications regarding accounts?
 7            A.   Yes, sir.
 8            Q.   Is it against corporate policy
 9    to have an e-mail account that is not a
10    corporate account?
11            A.   Yes, sir.
12            Q.   So any e-mail that you have
13    ever sent, since you have been employed at
14    Wells Fargo, is under the name
15    CindyShanabrook@WellsFargo.com?
16            A.   Correct.
17            Q.   And you assume that every other
18    employee is the same way?
19            A.   Yes, sir.
20            Q.   Is your department moving to
21    the new facility as well?
22            A.   Yes, sir.
23            Q.   You just the last to go?
```

```
24            A.   Yes, sir.
25            Q.   Okay.  Better to be the last
0044
 1   man out than a left man, right?  I'm going
 2   to pull off the top page of these series
 3   of documents that you have produced.  This
 4   one's marked ASC number 233.  And I'm
 5   going to represent to you that in
 6   reviewing this, this set of documents, it
 7   appears to be a printout from the Fidelity
 8   system.  And it's titled "Consolidated
 9   Notes Log."
10            A.   Yes, sir.
11            Q.   I'm going to ask you -- you
12   know what?  I need to give you -- we'll
13   use that one.  And I'll just put this one
14   back on top.
15            MR. ANDRESS:  So what's that,
16   Plaintiff's Exhibit Four?
17            Q.   Four.  And it's 233.
18
19            (Whereupon, Plaintiff's Exhibit
20            Number Four was marked for
21            identification.)
22
23            Now, this whole page, the
24            entries on the left, are all
25            collection entries?
0045
 1            A.   Yes, sir.
 2            Q.   Okay.  And then the second
 3   column are all the dates?
 4            A.   Yes, sir.
 5            Q.   And then every designation in
 6   here, that is all letters, is a DVX, which
 7   is your dialer?
 8            A.   Yes, sir.
 9            Q.   Okay.  Then you have some --
10   three entries about mid way down the page
11   all dated 3/28/05 that say C 32.  Do you
12   know what that designation is?
13            A.   (Witness reviewing document.)
14   No, sir.
15            Q.   Is it possible that that
16   designation indicates recording?
17            A.   I don't know.
18            Q.   Now, in reading those C 32
19   designations, these appear to memorialize
20   conversations between a Wells Fargo
21   employee, who is unidentified, and my
22   clients.
23            A.   Yes, sir.
24            Q.   Is there a reason that Wells
25   Fargo would not identify who their
0046
 1   employees were, who were talking to the
 2   clients in this situation?
```

```
 3          A.    I don't know.
 4          Q.    Is it possible that C 32 does
 5   identify the person who spoke to my
 6   clients?
 7          A.    It's possible, yes, sir.
 8          Q.    Okay.  You've never seen those
 9   designations before today?
10          A.    No, sir.
11          Q.    Did you go over these documents
12   to prepare for your deposition?
13          A.    Yes, sir.
14          Q.    Did you discuss these documents
15   with anyone other than your attorney?
16          A.    No, sir.
17          Q.    The entry from the top, the
18   second C 32 entry, are you able to read
19   those notes and determine what's being
20   said there?
21          A.    Yes, sir.
22          Q.    Can you interpret that for me,
23   please?
24          A.    Yes, sir.  "Borrower states
25   that he should be current because he makes
0047
 1   his payments every month.  But I advised
 2   that his loan has been behind, probably
 3   since we received.  He stated he already
 4   --"  and that moves into the next entry.
 5          Q.    Okay.
 6          A.    "-- had payment history and
 7   couldn't understand it.  I tried trans to
 8   customer service, but borrower hung up."
 9          Q.    Okay.  Up at the top, where
10   these asterisk make their entry there by
11   4/5/05, this says Score 222; and it says
12   04/04/05, AGT E30S days delinquent 035
13   Risk E.  Are you able to interpret what
14   Score 222 means?
15          A.    No, sir.
16          Q.    Is that some internal system
17   that Wells Fargo has developed to
18   determine the risk of a loan default, or
19   something of that nature?
20          A.    I don't know.
21          Q.    So you have no idea of the
22   significance or insignificance of the term
23   Score 222?
24          A.    No, sir, I do not.
25          Q.    Who would be the person most
0048
 1   knowledgeable about what that means?
 2          A.    I don't know.
 3          Q.    Okay.  Do you know what AGT
 4   E30S means?
 5          A.    No, sir, I don't.
 6          Q.    Do you agree with me that that
 7   next entry means days delinquent, right
```

```
 8    beside E30S?  Is that how you interpret
 9    that, based on your training with Wells
10    Fargo?
11         A.   I don't know.
12         Q.   So you're not even sure that
13    means days delinquent?
14         A.   No, sir.
15         Q.   And then -- so that whole line
16    is just a blur to you, you know nothing
17    about that?
18         A.   Correct.
19         Q.   Do you know the person in
20    charge of collections training at Wells
21    Fargo?
22         A.   No, I don't.
23         Q.   So, it really wouldn't do me
24    any good to go through this page by page,
25    these entries that you've sent me, that
0049
 1    are 234 to 272, that appear to be the
 2    consolidated note log.  It wouldn't do us
 3    any good to try to discuss those line by
 4    line, because there's going to be a lot of
 5    things that you don't know in those,
 6    right?
 7              MR. ANDRESS:  Object to form.
 8         Q.   You can answer.
 9         A.   Oh, I'm sorry.
10         Q.   Would you like to take a second
11    to look through some of them and see?
12         A.   Yes, sir.
13         Q.   Let me show you, I'll start
14    with just 234.  I won't mark it yet.  But
15    just take a second and look through that.
16         A.   (Witness reviewing document.)
17    Okay.  Some of the lines I would not
18    understand.
19         Q.   So, is it fair to say that
20    every line with asterisks, that has the
21    Score 222 beside it, are lines that you
22    could not interpret for me?
23         A.   That is correct.
24         Q.   Okay.  And every line that says
25    DVX on that page, you can tell me is an
0050
 1    automatic dialer to my clients?
 2         A.   That is correct.
 3         Q.   Okay.  There's another line
 4    with asterisks dated 5/3/05.  It's the
 5    second entry from the top on that date.
 6    It says, CL747; do you know what that
 7    means?
 8         A.   No, sir, I don't.
 9         Q.   Okay.  Down where it says, the
10    one entry on that page, is says SER, which
11    is customer service department, correct?
12         A.   Correct.
```

```
13          Q.   It's dated 4/21/05, it says
14   DL3; do you know what that means?
15          A.   That would be the identifier of
16   the person who made the entry.
17          Q.   Okay.  Are you able to
18   interpret what that line says?
19          A.   "Open collection 24B for BK
20   history."
21          Q.   So is that -- does that say to
22   you that at that point, on that day, that
23   someone sent for a bankruptcy history on
24   this file?
25          A.   That is correct.
0051
 1          Q.   All right.  Let me go ahead and
 2   mark that one.  We'll just mark that one
 3   as Five.
 4
 5          (Whereupon, Plaintiff's Exhibit
 6          Number Five was marked for
 7          identification.)
 8
 9          I'm going to mark the one
10          labeled 235 as Six, and ask you to
11          take a look at that one.
12
13          (Whereupon, Plaintiff's Exhibit
14          Number Six was marked for
15          identification.)
16
17          My particular interest in that
18          page, again, there are a lot of
19          entries there that are your
20          automatic dialer?
21          A.   (Witness reviewing document.)
22   Yes, sir.
23          Q.   And then you have some CL747
24   entry at the top, and some Score 222
25   entries, which you've indicated you don't
0052
 1   know what they are?
 2          A.   Correct.
 3          Q.   But about half, three quarters
 4   of the way down, there is a collection
 5   entry dated 05/16/05, has the initials
 6   MEL.  That would be the operator, correct?
 7          A.   Correct.
 8          Q.   And it says, "acceleration
 9   demand letter sent.  Expires in 30 days."
10          A.   Correct.
11          Q.   Okay.  Let's talk about page
12   236 for just a minute.  I'm going to mark
13   it.
14
15          (Whereupon, Plaintiff's Exhibit
16          Number Seven was marked for
17          identification.)
```

```
18
19              I'm going to go ahead and write
20        some of these down so I can keep up
21        with where I'm at.  This is 236.
22        The top entry on 236 is a service --
23        customer service department entry?
24        A.   (Witness reviewing document.)
25   Yes, sir.
0053
 1        Q.   Do you know what 46T
 2   represents, beside the date?
 3        A.   That is the person that made
 4   the entry.  It's their designation.
 5        Q.   So that's a number and a
 6   letter?
 7        A.   Yes, sir.
 8        Q.   Do you know how they set those
 9   designations up?
10        A.   No, sir, I don't.
11        Q.   Who would be the person who
12   knows the most at Wells Fargo about how
13   those designations are given?
14        A.   I don't know.
15        Q.   Do you understand that entry,
16   beside the designation, 46T?
17        A.   Yes, I do.
18        Q.   Okay.  Can you explain it to
19   me?
20        A.   The LITC is litigation costs.
21   And 4.11 is the dollar amount.  01R01
22   means that it is recoverable from the
23   borrower.  And it was sent to Doris for
24   processing, in default servicing.
25        Q.   Okay.
0054
 1        A.   So that the litigation cost
 2   bill was actually sent to be processed.
 3        Q.   Is Doris, D. Ramsburg?
 4        A.   I don't know.
 5        Q.   Do you know who D. Ramsburg is
 6   reflected in that entry?
 7        A.   No, I don't.
 8        Q.   And you don't know if Doris'
 9   last name is Ramsburg?
10        A.   No, I don't.
11        Q.   Do you know Doris?
12        A.   I know a Doris.
13        Q.   What does DOS stand for after
14   her name?
15        A.   Default servicing.
16        Q.   And MD, is that state?
17        A.   That's Maryland.
18        Q.   Yeah.  Down below that is,
19   again, two entries down, in the servicing
20   department on June 21st of '05, it says
21   FSD.  What is that?  Is that the person's
22   designation again?
```

```
23          A.   Yes, sir, it is.
24          Q.   Okay.  And does that reflect
25     that Wells Fargo was corresponding with
0055
 1     Ocwen regarding a history of this loan,
 2     prior to purchasing the loan?
 3          A.   (Witness reviewing document.)
 4     It states that we e-mailed Ocwen for the
 5     payment history.
 6          Q.   Okay.  Do you know why this
 7     entry was made; what was the purpose of
 8     this entry?  Was it made in response to
 9     litigation?
10          A.   Made in response to
11     correspondence that was received.  And
12     there was research being done.
13          Q.   Okay.  Down, the next serviced
14     entry down, customer service department on
15     6/14/05, again, OFQ is the person that
16     handled this, correct?
17          A.   Correct.
18          Q.   And that entry has to do with a
19     waiver of summons from a prior lawsuit;
20     are you familiar with that?
21          A.   No, sir.
22          Q.   Are you aware that there's been
23     litigation over this same account,
24     previous to this lawsuit?
25          A.   Yes, sir, I am.
0056
 1          Q.   Okay.  Did you review that, in
 2     preparing for this deposition?
 3          A.   Yes, I did.
 4          Q.   Okay.  Is it safe to say that
 5     any entry in these documents that we've
 6     talked about through 272, I believe is the
 7     number, where the designation on the left
 8     is COL, that is from Wells Fargo's
 9     collection department?
10          A.   That is correct.
11          Q.   That they are the person
12     responsible for that entry?
13          A.   Yes, sir.
14          Q.   Okay.  And whatever those
15     entries say, Wells Fargo does not dispute
16     either those contents or the entries
17     themselves?
18          A.   Correct.
19          Q.   Okay.  Are you familiar with
20     whether or not Wells Fargo has ever been
21     sued, prior to this lawsuit, for any claim
22     of failure to properly service a mortgage?
23          A.   No, sir, I'm not aware.
24          Q.   In preparing for this
25     deposition today, did you inquire as to
0057
 1     whether or not Wells Fargo had ever been
```

```
 2    sued for any prior suit, claiming a
 3    failure to properly service a mortgage?
 4         A.   No, sir, I have not.
 5         Q.   When did Wells Fargo begin to
 6    service this mortgage?
 7         A.   I don't recall the date, off
 8    the top of my head.
 9         Q.   Okay.  I'm going to show you a
10    document that I'm going to mark as Exhibit
11    Eight.
12
13         (Whereupon, Plaintiff's Exhibit
14         Number Eight was marked for
15         identification.)
16
17         It's -- I'll represent to you
18         that it's a notice received by my
19         clients from Ocwen, that ASC would
20         be serving this mortgage.
21         A.   (Witness reviewing document.)
22    Okay.
23         Q.   The contents of this indicate
24    that ASC would begin servicing mortgage on
25    November 1st of 2002.  Are you able to see
0058
 1    that in the first line of that letter,
 2    first two lines of that letter?
 3         A.   Yes, sir, I am.
 4         Q.   Do you dispute that that is the
 5    time in which ASC began servicing this
 6    loan?
 7         A.   No, sir.  I'm not disputing
 8    that.
 9         Q.   In reviewing the documents that
10    ASC maintains, are you able to determine
11    that that is correct?
12         A.   That is correct.
13         Q.   Okay.  I'm going to mark this
14    document as Exhibit Nine.
15
16         (Whereupon, Plaintiff's Exhibit
17         Number Nine was marked for
18         identification.)
19
20         Ask you if you have -- this is
21         going to have to be a cumulative
22         exhibit.  We got any paper clips or
23         staplers?  This is a response from
24         ASC.  I assumed y'all already had a
25         copy of that.  I represent to you
0059
 1         that that is the ultimate response
 2         received by my clients, to the
 3         qualified written request, that I
 4         sent to ASC on August -- or October
 5         of 2005.  Have you seen that
 6         document, in preparation for this
```

```
 7          deposition?
 8          A.   Yes, sir, I have.
 9          Q.   Okay.  Have you reviewed that
10     document?
11          A.   Yes, sir, I have.
12          Q.   And it's my understanding that,
13     as we sit here today, ASC's position is
14     that the amounts charged by Ocwen, for
15     insurance in 2000 and 2001, were improper;
16     are due to be refunded?
17          A.   I'm sorry, could you rephrase
18     that?
19          Q.   Let me back up a little bit
20     further.  Up to today, America's Servicing
21     Company's position has been that insurance
22     was not paid on this loan in 2000 and
23     2001, correct?
24          A.   Correct.
25          Q.   Okay.  And that is reason why
0060
 1     the payment changed on my client's
 2     mortgage in, approximately, August of
 3     2005?
 4          A.   Correct.
 5          Q.   Okay.  And it's my
 6     understanding, that in preparing for this
 7     deposition, America's Servicing Company or
 8     Wells Fargo has realized that that is in
 9     fact incorrect?
10          A.   Correct.
11          Q.   And that my client's do not owe
12     insurance for 2000 or 2001?
13          A.   That is correct.
14          Q.   Okay.  But that was not the
15     case in this response that was issued in
16     August of 2006, correct?
17          A.   Correct, sir.
18          Q.   Okay.  So is it Wells Fargo's
19     position, as we sit here today, that their
20     intention is to correct the mortgage
21     account of my client's and remove those
22     charges and bring everything current?
23          A.   Correct.
24          Q.   And that includes refunding all
25     the late fees and collection charges and
0061
 1     things that were put on the account since
 2     then?
 3          A.   Correct.
 4          Q.   And that's what your
 5     responsibilities are under the servicing
 6     provisions of the RESPA Act, correct?
 7          A.   Correct.
 8          Q.   Do you agree that ASC or Wells
 9     Fargo began to service this loan when my
10     clients were in Chapter 13 bankruptcy?
11          A.   Yes, sir.
```

```
12          Q.   Okay.  And that would have
13  qualified as a default under the terms of
14  their loan, correct?
15          MR. ANDRESS:  Object to the
16  form.  Legal conclusion.
17          Q.   You can answer.
18          A.   Could you rephrase the
19  question, please?
20          Q.   Certainly.
21          A.   Thank you.
22          Q.   You agree that the failure to
23  pay is required, is a default under the
24  terms of the note, correct?
25          A.   Correct.
0062
 1          Q.   And you agree that a bankruptcy
 2  is a default under the terms of the
 3  mortgage, right?
 4          MR. ANDRESS:  Could you show
 5  her the note?
 6          Q.   Certainly.  I'm about to mark
 7  it.  I'm going to mark as Exhibit Ten, a
 8  copy of the note and mortgage.  And these
 9  are Bate stamped ASC 98 through 104.
10
11          (Whereupon, Plaintiff's Exhibit
12      Number Ten was marked for
13      identification.)
14
15          A.   Okay.
16          Q.   Take a look at that.
17          A.   (Witness reviewing document.)
18  Yes, sir.
19          Q.   Okay.  Do you agree that a
20  default occurs when a mortgager does not
21  pay as agreed, correct?
22          A.   Correct.
23          Q.   I mean, y'all sent out,
24  literally, dozens of letters to these
25  folks saying they're in default, since
0063
 1  you've serviced the loan, right?  And you
 2  reviewed those, haven't you?
 3          A.   Letters?
 4          Q.   Right.  You sent out notices of
 5  default, as part of your servicing?
 6          A.   We have sent out letters.
 7          Q.   Have you reviewed those
 8  letters?
 9          A.   Yes, I have.
10          Q.   Some of them say that my
11  clients were in default?
12          A.   Correct.
13          Q.   Would they have been in default
14  if they were in bankruptcy?
15          MR. ANDRESS:  Object to form.
16  Legal conclusion.
```

17          Q.   Well now, you're here as the
18   corporate rep of Wells Fargo?
19          A.   Yes, sir, I am.
20          Q.   And you're a litigation
21   specialist?
22          A.   Yes, I am.
23          Q.   Is a default triggered when a
24   person's in bankruptcy?
25               MR. ANDRESS:  Same objection.
0064
 1          Q.   You can still answer.
 2          A.   The bankruptcy is filed to
 3   protect the person when they are in
 4   default.
 5          Q.   Okay.  So that means that
 6   they're in default if they're in
 7   bankruptcy, basically?
 8               MR. ANDRESS:  Same objection.
 9          A.   At that time, then it becomes a
10   post-petition issue.
11          Q.   Okay.  Let me do a little bit
12   better job with my questions, okay?
13          A.   Okay.
14          Q.   I guess the issue here is, that
15   my clients -- you purchased the servicing
16   of this loan while my client's were in
17   bankruptcy?
18          A.   Correct.
19          Q.   And that means that, prior to
20   filing bankruptcy, my clients must have
21   been in default, right?
22               MR. ANDRESS:  Object to the
23   form.  Legal conclusion.
24          A.   I don't know.
25          Q.   Have you reviewed those
0065
 1   documents to determine that?
 2          A.   Prior to the bankruptcy?
 3          Q.   Uh-huh.
 4          A.   No, sir, I have not.
 5          Q.   Have you reviewed the payment
 6   history from America's Servicing Company,
 7   or from Ocwen, in preparation for this
 8   deposition?
 9          A.   No, sir, I did not.
10          Q.   I'll get around to it in just a
11   minute.  Was Wells Fargo Bank formerly
12   known as Norwest?
13          A.   Yes, sir.
14          Q.   When did that name change take
15   place?
16          A.   I don't know.
17          Q.   Did Wells Fargo ever have any
18   ownership interest in Ocwen Bank?
19          A.   No, sir.
20          Q.   Let's go off the record for
21   just a minute.

```
22              VIDEOGRAPHER:  Standby, please.
23       We're off the record at 11:06.
24
25              (Whereupon, a discussion was
0066
 1       held off the record.)
 2
 3              VIDEOGRAPHER:  We're back on
 4       the record at 11:15 a.m.
 5         Q.   Let me show you a document that
 6       I have marked as Exhibit 11, and let you
 7       take a look at that.
 8
 9              (Whereupon, Plaintiff's Exhibit
10              Number 11 was marked for
11              identification.)
12
13         A.   (Witness reviewing document.)
14       Yes, sir.
15         Q.   Who filed that -- well, let's
16       back up a little further than that.  Is
17       that a pleading filed in my client's
18       Chapter 13 bankruptcy?
19         A.   Yes, it is.
20         Q.   Was it filed in December of
21       2000?
22         A.   (Witness reviewing document.)
23       Yes, sir.
24         Q.   And who filed that pleading;
25       what company?
0067
 1         A.   Secure Creditor, Wells Fargo
 2       Bank.
 3         Q.   That'd be y'all, right?
 4         A.   Yes, sir.
 5         Q.   What does paragraph three say,
 6       second sentence?
 7         A.   "Said mortgage is payable in
 8       monthly installments which include
 9       principle, interest and escrow.  The
10       payments upon such mortgage are currently
11       post-petition delinquent for the months of
12       October through November, 2000."
13         Q.   Post-petition delinquent for
14       two months would be in default, right?
15         A.   Correct.
16         Q.   So when you bought this loan,
17       it was in default?
18         A.   Post-petition.
19         Q.   Default?
20         A.   Correct.
21         Q.   Okay.  To just show, so it's
22       clear for the court, sometime after this,
23       Ocwen service this loan for a period of
24       time?
25         A.   Correct.
0068
```

```
 1          Q.   And then Wells Fargo took it
 2   back?
 3          A.   Correct.
 4          Q.   Under the doing business as
 5   name of America's Servicing Company?
 6          A.   Correct.
 7          Q.   Okay.  I think that's all I
 8   have.
 9
10               EXAMINATION BY MR. ANDRESS:
11          Q.   Let me ask you a question.  You
12   were asked earlier about whether or not
13   ASC adopts the log notes; do you remember
14   that question by the plaintiff's counsel?
15          A.   Yes, sir.
16          Q.   And you responded, yes.  Now,
17   by that response, did you mean that those
18   are -- that you -- that Wells Fargo does
19   not dispute that those are the business
20   records for the collection notes?
21          A.   That is correct.
22          Q.   You did not, during your
23   deposition, review every entry in those
24   log notes, did you?
25          A.   No, sir, I did not.
0069
 1          Q.   And you were not asked to do
 2   that, were you?
 3          A.   No, sir, I was not.
 4          Q.   So, is it your position, as the
 5   corporate representative of ASC, that
 6   those documents that you were referred to
 7   my plaintiff's counsel, were simply the
 8   log notes, the business records of ASC?
 9          A.   That is correct.
10          Q.   Let me see the other exhibits.
11   Do y'all have a stack of them?  You were
12   handed a document, Plaintiff's Exhibit 11,
13   which was a bankruptcy petition.  Did you
14   have an opportunity to review that before
15   your deposition?
16          A.   Yes, sir.
17          Q.   You did?  Did you -- do you
18   know whether or not any response to this
19   motion was filed by the Alewines?
20          A.   No, sir.
21          Q.   And you don't know, sitting
22   here today, what the payment history was
23   in October or November of 2000, for the
24   Alewines, do you?
25          A.   No, sir, I do not.
0070
 1          Q.   That's all I have.
 2
 3               RE-EXAMINATION BY MR. WOOTEN:
 4          Q.   I'm going to be very brief.
 5   Because you did not read each of those
```

```
 6    individual entries, you are not attempting
 7    to say that those entries are not, were
 8    not, the entries of employees of Wells
 9    Fargo that corresponded to their
10    activities, with respect to my client's
11    mortgage, on the day that they were
12    entered?
13          A.   I'm sorry, could you rephrase
14    that?
15          Q.   The log notes, I think your
16    lawyer's term was, they are business
17    records of Wells Fargo?
18          A.   Correct.
19          Q.   You don't have any reason to
20    believe that they are, in any material
21    way, inaccurate, do you?
22          A.   No, sir.
23          Q.   And you rely on those entries
24    to refresh your recollection, or to
25    provide you knowledge, with what your
0071
 1    company did with respect to this loan, at
 2    each entry?
 3          A.   Correct.
 4          Q.   So you would rely on, as a
 5    corporate rep, the accuracy of those
 6    records, when determining what your
 7    company did, with respect to my client's
 8    loan?
 9          A.   Correct.
10          Q.   Okay.  Nothing else.
11
12          RE-EXAMINATION BY MR. ANDRESS:
13          Q.   And if there was anything in
14    the records that you were not certain of,
15    would you conduct additional investigation
16    into the incident recorded?
17          A.   Yes, sir, I would.
18          Q.   Thank you.
19
20          VIDEOGRAPHER:  Does that
21    conclude the deposition?
22          MR. WOOTEN:  How much tape you
23    got left?
24          VIDEOGRAPHER:  About 20
25    minutes.
0072
 1          MR. WOOTEN:  Just a second.
 2
 3          RE-EXAMINATION BY MR. WOOTEN:
 4          Q.   Are the log notes the best
 5    source of information to determine what
 6    America's Servicing Company did with
 7    respect to my client's loan, based on each
 8    entry?
 9          A.   Yes, sir.
10          Q.   Is there any more complete
```

```
11    repository information, with respect to my
12    client's mortgage, that is controlled by
13    Wells Fargo?
14         A.    I don't have that information.
15         Q.    Okay.  So you don't have any
16    idea whether that's the case or not?
17         A.    No, sir, I do not.
18         Q.    So you don't have access to
19    that information?
20         A.    No, sir, I do not.
21         Q.    You don't know whether it even
22    exists?
23         A.    No, sir, I do not.
24         Q.    Okay.  I'm through now.
25              MR. ANDRESS:  Thank you.
0073
 1              VIDEOGRAPHER:  That concludes
 2    the deposition.  We're off the record at
 3    11:23 a.m., ending tape number one.  Thank
 4    you.
 5
 6              (Whereupon, the preceding
 7         deposition was concluded at 11:23
 8         a.m.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0074
 1              REPORTER'S CERTIFICATE
 2
 3    STATE OF ALABAMA  )
      JEFFERSON COUNTY  )
 4
 5              I hereby certify that the
 6    above and foregoing deposition was taken
 7    down by me in stenotype, and the
 8    questions and answers thereto were
 9    transcribed by means of computer-aided
10    transcription, and that the foregoing
11    represents a true and correct transcript
12    of the testimony given by said witness
13    upon said hearing, to the best of my
14    ability and understanding.
```

```
15          I further certify that I am
16  neither of counsel, nor of kin to the
17  parties to the action, nor am I in
18  anywise interested in the result of said
19  cause.
20
21          _____
            Lori E. Defnall
22
23
24
25
```